No. __-_____

# United States Court of Appeals for the Fifth Circuit

IN RE YOUTUBE LLC, GOOGLE LLC, AND ALPHABET, INC.

*Petitioners.*

On Petition for Writ of Mandamus from the United States District Court
for the Western District of Texas (No. 1:25-cv-01095-ADA)

## APPENDIX TO PETITION FOR WRIT OF MANDAMUS

Steven J. Wingard
Robyn Hargrove
Eli Barrish
SCOTT DOUGLASS & MCCONNICO LLP
303 Colorado Street, Suite 2400
Austin, TX 78701
(512) 495-6300

Jonathan Patchen
Michael A. Rome
Anika Holland
Madeleine R. Ahlers
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
(415) 693-2000
jpatchen@cooley.com

Connie L. Wang
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
(650) 843-5000

*Counsel for Petitioners*
*YouTube LLC, Google LLC, and Alphabet, Inc.*

# TABLE OF CONTENTS

| Ex. | Description of Document | App. |
|:---:|:---|:---:|
| 1 | District Court Civil Docket Sheet, No. 1:25-cv-01095-ADA | 1-9 |
| 2 | Defendants' Notice of Appeal (12/1/2025), Dkt. No. 50 | 10-13 |
| 3 | District Court Order on Defendants' Motion to Transfer (11/13/2025), Dkt. No. 48 | 14-22 |
| 4 | Defendants' Notice of Removal (7/14/25), Dkt. No. 1 | 23-29 |
| 5 | Ex. A to Notice of Removal (7/14/25), Dkt. No. 1-2 | 30-87 |
| 6 | Defendants' Motion to Transfer (8/8/25), Dkt. No. 26 | 88-113 |
| 7 | Declaration of N. Korn in Support of Motion to Transfer (8/8/25), Dkt. No. 26-1 | 114-38 |
| 8 | Declaration of V. McGinnis in Support of Motion to Transfer (8/8/25), Dkt. No. 26-2 | 139-50 |
| 9 | Plaintiff's Response to Motion to Transfer (9/5/25), Dkt. No. 35 | 151-70 |
| 10 | Defendants' Reply in Support of Motion to Transfer (9/19/25), Dkt. No. 40 | 171-84 |
| 11 | Transcript of 11/6/25 Hearing (12/12/25), C.A. Dkt. No. 16-7 | 185-215 |
| 12 | Plaintiff's Motion to Dismiss Appeal for Lack of Jurisdiction (12/12/25), C.A. Dkt. No. 16-1 | 216-27 |
| 13 | Defendants' Opposition to Motion to Dismiss Appeal for Lack of Jurisdiction (12/22/25), C.A. Dkt. No. 42-1 | 228-59 |
| 14 | Plaintiff's Reply in Support of Motion to Dismiss Appeal for Lack of Jurisdiction (12/29/25), C.A. Dkt. No. 48 | 260-73 |
| 15 | Defendants' Opening Brief (1/16/26), C.A. Dkt. No. 52 | 274-337 |
| 16 | Order Granting Motion to Dismiss Appeal for Lack of Jurisdiction (1/20/26), C.A. Dkt. No. 55-2 | 338-39 |

# EXHIBIT 1

# U.S. District Court [LIVE]
## Western District of Texas (Austin)
## CIVIL DOCKET FOR CASE #: 1:25−cv−01095−ADA

Defense Distributed v. YouTube LLC et al
Assigned to: Judge Alan D Albright
Demand: $5,000,000
Case in other court:  Third Business Court Division of the State
of TX, 25− BC03B−0009
USCA Fifth Circuit, 25−51004
Cause: 28:1441 Petition for Removal − Constitutional Rights

Date Filed: 07/14/2025
Jury Demand: None
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: Diversity

**Plaintiff**

| | | |
|---|---|---|
| **Defense Distributed** | represented by | **Charles R. Flores**<br>Flores Law PLLC<br>917 Franklin Street<br>Suite 600<br>Houston, TX 77002<br>713−364−6440<br>Email: chad@chadflores.law<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Colleen Elizabeth McKnight**<br>McKnight Law<br>801 Travis Street, Suite 2101, Pmb 698<br>Houston, TX 77002<br>713−487−5465<br>Email: colleen.mcknight@mcknightlaw.us<br>*ATTORNEY TO BE NOTICED* |

V.

**Defendant**

| | | |
|---|---|---|
| **YouTube LLC** | represented by | **Anika Holland**<br>Cooley, LLP<br>3 Embarcadero Ctr. 20th Floor<br>San Francisco, CA 94111<br>(415) 693−2000<br>Fax: (415) 693−2222<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Jonathan Alan Patchen**<br>Cooley, LLP<br>3 Embarcadero Center, 20th Floor<br>San Francisco, CA 94111<br>415−693−2000<br>Fax: 415−693−2222<br>Email: jpatchen@cooley.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Madeleine Ahlers**<br>Cooley, LLP<br>3 Embarcadero Center, 20th Floor<br>San Francisco, CA 94111<br>415−693−2551<br>Email: mahlers@cooley.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

App.2

**Michael Rome**
Cooley, LLP
3355 S Grand Ave, Ste 900
Los Angeles, CA 90071
213−461−3250
Fax: 213−561−3244
Email: mrome@cooley.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sharon Song**
Cooley LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111−4004
415−693−2000
Fax: 415−693−2222
Email: song@cooley.com
*TERMINATED: 11/11/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven J. Wingard**
Scott, Douglass & McConnico, L.L.P.
303 Colorado Street
Suite 2400
Austin, TX 78701
(512)495−6300
Fax: 512/474−0731
Email: swingard@scottdoug.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elijah Barton Barrish**
Scott, Douglass & McConnico, LLP
303 Colorado Street, Suite 2400
Austin, TX 78701
512−495−6300
Email: ebarrish@scottdoug.com
*ATTORNEY TO BE NOTICED*

**Robyn Lynn Bigelow Hargrove**
Scott Douglass & McConnico LLP
303 Colorado Street
Suite 2400
Austin, TX 78701−2589
(512)495−6300
Fax: 512/495−6399
Email: rhargrove@scottdoug.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Google LLC**                          represented by
**Anika Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jonathan Alan Patchen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Madeleine Ahlers**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael Rome**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sharon Song**
(See above for address)
*TERMINATED: 11/11/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven J. Wingard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elijah Barton Barrish**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robyn Lynn Bigelow Hargrove**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Alphabet, Inc.**     represented by     **Anika Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jonathan Alan Patchen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Madeleine Ahlers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael Rome**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sharon Song**
(See above for address)
*TERMINATED: 11/11/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven J. Wingard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elijah Barton Barrish**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robyn Lynn Bigelow Hargrove**

| Date Filed | # | Docket Text |
|---|---|---|
| 07/14/2025 | 1 | NOTICE OF REMOVAL by Alphabet, Inc., Google LLC, YouTube LLC *Defendants' Notice of Removal to Federal Court* (Filing fee $405 receipt number ATXWDC−20451227), filed by Alphabet, Inc., Google LLC, YouTube LLC. (Attachments: # 1 Affidavit Decl. of M. Rome ISO of Removal, # 2 Exhibit Ex A, # 3 Exhibit Ex B, # 4 Exhibit Ex C, # 5 Civil Cover Sheet Civil Cover Sheet, # 6 Supplement Supp. to JS−44 Civil Cover Sheet)(Wingard, Steven) (Entered: 07/14/2025) |
| 07/14/2025 | 2 | RULE 7 DISCLOSURE STATEMENT filed by Alphabet, Inc., Google LLC, YouTube LLC. (Wingard, Steven) (Entered: 07/14/2025) |
| 07/14/2025 | 3 | NOTICE of Filing Defendant's Certificate of Filing of Notice of Removal in State Court by Google LLC (Attachments: # 1 Exhibit Exhibit 1)(Wingard, Steven) (Entered: 07/14/2025) |
| 07/14/2025 | 4 | Unopposed MOTION for Extension of Time to File Answer *or Otherwise Respond to Complaint* by Google LLC. (Wingard, Steven) (Entered: 07/14/2025) |
| 07/14/2025 | | Case assigned to Judge Alan D Albright. CM WILL NOW REFLECT THE JUDGE INITIALS AS PART OF THE CASE NUMBER. PLEASE APPEND THESE JUDGE INITIALS TO THE CASE NUMBER ON EACH DOCUMENT THAT YOU FILE IN THIS CASE. (lme) (Entered: 07/16/2025) |
| 07/14/2025 | | If ordered by the court, all referrals and consents in this case will be assigned to Magistrate Judge Lane. (lme) (Entered: 07/16/2025) |
| 07/14/2025 | 8 | STANDING ORDER (dated 02/27/2025) REFERRING CASE to Magistrate Judge Mark Lane. Signed by Judge Alan D Albright. Referral Magistrate Judge: Mark Lane. (lme) (Entered: 07/17/2025) |
| 07/16/2025 | 10 | MOTION to Appear Pro Hac Vice by Chad Flores (Fee Due) on behalf of Defense Distributed.. Motions referred to Judge Mark Lane. (dm) (Entered: 07/21/2025) |
| 07/17/2025 | 5 | Order Directing Chad Flores to File a Motion to Appear Pro Hac Vice within 14 days. Signed by Judge Alan D Albright. (lme) (Entered: 07/17/2025) |
| 07/17/2025 | 6 | Order Directing Colleen McKnight to File a Motion to Appear Pro Hac Vice within 14 days. Signed by Judge Alan D Albright. (lme) (Entered: 07/17/2025) |
| 07/17/2025 | 7 | ORDER that the removing party, if it has not already done so, shall within ten (10) days from the date of this order supplement the record with state court pleadings. Signed by Judge Alan D Albright. (lme) (Entered: 07/17/2025) |
| 07/17/2025 | | Text Order GRANTING 4 Motion for Extension of Time to Answer entered by Judge Alan D Albright. The Court grants this unopposed motion and extends the deadline to move, answer, or otherwise respond to the Petition up to and including August 20, 2025. (This is a text−only entry generated by the court. There is no document associated with this entry.) (rhlc) (Entered: 07/17/2025) |
| 07/17/2025 | | Reset Deadlines: Alphabet, Inc. answer due 8/20/2025; Google LLC answer due 8/20/2025; YouTube LLC answer due 8/20/2025. (dm) (Entered: 07/18/2025) |
| 07/18/2025 | 9 | DOCKET CONTROL ORDER PURSUANT TO RULES 16(b) AND 26(f). Joint Proposed Scheduling and Discovery Plan due by 9/12/2025. Signed by Judge Mark Lane. (dm) (Entered: 07/18/2025) |
| 07/22/2025 | 11 | ORDER GRANTING 10 Motion to Appear Pro Hac Vice as to Chad Flores. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center. Signed by Judge Alan D Albright. (dm) (Entered: 07/22/2025) |

| 07/24/2025 | 12 | NOTICE of Attorney Appearance by Charles R. Flores on behalf of Defense Distributed (Flores, Charles) (Entered: 07/24/2025) |
|---|---|---|
| 07/25/2025 | 13 | MOTION to Appear Pro Hac Vice by Steven J. Wingard *for Madeleine Ahlers* ( Filing fee $ 100 receipt number ATXWDC−20507802) by on behalf of Alphabet, Inc., Google LLC, YouTube LLC.. Motions referred to Judge Mark Lane. (Wingard, Steven) (Entered: 07/25/2025) |
| 07/25/2025 | 14 | MOTION to Appear Pro Hac Vice by Steven J. Wingard *for Jonathan Alan Patchen* ( Filing fee $ 100 receipt number ATXWDC−20507948) by on behalf of Alphabet, Inc., Google LLC, YouTube LLC. (Attachments: # 1 Proposed Order). Motions referred to Judge Mark Lane. (Wingard, Steven) (Entered: 07/25/2025) |
| 07/25/2025 | 15 | MOTION to Appear Pro Hac Vice by Steven J. Wingard *for Michael Rome* ( Filing fee $ 100 receipt number ATXWDC−20507970) by on behalf of Alphabet, Inc., Google LLC, YouTube LLC. (Attachments: # 1 Proposed Order). Motions referred to Judge Mark Lane. (Wingard, Steven) (Entered: 07/25/2025) |
| 07/25/2025 | 16 | MOTION to Appear Pro Hac Vice by Steven J. Wingard *for Sharon Song* ( Filing fee $ 100 receipt number ATXWDC−20508014) by on behalf of Alphabet, Inc., Google LLC, YouTube LLC. (Attachments: # 1 Proposed Order). Motions referred to Judge Mark Lane. (Wingard, Steven) (Entered: 07/25/2025) |
| 07/28/2025 | 17 | ORDER GRANTING 13 Motion to Appear Pro Hac Vice as to Madeleine Ahlers. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center. Signed by Judge Alan D Albright. (dm) (Entered: 07/28/2025) |
| 07/28/2025 | 18 | ORDER GRANTING 14 Motion to Appear Pro Hac Vice as to Jonathan Alan Patchen. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center. Signed by Judge Alan D Albright. (dm) (Entered: 07/28/2025) |
| 07/28/2025 | 19 | ORDER GRANTING 15 Motion to Appear Pro Hac Vice as to Michael Rome. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center. Signed by Judge Alan D Albright. (dm) (Entered: 07/28/2025) |
| 07/28/2025 | 20 | ORDER GRANTING 16 Motion to Appear Pro Hac Vice as to Sharon Song. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center. Signed by Judge Alan D Albright. (dm) (Entered: 07/28/2025) |
| 07/29/2025 | 21 | MOTION to Appear Pro Hac Vice by Charles R. Flores *for Colleen McKnight* ( Filing fee $ 100 receipt number ATXWDC−20520450) by on behalf of Defense Distributed. (Attachments: # 1 Proposed Order). Motions referred to Judge Mark Lane. (Flores, Charles) (Entered: 07/29/2025) |
| 07/30/2025 | 22 | ORDER GRANTING 21 Motion to Appear Pro Hac Vice as to Colleen McKnight. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center. Signed by Judge Alan D Albright. (dm) (Entered: 07/30/2025) |
| 07/30/2025 | 23 | Pro Hac Vice Fee Paid by Charles R. Flores; Filing fee $ 100, receipt number 2622. (dm) (Entered: 08/01/2025) |
| 08/07/2025 | 25 | MOTION to Remand to State Court by Defense Distributed. (Flores, Charles) (Entered: 08/07/2025) |
| 08/08/2025 | | DEFICIENCY NOTICE to Charles Flores: re 25 MOTION to Remand to State Court . **Your document is deficient as it lacks a Certificate of Service. Please file a Certificate of Service as a SEPARATE PLEADING. Use the "Certificate of** |

| | | |
|---|---|---|
| | | Service" event under the "Service of Process" menu. State parties served by CM/ECF and the alternate means of service for parties NOT registered for CM/ECF (as indicated by a lack of email address on the docket sheet). (klw) (Entered: 08/08/2025) |
| 08/08/2025 | 26 | MOTION to Transfer Case *to the Northern District of California* by Alphabet, Inc., Google LLC, YouTube LLC. (Attachments: # 1 Affidavit of Nicole Korn, # 2 Affidavit of Victoria McGinnis). Motions referred to Judge Mark Lane. (Wingard, Steven) (Entered: 08/08/2025) |
| 08/10/2025 | 27 | CERTIFICATE OF SERVICE by Defense Distributed *of Document* 25 MOTION to Remand to State Court (Flores, Charles) (Entered: 08/10/2025) |
| 08/12/2025 | 29 | Joint MOTION to Extend Scheduling Order Deadlines *Joint Motion to Extend Deadlines*. (Attachments: # 1 Proposed Order Proposed Order). Motions referred to Judge Mark Lane. (Wingard, Steven) (Entered: 08/12/2025) |
| 08/18/2025 | | Text Order GRANTING 29 Motion to Extend Scheduling Order Deadlines. The parties' proposed order will be entered separately, entered by Judge Mark Lane. (This is a text−only entry generated by the court. There is no document associated with this entry.) (ah) (Entered: 08/18/2025) |
| 08/18/2025 | 30 | ORDER Granting Joint Motion to Extend Deadlines. Signed by Judge Mark Lane. (dm) (Entered: 08/18/2025) |
| 08/19/2025 | 31 | CORRECTED MOTION to Amend/Correct *Corrected Joint Motion to Extend Deadlines*. (Attachments: # 1 Proposed Order Proposed Order). Motions referred to Judge Mark Lane. (Wingard, Steven) (Entered: 08/19/2025) |
| 08/20/2025 | 32 | ORDER GRANTING CORRECTED JOINT MOTION TO EXTEND DEADLINES. Signed by Judge Mark Lane. (dm) (Entered: 08/20/2025) |
| 09/05/2025 | 33 | MOTION to Appear Pro Hac Vice by Steven J. Wingard ( Filing fee $ 100 receipt number ATXWDC−20681916) by Anika Holland on behalf of Alphabet, Inc... Motions referred to Judge Mark Lane. (Wingard, Steven) (Entered: 09/05/2025) |
| 09/05/2025 | 34 | Response in Opposition to Motion, filed by Alphabet, Inc., Google LLC, YouTube LLC, re 25 MOTION to Remand to State Court filed by Plaintiff Defense Distributed (Attachments: # 1 Exhibit Exhibit A − Texas Business Court−25−BC03B−0009)(Wingard, Steven) (Entered: 09/05/2025) |
| 09/05/2025 | 35 | Response in Opposition to Motion, filed by Defense Distributed, re 26 MOTION to Transfer Case *to the Northern District of California* filed by Defendant Google LLC, Defendant YouTube LLC, Defendant Alphabet, Inc. (Attachments: # 1 Exhibit A − Caseload Statistics)(Flores, Charles) (Entered: 09/05/2025) |
| 09/08/2025 | 36 | ORDER, ( Video Status Conference set for 9/17/2025 at 02:00 PM before Judge Mark Lane,). Signed by Judge Mark Lane. (dm) (Entered: 09/08/2025) |
| 09/09/2025 | 37 | ORDER GRANTING 33 Motion to Appear Pro Hac Vice as to Anika Holland. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center. Signed by Judge Alan D Albright. (dm) (Entered: 09/09/2025) |
| 09/10/2025 | 38 | NOTICE of Filing Joint Statement Regarding Venue Discovery by Alphabet, Inc., Google LLC, YouTube LLC (Wingard, Steven) (Entered: 09/10/2025) |
| 09/11/2025 | 39 | ORDER Cancelling Video Status Hearing. Signed by Judge Mark Lane. (dm) (Entered: 09/11/2025) |
| 09/19/2025 | 40 | RESPONSE in Support, filed by Alphabet, Inc., Google LLC, YouTube LLC, re 26 MOTION to Transfer Case *to the Northern District of California* filed by Defendant Google LLC, Defendant YouTube LLC, Defendant Alphabet, Inc. (Wingard, Steven) (Entered: 09/19/2025) |
| 09/19/2025 | 41 | REPLY to Response to Motion, filed by Defense Distributed, re 25 MOTION to Remand to State Court filed by Plaintiff Defense Distributed (Flores, Charles) (Entered: 09/19/2025) |

| 10/20/2025 | 42 | ORDER, Referral of Case to Magistrate Judge Mark Lane is Vacated. Signed by Judge Alan D Albright. (dm) (Entered: 10/21/2025) |
| 10/20/2025 | 43 | ORDER re 26 MOTION to Transfer Case *to the Northern District of California* filed by Google LLC, YouTube LLC, Alphabet, Inc., 25 MOTION to Remand to State Court filed by Defense Distributed ( Motion Hearing set for 10/30/2025 at 02:00 PM before Judge Alan D Albright,). Signed by Judge Alan D Albright. (dm) (Entered: 10/21/2025) |
| 10/28/2025 | 44 | ORDER re 26 MOTION to Transfer Case *to the Northern District of California* filed by Google LLC, YouTube LLC, Alphabet, Inc., 25 MOTION to Remand to State Court filed by Defense Distributed, ( Motion Hearing reset for 11/6/2025 at 10:15 AM before Judge Alan D Albright,). Signed by Judge Alan D Albright. (dm) (Entered: 10/28/2025) |
| 11/06/2025 | 45 | Transcript filed of Proceedings held on 11−6−25, Proceedings Transcribed: Motions Hearing. Court Reporter/Transcriber: Kristie Davis, Telephone number: 2546660904. Parties are notified of their duty to review the transcript to ensure compliance with the FRCP 5.2(a)/FRCrP 49.1(a). A copy may be purchased from the court reporter or viewed at the clerk's office public terminal. If redaction is necessary, a Notice of Redaction Request must be filed within 21 days. If no such Notice is filed, the transcript will be made available via PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed Redaction Request due 11/28/2025, Redacted Transcript Deadline set for 12/8/2025, Release of Transcript Restriction set for 2/4/2026, (kd) (Entered: 11/06/2025) |
| 11/06/2025 | 46 | Minute Entry for proceedings held before Judge Alan D Albright: Motion Hearing held on 11/6/2025 re 26 MOTION to Transfer Case *to the Northern District of California* filed by Google LLC, YouTube LLC, Alphabet, Inc., 25 MOTION to Remand to State Court filed by Defense Distributed (Minute entry documents are not available electronically.). (Court Reporter Kristie Davis.)(dm) (Entered: 11/07/2025) |
| 11/11/2025 | 47 | Unopposed MOTION to Withdraw as Attorney *Sharon Song* by Alphabet, Inc., Google LLC, YouTube LLC. (Barrish, Elijah) (Entered: 11/11/2025) |
| 11/11/2025 | | Text Order GRANTING 47 Defendants' Unopposed Motion to Withdraw Attorney entered by Judge Alan D Albright. IT IS ORDERED that Sharon Song is withdrawn as counsel for Defendants YouTube LLC, Google LLC, and Alphabet, Inc. (This is a text−only entry generated by the court. There is no document associated with this entry.) (jglc) (Entered: 11/11/2025) |
| 11/13/2025 | 48 | ORDER DENYING 26 Motion to Transfer Case. Signed by Judge Alan D Albright. (dm) (Entered: 11/13/2025) |
| 11/20/2025 | 49 | Response in Opposition to Motion, filed by Alphabet, Inc., Google LLC, YouTube LLC, re 25 MOTION to Remand to State Court filed by Plaintiff Defense Distributed *Defendants' Supplemental Brief in Opposition to Plaintiff's Motion to Remand* (Attachments: # 1 Exhibit Declaration of Michael A. Rome, # 2 Exhibit EXHIBIT A, # 3 Exhibit EXHIBIT B)(Hargrove, Robyn Lynn) (Entered: 11/20/2025) |
| 12/01/2025 | 50 | Appeal of Order entered by District Judge 48 by Alphabet, Inc., Google LLC, YouTube LLC.*Defendants' Notice of Appeal* ( Filing fee $ 605 receipt number ATXWDC−21037310) (Hargrove, Robyn Lynn) (Entered: 12/01/2025) |
| 12/01/2025 | | NOTICE OF INTERLOCUTORY APPEAL as to 48 Order on Motion to Transfer Case by Alphabet, Inc., Google LLC, YouTube LLC. Filing fee $ 605, receipt number ATXWDC−21037310. Per 5th Circuit rules, the appellant has 14 days, from the filing of the Notice of Appeal, to order the transcript. To order a transcript, the appellant should fill out (Transcript Order) and follow the instructions set out on the form. This form is available in the Clerk's Office or by clicking the hyperlink above. (dm) (Entered: 12/03/2025) |
| 12/03/2025 | 51 | NOTICE *DEFENDANTS' NOTICE OF NOTICE OF APPEAL* by Alphabet, Inc., Google LLC, YouTube LLC (Hargrove, Robyn Lynn) (Entered: 12/03/2025) |
| 12/08/2025 | 52 | TRANSCRIPT REQUEST by Alphabet, Inc., Google LLC, YouTube LLC for dates of 11/6/2025. Proceedings Transcribed: 11/6/2025. Court Reporter: Kristie M. Davis.. (Barrish, Elijah) (Entered: 12/08/2025) |

| 12/15/2025 | 53 | RESPONSE in Support, filed by Defense Distributed, re 25 MOTION to Remand to State Court filed by Plaintiff Defense Distributed (Flores, Charles) (Entered: 12/15/2025) |
|---|---|---|
| 12/23/2025 | 54 | MOTION for Leave to File MFL to File Supp Mot in Opp to Pl's Mot to Remand by Alphabet, Inc., Google LLC, YouTube LLC. (Attachments: # 1 Exhibit Exhibit A − Supp. Brief ISO Defs' Supp Mot in Opp to Pl's Mot to Remand, # 2 Exhibit Exhibit 1 − Plaintiff's MTD Appeal for Lack of Jurisdiction, # 3 Exhibit Exhibit 2 − Defendants' Opposition to Plaintiff's MTD Appeal for Lack of Jurisdiction, # 4 Exhibit Exhibit 3 − Bruck Brief of Appellants, # 5 Exhibit Exhibit 4 − Bruck Brief of Appellee, # 6 Exhibit Exhibit 5 − Bruck Reply Brief of Appellants, # 7 Exhibit Exhibit 6 − Bruck Administrative Stay Order, # 8 Proposed Order Prop Order Defs Leave to File Supp Mot in Opp to Pl's Mot)(Barrish, Elijah) (Entered: 12/23/2025) |
| 12/24/2025 | 55 | Response in Opposition to Motion, filed by Defense Distributed, re 54 MOTION for Leave to File MFL to File Supp Mot in Opp to Pl's Mot to Remand filed by Defendant Google LLC, Defendant YouTube LLC, Defendant Alphabet, Inc. (Flores, Charles) (Entered: 12/24/2025) |
| 01/14/2026 | | Certification of the Electronic Record on Appeal has been accepted by the 5th Circuit re Notice of Appeal − Interlocutory. Attorneys are advised that they may now download the EROA from the Fifth Circuit CM/ECF site by following these instructions here (dm) (Entered: 01/20/2026) |
| 01/20/2026 | 56 | NOTICE of Supplemental Authority in Support of Plaintiffs Motion to Remand by Defense Distributed re 41 Reply to Response to Motion, 53 Response in Support of Motion, 25 MOTION to Remand to State Court , 55 Response in Opposition to Motion, 49 Response in Opposition to Motion, 54 MOTION for Leave to File MFL to File Supp Mot in Opp to Pl's Mot to Remand , 34 Response in Opposition to Motion, 51 Notice (Other) (Attachments: # 1 Exhibit Fifth Circuit Order)(Flores, Charles) (Entered: 01/20/2026) |
| 01/21/2026 | | Text Order GRANTING 54 Motion for Leave to File entered by Judge Alan D Albright. Upon consideration of the Motion for Leave, the Court finds there to be good cause to grant the Motion for Leave. The Court grants Defendants' Motion for Leave and orders that the proposed brief attached to Defendants' Motion for Leave as Exhibit A be docketed by the Clerk. IT IS SO ORDERED that the Motion is GRANTED. (This is a text−only entry generated by the court. There is no document associated with this entry.) (MClc) (Entered: 01/21/2026) |
| 01/21/2026 | 57 | NOTICE Defendants' Response to Plaintiff's Notice of Supplemental Authority by Alphabet, Inc., Google LLC, YouTube LLC re 56 Notice (Other),, (Attachments: # 1 Exhibit Exhibit A)(Wingard, Steven) (Entered: 01/21/2026) |

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| DEFENSE DISTRIBUTED,<br><br>                    *Plaintiff*,<br><br>v.<br><br><br>YOUTUBE LLC, GOOGLE LLC, and ALPHABET, INC.,<br><br>                    *Defendants*. | Case No. 1:25-cv-01095-ADA |

<u>DEFENDANTS' NOTICE OF APPEAL</u>

Defendants YouTube LLC, Google LLC, and Alphabet Inc. (collectively, "Defendants") gives notice of their appeal of the Order Denying Defendants' Motion to Transfer (Dkt. 48) entered in the above-styled and numbered case on November 13, 2025. The appeal will be to the United States Court of Appeals for the Fifth Circuit.

App.11

Dated: December 1, 2025        Respectfully submitted,

**SCOTT DOUGLASS & MCCONNICO LLP**

Steven J. Wingard
Texas Bar No. 00788694
Robyn Hargrove
Texas Bar No. 24031859
Eli Barrish
Texas Bar No. 24144433
303 Colorado Street, Suite 2400
Austin, TX 78701
Telephone: (512) 495-6300
Facsimile: (512) 474-0731
swingard@scottdoug.com
rhargrove@scottdoug.com
ebarrish@scottdoug.com

**COOLEY LLP**

*/s/ Jonathan Patchen*
Jonathan Patchen (admitted *pro hac vice*)
Michael A. Rome (admitted *pro hac vice*)
Anika Holland (*pro hac vice* pending)
Madeleine R. Ahlers (admitted *pro hac vice*)

3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Telephone: (415) 693-2000
Facsimile: (415) 693-2222
jpatchen@cooley.com
mrome@cooley.com
anika.holland@cooley.com
mahlers@cooley.com

*Attorneys for Defendants YouTube LLC, Google LLC, and Alphabet, Inc.*

App.12

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served upon counsel via the CM/ECF electronic noticing system, email, certified mail, return receipt requested, or US mail, on this the 1st day of December, 2025.

_____

Robyn Hargrove

# EXHIBIT 3

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| Defense Distributed, | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Case No. 1:25-cv-01095-ADA |
| | § | |
| YouTube LLC, Google LLC, and | § | |
| Alphabet, Inc., | § | |
| *Defendants*. | § | |

## ORDER

Before the Court is Defendants' Motion to Transfer to the Northern District of California. Dkt. 26. After carefully considering the parties' arguments and the relevant law, the Court finds that Defendants' motion should be denied.

## I.     Background

Plaintiff Defense Distributed is a Texas company that specializes in "small scale, digital, personal gunsmithing technology." Dkt. 1-2, at ¶ 22. As part of its business, Defense Distributed regularly publishes videos on YouTube and utilizes the Google Ads platform. *Id.* Defense Distributed claims that its YouTube publications and Google Ads campaigns "espouse viewpoints that favor continuation of the American constitutional right to keep and bear arms in theory and practice." *Id.* at ¶ 23.

In June of this year, Defense Distributed filed this suit against YouTube LLC, Google LLC, and Alphabet, Inc., in the Third Division of the Texas Business Court. *Id.* at 1. Defense Distributed alleges that Defendants have repeatedly censored its "pro-gun" videos and advertisements in violation of Texas Civil Practice and

App.15

Remedies Code Chapter 143A, which prohibits social media companies from censoring a user based on viewpoint. *Id.* at ¶¶ 10, 12.[1] Plaintiff seeks a judgment declaring the illegality of Defendants' viewpoint discrimination and enjoining Defendants from any further illegal censorship. *Id.* at ¶ 12.

After Defense Distributed filed suit, Defendants removed this case to federal court and moved to transfer it to the Northern District of California. Dkt. 1; Dkt. 26.[2] Defendants argue that Defense Distributed agreed to multiple forum-selection clauses that require all claims "arising out of or relating to" the YouTube and Google Ads platforms to be "litigated exclusively in the federal or state courts of Santa Clara County, California." Dkt. 26, at 1–2. Defendants ask the Court to enforce the forum-selection clauses and transfer this case pursuant to 28 U.S.C. § 1404(a). *Id.* at 1.

## II.    Legal Standard

Under § 1404(a), "a district court may transfer any civil action to any other district or division where it might have been brought" if it is "[f]or the convenience of parties and witnesses" and "in the interest of justice." 28 U.S.C. § 1404(a). When a party moves to transfer a case under this provision, the Court typically weighs several private and public interest factors "to determine whether the destination venue is 'clearly more convenient than the venue chosen by the plaintiff.'" *See In re Planned*

---

[1] The constitutionality of Chapter 143A is currently under review in *NetChoice, LLC v. Paxton*, No. 1:21-cv-00840-RP (W.D. Tex.).

[2] The day before Defendants moved to transfer, Defense Distributed moved to remand this case to state court. Dkt. 25. The Court exercises its discretion to resolve the motion to transfer before the motion to remand. *See KeyCity Cap., LLC v. Davenport Invs.*, LLC, No. 3:21-CV-2046-D, 2022 WL 581146, at *2 (N.D. Tex. Feb. 25, 2022) (noting that courts may address a motion to transfer before addressing subject matter jurisdiction).

*Parenthood Fed'n of Am., Inc.*, 52 F.4th 625, 630 (5th Cir. 2022) (quoting *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 315 (5th Cir. 2008)).

"The calculus changes, however, when the parties' contract contains a valid forum-selection clause." *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 63 (2013). When a forum-selection clause is present, the Court first determines whether the clause is mandatory and enforceable. *See, e.g.*, *Weber v. PACT XPP Techs., AG*, 811 F.3d 758, 768 & 773 (5th Cir. 2016). If the clause is mandatory and enforceable, the Court then considers whether transfer is warranted under § 1404(a). *Id.* at 775–76. However, the Court adjusts its usual § 1404(a) analysis in three ways. *Atl. Marine*, 571 U.S. at 63.

First, the Court gives no weight to the plaintiff's choice of forum and places the burden on the plaintiff to establish that transfer is unwarranted. *Id.* Second, the court weighs the private-interest factors in favor of the preselected forum and considers arguments about the public-interest factors only. *Id.* at 64. Third, a transfer of venue will not carry with it the original venue's choice-of-law rules, which may affect public-interest considerations. *Id.* The practical result of this modified analysis is that forum-selection clauses should be given "controlling weight in all but the most exceptional cases." *Id.* at 63 (quotation marks and citation omitted).

## III.    Analysis

Defendants argue that the Court should transfer this case pursuant to the forum-selection clauses Defense Distributed agreed to. Dkt. 26, at 7. Defense Distributed does not dispute that its claims fall within the scope of the forum-

3

App.17

selection clauses or that the clauses are mandatory. *See* Dkt. 35, at 5. Instead, Defense Distributed argues that the forum-selection clauses are unenforceable and, alternatively, that the public-interest factors overwhelmingly disfavor transfer. *Id.* at 5, 13.

The Court begins with the enforceability of the forum-selection clauses. "Federal law applies to determine the enforceability of forum selection clauses in diversity cases." *PCL Civ. Constructors, Inc. v. Arch Ins. Co.*, 979 F.3d 1070, 1074 (5th Cir. 2020). Under federal law, there is a "strong presumption" in favor of enforcing mandatory forum-selection clauses. *Weber*, 811 F.3d at 773. But the presumption may be overcome "by a clear showing that the clause is 'unreasonable' under the circumstances." *Id.* (quoting *Haynsworth v. The Corp.*, 121 F.3d 956, 962–63 (5th Cir. 1997)).

There are several ways in which a forum-selection clause may be unreasonable. *Haynsworth*, 121 F.3d at 963 (listing four situations in which "[u]nreasonableness potentially exists"). Relevant to this dispute, a forum-selection cause is potentially unreasonable if enforcing the clause "would contravene a strong public policy of the forum state." *Id.* The party resisting enforcement on this ground bears a "heavy burden of proof." *PCL*, 979 F.3d at 1074 (quoting *Ginter ex rel. Ballard v. Belcher, Prendergast & Laporte*, 536 F.3d 439, 441 (5th Cir. 2008)).

Defense Distributed argues that enforcing the forum-selection clauses would contravene a strong public policy of Texas. Dkt. 35, at 5-8. Specifically, Defense Distributed argues that enforcement would contravene Chapter 143A's venue and

waiver provisions. *Id.* Chapter 143A's venue provision states that actions brought against social media platforms under this chapter shall be maintained in Texas notwithstanding any forum-selection clause in a contract:

### § 143A.0035. Venue and Choice of Law

Notwithstanding any other law, any contract, or any venue, forum selection, or choice-of-law provision in a contract, an action brought under this chapter against a social media platform shall be brought and maintained in a court in this state, and the law of this state applies to the action.

Tex. Civ. Prac. & Rem. Code § 143A.0035. Chapter 143A's waiver provision voids waivers of the protections provided by the chapter as unlawful and against public policy and instructs courts not to enforce them:

### § 143A.003. Waiver Prohibited

(a) A waiver or purported waiver of the protections provided by this chapter is void as unlawful and against public policy, and a court or arbitrator may not enforce or give effect to the waiver, including in an action brought under Section 143A.007, notwithstanding any contract or choice-of-law provision in a contract.

(b) The waiver prohibition described by Subsection (a) is a public-policy limitation on contractual and other waivers of the highest importance and interest to this state, and this state is exercising and enforcing this limitation to the full extent permitted by the United States Constitution and Texas Constitution.

*Id.* § 143A.003. Defense Distributed argues that these provisions, taken together, codify the strong public policy of the forum state that enforcement of Defendants' clauses would contravene. Dkt. 35, at 7.

The Court agrees. If the Court transferred this case to California pursuant to the forum-selection clauses, it would contravene Texas's policy that actions under

Chapter 143A are to be "maintained" in this state notwithstanding any "forum selection" provision in a contract. Tex. Civ. Prac. & Rem. Code § 143A.003. It would also contravene Texas's policy that waivers of Chapter 143A's protections—including the protection provided by the venue provision—are void and unenforceable. *Id.* § 143A.003.

These public policies are undoubtedly strong. Texas made clear that it wants Chapter 143A actions litigated within its borders and that it does not tolerate contracts that waive the chapter's protections. *See id.* §§ 143A.003, 0035. Texas felt so strongly that it declared the waiver prohibition is "of the highest importance and interest to this state." *Id.* § 143A.003. Because enforcing the forum-selection clauses would contravene a strong public policy of the forum state, the Court finds that the clauses are unreasonable and will not enforce them. *See Haynsworth*, 121 F.3d at 963 (holding that forum-selection clauses may be unreasonable if enforcing them "would contravene a strong public policy of the forum state").

Defendants urge this Court to go the other way, but their arguments are not convincing. Defendants argue that since federal law governs the transfer analysis under § 1404(a) in diversity cases, state laws purporting to invalidate forum-selection clauses are irrelevant. Dkt. 40, at 2. Defendants are correct that federal law governs the analysis, but that does not render state laws purporting to invalidate forum-selection clauses irrelevant. Such laws are relevant to the threshold enforceability determination, which can hinge on whether enforcing the forum-selection clause

"would contravene a strong public policy of the forum state." *Weber*, 811 F.3d 773 (quotation marks and citation omitted).[3]

Defendants next argue that to the extent state laws purport to direct federal courts not to consider forum-selection clauses, they are preempted under a line of Supreme Court authority. Dkt. 40, at 2. But for this argument to matter, the Court would have to be applying state law in deciding whether to transfer this case. That's not what the Court is doing. The Court is applying federal law to answer the threshold enforceability question. *PCL*, 979 F.3d at 1074. And federal law allows the Court to consider whether enforcement would contravene state public policy. *Weber*, 811 F.3d 773.

Finally, Defendants rely heavily on *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22 (1988). *Stewart* held that a district court cannot apply state law alone when determining whether to transfer a case to a venue provided in a forum-selection clause; instead, the district court must apply federal law, specifically 28 U.S.C. § 1404(a), in resolving this issue. *Id.* at 30–32. Here, the Court is not applying state law in determining whether to transfer this case; it is following the Fifth Circuit's lead (in cases that post-date *Stewart*) by determining whether the forum-selection clauses are unenforceable as a threshold matter, which involves considering whether

---

[3] Defendants themselves cite a case in which the Fifth Circuit considered state public policy when deciding whether to enforce a forum-selection clause. Dkt. 26, at 13 (citing *Matthews v. Tidewater, Inc.*, 108 F.4th 361 (5th Cir. 2024)). Although *Matthews* held that the state's public policy did not outweigh the presumption of enforcement, its holding was limited to the facts presented and based on federal public policy considerations in the maritime context. *Matthews*, 108 F.4th at 370 (holding that the state's public policy "particular application in this case does not overcome the federal public policy's presumption of a maritime forum-selection clause's validity").

the clauses contravene a strong public policy of the forum state. *See Weber*, 811 F.3d at 773.[4] *Stewart* therefore does not save Defendants' motion.

The Court finds that Defense Distributed has overcome the strong presumption in favor of enforcing the forum-selection clauses by clearly showing that the clauses at issue here are unreasonable given that enforcing them would contravene the strong public policy of Texas codified in Chapter 143A. Because the forum-selection clauses are unenforceable, the Court **ORDERS** that Defendants' motion to transfer to the Northern District of California, Dkt. 26, is **DENIED**.[5]

**SIGNED** on November 13, 2025.

_____
ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE

---

[4] Defendants also argue that Chapter 143A.003 does not apply at all because the forum-selection clauses in this case are not "waivers" of the protections provide by Chapter 143A. Dkt. 26, at 6–9. Defendants did not raise this argument until their reply brief, so the Court declines to consider it. *See Ga. Firefighters' Pension Fund v. Anadarko Petrol. Corp.*, 99 F.4th 770, 774 (5th Cir. 2024) (holding that "when a party raises new arguments or evidence for the first time in a reply, the district court must either give the other party an opportunity to respond or decline to rely on the new arguments and evidence").

[5] The Court need not reach Defense Distributed's second argument regarding the public-interest factors. *See Weber*, 811 F.3d at 767, 773–75 (treating enforceability as a threshold question). Nor does the Court need to conduct a traditional § 1404(a) analysis because Defendants' motion relies solely on the forum-selection clauses. *See* Dkt. 26.

# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| DEFENSE DISTRIBUTED, | |
| Plaintiff, | |
| v. | Case No. ___1:25-cv-1095___ |
| YOUTUBE LLC, GOOGLE LLC, and ALPHABET, INC. | |
| Defendants. | |

## NOTICE OF REMOVAL

Defendants YouTube LLC, Google LLC, and Alphabet, Inc. (collectively, "Defendants")

hereby file this Notice of Removal pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, and remove

the above-captioned action, originally filed in the Third Business Court Division of the Business

Court of the State of Texas, to the United States District Court for the Western District of Texas,

Austin Division.  In support of this Notice of Removal, Defendants state as follows:

## BACKGROUND

1.      On June 6, 2025, Plaintiff Defense Distributed ("Plaintiff") filed the Original

Petition in this action in the Third Business Court Division of the Business Court of the State of

Texas ("Petition").  The action is styled *Defense Distributed v. YouTube LLC, et al.*, Case No. 25-

BC03B-0009 ("State Court Action").  Plaintiff alleges that Defendants have "censored" pro-gun

content on their platforms in violation of Texas House Bill 20, now codified in part as

Chapter 143A of the Texas Civil Practice and Remedies Code.

2.      Defendant Google LLC was served with the Petition on June 23, 2025.  Defendants YouTube LLC and Alphabet, Inc. have not been served to the best of their knowledge, but are removing this case as well.  All three Defendants consent to the removal.  No proceedings have taken place in this matter besides the filing of the Petition.

3.      Pursuant to 28 U.S.C. § 1446(a), a copy of all process, pleadings, and orders in the State Court Action received by Defendants are attached hereto as composite **Exhibit A**.  *See* Declaration of Michael A. Rome ("Rome Decl."), Ex. A.

## DIVERSITY JURISDICTION

4.      Under 28 U.S.C. § 1332(a)-(a)(1), a federal district court has diversity jurisdiction over a case "where the amount in controversy exceeds $75,000, and the action is between citizens of different states." *Hernandez v. Lowe's Home Centers, Inc.,* No. DR-12-CV-064-AM/CW, 2013 WL 12394372, at *1 (W.D. Tex. May 29, 2013).  Here, the amount in controversy exceeds $75,000, exclusive of interests and costs, and there is complete diversity of citizenship among the parties.  As such, removal of this action is proper under 28 U.S.C. § 1441(b).

5.      **The Amount-In-Controversy Requirement Is Met.**  Here, it is undisputed that the amount in controversy exceeds $75,000.  The Petition expressly alleges that "this is an action in which the amount in controversy exceeds $5 million[.]"  Rome Decl., Ex. A, Petition ¶ 14; *see also id.*, Ex. A, Business Court Case Information Sheet at 3 (Section VI.) (indicating that the "amount in controversy exceeds $5 million").  Thus, the amount-in-controversy requirement is satisfied.  *See* 28 U.S.C. § 1446(c)(2).

6.      **Complete Diversity Exists.**  A corporation is deemed a citizen of its state of incorporation and where it has its principal place of business.  *See* 28 U.S.C. § 1332(c)(1).  The citizenship of a limited liability company is determined by the citizenship of each of its members.  *See Harvey v. Great Wolf Drilling Co.*, 542 F.3d 1077, 1080 (5th Cir. 2008).  Here, there is

complete diversity of citizenship among the parties, as Plaintiff is a citizen of Texas and all three Defendants are citizens of Delaware and California:

        (a)     Plaintiff is a Texas corporation headquartered in Austin, Texas. *See* Rome Decl., Ex. A, Petition ¶¶ 21; *see also id.*, Ex. B, Articles of Incorporation of Defense Distributed (showing company was incorporated in Texas); *id.*, Ex. C, Results of Entity Name Search for Defense Distributed on Texas Secretary of State's website on June 23, 2025 (showing company was formed in Texas and has its headquarters in Texas). It is therefore a citizen of Texas for diversity purposes.

        (b)     Defendant Alphabet, Inc. is a Delaware corporation with its principal place of business in California. *See* Rome Decl., Ex. A, Petition ¶¶ 32. It is therefore a citizen of Delaware and California for diversity purposes.

        (c)     Defendant Google LLC is a Delaware limited liability company with its principal place of business in California. *See id.* at ¶¶ 31. The sole member of Google LLC is XXVI Holdings Inc., which is a Delaware corporation with its principal place of business in California. Google LLC is, thus, a citizen of Delaware and California for diversity purposes.

        (d)     Defendant YouTube LLC is a Delaware limited liability company with its principal place of business in California. *See id.* at ¶¶ 30. The sole member of YouTube LLC is Google LLC. YouTube LLC is, thus, a citizen of Delaware and California for diversity purposes.

        7.     Based on the foregoing, the amount in controversy exceeds $75,000 and complete diversity exists. Thus, this Court has "original jurisdiction" over this action, and removal is

4915-3059-2341

App.26

appropriate.  *See* 28 U.S.C. §§ 1331, 1441(a); *Exxon Mobil Corp. v. Allapattah Services, Inc.*, 545 U.S. 546, 552 (2005).

### PROCEDURAL REQUIREMENTS FOR REMOVAL HAVE BEEN SATISFIED

8.     This Court is the proper venue upon removal because the State Court Action is pending in the Third Business Court Division of the Business Court of the State of Texas, Plaintiff alleges that a substantial part of the events giving rise to this action occurred in Travis County, Texas, and the United States District Court for the Western District of Texas (Austin Division) is the district court of the United States for the district and division embracing the place where this action is pending.  *See* Rome Decl., Ex. A, Petition ¶¶ 18-19; 28 U.S.C. § 1441(a).

9.     This Notice of Removal is timely because it is filed within 30 days after the receipt by Defendants,[1] through service or otherwise, of a copy of the Petition on June 23, 2025.  *See* 28 U.S.C. § 1446(b).

10.     Exhibit A to the Rome Decl., described above, includes true and correct copies of all process, pleadings, and orders served on Defendants in the State Court Action. *See* 28 U.S.C. § 1446(a).

11.     In accordance with 28 U.S.C. § 1446(d), after filing this Notice of Removal, Defendants will promptly serve written notice of this Notice of Removal on Plaintiff's counsel of record and file a copy with the clerk of the Third Business Court Division of the Business Court of the State of Texas.

12.     Defendants deny the allegations in the Petition and file this Notice of Removal without waiving any defenses, objections, exceptions, remedies, or obligations that may exist in their favor in either state or federal court.  Defendants reserve the right to amend or supplement

---

[1] As noted in paragraph 2 above, of the Defendants, only Google has been served.

4915-3059-2341

App.27

this Notice of Removal.  In the event any questions arise as to the propriety of the removal of this

action, Defendants request the opportunity to present a brief, oral argument, and/or any further

evidence necessary in support of their position that this action is removable.

Dated: July 14, 2025                        Respectfully submitted,


                                            **SCOTT DOUGLASS & MCCONNICO LLP**

                                            */s/ Steven J. Wingard*
                                            Steven J. Wingard
                                            Texas Bar No. 00788694
                                            Robyn Hargrove
                                            Texas Bar No. 24031859
                                            Eli Barrish
                                            Texas Bar No. 24144433

                                            303 Colorado Street, Suite 2400
                                            Austin, TX 78701
                                            Telephone: (512) 495-6300
                                            Facsimile: (512) 474-0731
                                            swingard@scottdoug.com
                                            rhargrove@scottdoug.com
                                            ebarrish@scottdoug.com


                                            **COOLEY LLP**
                                            Jonathan Patchen*
                                            Michael A. Rome*
                                            Sharon Song*
                                            Madeleine R. Ahlers*

                                            3 Embarcadero Center, 20th Floor
                                            San Francisco, CA 94111
                                            Telephone: (415) 693-2000
                                            Facsimile: (415) 693-2222
                                            jpatchen@cooley.com
                                            mrome@cooley.com
                                            ssong@cooley.com
                                            mahlers@cooley.com
                                            **Pro Hac Vice* forthcoming

                                            *Attorneys for Defendants YouTube LLC, Google
                                            LLC, and Alphabet, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served on all counsel of record, as listed below, on July 14, 2025.

*VIA E-FILING AND E-MAIL*
Chad Flores
Texas Bar No. 24059759
cf@chadflores.law
Flores Law PLLC
917 Franklin Street, Suite 600
Houston, Texas 77002
(713) 364-6640

*Counsel for Plaintiff*

*VIA E-FILING AND E-MAIL*
Colleen McKnight
Texas Bar No. 24078976
colleen.mcknight@mcknightlaw.us
McKnight Law PLLC
801 Travis Street Suite 2101, PMB 698
Houston, TX 77002
(713) 487-5645

*Counsel for Plaintiff*

*/s/ Steven J. Wingard*
Steven J. Wingard

App.29

4915-3059-2341

# EXHIBIT 5

# EXHIBIT A

# Case Information

## Defense Distributed vs. YouTube, LLC,Google LLC,Alphabet, Inc.

25-BC03B-0009

Location
Business Court 3b

Case Category
Civil - Other Civil

Case Type
Other Civil

Case Filed Date
6/6/2025

Judge
Sweeten, Patrick K.

Case Status
Open (Active)

## Parties 4

| Type | Name | Nickname/Alias | Attorneys |
|------|------|----------------|-----------|
| Plaintiff | Defense Distributed | | Colleen McKnight, Mr Charles Flores |
| Defendant | YouTube, LLC | | |
| Defendant | Google LLC | | |
| Defendant | Alphabet, Inc. | | |

## Events 10

| Date | Event | Type | Comments | Documents |
|------|-------|------|----------|-----------|
| 6/6/2025 | Filing | O | | No Documents ⓘ |
| 6/6/2025 | Filing | OP | Plaintiff's Original Petition | Plaintiff's Original Petition.pdf |
| 6/6/2025 | Filing | CIS | Business Court Case Information Sheet | Case Information Sheet.pdf |
| 6/6/2025 | Filing | REQ | Request for Issuance of Citation | Request for Issuance of Citation.pdf |
| 6/13/2025 | Service | Citation | - | - |
| 6/13/2025 | Service | Citation | - | - |
| 6/13/2025 | Service | Citation | - | - |
| 6/13/2025 | Filing | REQ | Request for Issuance of Citation | DD v. YouTube (Tex. Bus. Ct.) - Request for Issuance of Citation.pdf |
| 6/13/2025 | Filing | CITISS | Citation Issued Alphabet Inc | Citation Issued Alphabet Inc.pdf |
| 6/13/2025 | Filing | CITISS | Citation Issued YouTube, LLC | Citation Issued YouTube LLC.pdf |

© 2025 Tyler Technologies, Inc. | All Rights Reserved
Version: 2025.4.3.1269



E-filed in the Office of the Clerk
for the Business Court of Texas
6/6/2025 10:56 PM
Accepted by: Alexis Jennings
Case Number: 25-BC03B-0009

No. _____
25-BC03B-0009

| | | |
|---|---|---|
| Defense Distributed, | § | IN THE BUSINESS COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | THE STATE OF TEXAS |
| YouTube LLC, | § | |
| Google LLC, and | § | |
| Alphabet, Inc., | § | |
| | § | |
| Defendants. | § | 3RD BUSINESS COURT DIVISION |

## PLAINTIFFS' ORIGINAL PETITION

Copy from re:SearchTX

**Table of Contents**

I.      Discovery Plan ...................................................................................................... 3

II.     Statement of the Case ......................................................................................... 3

III.    Jurisdiction ........................................................................................................... 6

IV.     Venue ..................................................................................................................... 7

V.      Parties .................................................................................................................... 7

        A.      Defense Distributed .............................................................................. 7

        B.      YouTube, Google, and Alphabet ........................................................ 9

VI.     Facts ..................................................................................................................... 11

        A.      YouTube discriminates against pro-gun videos. ........................... 11

        B.      YouTube illegally censored the "G80 | Next-Gen Receivers" Video. ................ 17

        C.      YouTube illegally censored the Vice documentary about Defense Distributed .... 25

        D.      Google's advertising policies illegally censored Defense Distributed. .................. 28

        E.      YouTube and Google's illegal censorship causes irreparable harm. .................... 30

VII.    Causes of Action ............................................................................................... 33

        A.      Count One: Message Censorship ...................................................... 33

        B.      Count Two: Messenger Censorship. ................................................ 34

        C.      Count Three: Audience Censorship. ................................................ 36

VIII.   Prayer for Relief ................................................................................................ 37

        A.      Injunctive Relief .................................................................................. 37

        B.      Declaratory Relief ............................................................................... 38

        C.      Costs & Attorney's Fees .................................................................... 38

Copy from re:SearchTX

## I.    Discovery Plan

1.        Plaintiffs intend to conduct discovery under Level 3.  *See* Tex. R. Civ. P. 190.

## II.    Statement of the Case

2.        YouTube and Google discriminate against pro-gun content to disadvantage Second Amendment viewpoints.  Their systemic suppression targets all manner of safe and law-abiding pro-gun speech, squarely violating Texas Civil Practice and Remedies Code Chapter 143A.

3.        YouTube's anti-gun censorship is no accident.  It is YouTube's policy to suppress speech advocating the Second Amendment.  By policy, YouTube censors videos about "how to make firearms" even though videos about how to make things are generally allowed.  By policy, YouTube censors videos "intended to sell" firearms even though videos about selling things are generally allowed. By policy, YouTube censors videos about "how to install" firearm accessories even though videos about installing things are generally allowed.   If that were not enough, YouTube also uses an array of individualized tools to selectively censor pro-gun content.

4.        Illegality is not the issue.  YouTube has a separate policy (apart from the "Firearms policy") on "illegal or regulated goods or services."  When YouTube censors the pro-gun videos at issue, illegality is not given as justification because it cannot be.  Pro-gun videos about personal gunsmithing, self-defense, and other important Second Amendment topics are totally legal to host online, just as pro-gun books on those topics are totally legal to host in libraries across America.

5.        Dangerousness is not the issue either.  YouTube has a separate policy (apart from the "Firearms policy") about "dangerous" content.  But when YouTube censors the pro-gun videos at issue, dangerousness it not given as justification because it cannot be.  Pro-gun videos are plenty safe to host online, just as pro-gun books are plenty safe to host on library bookshelves.

Copy from re:SearchTX

6.     Meanwhile, the Google suppresses lawful pro-gun advertisements on Google Ads. By enforcing a "Guns" policy that block ads promoting Second Amendment advocacy and legal firearms technology, Google stifles protected speech just like YouTube, reflecting a pattern of viewpoint-based discrimination across Alphabet Inc.'s ecosystem.

7.     Federal law should put a stop to YouTube and Google's private defeat of these critical free speech norms. Whether it has done so remains to be seen. *Cf.* 47 U.S.C. § 230. Thankfully, federal law is not the citizenry's only source of civil liberties protections. The founders knew that "freedom is enhanced by the creation of two governments, not one." *Alden v. Maine*, 527 U.S. 706, 758 (1999). Hence the freedom of States to do better, as Texas has now done.

8.     The State of Texas enacted in 2021 a law known then as House Bill 20, now codified in part as Chapter 143A of the Texas Civil Practice and Remedies Code. Governor Abbott when signing the bill realized that "there is a dangerous movement by social media companies to silence conservative viewpoints and ideas. That is wrong, and we will not allow it in Texas." Office of the Texas Governor, Press Release: Governor Abbott Signs Law Protecting Texans From Wrongful Social Media Censorship (Sept. 9, 2021), https://bit.ly/38ZEkxQ.

9.     The new law gives a clear free speech mandate: "A social media platform may not censor a user, a user's expression, or a user's ability to receive the expression of another person based on: . . . the viewpoint represented in the user's expression or another person's expression." Tex. Civ. Prac. & Rem. Code § 143A.002(A)(2). While other courts are grappling with "facial challenges" that test the law's constitutionality "in all of its applications," *Moody v. NetChoice*, LLC, 603 U.S. 707, 744 (2024), their facial challenges remain unresolved and do not control. In this as-applied posture with concrete facts, applying Chapter 143A is clearly constitutional.

4

Copy from re:SearchTX

10.    Texas law's safeguard is urgently needed for Defense Distributed.  For over a decade, it has led development of the Second Amendment's individual right to keep and bear Arms by both pioneering key technological developments and—just as critically—shaping pro-gun discourse on key speech platforms like YouTube and Google Ads.  But even though Defense Distributed's pro-gun videos are perfectly law-abiding and safe, YouTube and Google have repeatedly and increasingly censored Defense Distributed's speech because of its pro-gun viewpoint, citing the "Firearms" and "Guns" policies that so blatantly discriminate illegally.

11.    The censorship of Defense Distributed's videos and ads exemplifies YouTube and Google's broader campaign to suppress safe and law-abiding pro-Second Amendment speech. Their actions against Defense Distributed are not isolated but reflect a pervasive pattern of censorship targeting pro-gun publishers and their audiences across the platforms.  This widespread censorship includes the removal, demonetization, or algorithmic suppression of videos that discuss lawful firearms use, self-defense, and other constitutionally protected topics.  Plaintiff anticipates soon uncovering many additional instances of YouTube and Google's viewpoint-based anti-gun censorship, including internal communications, policy documents, and data analytics that confirm the coordinated and intentional targeting of pro-gun videos.  YouTube and Google's censorship of Defense Distributed is not an aberration but a core component of their overall censorship strategy, designed to silence Second Amendment advocacy in direct contravention of Texas law.

12.    Because YouTube and Google are violating the core non-discrimination mandate of Chapter 143A, Defense Distributed is entitled to a judgment declaring the illegality of this viewpoint discrimination and enjoining them from any further illegal censorship.

Copy from re:SearchTX

### III.    Jurisdiction

13.     The Court's subject-matter jurisdiction over this action comes from Texas Government Code Section 25A.004(b)(3)(A) and (c) because (1) this is an action in which a claim under a "state … trade regulation law" is asserted against Chapter 25A "organization," and (2) a party to the action is a publicly traded company, making the amount in controversy irrelevant.  *See* Tex. Gov't Code §§ 25A.001, .004(b)(3)(A), 004(c),

14.     The Court's subject-matter jurisdiction over this action comes from Texas Government Code Section 25A.004(b)(3)(A) because (1) this is an action in which a claim under a "state … trade regulation law" is asserted against Chapter 25A "organization," and (2) this is an action in which the amount in controversy exceeds $5 million, excluding interest, statutory damages, exemplary damages, penalties, attorney's fees, and court costs, making the presence of a publicly-traded company irrelevant.  *See* Tex. Gov't Code §§ 25A.001, .004(b)(3)(A), 004(c).

15.     The Court's power to issue the requested relief, including declaratory judgments and writs of injunction, comes from Texas Government Code Section 25A.004(a).

16.     This action arises solely under the laws of the State of Texas.  This action does not arise under the Constitution, laws, or treaties of the United States.  This is not a civil action filed under Rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action.

17.     The Court has personal jurisdiction over the Defendants because the action's operative facts arise out of and are substantially related to their contacts with the Texas—contacts that constitute purposeful availment of the privilege of conducting activities in Texas—such that maintenance of this action does not offend traditional notions of fair play and substantial justice.  These contacts include Defendants doing business in Texas, contracting by mail or otherwise with

Copy from re:SearchTX

a Texas resident where either party is to perform the contract in whole or in part in Texas, committing a tort in whole or in part in Texas, and delivering into Texas communications whose actual content gives rise to the instant causes of action.

## IV.    Venue

18.    Travis County constitutes a proper venue for this action because a substantial part of the events or omissions giving rise to the action occurred in Travis County.  See Tex. Civ. Prac. & Rem. Code § 15.002(a)(1).

19.    Alternatively, Texas Civil Practice and Remedies Code Section 15.002(a)(4) deems Travis County a proper venue for Plaintiff Defense Distributed because Texas Civil Practice and Remedies Code Section 15.002(a) Subdivisions (1), (2), and (3) do not apply and Travis County is where Plaintiff Defense Distributed resided when its claims accrued.  See Tex. Civ. Prac. & Rem. Code § 15.002(a)(4).

20.    Travis County lies in the Third Business Court Division of the Business Court of the State of Texas.

## V.    Parties

### A.    Defense Distributed

21.    Plaintiff Defense Distributed is a private business corporation headquartered in Austin, Texas.  Cody Wilson founded Defense Distributed and serves as its Director.

22.    Defense Distributed is the first private defense contractor in service of the general public.  Since 2012's Wiki Weapon project, Defense Distributed has defined the state of the art in small scale, digital, personal gunsmithing technology.  As an integral part of that mission, Defense Distributed regularly publishes videos though YouTube and utilizes the Google Ads platform.

7

Copy from re:SearchTX

23.     Defense Distributed's YouTube publications and Google Ads campaigns address topics of legitimate public concern: technical, scientific, political, and artistic aspects of the American constitutional right to keep and bear arms, both in theory and practice.  They espouse viewpoints that favor continuation of the American constitutional right to keep and bear arms in theory and practice.  They do not violate any applicable federal or state law.

24.     Defense Distributed resides in the State of Texas, does business in the State of Texas, shares expression through YouTube and Google in the State of Texas, and receives expression through YouTube and Google in the State of Texas.  Defense Distributed is therefore a "user" to whom Texas Civil Practice and Remedies Code Chapter 143A applies.  See Tex. Civ. Prac. & Rem. Code § 143A.004 ("This chapter applies only to a user who: (1) resides in this state; (2)  does business in this state; or (3)  shares or receives expression in this state.").

25.     Defense Distributed has posted, uploaded, transmitted, shared, and otherwise published expression in the State of Texas through YouTube and the Google Ads platform from at least 2013 to present.  That expression has been received in the State of Texas.  Defense Distributed's publications therefore constitute "expression" to which Texas Civil Practice and Remedies Code Chapter 143A applies.  See Tex. Civ. Prac. & Rem. Code § 143A.004(b) ("This chapter applies only to expression that is shared or received in this state.").

26.     Defense Distributed has a concrete, particularized, substantial, and imminent desire to post, upload, transmit, share, and otherwise publish pro-gun expressions in the State of Texas through YouTube and the Google Ads platform.

8

Copy from re:SearchTX

### B.    YouTube, Google, and Alphabet

27.    YouTube is a social media platform for creating, sharing, viewing, and discussing videos that has more than 50 million active users in the United States in a calendar month. YouTube is therefore a "social media platform" to which Texas Civil Practice and Remedies Code Chapter 143A applies. *See* Tex. Civ. Prac. & Rem. Code § 143A.004(c) ("This chapter applies only to a social media platform that functionally has more than 50 million active users in the United States in a calendar month.").

28.    The Google Ads platform is a digital advertising service that enables businesses, organizations, and individuals to create, manage, and distribute advertisements across Google's vast ecosystem, including Google Search, YouTube, Gmail, Google Maps, and millions of partner websites and apps within the Google Display Network. It is a "social media platform" to which Texas Civil Practice and Remedies Code Chapter 143A applies. *See id.*

29.    The Defendants are the companies responsible for the YouTube and Google Ads policies and practices in question: YouTube LLC, Google LLC, and Alphabet, Inc.

30.    Defendant YouTube LLC is a Delaware limited liability company headquartered in San Bruno, California.

31.    Defendant Google LLC  is a Delaware limited liability company headquartered in Mountain View, California.

32.    Defendant Alphabet Inc., a Delaware corporation also headquartered in Mountain View, California.

33.    YouTube LLC is a wholly owned subsidiary of Google LLC, which is a wholly owned subsidiary of Alphabet Inc.  This corporate structure establishes a direct chain of ownership

Copy from re:SearchTX

and control, with Alphabet Inc. as the ultimate parent entity overseeing the operations of both Google LLC and YouTube LLC.

    (a)    YouTube LLC, Google LLC, and Alphabet Inc. operate as an integrated enterprise with respect to the YouTube platform's content moderation and censorship activities. YouTube LLC's policies, including those governing content removal, demonetization, and account suspensions, are developed, implemented, and enforced in coordination with Google LLC and under the strategic direction of Alphabet Inc. Google LLC provides critical technological infrastructure, including algorithms, artificial intelligence systems, and data analytics, that enable YouTube LLC's content moderation practices. Alphabet Inc., as the parent entity, exercises ultimate authority over the policies and practices of its subsidiaries, including approving high-level decisions related to YouTube's content moderation framework.

    (b)    The interconnected operations of the Defendants are further evidenced by their shared leadership and governance structures. Key executives and board members of Alphabet Inc. hold oversight roles that influence the strategic and operational decisions of both Google LLC and YouTube LLC. For example, Alphabet Inc.'s chief executive officer and other senior officers provide unified policy guidance that shapes YouTube's approach to content moderation, ensuring alignment with the broader corporate objectives of the Alphabet family of companies.

    (c)    YouTube LLC, Google LLC, and Alphabet Inc. share resources, including legal, compliance, and technical teams, that collectively design and execute YouTube's

<center>10</center>

Copy from re:SearchTX

censorship policies. These shared resources facilitate the seamless implementation of content moderation decisions across the YouTube platform, including the alleged unlawful censorship activities that violate Texas Civil Practice and Remedies Code Chapter 143A by restricting protected speech based on viewpoint.

(d)     As a result of their integrated operations, shared governance, and unified policy framework, YouTube LLC, Google LLC, and Alphabet Inc. are jointly and severally responsible for the alleged censorship activities on the YouTube platform. Each plays an indispensable role in the development, implementation, and enforcement of the content moderation policies that are the subject of this action, rendering them equally liable for any violations of Texas law, including the prohibitions on censorship under Chapter 143A.

34.     This petition's references to "YouTube" and "Google" mean YouTube LLC, Google LLC, and Alphabet, Inc. , jointly and severally, unless otherwise specified.

## VI.    Facts

### A.    YouTube discriminates against pro-gun videos.

35.     YouTube is a social media platform for creating, sharing, viewing, and discussing videos.[1]  Over 1 billion people use YouTube each month and over 1 billion hours of video are watched daily.[2]  Around 4000 hours of video are uploaded to YouTube every minute; 65 years of

---

[1] See Mareike Möhlmann, THE INVISIBLE HAND: ALGORITHMIC CONTROL OF YOUTUBE CONSUMERS AND PROVIDERS at 9 (April 2021) (available at https://bit.ly/3zYszW4) ("Founded in 2005, YouTube is a leading global video streaming platform, ranked by Alexa Internet (2020) as the second most popular website worldwide. The YouTube platform facilitates uploading, viewing, commenting and sharing of video content, ranging from documentaries and educational videos to video blogging.").
[2] See Anthony Zappina, et al., Procedia Computer Science 198, *YouTube Monetization and Censorship by Proxy: A Machine Learning Prospective*, at 1 (2022) (available at https://bit.ly/3zYowsU) ("YouTube has over 1 billion users log in monthly and over a billion hours of video are watched daily.")

Copy from re:SearchTX

video a day. [3]  "The reality of monopoly tech platforms acting to censor public availability of information and viewpoints is already with us, in ways that few people seem to acknowledge or understand."[4]

36.     YouTube hosts video content discriminately.  Some of YouTube's hosting discrimination is individualized.  Some of YouTube's hosting discrimination is categorical.  Some of YouTube's hosting discrimination is part categorical and part individualized.

37.     YouTube carries out its hosting discrimination with a variety of methods, processes, and tools.  They include but are not limited to (i) individual content removal, (ii) channel removal through a three-strike system and (iii) demonetization.[5]

38.     One way that YouTube directs its discrimination is by enforcing YouTube's "Community Guidelines" and "Policies,"[6] which are roughly organized into five subject categories: (i.) Spam and Deceptive Practices; (ii.) Sensitive Content, (iii.), Violent or Dangerous Content; (iv.) Regulated Goods (e.g., firearms) and (v) Copyrighted Content.[7]

39.     YouTube's "YouTube policies" are  30+ content-based policies that YouTube uses to discriminate against content.  One of those is YouTube's "Firearms policy."

40.     YouTube's "Firearms policy" consists of a primary policy statement and several secondary paragraphs giving non-exhaustive explanations and examples of the primary policy

---

[3] *Id.* at 1 ("Around 4000 hours of video are uploaded to YouTube every minute; 65 years of video a day.").
[4] *See* Jacob Siegel, Tablet Magazine, *Google Censorship Is a Danger to Public Health* (July 13, 2020) (available at https://bit.ly/3GDxbVl) ("The reality of monopoly tech platforms acting to censor public availability of information and viewpoints is already with us, in ways that few people seem to acknowledge or understand.")
[5] *See id.*
[6] *See* Zappina, *supra*, at 2 ("YouTube moderates content published on its platform through its "Community Guidelines and Policies.")
[7] *See* Zappina, *supra*, at 2 ("The types of content fall into five categories: (i.) Spam and Deceptive Practices; (ii.) Sensitive Content, (iii.), Violent or Dangerous Content; (iv.) Regulated Goods (e.g., firearms) and (v) Copyrighted Content.").

12

Copy from re:SearchTX

statement. The primary policy statement of YouTube's "Firearms policy" provides as follows: "Content intended to sell firearms, instruct viewers on how to make firearms, ammunition, and certain accessories, or instruct viewers on how to install those accessories is not allowed on YouTube. YouTube shouldn't be used as a platform to sell firearms or accessories noted below. YouTube also doesn't allow live streams that show someone holding, handling, or transporting a firearm." The YouTube "Firearms policy" stated the following from at least July 2024 to present:

### Firearms policy

> Starting June 18, 2024, certain content showing how to remove safety devices will be prohibited. Content showing the use of homemade firearms, automatic firearms, and certain firearm accessories will be age restricted.

Content intended to sell firearms, instruct viewers on how to make firearms, ammunition, and certain accessories, or instruct viewers on how to install those accessories is not allowed on YouTube. YouTube shouldn't be used as a platform to sell firearms or accessories noted below. YouTube also doesn't allow live streams that show someone holding, handling, or transporting a firearm.

Sometimes content doesn't violate our policies, but it may not be appropriate for viewers under 18. YouTube age restricts content showing the use of certain firearms and accessories also noted below (note: this restriction applies to real use of firearms only; details are below).

### What this means for you

### If you're posting content

Don't post content on YouTube if the purpose is to do one or more of the following:

- Sell firearms or certain firearms accessories through direct sales (e.g. private sales by individuals) or links to sites that sell these items. These accessories may include:
  - Accessories that enable a firearm to simulate automatic fire,
  - Accessories that convert a firearm to automatic fire, such as: bump stocks, gatling triggers, drop-in auto sears, or conversion kits,
  - High capacity magazines or belts carrying more than 30 rounds.
- Provide instructions on manufacturing any of the following:

13

App.45

Copy from re:SearchTX

- Firearms,
- Ammunition,
- High capacity magazines,
- Homemade silencers/suppressors,
- Accessories that enable a firearm to simulate automatic fire,
- Accessories that convert a firearm to automatic fire, such as: bump stocks, gatling triggers, drop-in auto sears, or conversion kits.
- Provide instructions on how to convert a firearm to automatic or simulated automatic firing capabilities.
- Provides instructions on how to install the above-mentioned accessories or modifications.
- Provides instructions on how to remove certain firearm safety devices, such as a device that limits the release of a magazine. This does not include removal of a device used to temporarily disable a weapon like a gun lock.

Please note this is not a complete list.

**Age-restricted content**

Sometimes content doesn't violate our policies, but it may not be appropriate for viewers under 18.

- Content showing use of a homemade firearm (e.g. 3D printed gun), an automatic firearm, or any of the below accessories:
    - Accessories that enable a firearm to simulate automatic fire
    - Accessories that convert a firearm to automatic fire, such as: bump stocks, gatling triggers, drop-in auto sears, or conversion kits
    - High capacity magazines
    - Homemade silencers/suppressors
- Examples (non-exhaustive):
    - Firing a 3D printed firearm
    - Firing a fully automatic rifle
    - Firing a firearm with a high capacity magazine

These guidelines apply to real use of firearms and may not apply, for example, to use of firearms in artistic content such as a film. We may also make exceptions for public interest content such as military or police footage, news footage, or footage from warzones.

**Examples**

Here are some examples of content that isn't allowed on YouTube.

14

Copy from re:SearchTX

- Links in the title or description of your video to sites where firearms or the accessories noted above are sold. You can link to sites that discuss or review the items as long as those sites don't sell or give away those items directly.
- Displaying a firearm with the intention to sell that firearm via private sale. This includes giving the seller's phone number, email address, or other contact information.
- Showing users step-by-step instructions on how to finish a lower receiver in order to complete fabrication of a firearm.
- Showing users how to make a silencer out of a flashlight, oil can, solvent catcher or other parts.
- Showing users how to install a bump stock, or install a comparable accessory built to enable simulated automatic fire.
- Live streams that feature someone holding or handling a firearm, regardless of whether or not they are firing it. Note: this does not include firearms in video games.
- Live streams that feature someone transporting firearms from place to place, such as by carrying them or traveling with them by car, truck, or other vehicle. Note: this does not include firearms in video games.

Please remember these are just some examples, and don't post content if you think it might violate this policy.

**What happens if content violates this policy**

If your content violates this policy, we will remove the content and send you an email to let you know. If we can't verify that a link you post is safe, we may remove the link. Note that violative URLs posted within the video itself or in the video's metadata may result in the video being removed.

If this is your first time violating our Community Guidelines, you'll likely get a warning with no penalty to your channel. You will have the chance to take a policy training to allow the warning to expire after 90 days. The 90 day period starts from when the training is completed, not when the warning is issued. However, if the same policy is violated within that 90 day window, the warning will not expire and your channel will be given a strike. If you violate a different policy after completing the training, you will get another warning.

If you get 3 strikes within 90 days, your channel will be terminated. Learn more about our strikes system.

We may terminate your channel or account for repeated violations of the Community Guidelines or Terms of Service. We may also terminate your channel or account after a single case of severe abuse, or when the channel is dedicated to a

App.47

Copy from re:SearchTX

policy violation. We may prevent repeat offenders from taking policy trainings in the future. Learn more about channel or account terminations.

If you find content that violates this policy, report it. Instructions for reporting violations of our Community Guidelines are available here. If you've found a few videos or comments that you would like to report, you can report the channel.

https://support.google.com/youtube/answer/7667605 (July 2, 2024; June 6, 2025).

41.    YouTube does not enforce its "Firearms policy" with concerns of legality. The YouTube "Firearms policy" does not turn on whether or not the video's content depicts something illegal and does not turn on whether or not the video content is itself illegal.

42.    To identify content it eventually discriminates against, YouTube employs a combination of human effort, algorithmic control, and machine learning.[8]  YouTube's control algorithms are collectively maintained by thousands of people who work for Google (software engineers, researchers, and content moderators) and millions who participate on the platform, create content, and help train the algorithm.[9]  YouTube keeps algorithm details secret to ensure that any patterns indicating unintended biases or distortions are concealed from public view.[10] YouTube publicly admits to reducing the distribution of content that comes close to, but does not quite cross the line into, violating its community guidelines.[11]

---

[8] *See* Möhlmann, *supra*, at 10, 16 ("YouTube employs machine learning technology, paired with human moderation, to identify content that does not comply with its community guidelines or with government regulations.").
[9] *See* Zappina, *supra*, at 1 ("The algorithm is collectively maintained by thousands of people who work for Google (software engineers, researchers, and content moderators) and millions who participate on the platform, create content, and help train the algorithm, which has not been public to date").
[10] *See* Zappina, *supra*, at 1 ("By keeping the algorithm and its results under wraps, YouTube ensures that any patterns that indicate unintended biases or distortions associated with its algorithm are concealed from public view").
[11] *See* Möhlmann, *supra*, at 16 ("YouTube publicly admits to reducing the distribution of content that comes close to, but does not quite cross the line into, violating its community guidelines….").

App.48

Copy from re:SearchTX

**B.    YouTube illegally censored the "G80 | Next-Gen Receivers" Video.**

43.    "G80 | Next-Gen Receivers" is a video that Defense Distributed created in early 2025 and published via YouTube before YouTube took it down in violation of Texas Civil Practice and Remedies Code Chapter 143A.

44.    Defense Distributed's "G80 | Next-Gen Receivers" video constitutes "speech" protected by the First Amendment to the Constitution of the United States and the Second Amendment to the Constitution of the United States.  It delivers an important expression of legal, political, technical, scientific, and artistic matters in the abstract.  It delivers commentary on Second Amendment rights, technological innovation in firearms components, and judicial decisions such as *Bondi v. VanDerStok*, 145 S. Ct. 857 (2025).  Its content, comprising symbolic imagery, music, and spoken words, conveys a pro-gun viewpoint through artistic and political expression, making it core protected speech under both federal and Texas law.

45.    Defense Distributed's "G80 | Next-Gen Receivers" video is law-abiding in every respect.  It does not depict, promote, or instruct on any illegal activity, nor does it violate any federal or state laws, including those regulating firearms or online content.  The video's focus on the "G80 Jig Set," "G80 Unfinished Receiver," and "G80 Grip Module" involves the lawful discussion of firearm components.  The video's references to the *Bondi v. VanDerStok* decision and Defense Distributed's emblem further situate it as a lawful commentary on legal and political developments, akin to written publications or public speeches on Second Amendment issues.

46.    Defense Distributed's "G80 | Next-Gen Receivers" video is indisputably safe for hosting on a platform like YouTube. It contains no violent, dangerous, or harmful content, nor does it encourage such behavior. The slow-motion, abstract presentations of firearm components, accompanied by music and minimal spoken words, are purely informational and artistic, posing no

Copy from re:SearchTX

risk to viewers or the public. The content is analogous to technical diagrams or photographs in books about firearms, which are routinely and safely hosted in libraries and bookstores.

47.    Defense Distributed's "G80 | Next-Gen Receivers" video presents the following thirty-eight seconds of content:

a.    At time ~0:00, Defense Distributed's "G80 | Next-Gen Receivers" video presents for approximately one second a static view of this work—a critical parody of the seal of the Supreme Court of the United States and an indirect reference to the Court's decision in *Bondi v. VanDerStok*, 145 S. Ct. 857 (2025), which Defense Distributed was party to:



During this part of the video, music plays.

b.    At time ~0:01, Defense Distributed's "G80 | Next-Gen Receivers" presents for approximately a second a static view of this work—the emblem of Defense Distributed:

18

Copy from re:SearchTX



During this part of the video, music plays.

c.    At time ~0:01, Defense Distributed's "G80 | Next-Gen Receivers" video presents for approximately one second a static view of this work—Dimmit's Goliad Arm:



During this part of the video, music plays.

d.    At time ~0:02, Defense Distributed's "G80 | Next-Gen Receivers" video presents for approximately one second a static view of this work—an atypographic presentation of "G80":

19

Copy from re:SearchTX



During this part of the video, music plays.

e.      At time ~0:03, Defense Distributed's "G80 | Next-Gen Receivers" video presents for approximately two seconds a dynamic view (panning and scanning) of this work in slow motion against a white field—a version of the "G80 Jig Set" engraved with an atypographic presentation of "G80":



During this part of the video, music plays and the words "do you remember the

times" are spoken.

f.      At time ~0:05, Defense Distributed's "G80 | Next-Gen Receivers" video presents for approximately two seconds a dynamic view (panning and scanning) of this work in slow motion against a white field —a version of the "G80 Grip Module":

20

Copy from re:SearchTX



During this part of the video, music plays.

g.    At time ~0:08, Defense Distributed's "G80 | Next-Gen Receivers" video presents for approximately two seconds a dynamic view (panning and scanning) of this work in slow motion against a white field — a version of "G80 Unfinished Receiver" with an inscribed shape of the State of Texas.



During this part of the video, music plays and the words "when we thought of all those things" are spoken.

h.    At time ~0:10, Defense Distributed's "G80 | Next-Gen Receivers" video presents for approximately two seconds a dynamic view (panning and scanning) of this work in slow motion against a white field—a version of the "G80 Grip Module":



During this part of the video, music plays.

21

Copy from re:SearchTX

i.    At time ~0:12, Defense Distributed's "G80 | Next-Gen Receivers" video presents for approximately four seconds a dynamic view (panning and scanning) of these works in slow motion against a white field—a version of the "G80 Jig Set" engraved with an atypographic presentation of "G80" and a version of "G80 Unfinished Receiver":



During this part of the video, music plays and the words "when we thought of all those things" are spoken.

j.    At time ~0:16, Defense Distributed's "G80 | Next-Gen Receivers" video presents for approximately two seconds a dynamic view (panning and scanning) of these works in slow motion against a white field —a version of the "G80 Unfinished Receiver" interpolating a version of the "G80 Jig Set" engraved with an atypographic presentation of "G80":



During this part of the video, music plays.

k.    At time ~0:18, Defense Distributed's "G80 | Next-Gen Receivers" video presents for approximately four seconds a dynamic view (panning and scanning) of this work in slow motion against a white field —a version of the "G80 Unfinished Receiver":

22

Copy from re:SearchTX



During this part of the video, music plays.

l.      At time ~0:19, Defense Distributed's "G80 | Next-Gen Receivers" video presents for approximately four seconds a dynamic view (panning and scanning) of these works in slow motion against a white field—a version of the "G80 Unfinished Receiver" engraved with an icon of the State of Texas interpolating a version of the "G80 Grip Module" engraved with the phrase "Umbilicus Limbo":



During this part of the video, music plays.

m.      At time ~0:23, Defense Distributed's "G80 | Next-Gen Receivers" video presents for approximately two seconds a dynamic view (panning and scanning) of these works in slow motion against a white field —a version of the "G80 Jig Set" interposing a version of the "G80 Unfinished Receiver" and a version "G80 Grip Module":



During this part of the video, music plays.

23

Copy from re:SearchTX

n.     At time ~0:10, Defense Distributed's "G80 | Next-Gen Receivers" video presents for approximately five seconds a dynamic view (panning and scanning) of these works in slow motion against a white field—the "G80 Jig Set," "G80 Unfinished Receiver," and "G80 Grip Module":



During this part of the video, music plays.

o.     At time ~0:31, Defense Distributed's "G80 | Next-Gen Receivers" video presents for approximately two seconds a static view of this work against a white field—an atypographic presentation of "G80":



During this part of the video, music plays. Then the video fades to black.

p.     When hosted at YouTube, links to video sometimes appeared with one of these thumbnails:

 

24

Copy from re:SearchTX

48.     YouTube began hosting the "G80 | Next-Gen Receivers" video on April 28, 2025. YouTube took down (stopped hosting) the "G80 | Next-Gen Receivers" video on May 2, 2025.

49.     When YouTube took down Defense Distributed's G80 video, YouTube issued the following notice: "This video has been removed for violating YouTube's Community Guidelines."

50.     By censoring Defense Distributed's "G80 | Next-Gen Receivers" video, YouTube targeted protected speech based solely on the pro-gun viewpoint of the video and/or its publisher and/or its viewers, in direct violation of Texas Civil Practice and Remedies Code Chapter 143A. This video's suppression reflects YouTube's systemic bias against Second Amendment advocacy and exemplifies the broader pattern of viewpoint-based discrimination against pro-gun content on YouTube.

**C.     YouTube illegally censored the Vice documentary about Defense Distributed.**

51.     The Vice documentary "Inside The Battle To Arm America" is a video about Defense Distributed and its founder, Cody Wilson, that was published and widely viewed on YouTube before YouTube took it down in violation of Texas Civil Practice and Remedies Code Chapter 143A.

52.     The censored Vice documentary about Cody Wison's direction of Defense Distributed constitutes "speech" protected by the First Amendment to the Constitution of the United States that is fully law-abiding and perfectly safe. It explores the cultural, political, and technological dimensions of the Second Amendment in the United States, focusing on the activities of Defense Distributed, Cody Wilson, and the broader debate over firearms access and regulation. As a journalistic work, it delivers critical expression on legal, political, cultural, and

Copy from re:SearchTX

technological matters, including the Second Amendment, firearms innovation, and the societal debate over gun rights. The documentary's interviews, narration, and visuals convey a balanced exploration of pro-gun and anti-gun viewpoints, making it core protected speech under both federal and Texas law. Its focus on Defense Distributed and other pro-gun advocates situates it as a significant contribution to public discourse on a matter of constitutional importance.

53.    The censored Vice documentary about Cody Wison's direction of Defense Distributed is law-abiding in every respect. It does not depict, promote, or incite any illegal activity, nor does it violate any federal or state laws, including those regulating firearms or online content. The video's discussion of 3D-printed firearms components, such as those developed by Defense Distributed, addresses lawful activities, and its portrayal of firearms trade shows further align it with lawful commentary on judicial and cultural developments, comparable to news articles or televised debates on Second Amendment issues.

54.    The censored Vice documentary about Cody Wison's direction of Defense Distributed is also safe for hosting on a platform like YouTube. It contains no violent, dangerous, or harmful content, nor does it encourage such behavior. The visuals of firearms and components are presented in a journalistic context, akin to images in news reports or educational materials, posing no risk to viewers or the public. The inclusion of interviews, archival footage, and balanced narration ensures the content is informational and non-inflammatory.

55.    The censored Vice documentary about Cody Wison's direction of Defense Distributed presents the following content:

(a)    At time ~0:00 to ~2:00, the Vice documentary opens with an introductory segment featuring archival footage of firearms and news clips discussing gun culture in

App.58

Copy from re:SearchTX

America, overlaid with narration that frames the Second Amendment as a polarizing issue. The segment introduces the documentary's intent to examine the efforts of pro-gun activists to expand access to firearms through technological innovation and advocacy.

(b)    At time ~2:01 to ~8:00, the Vice documentary profiles Defense Distributed, highlighting its role in developing 3D-printed firearms components and its legal battles.    This segment includes interviews with Defense Distributed representatives, footage of their workshops, and visuals of 3D printers and firearm parts, accompanied by narration discussing the implications of decentralized firearms manufacturing.

(c)    At time ~8:01 to ~14:00, the Vice documentary shifts to broader Second Amendment advocacy, featuring interviews with gun rights activists, scenes from firearms trade shows, and discussions of legislative efforts to protect gun ownership. Visuals include displays of legal firearms and accessories, with narration emphasizing the cultural significance of the right to bear arms.

(d)    At time ~14:01 to ~20:00, the Vice documentary examines counterperspectives, including interviews with gun control advocates and footage of anti-gun protests. This segment provides a balanced journalistic approach, presenting arguments for stricter firearms regulations while maintaining focus on the pro-gun movement's motivations and activities.

(e)    At time ~20:01 to ~26:00, the Vice documentary concludes with a reflective segment, combining narration, interviews, and visuals of American landscapes and

27

Copy from re:SearchTX

firearms to underscore the ongoing tension between individual rights and public safety. The documentary closes with a call for viewers to engage in informed dialogue about the Second Amendment, fading to credits with background music.

56.     YouTube began hosting this video in March of 2013, resulting in over 12 million views. YouTube took down (stopped hosting) this video recently, after the enactment of Chapter 143A's key non-discrimination mandate.

57.     By censoring the Vice documentary about Cody Wison's direction of Defense Distributed, YouTube discriminated against user speech based solely on the pro-gun viewpoint of the video's subject and/or the pro-gun viewpoint of the video's viewers, in direct violation of Texas Civil Practice and Remedies Code Chapter 143A. This aligns with the viewpoint-based discrimination seen in YouTube's treatment of Defense Distributed's content and other pro-gun videos. Animus is further evidenced by YouTube's pattern of censoring pro-gun content while permitting comparable journalistic works on other controversial topics, such as immigration or climate change, to remain hosted without restriction. This video's suppression reflects YouTube's systemic bias against Second Amendment advocacy and exemplifies the broader pattern of viewpoint-based discrimination against pro-gun content on YouTube.

**D.     Google's advertising policies illegally censored Defense Distributed.**

58.     Google operates the Google Ads platform, another critical tool for Defense Distributed to promote its lawful firearms technology and Second Amendment advocacy. Google has systematically censored Defense Distributed's advertisements based on the pro-gun viewpoint of Defense Distributed, its speech, and its audience.

28

Copy from re:SearchTX

59.    Repeatedly during effective period of Chapter 143A, Defense Distributed sought to publish lawful advertisements through the Google Ads platform and was stifled by a "Guns" policy that prohibits content featuring firearm parts.  Just like YouTube's Firearms policy, the Google Ads "Guns" policy expressly discriminates against safe and lawful pro-gun speech, deeming such advertisements ineligible while permitting ads on other analogous non-gun topics:



These actions targeted Defense Distributed's pro-gun viewpoint, not illegal or dangerous content.

Copy from re:SearchTX

### E.    YouTube and Google's illegal censorship causes irreparable harm.

60.    YouTube's viewpoint-based censorship of content by and about Defense Distributed causes irreparable harm to Plaintiff's First Amendment liberties and its mission to advance Second Amendment discourse.  So does Google's censorship via discriminatory Ads platform policies.

61.    The "G80 | Next-Gen Receivers" video, a 38-second artistic and political expression of lawful firearms innovation, and the Vice documentary, a 26-minute journalistic exploration of pro-gun advocacy featuring Defense Distributed, both constitute protected speech under the First Amendment and Texas Civil Practice and Remedies Code Chapter 143A.  By removing or suppressing these videos, YouTube has suppressed Defense Distributed's ability to communicate its pro-gun viewpoint to a global audience, inflicting a direct and ongoing injury to its constitutional freedoms.

62.    The censorship of these videos and advertisements exemplifies a broader pattern of Defendants' animus toward Second Amendment advocacy, targeting both content created by Defense Distributed and content about its lawful activities.  This dual censorship demonstrates the Defendants' intent to suppress Defense Distributed's voice and erase its contributions to public discourse on the Second Amendment, causing irreparable harm by stifling protected speech.

63.    The irreparable harm to Defense Distributed is compounded by the loss of its ability to reach its audience on YouTube, the world's largest video-sharing platform, and the Google Ads platform.  The removal of the "G80 | Next-Gen Receivers" video deprives Plaintiff of a critical platform to share its innovative and expressive content, undermining its mission to educate and engage the public on lawful firearms technology. Likewise, the takedown of the Vice documentary eliminates a widely accessible, third-party perspective on Defense Distributed's work, further

30

Copy from re:SearchTX

isolating Defense Distributed from potential supporters, collaborators, and viewers. And the censorship accomplished via Google's Google Ads policies further stifles Defense Distributed's ability to engage viewers, supporters, and customers.

64.    Defense Distributed's ability to shape public discourse on the Second Amendment, a matter of profound constitutional and cultural significance, is uniquely dependent on platforms like YouTube and Google Ads. Content creators like Defense Distributed now face ongoing pressure to self-censor to avoid penalties such as channel strikes or termination, stifling innovation and discourse on lawful firearms technology. This chilling effect undermines the public's access to diverse perspectives on the Second Amendment, a core issue of constitutional significance. By censoring both Plaintiff's own publications and third-party content about its activities, Defendants have severed this vital channel of communication, causing ongoing and irreparable harm to Plaintiff's reputation, outreach, and advocacy efforts.

65.    Defendants' viewpoint-based censorship of Defense Distributed's content inflicts significant economic harm by depriving it of revenue opportunities tied to its YouTube presence and the Google Ads platform. The demonetization and removal of Defense Distributed's speech eliminates potential advertising income, sponsorships, and partnerships critical to sustaining Defense Distributed's operations as a private defense contractor. These financial losses, directly attributable to YouTube and Google's discriminatory practices, exacerbate the irreparable harm caused by the suppression of Plaintiff's protected speech.

66.    Beyond economic losses, YouTube and Google's censorship causes severe reputational harm to Defense Distributed, undermining its standing as a leader in Second Amendment advocacy and firearms technology innovation. By removing content by and about

31

Copy from re:SearchTX

Defense Distributed, YouTube and Google falsely signal to the public that Defense Distributed's lawful activities are inappropriate or harmful, damaging its credibility with supporters, collaborators, and the broader gun rights community. This reputational injury, compounded by the lack of a public platform to counter such misperceptions, constitutes an ongoing and irreparable harm that Chapter 143A redresses.

67.    The joint economic and reputational harms resulting from YouTube and Google's censorship create a compounding effect, threatening Defense Distributed's ability to fulfill its mission of advancing Second Amendment rights through technological and discursive innovation. These injuries, which cannot be fully quantified or remedied through monetary damages alone, underscore the urgent need for injunctive relief to halt YouTube and Google's unlawful practices and restore Defense Distributed's ability to engage with its audience.

<div align="center">*    *    *</div>

68.    Defense Distributed never waived the protections of Texas Civil Practice and Remedies Code Chapter 143A as a matter of fact.

69.    Alternatively, Defense Distributed never waived the protections of Texas Civil Practice and Remedies Code Chapter 143A as a matter of law because any "waiver or purported waiver of the protections provided by this chapter is void as unlawful and against public policy, and a court or arbitrator may not enforce or give effect to the waiver, including in an action brought under Section 143A.007, notwithstanding any contract or choice-of-law provision in a contract." Tex. Civ. Prac. & Rem. Code § 143A.003.

App.64

Copy from re:SearchTX

## VII.    Causes of Action

### A.    Count One: Message Censorship

70.    Defendants are violating Texas Civil Practice and Remedies Code Section 143A.002 by censoring publications on the YouTube and Google Ads platforms by and about Defense Distributed because of the viewpoints expressed in the censored publications, including in particular Defense Distributed's "G80 | Next-Gen Receivers" video, the Vice documentary "Inside The Battle To Arm America" about Cody Wilson's direction of Defense Distributed, and Defense Distributed's February 2025 Google Ad campaign.

71.    This censorship violates Texas Civil Practice and Remedies Code Sections 143A.002(a)(**1**) and 143A.002(a)(**2**).  Defendants have therefore violated and are violating Texas Civil Practice and Remedies Code Chapter 143 both with respect to Defense Distributed.

72.    *Injunctive Relief.*  For this Count, Defense Distributed is entitled to injunctive relief halting this wrongdoing temporarily and permanently.  *See* Tex. Civ. Prac. & Rem. Code § 143A.007(b)(2) ("If the user proves that the social media platform violated this chapter with respect to the user, the user is entitled to recover . . . injunctive relief.").  If Defendants fail to promptly comply with any such injunction, Defense Distributed will be further entitled to an order holding them in contempt and securing immediate compliance with the order by requiring payment to Defense Distributed of daily penalties sufficient to secure immediate compliance.  *See* Tex. Civ. Prac. & Rem. Code § 143A.007(c) ("If a social media platform fails to promptly comply with a court order in an action brought under this section, the court shall hold the social media platform in contempt and shall use all lawful measures to secure immediate compliance with the order, including daily penalties sufficient to secure immediate compliance.").

33

App.65

Copy from re:SearchTX

73.   *Declaratory Relief.*  For this Count, Defense Distributed is entitled to declaratory relief deeming all of this conduct illegal.  *See* Tex. Civ. Prac. & Rem. Code § 143A.007(b) ("If the user proves that the social media platform violated this chapter with respect to the user, the user is entitled to recover . . . declaratory relief including costs and reasonable and necessary attorney′s fees under Section 37.009. . . .").

74.   *Attorney's Fees & Costs.*  For this Count, Defense Distributed is entitled to an award of its attorney's fees and costs. *See* Tex. Civ. Prac. & Rem. Code § 143A.007(b) ("If the user proves that the social media platform violated this chapter with respect to the user, the user is entitled to recover . . . declaratory relief including costs and reasonable and necessary attorney′s fees under Section 37.009. . . .").

75.   Plaintiff incorporates into this Count all of the allegations in Parts I-VI.

**B.    Count Two: Messenger Censorship.**

76.   Defendants are violating Texas Civil Practice and Remedies Code Section 143A.002 by censoring publications on the YouTube and Google Ads platforms by and about Defense Distributed because of the viewpoints expressed by Defense Distributed at large (outside of the censored publications), including in particular Defense Distributed's "G80 | Next-Gen Receivers" video, the Vice documentary "Inside The Battle To Arm America" about Cody Wilson's direction of Defense Distributed, and Defense Distributed's February 2025 Google Ad campaign.

77.   This violates Texas Civil Practice and Remedies Code Sections 143A.002(a)(1) and 143A.002(a)(2).  Defendants have therefore violated and is violating Texas Civil Practice and Remedies Code Chapter 143 with respect to Defense Distributed.

34

Copy from re:SearchTX

78.    Injunctive Relief.  For this Count, Defense Distributed is entitled to injunctive relief halting this wrongdoing temporarily and permanently.  See Tex. Civ. Prac. & Rem. Code § 143A.007(b)(2) ("If the user proves that the social media platform violated this chapter with respect to the user, the user is entitled to recover . . . injunctive relief.").  If Defendants fail to promptly comply with any such injunction, Defense Distributed will be further entitled to an order holding them in contempt and securing immediate compliance with the order by requiring payment to Defense Distributed of daily penalties sufficient to secure immediate compliance.  See Tex. Civ. Prac. & Rem. Code § 143A.007(c) ("If a social media platform fails to promptly comply with a court order in an action brought under this section, the court shall hold the social media platform in contempt and shall use all lawful measures to secure immediate compliance with the order, including daily penalties sufficient to secure immediate compliance.").

79.    Declaratory Relief.  For this Count, Defense Distributed is entitled to declaratory relief deeming all of this conduct illegal.  *See* Tex. Civ. Prac. & Rem. Code § 143A.007(b) ("If the user proves that the social media platform violated this chapter with respect to the user, the user is entitled to recover . . . declaratory relief including costs and reasonable and necessary attorney's fees under Section 37.009. . . .").

80.    Attorney's Fees & Costs.  For this Count, Defense Distributed is entitled to an award of its attorney's fees and costs. See Tex. Civ. Prac. & Rem. Code § 143A.007(b) ("If the user proves that the social media platform violated this chapter with respect to the user, the user is entitled to recover . . . declaratory relief including costs and reasonable and necessary attorney's fees under Section 37.009. . . .").

81.    Plaintiffs incorporate into this Count all of the allegations in Parts I-VI.

Copy from re:SearchTX

### C.    Count Three: Audience Censorship.

82.    Defendants are violating Texas Civil Practice and Remedies Code Section 143A.002 by censoring publications on the YouTube and the Google Ads platforms by and about Defense Distributed because of the viewpoints expressed by Defense Distributed's audience, including in particular Defense Distributed's "G80 | Next-Gen Receivers" video, the Vice documentary "Inside The Battle To Arm America" about Cody Wilson's direction of Defense Distributed, and Defense Distributed's February 2025 Google Ad campaign.

83.    This violates Texas Civil Practice and Remedies Code Sections 143A.002(a)(**1**) and 143A.002(a)(**2**).    Defendants have therefore violated and is violating Texas Civil Practice and Remedies Code Chapter 143 with respect to both Defense Distributed.

84.    *Injunctive Relief.*    For this Count, Defense Distributed is therefore entitled to injunctive relief halting this wrongdoing temporarily and permanently.    *See* Tex. Civ. Prac. & Rem. Code § 143A.007(b)(2) ("If the user proves that the social media platform violated this chapter with respect to the user, the user is entitled to recover . . . injunctive relief.").    If Defendants fails to promptly comply with any such injunction, Defense Distributed will be further entitled to an order holding them in contempt and securing immediate compliance with the order by requiring payment to Defense Distributed of daily penalties sufficient to secure immediate compliance.    *See* Tex. Civ. Prac. & Rem. Code § 143A.007(c).

85.    *Declaratory Relief.*    For this Count, Defense Distributed is entitled to declaratory relief deeming all of this conduct illegal.    *See* Tex. Civ. Prac. & Rem. Code § 143A.007(b) ("If the user proves that the social media platform violated this chapter with respect to the user, the user is entitled to recover . . . declaratory relief including costs and reasonable and necessary attorney's fees under Section 37.009. . . .").

36

Copy from re:SearchTX

86.    *Attorney's Fees & Costs.*  For this Count, Defense Distributed is entitled to an award of its attorney's fees and costs. *See* Tex. Civ. Prac. & Rem. Code § 143A.007(b) ("If the user proves that the social media platform violated this chapter with respect to the user, the user is entitled to recover . . . declaratory relief including costs and reasonable and necessary attorney's fees under Section 37.009. . . .").

87.    Plaintiffs incorporate into this Count all of the allegations in Parts I-VI.

## VIII.    Prayer for Relief.

88.    Defense Distributed requests a judgment in its favor on all counts.

### A.    Injunctive Relief

89.    Defense Distributed requests a judgment awarding it all of the injunctive relief to which it is entitled, *See* Tex. Civ. Prac. & Rem. Code § 143A.007(b)(2)) ("If the user proves that the social media platform violated this chapter with respect to the user, the user is entitled to recover: . . . (2) injunctive relief."), including but not limited to the following:

(a)    Defense Distributed requests a temporary injunction stopping Defendants' ongoing violations of Texas Civil Practice and Remedies Code Sections 143A.002(a) and 143A.002(b).

(b)    Defense Distributed requests a permanent injunction stopping Defendants' ongoing violations of Texas Civil Practice and Remedies Code Sections 143A.002(a) and 143A.002(b).

(c)    Injunctive Relief:  Defense Distributed requests an injunction pending appeal, if any, of Defendants' ongoing violations of Texas Civil Practice and Remedies Code Sections 143A.002(a) and 143A.002(b).

Copy from re:SearchTX

**B.     Declaratory Relief**

90.     Defense Distributed requests a judgment awarding it all of the declaratory relief to which it is are entitled.  *See* Tex. Civ. Prac. & Rem. Code § 143A.007(b)(1) ("If the user proves that the social media platform violated this chapter with respect to the user, the user is entitled to recover: (1) declaratory relief under [Texas Civil Practice & Remedies Code] Chapter 37 . . . ."), including but not limited to the following:

(a)     Defense Distributed requests a declaration that Defendants violated and are violating Texas Civil Practice and Remedies Code Sections 143A.002(a)(1) ("A social media platform may not censor a user, a user′s expression, or a user′s ability to receive the expression of another person based on . . . the viewpoint of the user or another person . . . .") by engaging in viewpoint-based discrimination of publications by Defense Distributed.

(b)     Defense Distributed requests a declaration that Defendants violated and are violating 143A.002(a)(2) ("A social media platform may not censor a user, a user′s expression, or a user′s ability to receive the expression of another person based on . . . the viewpoint represented in the user′s expression or another person′s expression . . . .") by engaging in viewpoint-based discrimination of publications about Defense Distributed.

**C.     Costs & Attorney's Fees**

91.     Defense Distributed requests a judgment awarding them all of the costs and attorney's fees to which they are entitled, including but not limited to the following:

(a)     Defense Distributed requests a judgment ordering that Defendants pay Plaintiffs' costs for this action pursuant to Texas Civil Practice and Remedies Code Chapter

Copy from re:SearchTX

143A and Texas Civil Practice and Remedies Code Chapter 37. *See* Tex. Civ. Prac. & Rem. Code § 143A.007(b)(1) ("If the user proves that the social media platform violated this chapter with respect to the user, the user is entitled to recover . . . costs . . . under [Texas Civil Practice and Remedies Code] Section 37.009 . . . ."); Tex. Civ. Prac. & Rem. Code § 37.009 ("In any proceeding under this chapter, the court may award costs . . . as are equitable and just.").

(b)     Defense Distributed requests a judgment ordering that Defendants pay Plaintiffs' attorney's fees for this action pursuant to Texas Civil Practice and Remedies Code Chapter 143A and Texas Civil Practice and Remedies Code Chapter 37. *See* Tex. Civ. Prac. & Rem. Code § 143A.007(b)(1) ("If the user proves that the social media platform violated this chapter with respect to the user, the user is entitled to recover . . . reasonable and necessary attorney's fees under [Texas Civil Practice and Remedies Code] Section 37.009 . . . ."); Tex. Civ. Prac. & Rem. Code § 37.009 ("In any proceeding under this chapter, the court may award ... reasonable and necessary attorney's fees. . . as are equitable and just.").

92.     Defense Distributed requests a judgment awarding them all other relief to which they are entitled. *See* Tex. R. Civ. P. 47(d).

Copy from re:SearchTX

Respectfully submitted,

Chad Flores
Texas Bar No. 24059759
cf@chadflores.law
Flores Law PLLC
917 Franklin Street, Suite 600
Houston, Texas 77002
(713) 364-6640

Colleen McKnight
Texas Bar No. 24078976
colleen.mcknight@mcknightlaw.us
McKnight Law PLLC
801 Travis Street Suite 2101
PMB 698
Houston, TX 77002
(713) 487-5645

**COUNSEL FOR PLAINTIFF
DEFENSE DISTRIBUTED**

40

Copy from re:SearchTX

**CERTIFICATE OF SERVICE**

I hereby certify that I served this filing in accordance with Texas Rules of Civil Procedure 21 and 21a on June 6, 2025.


By: */s/ Colleen McKnight*
Colleen McKnight

41

Copy from re:SearchTX

App.73

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Charles Flores on behalf of Charles Flores
Bar No. 24059759
cf@chadflores.law
Envelope ID: 101746746
Filing Code Description: Petition
Filing Description: PLAINTIFFS ORIGINAL PETITION
Status as of 6/9/2025 8:06 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Colleen McKnight | | colleen.mcknight@mcknightlaw.us | 6/6/2025 10:56:04 PM | SENT |
| Charles Flores | | cf@chadflores.law | 6/6/2025 10:56:04 PM | SENT |

Copy from re:SearchTX

E-filed in the Office of the Clerk
for the Business Court of Texas
6/6/2025 10:56 PM
Accepted by: Alexis Jennings
Case Number: 25-BC03B-0009

| | |
|---|---|
| **Case Number:** | 25-BC03B-0009 |
| **Case Style:** | Defense Distributed |
| | **v.** YouTube LLC, Google LLC, Alphabet, Inc. |

☐ Amended/Corrected CIS

# Business Court Case Information Sheet (CIS)

Business Court Division: 3rd Division

Manner of Origination in Business Court: Original filing in Business

**NOTE:** If you run out of space, you can include additional parties/attorneys/interested parties on a separate document containing the same information required below. Self-represented parties should provide their own contact information in the attorney column.

| I.  Plaintiff(s) | II.  Attorneys for Plaintiff(s) - Continued |
|---|---|
| ☐ Person   ☒ Organization | ☒ Lead Attorney |
| Name: Defense Distributed | Name: Chad Flores |
| ☐ Person   ☐ Organization | Bar No. 24059759 |
| Name: | Firm/Agency: Chad Flores Law |
| ☐ Person   ☐ Organization | Address 1: 917 Franklin Street |
| Name: | Address 2: Suite 600 |
| ☐ Person   ☐ Organization | City/State/Zip: Houston, Texas 77002 |
| Name: | Tel. (713) 364-6644     Ext. |
| **II.  Attorneys for Plaintiff(s)** | Email: cf@chadflores.law |
| ☐ Lead Attorney | ☐ Lead Attorney |
| Name: | Name: Colleen McKnight |
| Bar No. | Bar No. 24078976 |
| Firm/Agency: | Firm/Agency: McKnight Law PLLC |
| Address 1: | Address 1: 801 Travis Street |
| Address 2: | Address 2: Suite 2101, PMB 698 |
| City/State/Zip: | City/State/Zip: Houston, Texas 77002 |
| Tel.         Ext. | Tel. (713) 487-5645     Ext. |
| Email: | Email: colleen.mcknight@mcknightlaw.us |
| ☐ Lead Attorney | ☐ Lead Attorney |
| Name: | Name: |
| Bar No. | Bar No. |
| Firm/Agency: | Firm/Agency: |
| Address 1: | Address 1: |
| Address 2: | Address 2: |
| City/State/Zip: | City/State/Zip: |
| Tel.         Ext. | Tel.         Ext. |
| Email: | Email: |

Copy from re:SearchTX

| III.  Defendant(s) | IV.  Attorneys for Defendant(s) - Continued |
|---|---|
| ☐ Person ☒ Organization<br>Name: YouTube, LLC | ☐ Lead Attorney<br>Name:<br>Bar No.<br>Firm/Agency:<br>Address 1:<br>Address 2:<br>City/State/Zip:<br>Tel.                    Ext.<br>Email: |
|    Person   X Organization<br>Name:  Google, LLC | |
|    Person  X Organization<br>Name:  Alphabet, Inc. | |
|    Person    Organization<br>Name: | |

| IV.  Attorneys for Defendant(s) | |
|---|---|
| ☐ Lead Attorney<br>Name:<br>Bar No.<br>Firm/Agency:<br>Address 1:<br>Address 2:<br>City/State/Zip:<br>Tel.                    Ext.<br>Email: | ☐ Lead Attorney<br>Name:<br>Bar No.<br>Firm/Agency:<br>Address 1:<br>Address 2:<br>City/State/Zip:<br>Tel.                    Ext.<br>Email: |
| ☐ Lead Attorney<br>Name:<br>Bar No.<br>Firm/Agency:<br>Address 1:<br>Address 2:<br>City/State/Zip:<br>Tel.                    Ext.<br>Email: | ☐ Lead Attorney<br>Name:<br>Bar No.<br>Firm/Agency:<br>Address 1:<br>Address 2:<br>City/State/Zip:<br>Tel.                    Ext.<br>Email: |

| V.  Related Litigation (if any) |
|---|
| Case Name:<br>Court: |
| Case Name:<br>Court: |
| Case Name:<br>Court: |

Copy from re:SearchTX

## VI.  Business  Court  Jurisdiction

Basis for jurisdiction: an action in which a claim under a state or federal securities or trade regulation law is asserted against an orga

In the sections below, select any that apply:

☒ Yes  ☐ No   A party to the action is a publicly traded company
☒ Yes  ☐ No   The amount in controversy exceeds $5 million
☐ Yes  ☒ No   The amount in controversy exceeds $10 million

☒ Yes  ☐ No   A party seeks injunctive relief
☒ Yes  ☐ No   A party seeks declaratory judgment

☐ Yes  ☒ No    One or more claims require the Court's supplemental jurisdiction

This action is/includes a civil action or claim:

☐ Yes  ☒ No   Brought by or against a governmental entity
☐ Yes  ☒ No   To foreclose a lien on real or personal property
☐ Yes  ☒ No   Arising out of the Estates Code; the Family Code; the Insurance Code; Chapter 53 or Title 9 of the Property Code; or Subchapter E, Chapter 15, or Chapter 17 of the Business & Commerce Code
☐ Yes  ☒ No   Arising out of the production or sale of a farm product, as that term is defined by Section 9.102 of the Business & Commerce Code
☐ Yes  ☒ No   Related to a consumer transaction, as defined by Section 601.001 of the Business & Commerce Code, to which a consumer in Texas is a party, arising out of a violation of federal or state law
☐ Yes  ☒ No   Related to the duties and obligations under an insurance policy

This action includes a claim:

☐ Yes  ☒ No   Arising under Chapter 74 of the Civil Practice & Remedies Code
☐ Yes  ☒ No   In which a party seeks recovery of monetary damages for bodily injury or death
☐ Yes  ☒ No   Of legal malpractice

## VII.  Trial Venue

Please identify the county in which a jury trial should be held: Travis

## VIII.  ADR

☐ Yes  ☒ No   The parties have previously engaged in mediation or other alternative dispute resolution
☐ Yes  ☒ No   This party believes that future alternative dispute resolution efforts may be beneficial

App.77

Copy from re:SearchTX

E-filed in the Office of the Clerk
for the Business Court of Texas
6/6/2025 10:56 PM
Accepted by: Alexis Jennings
Case Number: 25-BC03B-0009

25-BC03B-0009

No. _____

| | | |
|---|---|---|
| Defense Distributed, | § | IN THE BUSINESS COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | THE STATE OF TEXAS |
| YouTube LLC, | § | |
| Google LLC, and | § | |
| Alphabet, Inc., | § | |
| | § | |
| Defendants. | § | 3RD BUSINESS COURT DIVISION |

## REQUEST FOR ISSUANCE OF CITATION

TO THE CLERK OF THE COURT:

Defense Distributed respectfully requests that the Clerk issue citation for service of process

on the following Defendants pursuant to Texas Rule of Civil Procedure 99**:**

**Defendant's Name:** YouTube, LLC
**Address for Service:** c/o Google LLC, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201
**Method of Service:** By Certified Mail

**Defendant's Name:** Google LLC
**Address for Service:** CT Corporation System, 211 E. 7th Street, Suite 260, Austin, Texas 78701
**Method of Service:** By Certified Mail

**Defendant's Name:** Alphabet, Inc.
**Address for Service:** c/o Google LLC, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201
**Method of Service:** By Certified Mail

App.78

Copy from re:SearchTX

Respectfully submitted,

Chad Flores
Texas Bar No. 24059759
cf@chadflores.law
Flores Law PLLC
917 Franklin Street, Suite 600
Houston, Texas 77002
(713) 364-6640

Colleen McKnight
Texas Bar No. 24078976
colleen.mcknight@mcknightlaw.us
McKnight Law PLLC
801 Travis Street Suite 2101
PMB 698
Houston, TX 77002
(713) 487-5645

**COUNSEL FOR PLAINTIFF
DEFENSE DISTRIBUTED**

2

App.79

E-filed in the Office of the Clerk
for the Business Court of Texas
6/13/2025 3:29 PM
Accepted by: Alexis Jennings
Case Number: 25-BC03B-0009

No. 25-BC03B-0009

| | | |
|---|---|---|
| Defense Distributed, | § | IN THE BUSINESS COURT OF |
| | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | THE STATE OF TEXAS |
| | § | |
| YouTube LLC, Google LLC, and | § | |
| Alphabet, Inc., | § | |
| | § | |
| Defendants. | § | 3RD BUSINESS COURT DIVISION |

## REQUEST FOR ISSUANCE OF CITATION

TO THE CLERK OF THE COURT:

COMES NOW Defense Distributed, Plaintiff in the above-entitled cause, and respectfully requests that the Clerk issue citation for service of process on the following Defendants pursuant to Rule 99 of the Texas Rules of Civil Procedure**:**

**Defendant's Name:** YouTube, LLC
**Address for Service:** c/o Google LLC, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201
**Method of Service:** By Certified Mail

**Defendant's Name:** Google LLC
**Address for Service:** CT Corporation System, 211 E. 7th Street, Suite 260, Austin, Texas 78701
**Method of Service:** By Certified Mail

**Defendant's Name:** Alphabet, Inc.
**Address for Service:** c/o Google LLC, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201
**Method of Service:** By Certified Mail

App.80

Copy from re:SearchTX

Respectfully submitted,

Chad Flores
Texas Bar No. 24059759
cf@chadflores.law
Flores Law PLLC
917 Franklin Street, Suite 600
Houston, Texas 77002
(713) 364-6640

Colleen McKnight
Texas Bar No. 24078976
colleen.mcknight@mcknightlaw.us
McKnight Law PLLC
801 Travis Street Suite 2101
PMB 698
Houston, TX 77002
(713) 487-5645

**COUNSEL FOR PLAINTIFF
DEFENSE DISTRIBUTED**

App.81

Copy from re:SearchTX

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Colleen  McKnight on behalf of Colleen McKnight
Bar No. 24078976
colleen.mcknight@mcknightlaw.us
Envelope ID: 102007300
Filing Code Description: Request
Filing Description: Request for Issuance of Citation
Status as of 6/13/2025 3:56 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Charles Flores | | cf@chadflores.law | 6/13/2025 3:29:12 PM | SENT |
| Colleen McKnight | | colleen.mcknight@mcknightlaw.us | 6/13/2025 3:29:12 PM | SENT |
| Business Court 3B | | BCDivision3B@txcourts.gov | 6/13/2025 3:29:12 PM | SENT |
| Sarah Wood | | sarah.wood@mcknightlaw.us | 6/13/2025 3:29:12 PM | SENT |

Copy from re:SearchTX

**CITATION**
**THE STATE OF TEXAS, Business Court 3B**
**NO. 25-BC03B-0009**

**DEFENSE DISTRIBUTED VS. YOUTUBE, LLC, GOOGLE LLC, ALPHABET, INC.**

TO:    **Alphabet, Inc.**
       **c/o Google LLC, CT Corporations Systems**
       **1999 Bryan Street, Suite 900**
       **Dallas, Texas 75201**

DEFENDANT in the above styled and numbered cause:

YOU HAVE BEEN SUED.  You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 a.m. on the Monday following the expiration of twenty days after you were served this citation and petition, a default judgment for the relief demanded in the petition may be taken against you.  In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit.  These disclosures generally must be made no later than 30 days after you file your answer with the clerk. Find out more at TexasLawHelp.org

Attached is a copy of the PLAINTIFF'S ORIGINAL PETITION in the above styled and numbered cause, which was filed on the 6th day of June 2025 in the Texas Business Court 3B. This instrument describes the claim against you.

ISSUED AND GIVEN UNDER MY HAND AND SEAL of said Court at office on this on this the 13th day of June 2025.

ADDRESS OF LEAD ATTORNEY FOR
PLAINTIFF:

Charles Flores
917 Franklin Street Suite 600
Houston TX  77002
713-364-6640



**Beverly Crumley, Business Court Clerk**
300 W. 15th Street, Suite 606
Austin, Texas 78701
(512) 463-1616

By: _____

---

**RETURN OF SERVICE**

Came to hand on the _____ day of _____, 20____, at _____ o'clock ___M. and executed at _____, within the County of _____, Texas, at _____ o'clock ____M. on the ____ day of _____, 20 ___, by delivering to the within named _____, in person a true copy of this citation, with a true and correct copy of PLAINTIFF'S ORIGINAL PETITION attached thereto, having first endorsed on such copy of citation the date of delivery.
*NOT EXECUTED*, the diligence used to execute being (show manner of delivery) _____
_____; for the following reason _____
The defendant may be found at _____.
*Strike if not applicable.
**TO CERTIFY WHICH WITNESS MY HAND OFFICIALLY** _____ COUNTY, TEXAS
_____ SHERIFF/CONSTABLE    BY: _____ DEPUTY
**FEE FOR SERVICE OF CITATION: $ _____**

**COMPLETE IF YOU ARE A PERSON OTHER THAN A SHERIFF, CONSTABLE, OR CLERK OF THE COURT.**
In accordance with Rule 107: The officer or authorized person who serves, or attempts to serve, a citation shall sign the return.
My name is _____, my date of birth is _____, and my address is
_____ (Street, City, Zip).
     Please print.    (First, Middle, Last)
I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.
Executed in _____ County, State of _____, on the _____ day of _____, 20 ___

_____                    _____
Declarant/Authorized Process Server                 ID # & expiration of certification

App.83

Copy from re:SearchTX

**CITATION**
**THE STATE OF TEXAS, Business Court 3B**
**NO. 25-BC03B-0009**

**DEFENSE DISTRIBUTED VS. YOUTUBE, LLC, GOOGLE LLC, ALPHABET, INC.**

TO:     **YouTube, LLC**
        **c/o Google LLC, CT Corporation Systems**
        **1999 Bryan Street, Suite 900**
        **Dallas, Texas 75201**

DEFENDANT in the above styled and numbered cause:

YOU HAVE BEEN SUED.  You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 a.m. on the Monday following the expiration of twenty days after you were served this citation and petition, a default judgment for the relief demanded in the petition may be taken against you.  In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit.  These disclosures generally must be made no later than 30 days after you file your answer with the clerk. Find out more at TexasLawHelp.org

Attached is a copy of the PLAINTIFF'S ORIGINAL PETITION in the above styled and numbered cause, which was filed on the 6th day of June 2025 in the Texas Business Court 3B. This instrument describes the claim against you.

ISSUED AND GIVEN UNDER MY HAND AND SEAL of said Court at office on this on this the 13th day of June 2025.

ADDRESS OF LEAD ATTORNEY FOR
PLAINTIFF:
Charles Flores
917 Franklin Street Suite 600
Houston TX  77002
713-364-6640



**Beverly Crumley, Business Court Clerk**
300 W. 15th Street, Suite 606
Austin, Texas 78701
(512) 463-1616

By: _____

---

**RETURN OF SERVICE**

Came to hand on the _____ day of _____, 20____, at _____ o'clock __M. and executed at _____, within the County of _____, Texas, at _____ o'clock ____M. on the ____ day of _____ , 20 __, by delivering to the within named _____, in person a true copy of this citation, with a true and correct copy of PLAINTIFF'S ORIGINAL PETITION attached thereto, having first endorsed on such copy of citation the date of delivery.

*NOT EXECUTED*, the diligence used to execute being (show manner of delivery) _____
_____; for the following reason _____
The defendant may be found at _____.
*Strike if not applicable.

**TO CERTIFY WHICH WITNESS MY HAND OFFICIALLY** _____ COUNTY, TEXAS
_____ SHERIFF/CONSTABLE    BY: _____ DEPUTY

**FEE FOR SERVICE OF CITATION: $** _____

---

**COMPLETE IF YOU ARE A PERSON OTHER THAN A SHERIFF, CONSTABLE, OR CLERK OF THE COURT.**

In accordance with Rule 107: The officer or authorized person who serves, or attempts to serve, a citation shall sign the return.

My name is _____, my date of birth is _____, and my address is _____

        Please print.       (First, Middle, Last)

_____ (Street, City, Zip).

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Executed in _____ County, State of _____, on the _____ day of _____ , 20 ___

_____                         _____
Declarant/Authorized Process Server                ID # & expiration of certification

App.84

Copy from re:SearchTX

**CITATION**
**THE STATE OF TEXAS, Business Court 3B**
**NO. 25-BC03B-0009**

**DEFENSE DISTRIBUTED VS. YOUTUBE, LLC, GOOGLE LLC, ALPHABET, INC.**

TO:   **Google LLC**
      **CT Corporation System**
      **211 E 7th Street, Suite 260**
      **Austin, Texas 78701**

DEFENDANT in the above styled and numbered cause:

YOU HAVE BEEN SUED. You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 a.m. on the Monday following the expiration of twenty days after you were served this citation and petition, a default judgment for the relief demanded in the petition may be taken against you. In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit. These disclosures generally must be made no later than 30 days after you file your answer with the clerk. Find out more at TexasLawHelp.org

Attached is a copy of the PLAINTIFF'S ORIGINAL PETITION in the above styled and numbered cause, which was filed on the 6th day of June 2025 in the Texas Business Court 3B. This instrument describes the claim against you.

ISSUED AND GIVEN UNDER MY HAND AND SEAL of said Court at office on this on this the 13th day of June 2025.

ADDRESS OF LEAD ATTORNEY FOR
PLAINTIFF:

Charles Flores
917 Franklin Street Suite 600
Houston TX 77002
713-364-6640

**Beverly Crumley, Business Court Clerk**
300 W. 15th Street, Suite 606
Austin, Texas 78701
(512) 463-1616

By: _____

**RETURN OF SERVICE**

Came to hand on the _____ day of _____, 20____, at _____o'clock ___M. and executed at _____, within the County of _____, Texas, at _____o'clock ____M. on the ____ day of _____, 20 __, by delivering to the within named _____, in person a true copy of this citation, with a true and correct copy of PLAINTIFF'S ORIGINAL PETITION attached thereto, having first endorsed on such copy of citation the date of delivery.
*NOT EXECUTED, the diligence used to execute being (show manner of delivery) _____
_____; for the following reason _____
The defendant may be found at _____.
*Strike if not applicable.
TO CERTIFY WHICH WITNESS MY HAND OFFICIALLY _____ COUNTY, TEXAS
_____ SHERIFF/CONSTABLE   BY: _____ DEPUTY
**FEE FOR SERVICE OF CITATION: $ _____**

**COMPLETE IF YOU ARE A PERSON OTHER THAN A SHERIFF, CONSTABLE, OR CLERK OF THE COURT.**
In accordance with Rule 107: The officer or authorized person who serves, or attempts to serve, a citation shall sign the return.
My name is _____, my date of birth is _____, and my address is
Please print.   (First, Middle, Last)
_____ (Street, City, Zip).
I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.
Executed in _____ County, State of _____, on the _____day of _____, 20_____.

Declarant/Authorized Process Server          ID # & expiration of certification

App.85



**Notice of Service of Process**

null / ALL
Transmittal Number: 31688330
Date Processed: 06/24/2025

| | |
|---|---|
| **Primary Contact:** | Legal Department/ Nadia Granke<br>Google LLC<br>1600 Amphitheatre Pkwy<br>Mountain View, CA 94043-1351 |
| **Electronic copy provided to:** | Susan Fischer<br>Amanda Tovar<br>Jennifer Polse<br>Nadia Granke<br>Leslie Altherr<br>Makesha Patterson<br>Emily O'Brien<br>Jessica Stephens<br>Aaron Madfes<br>Stephanie Milani<br>Matt Gubiotti<br>Timur Elgin<br>Howard Chen<br>Shaudy Danaye-Elmi<br>Lee-anne Mulholland<br>Demarron Berkley<br>Joe Shear<br>Kathlyn Querubin<br>David Kramer<br>Chester Day<br>Jim Sherwood<br>Patrick Weston<br>Tammy Jih<br>John Janhunen<br>Peter Cooper |

| | |
|---|---|
| **Entity:** | Google LLC<br>Entity ID Number  2151720 |
| **Entity Served:** | Google LLC |
| **Title of Action:** | Defense Distributed vs. Youtube LLC |
| **Matter Name/ID:** | Defense Distributed vs. Youtube LLC (17505724) |
| **Document(s) Type:** | Citation/Petition |
| **Nature of Action:** | Discrimination |
| **Court/Agency:** | Business Court, TX |
| **Case/Reference No:** | 25-BC03B-0009 |
| **Jurisdiction Served:** | Texas |
| **Date Served on CSC:** | 06/23/2025 |
| **Answer or Appearance Due:** | 10:00 am Monday next following the expiration of 20 days after service |
| **Originally Served On:** | CSC |
| **How Served:** | Certified Mail |
| Sender Information: | Flores Law PLLC<br>713-364-6640 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

App.86

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

# EXHIBIT 6

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| DEFENSE DISTRIBUTED,<br><br>                    Plaintiff,<br><br>v.<br><br><br>YOUTUBE LLC, GOOGLE LLC, and<br>ALPHABET, INC.<br><br>                    Defendants. | Case No. 1:25-cv-1095-ADA |

**DEFENDANTS' MOTION TO TRANSFER TO**
**THE NORTHERN DISTRICT OF CALIFORNIA**

I.    INTRODUCTION ............................................................................................. 1

II.   BACKGROUND .............................................................................................. 3

      A.    Overview of Plaintiff's Allegations ..................................................... 3

      B.    Plaintiff Agreed To the YouTube Terms and the Google Ad Terms
            Containing Forum-Selection Clauses ................................................. 4

III.  ARGUMENT .................................................................................................. 7

      A.    The Court Should Transfer This Case To the Northern District of
            California Pursuant To the Forum-Selection Clauses Plaintiff Agreed To ........... 7

            1.    Plaintiff Agreed To Valid and Enforceable Forum-Selection
                  Clauses Requiring Its Claims To Be Litigated in the Northern
                  District of California ............................................................... 9

            2.    Plaintiff Cannot Carry the Heavy Burden Necessary To Overcome
                  the Forum-Selection Clauses ................................................. 16

      B.    The Court Should Resolve This Motion To Transfer Before Plaintiff's
            Motion To Remand ............................................................................. 17

IV.   CONCLUSION .............................................................................................. 18

*Aguacate Consol. Mines, Inc. of Costa Rica v. Deeprock, Inc.*,
   566 F.2d 523 (5th Cir. 1978) ...................................................................8

*Ameri-Fab, LLC v. Vanguard Energy Partners, LLC*,
   646 F. Supp. 3d 795, 804 (W.D. Tex. 2022)..................................................14, 15

*Atl. Marine Constr. Co., Inc. v. U.S. Dist. Ct.*,
   646 F. Supp. 3d at 804, *objections overruled*, No. SA-22-CV-00767-JKP, 2023 WL 2145555
   (W.D. Tex. Feb. 16, 2023) ...................................................................15

*Atl. Marine Constr. Co., Inc. v. U.S. Dist. Ct.*,
   571 U.S. 49, 59-60 (2013) ............................................................... *passim*

*Davis v. Meta Platforms, Inc.*,
   No. 4:22-CV-01001, 2023 WL 4670491, at *11 (E.D. Tex. July 20, 2023) ....................11, 13

*Haynsworth v. The Corp.*,
   121 F.3d 956 (5th Cir. 1997) ..............................................................13, 15

*J.V. & Sons Trucking, Inc. v. Asset Vision Logistic*s,
   LLC, No. 1:20-CV-163-H, 2020 WL 10458645, at *4 (N.D. Tex. Dec. 15, 2020) ..........11, 12

*KeyCity Cap., LLC v. Davenport Invs.*,
   LLC, No. 3:21-CV-2046-D, 2022 WL 581146 (N.D. Tex. Feb. 25, 2022).........................2, 17

*Matthews v. Tidewater, Inc.*,
   108 F.4th 361, 367 (5th Cir. 2024) .................................................................13, 15

*McCormick v. Payne*,
   No. 3:15-CV-02729-M, 2015 WL 7424772 (N.D. Tex. Nov. 23, 2015)................................17

*Mishiyev v. YouTube, LLC*,
   No. 8:24-cv-2675-MSS-TGW, 2024 WL 4932773, at *2 (M.D. Fla. Dec. 2, 2024)...............12

*Moody v. NetChoice, LLC*,
   603 U.S. 707 (2024).................................................................................1

*Muhammad v. YouTube, LLC*,
   No. 18-836-SDD-EWD, 2019 WL 2338503 (M.D. La. June 3, 2019)...................................9

*Noble House, L.L.C. v. Certain Underwriters at Lloyd's, Lond.*,
   67 F. 4th 243, 248 (5th Cir. 2023) ...............................................................13

*PCL Civ. Constructors, Inc. v. Arch Ins. Co.*,
   979 F.3d 1070, 1073 (5th Cir. 2020) ..............................................................10

*Pinnacle Fuel, LLC v. Pure Aviation, LLC*,
 No. A-22-CV-979-LY, 2023 WL 3082409 (W.D. Tex. Apr. 14, 2023) (Lane, J.) ...............2, 8

*Ramos v. Super. Ct.*,
 239 Cal. Rptr. 679 (Ct. App. 2018) ......................................................................................11

*Ray v. Google, LLC*,
 No. 3:23-CV-65-KHJ-MTP, 2023 WL 7329562 (S.D. Miss. Aug. 18, 2023) ...................3, 10

*Sabal Ltd. LP v. Deutsche Bank AG*,
 209 F. Supp. 3d 907, 919 (W.D. Tex. 2016)..........................................................................10

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*,
 549 U.S. 422 (2007)............................................................................................................2, 17

*Sobel ex rel. SolarWinds Corp. v. Thompson*,
 No. 1:21-CV-272-RP, 2023 WL 4356066, at *7 n.6 (W.D. Tex. July 5, 2023).....................16

*Stewart Organization Inc. v. Ricoh Corp.*,
 487 U.S. 22, 25, 32 (1988)...............................................................................................14, 15

*Trump v. YouTube, LLC*,
 No. 1:21-CV-22445-KMM, 2021 WL 8398892 (S.D. Fla. Oct. 6, 2021) .........................10, 16

*In re Volkswagen AG*,
 371 F. 3d 201 (5th Cir. 2004) ...............................................................................................16

*Weber v. PACT XPP Techs., AG*,
 811 F.3d 758 (5th Cir. 2016) .................................................................................................10

*Wise Guys I v. Meta Platforms, Inc.*,
 No. 3:23-CV-0217-X, 2023 WL 8434452 (N.D. Tex. Dec. 4, 2023)......................................11

**Statutes**

28 U.S.C.
 § 84(a) .....................................................................................................................................6
 § 1404(a) ........................................................................................................................ *passim*

Tex. Civ. Pract. and Remedies Code
 § 143A............................................................................................................................ *passim*
 § 143A.002(a)(1)......................................................................................................................3
 § 143A.002(a)(2)......................................................................................................................3
 § 143A.0035......................................................................................................................14, 15

**Other Authorities**

Fed. R. Civ. Proc. 12(h) .................................................................................................................8

U.S. Const. First Amendment ...................................................................................................1, 16

## I.     INTRODUCTION

Defense Distributed ("Plaintiff") is a manufacturer and advocate of "ghost guns," which are untraceable firearms individuals may create at home using 3-D printers.  Plaintiff apparently wishes to upload videos to YouTube and place ads through Google Ads reflecting its self-described "pro-gun" views.  This case concerns Plaintiff's claims that by removing its videos and blocking its ads from their platforms for violation of their nationwide content policies, defendants YouTube LLC ("YouTube"), Google LLC ("Google"), and Alphabet, Inc. ("Alphabet") (collectively, "Defendants") unlawfully "censored" Plaintiff's content from YouTube and Google Ads in violation of Texas Civil Practice and Remedies Code Chapter 143A (enacted originally as House Bill 20) ("Chapter 143A"), a law that makes it unlawful to "censor" content on social media platforms based on the viewpoint expressed therein.

At the appropriate time and in the proper venue, Defendants will seek judgment on the merits on all of Plaintiff's claims because Plaintiff seeks to use Chapter 143A to "profoundly alter[] the platforms' choices about the views they will, and will not, convey" in violation of the First Amendment.  *Moody v. NetChoice, LLC,* 603 U.S. 707, 737 (2024).  But that time is not now and that venue is not here.  This case faces a threshold problem that requires its transfer now: Plaintiff agreed to multiple forum-selection clauses, each of which independently requires this case to be litigated in California courts.

This case should thus be transferred under 28 U.S.C. § 1404(a) to the Northern District of California pursuant to mandatory forum-selection clauses in the YouTube Terms of Service ("YouTube Terms") and Google's Advertising Program Terms ("Google Ad Terms"), both of which Plaintiff agreed to.  To upload its content onto YouTube and Google Ads—the very content that Plaintiff alleges was unlawfully censored by Defendants—Plaintiff had to agree to the YouTube Terms and Google Ad Terms, each of which contains clear and mandatory forum-

selection clauses that require all claims "arising out of or relating to" the YouTube and Google Ads platforms to be "litigated exclusively in the federal or state courts of Santa Clara County, California."

These agreements and their forum-selection clauses govern here, and binding Supreme Court precedent requires this case be transferred to the Northern District of California because Plaintiff's claims clearly fall within the scope of the forum-selection clauses. *See Pinnacle Fuel, LLC v. Pure Aviation, LLC*, No. A-22-CV-979-LY, 2023 WL 3082409, at *2 (W.D. Tex. Apr. 14, 2023) (Lane, J.) ("[A] proper application of § 1404(a) requires that a forum-selection clause be 'given controlling weight in all but the most exceptional cases.'") (quoting *Atl. Marine Constr. Co., Inc. v. U.S. Dist. Ct.*, 571 U.S. 49, 59-60 (2013)), *report and recommendation adopted*, No. 1:22-CV-979-DAE, 2023 WL 3294602 (W.D. Tex. May 5, 2023).

Finally, though Plaintiff filed a motion to remand this case to state court on jurisdictional grounds, well-settled law gives this Court the authority to "address a transfer motion before addressing [the] subject matter [jurisdiction]" issue raised by Plaintiff's motion to remand. *KeyCity Cap., LLC v. Davenport Invs.*, LLC, No. 3:21-CV-2046-D, 2022 WL 581146, at *2 (N.D. Tex. Feb. 25, 2022) (internal quotations and citation omitted); *see also Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 432, 436 (2007). And this Court should exercise its discretion to resolve this Motion to Transfer before Plaintiff's Motion to Remand to ensure the federal policy in favor of enforcing forum-selection clauses is honored.

For these reasons, and those discussed in further detail below, Defendants respectfully request that the Court transfer this action to the United States District Court for the Northern District of California pursuant to 28 U.S.C. § 1404(a).

## II.    BACKGROUND

### A.    Overview of Plaintiff's Allegations

Plaintiff filed this lawsuit against YouTube, Google, and Alphabet, alleging that YouTube and Google discriminate against and censor pro-gun content on their online platforms in violation of Chapter 143A, which seeks to prohibit censorship of "conservative viewpoints and ideas." *See* Petition ¶ 8, ECF No. 1[1]: *see also id.* ¶¶ 2, 38, 43, 51, 59.  Plaintiff alleges that it has "posted, uploaded, transmitted, shared, and otherwise published expression" on YouTube and the Google Ads platform "from at least 2013 to present." *Id.* ¶ 25.  Plaintiff claims that YouTube took down two of its videos—entitled "G80 | Next-Gen Receivers" and "Inside The Battle To Arm America"—for violating YouTube's Community Guidelines (specifically, YouTube's "Firearm" policy), in violation of Chapter 143A. *See id.* ¶¶ 43, 48-50, 51, 56.  According to Plaintiff, in taking down the videos, YouTube employed its content moderation policies—including its Community Guidelines and Firearms Policy—which Plaintiff alleges are developed and enforced through "unified policy guidance" from Google and Alphabet. *Id.* ¶¶ 33, 38-41.  Plaintiff also asserts that Google violated Chapter 143A by prohibiting publication of Plaintiff's advertisement through the Google Ads platform under Google's "Guns" policy in February 2025. *See id.* ¶ 59.

Based on these allegations, Plaintiff brings three claims against the Defendants, all under Sections 143A.002(a)(1) and 143A.002(a)(2) of the Texas Civil Practice and Remedies Code. *See id.* ¶¶ 70-71, 76-77, 82-83.  Each claim independently arises from or relates to Plaintiff's allegations about YouTube and Google Ads.

---

[1] *See* Exhibit A to the Declaration of Michael Rome in support of Defendants' Notice of Removal (ECF No. 1-2), at 5.

**B.     Plaintiff Agreed To the YouTube Terms and the Google Ad Terms Containing Forum-Selection Clauses**

YouTube is an online video service that allows users to create channels and upload videos free of charge, provided they agree and adhere to the YouTube Terms.  *See* Petition ¶ 27; Declaration of Nicole Korn ("Korn Decl.") ¶¶ 2-4; *id.*, Ex. 1 at p. 3/16.  The YouTube Terms govern the relationship between YouTube and its users and incorporate the "YouTube Community Guidelines" to promote a safe and thriving platform.  *See* Korn Decl. ¶¶ 3, 9; *id.*, Ex. 1 at p. 10/16.  It also makes clear to users that they agree to the YouTube Terms by using the YouTube service.  *See* Korn Decl. ¶ 3; *id.*, Ex. 1, at p. 3/16.

The YouTube Terms specify that any user who chooses to upload content on YouTube "must not submit to the Service any Content that does not comply with this Agreement (including the YouTube Community Guidelines)."  *Id.* ¶ 9; *id.*, Ex. 1 at p. 10/16.  YouTube further "reserve[s] the right to remove or take down some or all of such Content in [its] discretion."  *Id.*

In order to upload a video to the YouTube website, a user must first create a "channel" on YouTube.  *See id.* ¶ 4; *id.*, Ex. 1 at p. 5/16.  Even after a user creates a channel, it is not possible to upload a video via the YouTube website without accepting and agreeing to the YouTube Terms.  *See id.* ¶ 7.  That is because when a user attempts to upload a video via the YouTube website, YouTube always presents the uploading user with the following notice before the user can upload a video: "By submitting your videos to YouTube, you acknowledge that you agree to YouTube's Terms of Service and Community Guidelines."  *See id.*; *id.*, Ex. 2.  The phrases "Terms of Service" and "Community Guidelines" in the notice appear in blue font and are hyperlinks to the current versions of the YouTube Terms and Community Guidelines in effect at the time of the attempted upload.  *See id.*  A user cannot upload a video to YouTube via the YouTube website without viewing this screen and selecting a file to upload through it.  *See id.*

The facts demonstrate Plaintiff was repeatedly informed of, accepted, and agreed to be bound by the current YouTube Terms, which have been effective since they were last updated on December 15, 2023. *See id.* ¶¶ 7-8. On January 29, 2012, Plaintiff created a YouTube channel under the title "DXLiberty." *See id.* ¶ 4. YouTube's records show that since the current version of the YouTube Terms went into effect on December 15, 2023, Plaintiff has uploaded four videos via the YouTube website to its DXLiberty YouTube channel and thus agreed to the current YouTube Terms at least four times through the upload process. *See id.* ¶ 8. Those videos are: (1) GunCAD: History and Value, uploaded March 1, 2024; (2) G80 | Next-Gen Fixtures, uploaded April 30, 2024, (3) G80 | Next-Gen Receivers, uploaded April 28, 2025, and (4) Defense Distributed v. YouTube, uploaded June 9, 2025. *See id.* Notably, the third video–G80 | Next-Gen Receivers–is the specific video that Plaintiff alleges was unlawfully removed in violation of Chapter 143A in the Petition. *See id.*; Petition ¶¶ 48-50 (alleging YouTube "began hosting the 'G80 | Next-Gen Receivers' video on April 28, 2025" and then removed it "in direct violation" of Chapter 143A on May 2, 2025).

In connection with uploading each of these videos, Plaintiff necessarily received the disclosure described above before it submitted them informing Plaintiff that "[b]y submitting your videos to YouTube, you acknowledge that you agree to YouTube's Terms of Service." Korn Decl. ¶ 7. Further, as explained in the accompanying Declaration of Nicole Korn, the phrase "Terms of Service" in the notices Plaintiff received hyperlinked to the then-current Terms of Service as of the dates of these uploads linked to the then-current YouTube Terms, which were always the current YouTube Terms—which have not changed since December 15, 2023. *See id.* ¶¶ 7-8. Given that Plaintiff received direct notice that it would be bound by the YouTube Terms when

it uploaded each of these videos, including the video about which it bases its claims in this lawsuit, the core allegation of the Petition directly implicates the current YouTube Terms.

In addition to agreeing to be bound to the YouTube Terms in connection with uploading videos to YouTube, Plaintiff also agreed to be bound to them through its use of the YouTube service. The YouTube Terms inform users that their use of the YouTube service subjects them to the current YouTube Terms. *See id.* ¶ 3; *id.*, Ex. 1 at p. 3/16. Since opening its channel in 2012, Plaintiff continually uploaded videos to its DXLiberty channel, including as recently as June 9, 2025. *See id.* ¶¶ 5, 8; Petition ¶¶ 48, 56; *id.* ¶ 25 (alleging that Plaintiff has "published expression" through YouTube "from at least 2013 to present"). Plaintiff has not and cannot claim it was not aware of the YouTube Terms—indeed, the very Firearms Policy it complains about in the Petition specifically references the YouTube Terms. *See* Petition ¶ 40 ("We may terminate your channel or account for repeated violations of the Community Guidelines or Terms of Service").

At all times relevant here, the YouTube Terms have included an express forum-selection clause designating the courts in Santa Clara County, California, as the exclusive venue for litigation arising out of the YouTube service. *See* Korn Decl. ¶¶ 5-6; *id.*, Ex. 1 at p. 15/16. The current version of the forum-selection clause states the following:

> All claims arising out of or relating to these terms or the Service will be governed by California law, except California's conflict of laws rules, and will be litigated exclusively in the federal or state courts of Santa Clara County, California, USA. You and YouTube consent to personal jurisdiction in those courts.

*Id.* ¶ 5. "Service" is defined in the YouTube Terms as "the YouTube platform and the products, services and features we make available [to you] as part of the platform." *Id.* ¶ 5; *id.*, Ex. 1 at p. 2/16. Santa Clara County is located in the Northern District of California. *See* 28 U.S.C. § 84(a).

All of Plaintiff's causes of action arise from alleged censorship on the YouTube platform, and thus, are governed by the YouTube Terms, including the forum-selection clause therein. But Plaintiff also agreed to a *second* forum-selection clause when it accepted the Google Ad Terms in order to create a Google Ads account. *See* Declaration of Victoria McGinnis ("McGinnis Decl.") ¶¶ 2-5; Petition ¶ 59. Specifically, on November 14, 2022, Plaintiff accepted the Google Ad Terms, which, at all relevant times, have included a forum-selection clause designating the courts in Santa Clara County, California, as the required venue for claims arising out of or relating to the Google Ads platform that are litigated in court. *See* McGinnis Decl. ¶¶ 4-5; *id.*, Ex. 1 at p. 6/7, Section 14 ("EXCEPT AS PROVIDED IN SECTION 13, ALL CLAIMS ARISING OUT OF OR RELATING TO THESE TERMS OR THE PROGRAMS WILL BE LITIGATED EXCLUSIVELY IN THE FEDERAL OR STATE COURTS OF SANTA CLARA COUNTY, CALIFORNIA; THE PARTIES CONSENT TO PERSONAL JURISDICTION IN THESE COURTS."). The term "PROGRAMS" is defined to include all of Google's advertising programs and services made accessible through the accounts given to Defense Distributed in connection with the Google Ad Terms, one of which is Google Ads. *See id.* ¶ 5; *id.*, Ex. 1 at p. 1/7.

## III.  ARGUMENT

### A.  The Court Should Transfer This Case To the Northern District of California Pursuant To the Forum-Selection Clauses Plaintiff Agreed To

A district court may transfer a civil action to any district court where it could have originally been brought or to any district "to which all parties have consented." 28 U.S.C. § 1404(a). Generally, the moving party must establish under Section 1404(a) that a transfer would serve "the convenience of parties and witnesses" and otherwise promote "the interest of justice." *Id.*; *see also Atl. Marine Constr. Co., Inc. v. U.S. Dist. Ct.*, 571 U.S. 49, 62-63 (2013). "The calculus changes, however, when the parties' contract contains a valid forum-

selection clause, which 'represents the parties' agreement as to the most proper forum.'" *Atl. Marine*, 571 U.S. at 63.

Where such a clause exists, Supreme Court precedent requires courts "to adjust their usual § 1404(a) analysis in three ways." *Id*. First, the plaintiff's choice of forum "merits no weight" and the plaintiff "bears the burden of establishing that transfer to the forum for which the parties bargained is unwarranted." *Id*. Second, the court "should not consider arguments about the parties' private interests" and "must deem the private-interest factors to weigh entirely in favor of the preselected forum." *Id*. at 64. Thus, "a district court may consider arguments about public-interest factors only." *Pinnacle Fuel,* 2023 WL 3082409, at *3 (*quoting Atl. Marine*, 571 U.S. at 64). "Third, when a party bound by a forum-selection clause flouts its contractual obligation and files suit in a different forum, a § 1404(a) transfer of venue will not carry with it the original venue's choice-of-law rules—a factor that in some circumstances may affect public-interest considerations." *Atl. Marine*, 571 U.S. at 64.

The Supreme Court has held that valid forum-selection clauses should be enforced and Section 1404(a) motions be granted absent "extraordinary circumstances unrelated to the convenience of the parties." *Id*. at 62. As set forth below, no such circumstances exist here, and their valid forum-selection clauses should be enforced by transfer of this case under 28 U.S.C. § 1404(a). *See Aguacate Consol. Mines, Inc. of Costa Rica v. Deeprock, Inc.*, 566 F.2d 523, 524 (5th Cir. 1978) (finding that Section 1404(a) permits transfer "even if no personal jurisdiction existed in the transferring court").[2]

---

[2] Defendants object to the exercise of personal jurisdiction in this Court, especially as Plaintiff's jurisdictional allegations are wholly conclusory. *See* Petition ¶ 17. Defendants have not waived and do not waive their personal jurisdiction objection. *See* Fed. R. Civ. Proc. 12(h). If transfer is denied, this Court will need to address Defendants' jurisdictional objections. By contrast, there is

1.    **Plaintiff Agreed To Valid and Enforceable Forum-Selection Clauses Requiring Its Claims To Be Litigated in the Northern District of California**

Plaintiff is bound by the YouTube Terms and the Google Ad Terms, and the forum-selection clauses in those terms mandating that any dispute be resolved in California (together, the "forum-selection Clauses"). Plaintiff alleges and concedes that it uploaded two videos onto the YouTube platform, in April 2025 and March 2013. *See* Petition ¶¶ 48, 56. And after filing the Petition, Plaintiff uploaded another video on June 9, 2025. *See* Korn Decl. ¶ 8. To upload videos to YouTube, Plaintiff necessarily agreed to YouTube's Terms, including on April 28, 2025, when it uploaded the video entitled "G80 | Next-Gen Receivers." *See id.* ¶¶ 7-8; Petition ¶ 48. As shown in the accompanying Declaration of Nicole Korn, Plaintiff has uploaded four videos to YouTube since YouTube last updated the YouTube Terms in December 2023, ***including the "G80 | Next-Gen Receivers" video Plaintiff alleges Defendants "censor[ed]...in direct violation of Texas Civil Practice and Remedies Code Chapter 143A."*** *See* Petition ¶ 50 (emphasis added); Korn Decl. ¶ 8. Each time Plaintiff did so, Plaintiff was shown a clear disclosure indicating it "agree[d] to YouTube's Terms of Service" in effect at the time Plaintiff uploaded the video to YouTube. *See* Korn Decl. ¶¶ 7-8. Thus, Plaintiff agreed to and is bound by the current YouTube Terms four times over, including in connection with uploading the very video at the heart of this lawsuit. *See Muhammad v. YouTube, LLC*, No. 18-836-SDD-EWD, 2019 WL 2338503, at *2 (M.D. La. June 3, 2019) (holding that by uploading new videos to YouTube, the user "assent[ed] to the current Terms of Service" given the on-screen disclosures provided to the user at the time of upload).

no question of personal jurisdiction in the Northern District of California: Defendants are each headquartered in California and Plaintiff repeatedly consented to personal jurisdiction.

Plaintiff also admits that it had a Google Ads account in February 2025. *See* Petition ¶ 59. In order to create this account, Plaintiff had to affirmatively agree to the Google Ad Terms on November 14, 2022. *See* McGinnis Decl. ¶ 4.

The forum-selection Clauses that Plaintiff is bound to are valid and enforceable for the following reasons:

***First***, the forum-selection Clauses are mandatory. "A forum selection clause is mandatory if it 'affirmatively requires that litigation arising from the contract be carried out in a given forum.'" *PCL Civ. Constructors, Inc. v. Arch Ins. Co.*, 979 F.3d 1070, 1073 (5th Cir. 2020) (quoting *Weber v. PACT XPP Techs., AG*, 811 F.3d 758, 768 (5th Cir. 2016)). Permissive clauses, on the other hand, have "no mandatory language binding the parties to a particular forum," and instead "merely state that the [party] will submit to the jurisdiction to be selected by [the other party]." *Sabal Ltd. LP v. Deutsche Bank AG*, 209 F. Supp. 3d 907, 919 (W.D. Tex. 2016). The YouTube and Google Ad Terms contain a quintessential mandatory forum-selection clause, which provides that covered claims arising out of or relating to the terms "will be litigated exclusively in the federal or state courts of Santa Clara County, California, USA." *See* Korn Decl. ¶ 5; *id.*, Ex. 1 at p. 15/16; McGinnis Decl. ¶ 5; *id.*, Ex. 1 at p. 6/7, Section 14. There is nothing permissive about this clause; the parties unambiguously agreed to litigate any claims *exclusively* in Santa Clara County, California. Courts evaluating this language have uniformly found it to be mandatory. *See, e.g., Trump v. YouTube, LLC*, No. 1:21-CV-22445-KMM, 2021 WL 8398892, at *6 (S.D. Fla. Oct. 6, 2021) (holding that "the forum-selection clause" in the YouTube Terms of Service "is mandatory, not permissive, based on a plain reading of the entire clause."); *Ray v. Google, LLC*, No. 3:23-CV-65-KHJ-MTP, 2023 WL 7329562, at *3 (S.D. Miss. Aug. 18, 2023) (finding the forum-selection clauses in the YouTube and Google AdSense terms are

mandatory).  As the *Ray* court explained, the use of the word "exclusively" in the Terms of Service "demonstrates the parties' intent to litigate any disputes only in Santa Clara County, California."  *Id.* at *3.

**Second**, the forum-selection Clauses clearly encompass Plaintiff's claims.  The YouTube Terms state that "[a]ll claims arising out of or relating to these terms or the Service" of the YouTube platform "will be litigated exclusively in the federal or state courts of Santa Clara County, California, USA."  Korn Decl. ¶ 5; *id.*, Ex. 1 at p. 15/16.  Plaintiff's claims satisfy both aspects of the clause.  There is no serious question that Plaintiff's claims arise out of or relate to the "Service," which is defined to mean YouTube.  *See id*.  The heart of Plaintiff's case is that it has been deprived of its ability to display videos of its choice on the service.  *See, e.g.*, Petition ¶¶ 6, 11-12.  Such claims clearly "aris[e] out of or relat[e] to...the Service" and are thus encompassed by the broad forum-selection clause in the YouTube Terms.  *J.V. & Sons Trucking, Inc. v. Asset Vision Logistic*s, LLC, No. 1:20-CV-163-H, 2020 WL 10458645, at *4 (N.D. Tex. Dec. 15, 2020) ("[W]hen interpreting forum-selection clauses with 'relate to' language, Texas courts consistently interpret those clauses broadly to encompass all claims that have some possible relationship with the agreement.") (quotation omitted); *Davis v. Meta Platforms, Inc.*, No. 4:22-CV-01001, 2023 WL 4670491, at *11 (E.D. Tex. July 20, 2023) (under California law, a forum-selection clause covering "any claim arising from or relat[ing] to this agreement" is considered "broad," and to fall within the scope of such a clause the dispute "need only touch matters covered by the contract containing the forum-selection clause.") (quoting *Ramos v. Super. Ct*., 239 Cal. Rptr. 679, 689 (Ct. App. 2018) (cleaned up)).[3]

_____

[3] The court need not determine whether to interpret the forum-selection clause under the law of the original forum state (Texas) or the law required by the choice of law clauses in the YouTube Terms and the Google Ad Terms (California) because "the contractual analysis is identical under

Similarly, there is no credible basis to assert Plaintiff's claims do not arise out of or relate to the YouTube Terms themselves, given that the terms give YouTube the power to do exactly about which Plaintiff complains. Indeed, at least half a dozen federal cases "arising out of YouTube's moderation of users' content on its platform have been transferred pursuant to the forum-selection clause in YouTube's Terms of Service." *Mishiyev v. YouTube, LLC*, No. 8:24-cv-2675-MSS-TGW, 2024 WL 4932773, at *2 (M.D. Fla. Dec. 2, 2024) (collecting cases and transferring action to N.D. Cal), *appeal dismissed,* No. 24-14050, 2025 WL 1190794 (11th Cir. Apr. 24, 2025). As in *Mishiyev*, a "review of the Terms of Service and the Complaint reveals that Plaintiff's claims are subject to the forum-selection clause" because the YouTube Terms specifically grant YouTube the right to "remove or take down… Content in our discretion," and incorporate the Community Guidelines and Policies Plaintiff challenges in the Petition. *Id.*; *see* Petition ¶¶ 36-40 (alleging YouTube violates Texas law through its Community Guidelines and Firearms Policy); *see also* Korn Decl. ¶ 9 (under YouTube Terms, users must not submit to YouTube "any Content that does not comply with [the YouTube Terms] (including the YouTube Community Guidelines") and YouTube reserves the "right to remove or take down some or all of such Content in [its] discretion").

Thus, there is no doubt that Plaintiff's claims arise out of or relate to *both* Plaintiff's use of YouTube and the YouTube Terms themselves, either one of which is sufficient to trigger the mandatory forum provision. That Plaintiff's suit here triggers both amply confirms that the clause should be applied.

---

either Texas or California law." *Wise Guys I v. Meta Platforms, Inc.*, No. 3:23-CV-0217-X, 2023 WL 8434452, at *2 n.15 (N.D. Tex. Dec. 4, 2023); *see also Davis,* 2023 WL 4670491, at *11 (finding claims under Chapter 143A fell within scope of Meta's forum-selection clause as interpreted under Texas or California law).

The same is true for the forum-selection clause from the Google Ad Terms, which covers all claims arising out of or relating to Google's advertising programs.  *See* McGinnis Decl. ¶¶ 4-5; *id.*, Ex. 1 at p. 6/7, Section 14; *see also* Petition ¶ 59.  This clause also plainly applies to Plaintiff's claims, which are further based on the allegedly unlawful censorship of Plaintiff's attempt to place advertisements on the Google Ads platform.

*Third*, there is a "strong presumption" in favor of enforcing mandatory forum-selection clauses, and it can only be overcome "by a clear showing that the clause is unreasonable under the circumstances." *Noble House, L.L.C. v. Certain Underwriters at Lloyd's, Lond.*, 67 F. 4th 243, 248 (5th Cir. 2023).  A clause is unreasonable under the circumstances only if: (1) the clause "was the product of fraud or overreaching"; (2) the clause will deprive a party "of his day in court because of the grave inconvenience or unfairness of the selected forum"; (3) "the fundamental unfairness of the chosen law will deprive the plaintiff of a remedy"; or (4) "enforcement of the forum-selection clause would contravene a strong public policy of the forum state." *Matthews v. Tidewater, Inc.*, 108 F.4th 361, 367 (5th Cir. 2024) (quoting *Haynsworth v. The Corp.*, 121 F.3d 956, 963 (5th Cir. 1997)).  "The party resisting enforcement on these grounds bears a heavy burden of proof." *Noble House*, 67 F.4th at 249 (quotation marks omitted).

Plaintiff cannot show any of these circumstances exist.  There was no fraud and there is no basis on which to claim that Plaintiff will be deprived of its day in court if this case is transferred to the Northern District of California.  Indeed, "a judge sitting in the Northern District of California is capable of applying Texas law," and there is no basis for claiming transfer will leave Plaintiff with no remedy.  *Davis*, 2023 WL 4670491, at *11 (transferring claim under exact same law at issue in this case and rejecting argument that transfer to N.D. Cal. would leave the plaintiff with "no remedy").

App.106

Finally, the state-court venue provision of Chapter 143A does not give Plaintiff a basis to resist enforcement of the forum-selection clause on public policy grounds. Section 143A.0035 of the Texas Civil Practice and Remedies Code provides that "[n]otwithstanding any other law, any contract, or any venue, forum selection, or choice-of-law provision in a contract, an action brought under this chapter against a social media platform shall be brought and maintained in a court in this state, and the law of this state applies to the action." Whatever import this statute has on cases litigated in Texas state court, it is entitled to no weight here now that this case has been removed on diversity grounds and the issue before the Court is whether to transfer this matter under section 1404(a). For nearly forty years since the Supreme Court's decision in *Stewart Organization Inc. v. Ricoh Corp.,* the law has been clear that "questions of venue in diversity actions are governed by federal law," and courts must look to Section 1404(a) rather than state law in determining "whether to give effect to the parties' forum-selection clause." 487 U.S. 22, 25, 32 (1988).

*Stewart* involved a contract between parties from New Jersey and Alabama with a forum-selection clause for the Southern District of New York. The trial court refused to enforce the clause given Alabama law that "looks unfavorably upon" forum-selection clauses. *Id*. at 22, 24. The Supreme Court affirmed the circuit court's reversal. The *Stewart* court held that in addressing a section 1404(a) motion, where Alabama's law disfavoring forum-selection clauses disfavored the analysis required by 1404(a), "the instructions of Congress are supreme." *Id.* at 29-30. Ultimately, "*Stewart* held 'that federal law,' as opposed to contrary state law, 'governs the District Court's decision *whether to give effect* to the parties' forum-selection clause.'" *Ameri-Fab, LLC v. Vanguard Energy Partners, LLC*, 646 F.Supp.3d 795, 804 (W.D. Tex. 2022) (quoting *Stewart*, 487 U.S. at 32) (emphasis in original). The Supreme Court subsequently re-affirmed *Stewart's* logic in *Atlantic Marine,* holding that because a forum-selection clause "may have

App.107

figured centrally in the parties' negotiations and may have affected how they set monetary and other contractual terms," courts should enforce forum-selection clauses "[i]n all but the most unusual cases." *Atl. Marine*, 571 U.S. at 66. Moreover, to further discourage "forum shopping" and "gamesmanship," *Atlantic Marine* instructs courts to "not apply the law of the transferor venue to which the parties waived their right." *Id.*

*Stewart* and *Atlantic Marine* preclude application of Section 143A.0035 here. Courts in this Circuit have followed *Stewart* and rejected attempts to use state laws voiding or disfavoring forum-selection clauses to evade forum-selection clauses in the context of 1404(a) transfer motions. For example, in *Ameri-Fab*, Judge Farrer enforced a forum-selection clause pursuant to section 1404(a) notwithstanding a Texas state law making such clauses voidable, holding that such provisions were entitled to "no weight" under *Stewart* and *Atlantic Marine* in the context of a 1404(a) analysis. 646 F. Supp. 3d at 804, *objections overruled*, No. SA-22-CV-00767-JKP, 2023 WL 2145555 (W.D. Tex. Feb. 16, 2023); *see also Matthews*, 108 F.4th at 369-70 (affirming the enforcement of a forum-selection clause even though it contradicted a "strong Louisiana public policy concerning forum selection clauses[]"; holding that Louisiana public policy does not overcome the federal public policy's presumption of a forum-selection clause's validity).

This Court should do the same because Section 143A.0035 is no "different from the Alabama law given no weight in *Stewart,*" and "permitting [Plaintiff] to unilaterally [a]void a bargained-for forum-selection clause after-the-fact would only *encourage* gamesmanship." *Ameri-Fab*, 646 F. Supp. 3d at 804 (emphasis in original). The forum-selection Clauses are mandatory, enforceable, and govern Plaintiffs' claims. Federal law requires that they be enforced. *See Haynsworth v. The Corp.*, 121 F.3d 956, 962 (5th Cir. 1997) (the enforceability of forum-selection clauses is determined under federal law).

App.108

### 2.    Plaintiff Cannot Carry the Heavy Burden Necessary To Overcome the Forum-Selection Clauses

To prevent transfer in a case like this one involving a valid forum-selection clause, Plaintiff would need to "bear the burden of showing that public-interest factors *overwhelmingly* disfavor a transfer." *Atl. Marine*, 571 U.S. at 67 (emphasis added). It cannot do so. This is not among the "rare[]" circumstances where public-interest factors can "defeat a transfer motion[.]" *Id.* at 64.

Courts have identified four public-interest factors that may justify disregarding a forum-selection clause: "(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws." *Sobel ex rel. SolarWinds Corp. v. Thompson*, No. 1:21-CV-272-RP, 2023 WL 4356066, at *7 n.6 (W.D. Tex. July 5, 2023) (citing *In re Volkswagen AG*, 371 F. 3d 201, 203 (5th Cir. 2004)).

None of the public-interest factors weigh in Plaintiff's favor, let alone constitute the "exceptional" justification that would override the forum-selection clause. Transfer would not overly burden the Northern District. Judges in that District can fairly and promptly apply the law, and there is no particular local interest in this matter given that it involves the publication of videos and ads to a national audience, and the core issue in dispute is whether the law, as applied in this case, violates the First Amendment of the United States Constitution. That is a national issue with national ramifications. *Trump v. YouTube, LLC,* No. 1:21-CV-22445-KMM, 2021 WL 8398892, at *12 (S.D. Fla. Oct. 6, 2021) (rejecting assertion that lawsuit against YouTube involved a localized controversy where defendants invoked the First Amendment as a central defense to the application of a state statute).

Nor can Plaintiff invoke its private interests to keep its claims in this District. "When parties agree to a forum-selection clause, they waive the right to challenge the preselected forum

as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation.  A court accordingly must deem the private-interest factors to weigh entirely in favor of the preselected forum."  *Atl. Marine*, 571 U.S. at 64.

In short, Plaintiff agreed to two different forum-selection clauses, each of which independently requires the transfer of this case to the Northern District of California.  Because Plaintiff cannot come close to meeting the heavy burden required to overcome these clauses, transfer is required.

### B.    The Court Should Resolve This Motion To Transfer Before Plaintiff's Motion To Remand

On August 7, 2025, one day before the filing of this Motion to Transfer, Plaintiff moved to remand this case to Texas state court, arguing this Court lacks subject matter jurisdiction.  Defendants intend to oppose that motion, which is meritless, but note that regardless of the merits, well-settled Supreme Court case law applied by courts in this Circuit gives this Court discretion to resolve this transfer motion first.  Under *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, courts have discretion to bypass jurisdictional questions and first decide *forum non conveniens* motions or motions to transfer under section 1404(a).  549 U.S. 422, 432, 436 (2007).[4]  Following the Supreme Court's decision in *Sinochem,* district courts in the Fifth Circuit regularly exercise that discretion.  *See, e.g.*, *KeyCity Cap., LLC v. Davenport Invs.*, LLC, No. 3:21-CV-2046-D, 2022 WL 581146, at *10 (N.D. Tex. Feb. 25, 2022) (granting motion to transfer without ruling on personal jurisdiction issue); *McCormick v. Payne*, No. 3:15-CV-

---

[4]  While *Sinochem* addressed *forum non conveniens* motions rather than motions to transfer under section 1404(a), courts have interpreted its holding to apply to both such motions because "§ 1404(a) merely codifies the doctrine of forum non conveniens and provides for the transfer of a case from one federal court to another."  *KeyCity Cap., LLC*, 2022 WL 581146, at *2, n.5 (citing *Sinochem*, 549 U.S. at 430).

02729-M, 2015 WL 7424772, at **2–3 (N.D. Tex. Nov. 23, 2015) (granting motion to transfer in lieu of ruling on subject matter jurisdiction issue).

This Court should exercise its discretion to resolve the Motion to Transfer first because, for the reasons set forth above, the parties entered into a binding, enforceable forum-selection clause that requires this dispute to be litigated in a state or federal court in Santa Clara County, California, and resolving transfer before remand achieves that outcome. Defendants dispute remand is appropriate at all, but nothing would prevent a transferee court in the Northern District of California from addressing the jurisdictional issues raised in Plaintiff's motion. And if that Court granted the motion, the case would be remanded to a state court in Santa Clara County, which would be consistent with the parties' forum-selection clause. On the other hand, were the Court to address and grant the remand motion first, that could well preclude the enforcement of the forum-selection clause, a result contrary to federal law. In *Atlantic Marine*, the Supreme Court explained that "[w]hen parties have contracted in advance to litigate disputes in a particular forum, courts should not unnecessarily disrupt the parties' settled expectations," and that "[i]n all but the most unusual cases . . . 'the interest of justice' is served by holding parties to their bargain." 571 U.S. at 67. Resolving transfer first would be consistent with these principles as it would ensure an outcome that would "not unnecessarily disrupt the parties' settled expectations" by exercising discretion in a way that produces an outcome inconsistent with the federal policy in favor of enforcing forum-selection clauses.

## IV.     CONCLUSION

For the foregoing reasons, the Court should grant the Defendants' motion to transfer this action to the Northern District of California.

Dated: August 8, 2025                Respectfully submitted,

**SCOTT DOUGLASS & MCCONNICO LLP**

*/s/ Steven J. Wingard*
Steven J. Wingard
Texas Bar No. 00788694
Robyn Hargrove
Texas Bar No. 24031859
Eli Barrish
Texas Bar No. 24144433

303 Colorado Street, Suite 2400
Austin, TX 78701
Telephone: (512) 495-6300
Facsimile: (512) 474-0731
swingard@scottdoug.com
rhargrove@scottdoug.com
ebarrish@scottdoug.com

**COOLEY LLP**

*/s/ Jonathan Patchen*
Jonathan Patchen (admitted *pro hac vice*)
Michael A. Rome (admitted *pro hac vice*)
Sharon Song (admitted *pro hac vice*)
Madeleine R. Ahlers (admitted *pro hac vice*)

3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Telephone: (415) 693-2000
Facsimile: (415) 693-2222
jpatchen@cooley.com
mrome@cooley.com
ssong@cooley.com
mahlers@cooley.com

*Attorneys for Defendants YouTube LLC, Google
LLC, and Alphabet, Inc.*

App.112

## CERTIFICATE OF CONFERENCE

Pursuant to Local Rule CV-7(G), Defendants advise the Court that in advance of filing

this Motion, counsel for the parties met and conferred in a good-faith attempt to resolve this

motion by agreement. The discussions conclusively ended in an impasse as the parties disagree

on whether the case should be transferred to the Northern District of California. Counsel for

Plaintiff indicated that it opposes this motion.

*/s/ Jonathan Patchen*
Jonathan Patchen (admitted *pro hac vice*)
Michael A. Rome (admitted *pro hac vice*)
Sharon Song (admitted *pro hac vice*)
Madeleine R. Ahlers (admitted *pro hac vice*)

*Attorneys for Defendants YouTube LLC, Google
LLC, and Alphabet, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served upon counsel via

electronic service on August 8, 2025.

*/s/ Steven J. Wingard*
Steven J. Wingard

App.113

# EXHIBIT 7

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| DEFENSE DISTRIBUTED,<br><br>                      Plaintiff,<br><br>v.<br><br>YOUTUBE LLC, GOOGLE LLC, and<br>ALPHABET, INC.<br><br>                      Defendants. | Case No. 1:25-cv-1095-ADA |

**DECLARATION OF NICOLE KORN IN SUPPORT OF DEFENDANTS'
MOTION TO TRANSFER TO THE NORTHERN DISTRICT OF CALIFORNIA**

I, Nicole Korn, declare and state as follows:

1.      I am a Legal Specialist at YouTube LLC ("YouTube").  As part of my role and from my review of company records, I have personal knowledge of YouTube's Terms of Service (the "YouTube Terms") and Community Guidelines, including the facts described below, and, if called as a witness, could and would testify competently thereto.

2.      YouTube offers an online video service where users around the world can upload, stream, and watch videos and related content.  With limited exceptions, YouTube is a free service and does not charge users to upload or view videos.  To create a safe and vibrant community for its users, YouTube enforces its policies and Community Guidelines that prohibit content that may be harmful, offensive, and/or unlawful.

3.      Use of YouTube's services is governed by the YouTube Terms, which govern the relationship between YouTube and its users.  A true and correct copy of the current YouTube

Terms, effective December 15, 2023, is attached hereto as **Exhibit 1**. Specifically, the YouTube

Terms provide that use of YouTube's services are "subject to these terms" and explain that if a

user "do[es] not understand the [YouTube Terms], or do[es] not accept any part of it, then [the

user] may not use [YouTube's] Service." Exhibit 1 at p. 3/16. The YouTube Terms are available

online at https://www.youtube.com/static?template=terms, and elsewhere on the YouTube

website.

      4.      In order to upload videos onto the YouTube platform, a user must first create a

channel on YouTube. I have confirmed by reviewing YouTube's records that the YouTube video

referenced in the Petition in this case, entitled "G80 | Next-Gen Receivers," was uploaded to a

channel titled "DXLiberty," which has the following channel handle: Defense

Distributed. YouTube's records show that Defense Distributed ("Plaintiff") created this YouTube

channel on January 29, 2012. This channel creation date is also what is shown publicly on the

homepage for the DXLiberty channel. The URL for this channel is

https://www.youtube.com/user/DXLiberty.

      5.      I understand from Plaintiff's Petition and from review of YouTube's records that

Plaintiff has continually uploaded videos to its DXLiberty YouTube channel between

February 13, 2012 and June 9, 2025. Throughout the entirety of that period, the YouTube Terms

have required that disputes between YouTube and its users arising out of or relating to the Terms

or their use of the YouTube platform or services be litigated exclusively before a court located in

Santa Clara County, California. The current version of the YouTube Terms provides as follows:

**Governing Law**

All claims arising out of or relating to these terms or the Service will be governed by
California law, except California's conflict of laws rules, and will be litigated exclusively
in the federal or state courts of Santa Clara County, California, USA. You and YouTube
consent to personal jurisdiction in those courts.

Ex. 1 at p. 15/16. The term "Service" is defined by the YouTube Terms to encompass "the YouTube platform and the products, services, and features we make available to [the users] as part of the platform[.]" Ex. 1 at p. 2/16.

6.      The exact language of the "Governing Law" provision quoted in paragraph 10 above was included in the previous four versions of the YouTube Terms, and has been effective since December 10, 2019, through the present. Previous versions of the YouTube Terms effective since Plaintiff created its YouTube channel in January 2012 include similar language, requiring disputes to be litigated exclusively in a court in Santa Clara County, California.

7.      A user necessarily accepts and agrees to the YouTube Terms each time he or she uploads a video to YouTube via the YouTube website. When a user attempts to upload a video via the YouTube website, YouTube presents the uploading user with the following notice: "By submitting your videos to YouTube, you acknowledge that you agree to YouTube's Terms of Service and Community Guidelines." The phrases "Terms of Service" and "Community Guidelines" in the notice appear in blue font and are hyperlinks to the current versions of the YouTube Terms and Community Guidelines at the time of the attempted upload. A true and correct copy of a screenshot of this notice is attached as **Exhibit 2**. A user cannot upload a video to YouTube via the YouTube website without viewing this screen and selecting a file to upload through it. At all times since YouTube updated its Terms of Service on December 15, 2023, this disclosure has been provided to users before they can upload a new video to YouTube via the YouTube website.

8.      Since originally creating its DXLiberty channel, Plaintiff has continually uploaded videos to YouTube. In the time since YouTube last updated its Terms of Service on December 15, 2023, Plaintiff has uploaded four videos to its DXLiberty YouTube channel via the

YouTube website.  Those videos are: (1) GunCAD: History and Value, which YouTube's records indicate Plaintiff uploaded on March 1, 2024; (2) G80 | Next-Gen Fixtures, which YouTube's records indicate Plaintiff uploaded on April 30, 2024; (3) G80 | Next-Gen Receivers, which YouTube's records indicate Plaintiff uploaded on April 28, 2025; and (4) Defense Distributed v. YouTube, which YouTube's records indicate Plaintiff uploaded on June 9, 2025.  As explained above in paragraph 7, before uploading each of these videos, Plaintiff was informed and agreed to the current YouTube Terms.  Notably, I understand that the third listed video is one specifically identified by Plaintiff in its Petition in this case.  By uploading these videos, Plaintiff necessarily received the disclosure shown at **Exhibit 2** and agreed to be bound by the current YouTube Terms.  Those terms are the same as the current YouTube Terms which are attached as **Exhibit 1** to my Declaration and, as discussed at paragraph 5 above, contain a forum-selection clause requiring that disputes between YouTube and its users arising out of or relating to the Terms or their use of the YouTube platform or services be litigated exclusively by a court located in Santa Clara County, California.

9.    The YouTube Terms expressly incorporate YouTube's Community Guidelines and Policy, Safety and Copyright Policies, which are available online at www.youtube.com/howyoutubeworks/policies/community-guidelines/ and at www.support.google.com/youtube/topic/9223153?hl=en.  The YouTube Terms specify that any user who chooses to upload content on YouTube "must not submit to the Service any Content that does not comply with this Agreement (including the YouTube Community Guidelines)" and further reserves YouTube's "right to remove or take down some or all of such Content in [its] discretion."  Ex. 1 at p. 10/16.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on August 7, 2025 in New York, New York.


/s/ Nicole Korn
Nicole Korn

# EXHIBIT 1

Terms of Service

# ▶ YouTube

# Terms of Service

Terms of Service

Paid Service Terms of Service

Paid Service Usage Rules

Collecting Society Notices

Copyright Notices

Community Guidelines

**View the Terms of Service in other languages:** հայերեն, ខ្មែរ, فارسی, ಕನ್ನಡ, **Hmong, ium, Filipino**, العربية, **中文（中国）, 中文（台灣）,** हिन्दी, 日本語, 한국어, ਪੰਜਾਬੀ, **Русский, Español (Latinoamérica),** ไทย **Українська, Tiếng Việt,** and **English**

## What's in these terms?

This index is designed to help you understand some of the key updates we've made to our Terms of Service (Terms). We hope this serves as a useful guide, but please ensure you read the Terms in full.

### Welcome to YouTube!

This section outlines our relationship with you. It includes a description of the Service, defines our Agreement, and names your service provider.

### Who May Use the Service?

This section sets out certain requirements for use of the Service, and defines categories of users.

### Your Use of the Service

This section explains your rights to use the Service, and the conditions that apply to your use of the Service. It also explains how we may make changes to the Service.

### Your Content and Conduct

This section applies to users who provide Content to the Service. It defines the scope of the permissions that you grant by uploading your Content, and includes your agreement not to upload anything that infringes on anyone else's rights.

App.121

### Account Suspension and Termination

This section explains how you and YouTube may terminate this relationship.

### About Software in the Service

This section includes details about software on the Service.

### Other Legal Terms

This section includes our service commitment to you. It also explains that there are some things we will not be responsible for.

### About this Agreement

This section includes some further important details about our contract, including what to expect if we need to make changes to these Terms; or which law applies to them.

## Terms of Service

Dated: December 15, 2023

## TERMS OF SERVICE

## Welcome to YouTube!

**Introduction**
Thank you for using the YouTube platform and the products, services and features we make available to you as part of the platform (collectively, the "Service").

**Our Service**

The Service allows you to discover, watch and share videos and other content, provides a forum for people to connect, inform, and inspire others across the globe, and acts as a distribution platform for original content creators and advertisers large and small. We provide lots of information about our products and how to use them in our Help Center Among other things, you can find out about YouTube Kids, the YouTube Partner Program and YouTube Paid Memberships and Purchases (where available).You can also read all about enjoying content on other devices like your television, your games console, orGoogle Home.

**Your Service Provider**

The entity providing the Service is Google LLC, a company operating under the laws of Delaware, located at 1600 Amphitheatre Parkway, Mountain View, CA 94043 (referred to as "**YouTube**", "**we**", "**us**", or "**our**"). References to YouTube's "Affiliates" in these terms means the other companies within the Alphabet Inc. corporate group (now or in the future).

**Applicable Terms**

Your use of the Service is subject to these terms, the YouTube Community Guidelines and the Policy, Safety and Copyright Policies which may be updated from time to time (together, this "**Agreement**"). Your Agreement with us will also include the Advertising on YouTube Policies if you provide advertising or sponsorships to the Service or incorporate paid promotion in your content. Any other links or references provided in these terms are for informational use only and are not part of the Agreement.

Please read this Agreement carefully and make sure you understand it. If you do not understand the Agreement, or do not accept any part of it, then you may not use the Service.

# Who may use the Service?

**Age Requirements**

You must be at least 13 years old to use the Service; however

App.123

children of all ages may use the Service and YouTube Kids (where available) if enabled by a parent or legal guardian

**Permission by Parent or Guardian**

If you are under 18, you represent that you have your parent or guardian's permission to use the Service. Please have them read this Agreement with you.

If you are a parent or legal guardian of a user under the age of 18, by allowing your child to use the Service, you are subject to the terms of this Agreement and responsible for your child's activity on the Service. You can find tools and resources to help you manage your family's experience on YouTube (including how to enable a child under the age of 13 to use the Service and YouTube Kids) in our Help Center and through Google's Family Link.

**Businesses**

If you are using the Service on behalf of a company or organisation, you represent that you have authority to act on behalf of that entity, and that such entity accepts this Agreement.

# Your Use of the Service

**Content on the Service**

The content on the Service includes videos, audio (for example music and other sounds), graphics, photos, text (such as comments and scripts), branding (including trade names, trademarks, service marks, or logos), interactive features, software, metrics, and other materials whether provided by you, YouTube or a third-party (collectively, "Content").

Content is the responsibility of the person or entity that provides it to the Service. YouTube is under no obligation to host or serve Content. If you see any Content you believe does not comply with this Agreement, including by violating the Community Guidelines or the law, you can report it to us.

Terms of Service

## Google Accounts and YouTube Channels

You can use parts of the Service, such as browsing and searching for Content, without having a Google account. However, you do need a Google account to use some features. With a Google account, you may be able to like videos, subscribe to channels, create your own YouTube channel, and more. You can follow these instructions to create a Google account.

Creating a YouTube channel will give you access to additional features and functions, such as uploading videos, making comments or creating playlists (where available). Here are some details about how to create your own YouTube channel.

To protect your Google account, keep your password confidential. You should not reuse your Google account password on third-party applications. Learn more about keeping your Google account secure, including what to do if you learn of any unauthorized use of your password or Google account.

## Your Information

Our Privacy Policy explains how we treat your personal data and protect your privacy when you use the Service. The YouTube Kids Privacy Notice provides additional information about our privacy practices that are specific to YouTube Kids.

We will process any audio or audiovisual content uploaded by you to the Service in accordance with the YouTube Data Processing Terms, except in cases where you uploaded such content for personal purposes or household activities. Learn More.

## Permissions and Restrictions

You may access and use the Service as made available to you, as long as you comply with this Agreement and applicable law. You may view or listen to Content for your personal, non-commercial use. You may also show YouTube videos through the embeddable YouTube player.

App.125

The following restrictions apply to your use of the Service. You are not allowed to:

1. access, reproduce, download, distribute, transmit, broadcast, display, sell, license, alter, modify or otherwise use any part of the Service or any Content except: (a) as expressly authorized by the Service; or (b) with prior written permission from YouTube and, if applicable, the respective rights holders;

2. circumvent, disable, fraudulently engage with, or otherwise interfere with any part of the Service (or attempt to do any of these things), including security-related features or features that (a) prevent or restrict the copying or other use of Content or (b) limit the use of the Service or Content;

3. access the Service using any automated means (such as robots, botnets or scrapers) except (a) in the case of public search engines, in accordance with YouTube's robots.txt file; or (b) with YouTube's prior written permission;

4. collect or harvest any information that might identify a person (for example, usernames or faces), unless permitted by that person or allowed under section (3) above;

5. use the Service to distribute unsolicited promotional or commercial content or other unwanted or mass solicitations;

6. cause or encourage any inaccurate measurements of genuine user engagement with the Service, including by paying people or providing them with incentives to increase a video's views, likes, or dislikes, or to increase a channel's subscribers, or otherwise manipulate metrics in any manner;

7. misuse any reporting, flagging, complaint, dispute, or appeals process, including by making groundless, vexatious, or frivolous submissions;

App.126

8. run contests on or through the Service that do not comply with YouTube's contest policies and guidelines;

9. use the Service to view or listen to Content other than for personal, non-commercial use (for example, you may not publicly screen videos or stream music from the Service); or

10. use the Service to (a) sell any advertising, sponsorships, or promotions placed on, around, or within the Service or Content, other than those allowed in the Advertising on YouTube policies (such as compliant product placements); or (b) sell advertising, sponsorships, or promotions on any page of any website or application that only contains Content from the Service or where Content from the Service is the primary basis for such sales (for example, selling ads on a webpage where YouTube videos are the main draw for users visiting the webpage).

**Reservation**

Using the Service does not give you ownership of or rights to any aspect of the Service, including user names or any other Content posted by others or YouTube.

**Develop, Improve and Update the Service**

YouTube is constantly changing and improving the Service. As part of this continual evolution, we may make modifications or changes (to all or part of the Service) such as adding or removing features and functionalities, offering new digital content or services or discontinuing old ones. We may also need to alter or discontinue the Service, or any part of it, in order to make performance or security improvements, make changes to comply with law, or prevent illegal activities on or abuse of our systems. These changes may affect all users, some users or even an individual user. When the Service requires or includes downloadable software (such as the YouTube Studio application), that software may update automatically on your device once a new version or feature is

available, subject to your device settings. If we make material changes that negatively impact your use of the Service, we'll provide you with reasonable advance notice, except in urgent situations such as preventing abuse, responding to legal requirements, or addressing security and operability issues. We'll also provide you with an opportunity to export your content from your Google Account using Google Takeout, subject to applicable law and policies.

## Your Content and Conduct

### Uploading Content

If you have a YouTube channel, you may be able to upload Content to the Service. You may use your Content to promote your business or artistic enterprise. If you choose to upload Content, you must not submit to the Service any Content that does not comply with this Agreement (including the YouTube Community Guidelines) or the law. For example, the Content you submit must not include third-party intellectual property (such as copyrighted material) unless you have permission from that party or are otherwise legally entitled to do so. You are legally responsible for the Content you submit to the Service. We may use automated systems that analyze your Content to help detect infringement and abuse, such as spam, malware, and illegal content.

### Rights you Grant

You retain ownership rights in your Content. However, we do require you to grant certain rights to YouTube and other users of the Service, as described below.

### License to YouTube

By providing Content to the Service, you grant to YouTube a worldwide, non-exclusive, royalty-free, sublicensable and transferable license to use that Content (including to reproduce, distribute, prepare derivative works, display and perform it) in connection with the Service and YouTube's (and

its successors' and Affiliates') business, including for the purpose of promoting and redistributing part or all of the Service.

### License to Other Users

You also grant each other user of the Service a worldwide, non-exclusive, royalty-free license to access your Content through the Service, and to use that Content, including to reproduce, distribute, prepare derivative works, display, and perform it, only as enabled by a feature of the Service (such as video playback or embeds). For clarity, this license does not grant any rights or permissions for a user to make use of your Content independent of the Service.

### Duration of License

The licenses granted by you continue for a commercially reasonable period of time after you remove or delete your Content from the Service. You understand and agree, however, that YouTube may retain, but not display, distribute, or perform, server copies of your videos that have been removed or deleted.

### Right to Monetize

You grant to YouTube the right to monetize your Content on the Service (and such monetization may include displaying ads on or within Content or charging users a fee for access). This Agreement does not entitle you to any payments. Starting November 18, 2020, any payments you may be entitled to receive from YouTube under any other agreement between you and YouTube (including for example payments under the YouTube Partner Program, Channel memberships or Super Chat) will be treated as royalties.  If required by law, Google will withhold taxes from such payments.

### Removing Your Content

App.129

You may remove your Content from the Service at any time. You also have the option to make a copy of your Content before removing it. You must remove your Content if you no longer have the rights required by these terms.

**Removal of Content By YouTube**

If any of your Content (1) is in breach of this Agreement or (2 may cause harm to YouTube, our users, or third parties, we reserve the right to remove or take down some or all of such Content in our discretion. We will notify you with the reason for our action unless we reasonably believe that to do so: (a) would breach the law or the direction of a legal enforcement authority or would otherwise risk legal liability for YouTube or our Affiliates; (b) would compromise an investigation or the integrity or operation of the Service; or (c) would cause harm to any user, other third party, YouTube or our Affiliates. You can learn more about reporting and enforcement, including how to appeal on the Troubleshooting page of our Help Center.

# Community Guidelines Strikes

YouTube operates a system of "strikes" in respect of Content that violates the YouTube Community Guidelines Each strike comes with varying restrictions and may result in the permanent removal of your channel from YouTube. A full description of how a strike affects your channel is available on the Community Guidelines Strikes Basics page. If you believe that a strike has been issued in error, you may appeal here.

If your channel has been restricted due to a strike, you must not use another channel to circumvent these restrictions. Violation of this prohibition is a material breach of this Agreement and Google reserves the right to terminate your Google account or your access to all or part of the Service.

**Copyright Protection**

App.130

We provide information to help copyright holders manage their intellectual property online in our YouTube Copyright Center. If you believe your copyright has been infringed on the Service, please send us a notice.

We respond to notices of alleged copyright infringement according to the process in our YouTube Copyright Center, where you can also find information about how to resolve a copyright strike. YouTube's policies provide for the termination, in appropriate circumstances, of repeat infringers' access to the Service.

# Account Suspension & Termination

### Terminations by You
You may stop using the Service at any time. Follow these instructions to delete the Service from your Google Account, which involves closing your YouTube channel and removing your data. You also have the option to download a copy of your data first.

### Terminations and Suspensions by YouTube

YouTube reserves the right to suspend or terminate your Google account or your access to all or part of the Service if (a) you materially or repeatedly breach this Agreement; (b) we are required to do so to comply with a legal requirement or a court order; or (c) we reasonably believe that there has been conduct that creates (or could create) liability or harm to any user, other third party, YouTube or our Affiliates.

### Notice for Termination or Suspension

We will notify you with the reason for termination or suspension by YouTube unless we reasonably believe that to do so: (a) would violate the law or the direction of a legal enforcement authority; (b) would compromise an investigation; (c) would compromise the integrity, operation or security of the Service; or (d) would cause harm to any user, other third party, YouTube or our Affiliates.

App.131

Effect of Account Suspension or Termination

If your Google account is terminated or your access to the Service is restricted, you may continue using certain aspects of the Service (such as viewing only) without an account, and this Agreement will continue to apply to such use. If you believe that the termination or suspension has been made in error, you can appeal using this form.

# About Software in the Service

### Downloadable Software
When the Service requires or includes downloadable software (such as the YouTube Studio application), unless that software is governed by additional terms which provide a license, YouTube gives you a personal, worldwide, royalty-free, non-assignable and non-exclusive license to use the software provided to you by YouTube as part of the Service. This license is for the sole purpose of enabling you to use and enjoy the benefit of the Service as provided by YouTube, in the manner permitted by this Agreement. You are not allowed to copy, modify, distribute, sell, or lease any part of the software or to reverse-engineer or attempt to extract the source code of that software, unless laws prohibit these restrictions or you have YouTube's written permission.

### Open Source
Some software used in our Service may be offered under an open source license that we make available to you. There may be provisions in an open source license that expressly override some of these terms, so please be sure to read those licenses.

# Other Legal Terms

### Warranty Disclaimer
OTHER THAN AS EXPRESSLY STATED IN THIS AGREEMENT OR AS REQUIRED BY LAW, THE SERVICE IS PROVIDED "AS IS" AND YOUTUBE DOES NOT MAKE ANY SPECIFIC COMMITMENTS OR WARRANTIES ABOUT THE SERVICE. FOR

EXAMPLE, WE DON'T MAKE ANY WARRANTIES ABOUT: (A) THE CONTENT PROVIDED THROUGH THE SERVICE; (B) THE SPECIFIC FEATURES OF THE SERVICE, OR ITS ACCURACY, RELIABILITY, AVAILABILITY, OR ABILITY TO MEET YOUR NEEDS; OR (C) THAT ANY CONTENT YOU SUBMIT WILL BE ACCESSIBLE ON THE SERVICE.

**Limitation of Liability**

EXCEPT AS REQUIRED BY APPLICABLE LAW, YOUTUBE, ITS AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES AND AGENTS WILL NOT BE RESPONSIBLE FOR ANY LOSS OF PROFITS, REVENUES, BUSINESS OPPORTUNITIES, GOODWILL, OR ANTICIPATED SAVINGS; LOSS OR CORRUPTION OF DATA; INDIRECT OR CONSEQUENTIAL LOSS; PUNITIVE DAMAGES CAUSED BY:

1. ERRORS, MISTAKES, OR INACCURACIES ON THE SERVICE;

2. PERSONAL INJURY OR PROPERTY DAMAGE RESULTING FROM YOUR USE OF THE SERVICE;

3. ANY UNAUTHORIZED ACCESS TO OR USE OF THE SERVICE;

4. ANY INTERRUPTION OR CESSATION OF THE SERVICE;

5. ANY VIRUSES OR MALICIOUS CODE TRANSMITTED TO OR THROUGH THE SERVICE BY ANY THIRD PARTY;

6. ANY CONTENT WHETHER SUBMITTED BY A USER OR YOUTUBE, INCLUDING YOUR USE OF CONTENT; AND/OR

7. THE REMOVAL OR UNAVAILABILITY OF ANY CONTENT.

THIS PROVISION APPLIES TO ANY CLAIM, REGARDLESS OF WHETHER THE CLAIM ASSERTED IS BASED ON WARRANTY, CONTRACT, TORT, OR ANY OTHER LEGAL THEORY.

YOUTUBE AND ITS AFFILIATES' TOTAL LIABILITY FOR ANY CLAIMS ARISING FROM OR RELATING TO THE SERVICE IS LIMITED TO THE GREATER OF: (A) THE AMOUNT OF

REVENUE THAT YOUTUBE HAS PAID TO YOU FROM YOUR USE OF THE SERVICE IN THE 12 MONTHS BEFORE THE DATE OF YOUR NOTICE, IN WRITING TO YOUTUBE, OF THE CLAIM; AND (B) USD $500.

**Indemnity**

To the extent permitted by applicable law, you agree to defend, indemnify and hold harmless YouTube, its Affiliates, officers, directors, employees and agents, from and against any and all claims, damages, obligations, losses, liabilities, costs or debt, and expenses (including but not limited to attorney's fees) arising from: (i) your use of and access to the Service; (ii) your violation of any term of this Agreement; (iii) your violation of any third party right, including without limitation any copyright, property, or privacy right; or (iv) any claim that your Content caused damage to a third party. This defense and indemnification obligation will survive this Agreement and your use of the Service.

**Third-Party Links**

The Service may contain links to third-party websites and online services that are not owned or controlled by YouTube. YouTube has no control over, and assumes no responsibility for, such websites and online services. Be aware when you leave the Service; we suggest you read the terms and privacy policy of each third-party website and online service that you visit.

# About this Agreement

**Changing this Agreement**

We may change this Agreement, for example, (1) to reflect changes to our Service or how we do business - for example, when we add new products or features or remove old ones, (2) for legal, regulatory, or security reasons, or (3) to prevent abuse or harm.

If we materially change this Agreement, we'll provide you with reasonable advance notice and the opportunity to review the

changes, except (1) when we launch a new product or feature
or (2) in urgent situations, such as preventing ongoing abuse
or responding to legal requirements. If you don't agree to the
new terms, you should remove any Content you uploaded and
stop using the Service.

### Continuation of this Agreement

If your use of the Service ends, the following terms of this
Agreement will continue to apply to you: "Other Legal Terms",
"About This Agreement", and the licenses granted by you will
continue as described under "Duration of License".

### Severance

If it turns out that a particular term of this Agreement is not
enforceable for any reason, this will not affect any other
terms.

### No Waiver

If you fail to comply with this Agreement and we do not take
immediate action, this does not mean that we are giving up
any rights that we may have (such as the right to take action
in the future).

### Interpretation

In these terms, "include" or "including" means "including but
not limited to," and any examples we give are for illustrative
purposes.

### Governing Law

All claims arising out of or relating to these terms or the
Service will be governed by California law, except California's
conflict of laws rules, and will be litigated exclusively in the
federal or state courts of Santa Clara County, California, USA.
You and YouTube consent to personal jurisdiction in those
courts.

### Limitation on Legal Action

YOU AND YOUTUBE AGREE THAT ANY CAUSE OF ACTION
ARISING OUT OF OR RELATED TO THE SERVICES MUST
COMMENCE WITHIN ONE (1) YEAR AFTER THE CAUSE OF
ACTION ACCRUES. OTHERWISE, SUCH CAUSE OF ACTION IS
PERMANENTLY BARRED.

**Effective as of December 15, 2023 (**view previous version**)**

# EXHIBIT 2

# Upload videos





**Drag and drop video files to upload**

Your videos will be private until you publish them.

Select files

By submitting your videos to YouTube, you acknowledge that you agree to YouTube's Terms of Service and Community Guidelines.

Please be sure not to violate others' copyright or privacy rights. Learn more

App.138

# EXHIBIT 8

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

DEFENSE DISTRIBUTED,

                    Plaintiff,

v.                                                    Case No. 1:25-cv-1095-ADA

YOUTUBE LLC, GOOGLE LLC, and
ALPHABET, INC.

                    Defendants.

**DECLARATION OF VICTORIA MCGINNIS IN SUPPORT OF DEFENDANTS'**
**MOTION TO TRANSFER TO THE NORTHERN DISTRICT OF CALIFORNIA**

I, Victoria McGinnis, declare and state as follows:

1.      I am a Google Ads, Policy Support Consultant on the gTech Ads, Customer Support team at Google LLC ("Google").  As part of my role and from my review of company records, I have personal knowledge of Google's Advertising Program Terms (the "Google Ad Terms") and how advertisers can sign up for Google Ads, including the facts described below, and, if called as a witness, could and would testify competently thereto.

2.      When advertisers sign up to use Google Ads in the United States, they are shown the Google Ad Terms.  Advertisers must indicate they agree to be bound by the Google Ad Terms by clicking a button to accept them before they can begin using the Google Ads service.  Google keeps regular records of advertisers' acceptance of the Google Ad Terms.

3.      I understand that Plaintiff Defense Distributed ("Plaintiff") alleges it had a Google Ads account in February 2025, through which it attempted to publish an advertisement that was

App.140

ultimately prohibited by the Google Ads platform's Guns policy.  Plaintiff could not have even

attempted to publish an ad through Google Ads without first agreeing to the Google Ad Terms, as

it is not possible to use the Google Ads service without first agreeing to the Google Ad Terms.

4.      I reviewed Google's records pertaining to Plaintiff's Google Ads Account.  Based

on a review of these records, Plaintiff created a Google Ads account on October 25, 2022, and

accepted the Google Ad Terms on November 14, 2022.  As explained above, Plaintiff had to agree

to the Google Ad Terms in order to activate its Google Ads account.  A true and correct copy of

the version of the Google Ad Terms in effect at the time Plaintiff created its Google Ads account

and accepted the Google Ad Terms, is attached hereto as **Exhibit 1**.  These are the Google Ad

Terms Plaintiff agreed to on November 14, 2022.

5.      Section 14 of the applicable Google Ad Terms, which are attached as **Exhibit 1** to

my declaration, require that claims arising out of the Google Ad Terms that are litigated in court

be litigated exclusively in Santa Clara County:

> EXCEPT AS PROVIDED IN SECTION 13, ALL CLAIMS ARISING OUT OF
> OR RELATING TO THESE TERMS OR THE PROGRAMS WILL BE
> LITIGATED EXCLUSIVELY IN THE FEDERAL OR STATE COURTS OF
> SANTA CLARA COUNTY, CALIFORNIA.

Ex. 1 at p. 6/7.  Further, the preamble of the Google Ad Terms defines the term "PROGRAMS"

to encompass all of Google's advertising programs and services made accessible to customers that

agree to the Google Ad Terms.  *See id.* at p. 1/7.  As explained above in paragraph 2 of my

Declaration, Google Ads is one of Google's advertising programs and services that customers

cannot access without first agreeing to the Google Ad Terms.

/ / /

/ / /

I declare under penalty of perjury that the foregoing is true and correct.  Executed on August 7, 2025 in Boulder, Colorado.

/s/ Victoria McGinnis
Victoria McGinnis

# EXHIBIT 1

## Google LLC Advertising Program Terms

These Google LLC Advertising Program Terms ("**Terms**") are entered into by Google LLC ("**Google**") and the entity executing these Terms or that accepts these Terms electronically ("**Customer**"). These Terms govern Customer's participation in Google's advertising programs and services (i) that are accessible through the account(s) given to Customer in connection with these Terms or (ii) that incorporate by reference these Terms (collectively, "**Programs**"). **Please read these Terms carefully. They require the use of binding individual arbitration to resolve disputes rather than jury trials or class actions. If Customer wishes, Customer may opt out of the requirement to arbitrate disputes by following the instructions in Section 13(F) below within 30 days of the first acceptance date of any version of these Terms containing an arbitration provision.**

**1 Programs**. Customer authorizes Google and its affiliates to place Customer's advertising materials, feed data, and technology (collectively, "**Ads**" or "**Creative**") on any content or property (each a "**Property**") provided by Google or its affiliates on behalf of Google or, as applicable, a third party ("**Partner**"). Customer is solely responsible for all: (i) Ads, (ii) Ads trafficking or targeting decisions (e.g., keywords) ("**Targets**"), (iii) destinations to which Ads direct viewers (e.g., landing pages, mobile applications) along with the related URLs, waypoints, and redirects ("**Destinations**"), and (iv) services and products advertised on Destinations (collectively, "**Services**"). The Program is an advertising platform on which Customer authorizes Google and its affiliates to use automated tools to format Ads. Google and its affiliates may also make available to Customer certain optional Program features to assist Customer with the selection or generation of Targets, Ads, or Destinations. Customer is not required to authorize use of these optional features and, as applicable, may opt-in to or opt-out of usage of these features. However, if Customer uses these features, then Customer will be solely responsible for the Targets, Ads, and Destinations. Google and its affiliates or Partners may reject or remove a specific Target, Ad, or Destination at any time for any or no reason. Google and its affiliates may modify or cancel Programs at any time. Customer acknowledges that Google or its affiliates may participate in Program auctions in support of its own services and products. Some Program features are identified as "**Beta**" or as otherwise unsupported or confidential ("**Beta Features**"). Customer may not disclose any information from Beta Features or the terms or existence of any non-public Beta Features.

**2 Policies**. Customer is solely responsible for its use of the Programs (e.g., access to and use of Program accounts and safeguarding usernames and passwords) ("**Use**"). Program Use is subject to applicable Google policies available at google.com/ads/policies, and all other policies made available by Google to Customer, including any applicable Partner policies, and to the extent applicable, the Google EU User Consent Policy at privacy.google.com/businesses/userconsentpolicy (in each case, as modified from time to time, "**Policies**"). Customer also authorizes Google to modify Ads as described in Policies. In connection with the Program, Google will comply with the Google Privacy Policy available at google.com/policies/privacy (as modified from time to time). To the extent Program Use is within scope, Google and Customer agree, as applicable, to the (i) Google Ads Controller-Controller Data Protection Terms at privacy.google.com/businesses/controllerterms; or (ii) Google Ads Data Processing Terms at privacy.google.com/businesses/processorterms (collectively the "**Data Terms**"). Google will not modify the Data Terms, except as expressly permitted under the Data Terms. Customer will not, and will not authorize any third party to, (i) generate automated, fraudulent or otherwise invalid impressions, inquiries, clicks or conversions, (ii) conceal conversions for Programs where they are required to be disclosed, (iii) use any automated means or form of scraping or data extraction to access, query or otherwise collect Google advertising-related information from any Property except as expressly permitted by Google, or (iv) attempt to interfere with the functioning of the Programs. Customer will direct communications regarding Ads on Partner Properties under these Terms only to Google.

**3 Ad Serving**. (a) Customer will not provide Ads that contain or connect to malware, spyware, unwanted software or any other malicious code, or knowingly breach or circumvent any Program security measure. (b) Customer may utilize an Ad server solely for serving or tracking Ads under Programs that permit third-party Ad serving and only if the Ad server has been authorized by Google to participate in the Program. Google will implement Customer's Ad server tags so that they are functional. (c) For online display Ad impressions billed on a CPM or vCPM basis ("**Display Ads**"), if Google's applicable impression count ("**IC**") for a Program is higher than Customer's third-party Ad server ("**3PAS**") IC by more than 10% over the invoice period, Customer will

facilitate reconciliation efforts between Google and 3PAS. If this discrepancy is not resolved, Customer's sole remedy is to make a claim within 60 days after the invoice date ("**Claim Period**"). If Google determines that the claim is valid, then Google will issue to Customer advertising credits equal to (90% of Google's IC minus 3PAS's IC), multiplied by Google's reported campaign average CPM or vCPM, as applicable, over the invoice period. Any advertising credits issued must be used by Customer within 60 days of issuance ("**Use-By Date**") and Google may suspend Customer's permission to utilize that 3PAS provider and may suspend or void the effectiveness of the discrepancy resolution provisions of this Section for that 3PAS provider. Metrics from 3PAS whose Ad server tags are provided to Google will be used in the above discrepancy resolution calculations. Google may require that discrepancy records be provided directly by 3PAS to Google. Customer will not be credited for discrepancies caused by 3PAS's inability to serve Ads.

**4 Testing**. Customer authorizes Google and its affiliates to periodically conduct tests that may affect Customer's Use of Programs, including Ad formatting, Targets, Destinations, quality, ranking, performance, pricing, and auction-time bid adjustments. To ensure the timeliness and validity of test results, Customer authorizes Google to conduct such tests without notice or compensation to Customer.

**5 Ad Cancellation**. Unless a Policy, the Program user interface, or an agreement referencing these Terms (an "**IO**") provides otherwise, either party may cancel any Ad at any time before the earlier of Ad auction or placement, but if Customer cancels an Ad after a commitment date provided by Google (e.g., a reservation-based campaign), then Customer is responsible for any cancellation fees communicated by Google to Customer, and the Ad may still be published. Cancelled Ads will generally cease serving within 8 business hours or as described in a Policy or IO, and Customer remains obligated to pay all charges resulting from served Ads (e.g., fees based on conversion). Customer must effect cancellation of Ads (i) online through Customer's account, if the functionality is available, (ii) if this functionality is not available, with notice to Google via email to Customer's account representative, or (iii) if this functionality is not available and Customer does not have an account representative, with notice to Google via email to ads-support@google.com. Customer will not be relieved of any payment obligations for Ads not submitted or submitted by Customer after the due date provided by Google. Google will not be bound by a Customer provided IO.

**6 Warranty, Rights, and Obligations**. Customer warrants that (a) Customer holds, and hereby grants Google, its affiliates and Partners, the rights in Ads, Destinations, and Targets for Google, its affiliates and Partners to operate the Google Programs (including, in some cases, after Customer ceases to use the Programs (e.g. feed data)), and (b) all information and authorizations provided by Customer are complete, correct and current. Customer authorizes Google and its affiliates to automate retrieval and analysis of, and create test credentials to access, Destinations for the purposes of the Programs. By providing any mobile or other telephone number to Google in connection with the Programs, Customer authorizes Google, its affiliates and their agents to call and send text messages (for which standard message and data rates may apply) to the provided telephone numbers, including by an automatic telephone dialing system, for purposes of the Programs. However, Google will not rely on this permission to initiate autodialed calls or text messages for marketing purposes. Customer further authorizes Google, its affiliates and their agents to send electronic mail to Customer for purposes of the Programs. Customer warrants that it is authorized to act on behalf of, and has bound to these Terms, each third party, if any, for which Customer advertises in connection with these Terms ("**Advertiser**") and any references to Customer in these Terms will also apply to Advertiser, as applicable. If for any reason Customer has not bound an Advertiser to these Terms, Customer will be liable for performing any obligation Advertiser would have had under these Terms had Advertiser been bound. If Customer is using a Program on its own behalf to advertise, for that use Customer will be deemed to be both Customer and Advertiser. Customer will provide Advertiser with reporting data no less than on a monthly basis, that discloses absolute dollars spent on Google and performance (at a minimum cost, clicks and impressions of users on the account of that Advertiser) in a reasonably prominent location and in accordance with the Policies. Google may, upon request of an Advertiser, share Advertiser-specific information with Advertiser.

**7 Make-Goods**. For reservation-based Display Ads, Google will deliver any agreed on aggregate number of Display Ads by the end of the campaign, but if Google fails to do so, then Customer's sole remedy is to make a claim during the Claim Period. If Google confirms the accuracy of the claim, then Google will not charge

Customer for the undelivered Display Ads or, if Customer has already paid, at Google's reasonable discretion, Google will provide for (i) advertising credits, which must be used by the Use-By Date, (ii) placement of the Display Ads in a position Google deems comparable within 60 days of Google's confirmation of the accuracy of the claim or (iii) an extension of the term of the campaign. Google cannot assure that any auction-based Ads will be delivered and therefore make-goods do not apply to auction-based Ads.

**8 Payment**. Customer will pay all charges incurred in connection with a Program, using a payment method approved by Google for that Customer (as modified from time to time), within a commercially reasonable time period specified by Google (e.g., in the Program user interface or IO). Late payments bear interest at the rate of 1.5% per month (or the highest rate permitted by law, if less). Charges are exclusive of taxes and applicable regulatory operating or jurisdiction-specific fees or costs, as determined by Google, and Customer will pay all such taxes, fees, or costs. Customer will also pay all reasonable expenses and legal fees Google incurs in collecting late payments that are not disputed in good faith. Charges are based on the billing criteria under the applicable Program (e.g., based on clicks, impressions, or conversions). Any portion of a charge not disputed in good faith must be paid in full. Google will not be bound by any terms on a Customer online invoicing portal. No party may offset any payment due under these Terms against any other payment to be made under these Terms. Google may, in its sole discretion, extend, revise or revoke credit at any time. Google is not obligated to deliver any Ads in excess of any credit limit. If Google does not deliver Ads to the selected Targets or Destinations, then Customer's sole remedy is to make a claim for advertising credits within the Claim Period, after which Google will issue the credits following claim validation which must be used by the Use-By Date. Customer understands that third parties may generate impressions or clicks on Customer's Ads for prohibited or improper purposes and if that happens, Customer's sole remedy is to make a claim for advertising credits within the Claim Period, after which Google will issue the credits following claim validation, which must be used by the Use-By Date. TO THE FULLEST EXTENT PERMITTED BY LAW, (A) CUSTOMER WAIVES ALL CLAIMS RELATING TO ANY PROGRAM CHARGES UNLESS A CLAIM IS MADE WITHIN THE CLAIM PERIOD AND (B) THE ISSUANCE OF ADVERTISING CREDITS (IF ANY) IS AT GOOGLE'S REASONABLE DISCRETION AND IF ISSUED, MUST BE USED BY THE USE-BY DATE.

**9 Disclaimers**. TO THE FULLEST EXTENT PERMITTED BY LAW, GOOGLE, ON BEHALF OF ITSELF AND ITS PARTNERS AND AFFILIATES, DISCLAIMS ALL WARRANTIES, WHETHER IMPLIED, STATUTORY OR OTHERWISE, INCLUDING FOR NON-INFRINGEMENT, SATISFACTORY QUALITY, MERCHANTABILITY AND FITNESS FOR ANY PURPOSE, AS WELL AS ANY WARRANTIES ARISING OUT OF ANY COURSE OF DEALING OR USAGE OF TRADE. TO THE FULLEST EXTENT PERMITTED BY LAW, THE PROGRAMS AND GOOGLE AND PARTNER PROPERTIES ARE PROVIDED "AS IS," "AS AVAILABLE" AND "WITH ALL FAULTS," AND CUSTOMER USES THEM AT ITS OWN RISK. GOOGLE, ITS AFFILIATES, AND ITS PARTNERS DO NOT MAKE ANY GUARANTEE IN CONNECTION WITH THE PROGRAMS OR PROGRAM RESULTS. GOOGLE MAKES NO PROMISE TO INFORM CUSTOMER OF DEFECTS OR ERRORS.

**10 Limitation of Liability**. EXCEPT FOR SECTION 11 AND CUSTOMER'S BREACHES OF SECTIONS 3(A), 14(E) OR THE LAST SENTENCE OF SECTION 1, TO THE FULLEST EXTENT PERMITTED BY LAW REGARDLESS OF THE THEORY OR TYPE OF CLAIM: (a) GOOGLE, CUSTOMER, AND THEIR RESPECTIVE AFFILIATES WILL NOT BE HELD LIABLE UNDER THESE TERMS OR ARISING OUT OF OR RELATED TO THESE TERMS FOR ANY DAMAGES OTHER THAN DIRECT DAMAGES, EVEN IF THE PARTY IS AWARE OR SHOULD KNOW THAT SUCH OTHER TYPES OF DAMAGES ARE POSSIBLE AND EVEN IF DIRECT DAMAGES DO NOT SATISFY A REMEDY; AND (b) OTHER THAN CUSTOMER'S PAYMENT OBLIGATIONS UNDER THESE TERMS, GOOGLE, CUSTOMER, AND THEIR RESPECTIVE AFFILIATES WILL NOT BE HELD LIABLE FOR DAMAGES UNDER THESE TERMS OR ARISING OUT OF OR RELATED TO PERFORMANCE OF THESE TERMS FOR ANY GIVEN EVENT OR SERIES OF CONNECTED EVENTS IN THE AGGREGATE OF MORE THAN THE AMOUNT PAYABLE TO GOOGLE BY CUSTOMER UNDER THE TERMS IN THE THIRTY DAYS BEFORE THE DATE OF THE ACTIVITY FIRST GIVING RISE TO THE CLAIM.

**11 Indemnification**. Customer will defend and indemnify Google, its Partners, agents, affiliates, and licensors against all liabilities, damages, losses, costs, fees (including legal fees), and expenses relating to any third-party allegation or legal proceeding to the extent arising out of or related to Ads, Targets, Destinations, Services, Use or any breach of these Terms by Customer. Partners are intended third-party beneficiaries of this Section.

**12 Changes to Terms**. Google may make non-material changes to these Terms at any time without notice, but Google will provide advance notice of any material changes to these Terms. The Terms will be posted at google.com/ads/terms. Other than changes made under Section 13(G), the changes to the Terms will not apply retroactively and will become effective 7 days after posting. However, changes made for legal reasons will be effective immediately upon notice. Either party may terminate these Terms at any time with notice to the other party, but (i) campaigns not cancelled under Section 5 and new campaigns may be run and reserved and (ii) continued Program Use is, in each case, subject to Google's terms and conditions then in effect for the Programs (available at google.com/ads/terms). Google may suspend Customer's ability to participate in the Programs at any time. In all cases, the running of any Customer campaigns after termination is in Google's sole discretion.

**13 Dispute Resolution Agreement**.

**A. Arbitration of disputes**. Google, Customer, and Advertiser agree to arbitrate all disputes and claims between Google and Customer or between Google and Advertiser that arise out of or relate in any way to the Programs or these Terms. This agreement to arbitrate ("**Dispute Resolution Agreement**" or "**Section 13**") is intended to be broadly interpreted and includes, for example:

1. claims brought under any legal theory;
2. claims that arose before Customer or Advertiser first accepted any version of these Terms containing an arbitration provision;
3. claims that may arise after the termination of Customer's or Advertiser's Use of the Programs;
4. claims brought by or against Google, Google affiliates that provide the Programs to Customer or Advertiser, Google parent companies, and the respective officers, directors, employees, agents, predecessors, successors, and assigns of these entities; and
5. claims brought by or against Customer or Advertiser, the respective affiliates and parent companies of Customer or Advertiser, and the respective officers, directors, employees, agents, predecessors, successors, and assigns of these entities.

This Dispute Resolution Agreement does not preclude any party from seeking an individualized preliminary injunction or temporary restraining order until a claim is arbitrated, or from bringing an individualized action in small claims court, in any court that has jurisdiction; provided that, as limited by Section 13(C) below, the arbitrator will have exclusive jurisdiction to finally resolve claims not within the jurisdiction of a small claims court. Nor does this Dispute Resolution Agreement bar any party from bringing issues to the attention of federal, state, or local agencies.

Google, Customer, and Advertiser agree that, by entering into this arbitration agreement, all parties are waiving their respective rights to a trial by jury or to participate in a class or representative action. The Federal Arbitration Act governs the interpretation and enforcement of this Dispute Resolution Agreement. With respect to all disputes or claims that arise out of or relate in any way to the Programs or these Terms, this Dispute Resolution Agreement supersedes any contrary terms regarding dispute resolution in any other agreement between the parties.

**B. Notice of disputes**. If any party intends to seek arbitration of a dispute, that party must provide the other party with notice in writing ("**Notice of Dispute**"). This Notice of Dispute to Google must be sent to the following address ("**Google's Notice Address**"):

Google LLC

Legal Department - Google Ads Arbitration

c/o Corporation Service Company

2710 Gateway Oaks Drive, Suite 150N

Sacramento, CA 95833

Google will send notice to Customer or Advertiser at the e-mail and mailing addresses associated with Customer's account. Customer and Advertiser each agree to receive notice at those addresses. In addition, Customer agrees to notify Advertiser promptly of any such notice. Customer's or Advertiser's Notice of Dispute to Google must provide, as applicable, (a) Customer's or Advertiser's name and mailing address, (b) the email address Customer or Advertiser uses to log into Customer's account, (c) the Google Ads Customer ID(s), (d) the Case Number(s) assigned by Google to track previous attempts to resolve the dispute, (e) a description of the dispute, including identification of the relevant campaigns and/or AdGroups, and (f) a statement of the relief requested. If the parties are unable or unwilling to resolve the dispute within 60 days after the Notice of Dispute is submitted, the dispute will be resolved by arbitration upon one party sending the other party or parties and the American Arbitration Association ("**AAA**") a demand for arbitration. No arbitration demand may be submitted until at least 60 days after submission of the Notice of Dispute. Unless the parties agree otherwise, Customer's or Advertiser's demand for arbitration must be sent to Google's Notice Address and entitled "Demand for Arbitration." Google will send demands for arbitration to Customer or Advertiser at the e-mail and mailing addresses associated with Customer's account.

**C. Arbitration procedures**. The arbitration will be governed by the AAA's Commercial Arbitration Rules ("**AAA Rules**"), as modified by these Terms, and will be administered by the AAA. Unless the parties agree otherwise, the Expedited Procedures of the AAA Rules will apply to any claim of $75,000 or less. The AAA Rules are available online at adr.org. If the AAA is unavailable, the parties will agree to another arbitration provider or the court will appoint a substitute. To the fullest extent permitted by applicable law, any evidentiary submissions made in arbitration will be maintained as confidential in the absence of good cause for its disclosure. The arbitrator's award will be maintained as confidential only to the extent necessary to protect either party's trade secrets or proprietary business information or to comply with a legal requirement mandating confidentiality.

Unless the parties agree otherwise, any arbitration hearings will take place in the county (or parish) of Customer's principal place of business (or, if the arbitration is commenced by Advertiser, the county (or parish) of Advertiser's principal place of business). If the value of Customer's or Advertiser's claim is $25,000 or less, Customer or Advertiser may choose whether the arbitration will be conducted solely on the basis of documents submitted to the arbitrator, by telephone, or by an in-person hearing. If the value of Customer's or Advertiser's claim exceeds $25,000, the right to a hearing will be determined by the AAA Rules. Regardless of the manner in which the arbitration is conducted, the arbitrator will issue a reasoned written decision sufficient to explain the essential findings and conclusions on which the decision is based. All issues are for the arbitrator to decide, except that only a court of competent jurisdiction may decide issues relating to the scope and enforceability of this arbitration provision, the arbitrability of disputes, or the interpretation of Section 13(E). Arbitration rulings will not have preclusive effect in any proceedings involving different Customers or Advertisers in any forum. The arbitrator can award the same individualized damages and relief that a court can award. Judgment on the award may be entered by any court having jurisdiction.

**D. Costs of arbitration**. The AAA's fee schedule is subject to change and may be found in the AAA Rules (available online at adr.org or by calling the AAA at 1-800-778-7879). Google will pay all AAA filing, administrative, and arbitrator fees for any arbitration that Google commences. If Customer or Advertiser commenced arbitration at least 60 days after submitting the Notice of Dispute to Google, and the value of Customer's or Advertiser's claim is $75,000 or less, Google will pay Customer's or Advertiser's share of any such AAA fees. If the value of Customer's or Advertiser's claim is between $75,000 and $300,000, Customer's or Advertiser's share of any such fees will be capped at $200 (unless the law of Customer's or Advertiser's state requires Google to pay all such fees). If the value of Customer's or Advertiser's claim exceeds $300,000, the allocation of AAA fees will be governed by the AAA Rules. But the arbitrator may reallocate the fees to require Google to pay all fees if Customer or Advertiser cannot afford to pay them. If, however, the arbitrator finds that

App.148

either the substance of Customer's or Advertiser's claim or the relief sought is frivolous or brought for an improper purpose (as measured by the standards in Federal Rule of Civil Procedure 11(b)), then the payment of all AAA fees will be governed by the AAA Rules. In such cases, the arbitrator may direct Customer or Advertiser to reimburse Google for amounts that Google paid on Customer's or Advertiser's behalf.

**E. No class or representative arbitration**. The arbitrator may award declaratory or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim without affecting other Google users or other customers or advertisers. CUSTOMER, ADVERTISER, AND GOOGLE AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS, REPRESENTATIVE, OR PRIVATE ATTORNEY GENERAL PROCEEDING. Upon motion of one or more affected parties, and after providing all other affected parties an opportunity to be heard, the arbitrator may, in its discretion, consolidate more than one Advertiser's or Customer's claims to promote efficiency in discovery and to avoid inconsistent legal rulings. For the avoidance of doubt, any consolidation under the preceding sentence will be limited only to currently-pending arbitrations initiated under this agreement, and the arbitrator may not preside over any form of a representative or class proceeding. All parties will retain the right to request an individualized hearing. If a court decides that applicable law precludes enforcement of any of these prohibitions or limitations on (a) non-individualized relief, (b) class, representative, and private attorney general claims, or (c) consolidation with respect to a particular claim or a particular request for relief (such as injunctive relief), and if all appeals challenging the court's decision are denied, then the parties agree that such a claim or request for relief will be decided by a court after all other claims and requests for relief are arbitrated.

**F. 30-day opt out period**. Customer (both for itself and for any Advertiser that Customer represents) and Advertiser have the right to opt out of this Dispute Resolution Agreement. A Customer or Advertiser who does not wish to be bound by this Dispute Resolution Agreement (including its waiver of class and representative claims) must notify Google as set forth below within 30 days of the first acceptance date of any version of these Terms containing an arbitration provision (unless a longer period is required by applicable law). Customer's or Advertiser's notice to Google under this subsection must be submitted via webform available at ads.google.com/nav/arbitration. An opt-out notice does not revoke or otherwise affect any previous arbitration agreement between Customer and Google or between Advertiser and Google.

**G. Future changes to Dispute Resolution Agreement**. If Google makes any changes to this Dispute Resolution Agreement (other than a change to Google's Notice Address), Customer or Advertiser may reject any such change by notifying Google via the process set forth in Section 13(B) within 30 days of the change. It is not necessary to submit a rejection of the future change to this Dispute Resolution Agreement if Customer or Advertiser had properly opted out of arbitration in compliance with the requirements of Section 13(F). By rejecting a future change, Customer or Advertiser is agreeing that it will arbitrate any dispute in accordance with the language of this Dispute Resolution Agreement, as modified by any changes that Customer or Advertiser did not reject.

**14 Miscellaneous**. (a) ALL CLAIMS ARISING OUT OF OR RELATING TO THESE TERMS OR THE PROGRAMS WILL BE GOVERNED BY CALIFORNIA LAW, EXCLUDING CALIFORNIA'S CONFLICT OF LAWS RULES, EXCEPT TO THE EXTENT THAT CALIFORNIA LAW IS CONTRARY TO OR PREEMPTED BY FEDERAL LAW. (b) EXCEPT AS PROVIDED IN SECTION 13, ALL CLAIMS ARISING OUT OF OR RELATING TO THESE TERMS OR THE PROGRAMS WILL BE LITIGATED EXCLUSIVELY IN THE FEDERAL OR STATE COURTS OF SANTA CLARA COUNTY, CALIFORNIA; THE PARTIES CONSENT TO PERSONAL JURISDICTION IN THESE COURTS. (c) Customer will not seek an injunction based on patent infringement in connection with the Programs in any proceeding filed while these Terms are in effect, and for one year after any termination of these Terms. (d) These Terms are the parties' entire agreement relating to their subject matter and supersede all other agreements between the parties relating to its subject matter. (e) Customer may not make any public statement regarding the relationship contemplated by these Terms (except when required by law). (f) Except as provided in Section 13, all notices of termination or breach must be in writing and addressed to the other party's Legal Department (or if it is not known if the other party has a

Legal Department then to the other party's primary contact or other address on file). Emails are written notices. The email address for notices being sent to Google's Legal Department is legal-notices@google.com. Except as provided in Section 13, all other notices to Customer will be in writing and sent to an email address associated with Customer's account. Except as provided in Section 13, all other notices to Google will be in writing and addressed to Customer's primary contact at Google or other method made available by Google. Notice will be treated as given on receipt, as confirmed by written or electronic means. These notice requirements do not apply to legal service of process, which is instead governed by applicable law, nor do they apply to Section 13. (g) Except for modifications to these Terms by Google under Section 12, any amendment must be agreed to by both parties and must expressly state that it is amending these Terms. Neither party will be treated as having waived any rights by not exercising (or by delaying the exercise of) any rights under these Terms. Except as provided in Section 13(E), if any provision of these Terms is found unenforceable, that provision will be severed and the balance of the Terms will remain in full force and effect. (h) Neither party may assign any of its rights or obligations under these Terms without the written consent of the other party, except to an affiliate but only where (I) the assignee agrees in writing to be bound by these Terms, (II) the assigning party remains liable for obligations under these Terms if the assignee defaults on them, and (III) the assigning party has notified the other party of the assignment. Any other attempt to assign is void. (i) Except as provided in Sections 11 and 13, there are no third-party beneficiaries to these Terms. (j) These Terms do not create any agency, partnership, joint venture, or employment relationship among the parties. (k) Sections 1 (last sentence only) and 8 through 14 will survive termination of these Terms. (l) Except for payment obligations, no party or its affiliates are liable for failure or delay in performance to the extent caused by circumstances beyond its reasonable control.

January 10, 2022

# EXHIBIT 9

In the United States District Court
for the Western District of Texas
Austin Division

| | | |
|---|---|---|
| Defense Distributed, | § | |
|           Plaintiff, | § | |
| | § | |
| v. | § | No. 1:25-cv-01095-ADA-ML |
| | § | |
| YouTube LLC, | § | |
| Google LLC, | § | |
| Alphabet, Inc., | § | |
|           Defendants. | § | |

**Plaintiff's Response to
Defendants' Motion to Change Venue**

**Table of Contents**

Summary of the Argument ............................................................................................ 3

Argument......................................................................................................................... 5

I.      The motion to transfer should be denied. ........................................................ 5

      A.      Defendants' forum-selection clauses are not enforceable. ..................... 5

            1.      Federal law uses Texas law to determine enforceability............................ 6

            2.      Chapter 143A renders these clauses unenforceable................................... 6

            3.      Defendants' cases are inapposite. ............................................................. 9

            4.      The 2023 amendment filled the gap.........................................................10

      B.      Public-interest factors overwhelmingly favor Texas. ..........................13

            1.      The administrative difficulties flowing from court congestion.................14

            2.      The local interest in having localized interests decided at home...............14

            3.      The familiarity of the forum with the law that will govern the case. .........15

            4.      The avoidance of unnecessary problems of conflict of laws. .....................16

II.     Alternative request for relief. ............................................................................17

Conclusion....................................................................................................................18

Certificate of Service ...................................................................................................19

## Summary of the Argument

Defendants seek transfer to California based solely on forum-selection clauses in their Terms of Service. The motion fails because Texas Civil Practice and Remedies Code Chapter 143A renders these clauses unenforceable as a matter of law. Federal law decides enforceability by looking to the "strong public policy of the forum state." *Weber v. PACT XPP Techs.*, AG, 811 F.3d 758, 773 (5th Cir. 2016). The forum state is Texas and Chapter 143A is that strong public policy.

Chapter 143A codifies Texas public policy by supplying both (1) a mandatory Texas-venue provision, and (2) a waiver shield deeming any contrary contracts void and unenforceable. Section 143A.0035 provides that an action under Chapter 143A "shall be brought and maintained in a court in this state" "[n]otwithstanding any other law, any contract, or any venue, forum selection, or choice-of-law provision," § 143A.0035; and Section 143A.003 provides that a "waiver or purported waiver of the protections provided by this chapter is void as unlawful and against public policy, and a court or arbitrator may not enforce or give effect to the waiver, including in an action brought under Section 143A.007, notwithstanding any contract or choice-of-law provision in a contract." § 143A.003. Lest anyone doubt how "strong" this policy is, the Legislature expressly established that it "is a public-policy limitation on contractual and other waivers of the highest importance and interest to this state, and this state is exercising and enforcing this limitation to the full extent permitted by the United States Constitution and Texas Constitution." *Id.*

Chapter 143A therefore meets the federal doctrine's call for a "strong public policy of the forum state" rendering the invoked clauses unenforceable. Indeed, if these statutory provisions don't meet the test, none can; and if these don't meet the test, they are superfluous. Congress told federal courts to respect a forum state's strongest public policies, Texas has given just that here, and this Court should enforce it. HB20 cases belong in Texas courts—not Silicon Valley's.

Why don't the Defendants tout *Davis v. Meta Platforms, Inc.*, No. 4:22-CV-01001, 2023 WL 4670491 (E.D. Tex. July 20, 2023), and *Wise Guys I v. Meta Platforms, Inc.*, No. 3:23-CV-0217-X, 2023 WL 8434452 (N.D. Tex. Dec. 4, 2023), the only two cases from any court to have done a Section 1404 transfer inquiry as to the exact statute at hand? Because both of those decisions allowed for transfer of Chapter 143A suits *by expressly highlighting a statutory gap that has since been filled*. Both turned on the statute's lack of a Texas-venue mandate, which the Legislature supplied in 2023 by enacting Section 143A.0035. The missing link is no longer missing and they know it.

Even if Defendants could clear the enforceability hurdle, they would still lose at step (3) because this is the "rare" case where public-interest factors overwhelmingly disfavor transfer. The Western District of Texas resolves cases far faster than the Northern District of California—an especially weighty point where both sides want to vindicate free speech rights. Texas also has the strongest possible local interest: a Texas plaintiff invoking a Texas statute that applies only to Texas users, expression, and venues. Given that the Defendants refuse to let Texas state courts serve their role as the truly optimal venue, the proper federal alternative is this District, which already has singular familiarity with Chapter 143A through the ongoing *NetChoice v. Paxton* litigation. This Court is the federal epicenter for HB20 cases, and there may even come a point where consolidation or coordination with *NetChoice* ensures uniform rulings, if not at the district level perhaps on appeal. Splintering Chapter 143A cases into other circuits risks conflicting interpretations of the same statute. Keeping this case here both honors Texas's sovereign policy choice and promotes doctrinal consistency. Taken together, these factors present exactly the kind of special constellation *Atlantic Marine* reserved for denying transfer.

The motion should be denied.

<div align="center">

**Argument**

</div>

**I.     The motion to transfer should be denied.**

Defendants move to transfer venue under 28 U.S.C. § 1404(a) by invoking forum-selection

clauses. Doc. 26 at 7. The motion makes only that one argument—that forum-selection clauses

warrant transfer under the paradigm of *Atlantic Marine* (U.S. 2013)—and not any backup point

about transfer being warranted for any other reason (e.g., a traditional balancing of all factors).

Well-known legal standards apply. Two decisions have applied them to transfer motions in

the Chapter 143A context: *Davis v. Meta Platforms, Inc.*, No. 4:22-CV-01001, 2023 WL 4670491

(E.D. Tex. July 20, 2023), and *Wise Guys I v. Meta Platforms, Inc.*, No. 3:23-CV-0217-X, 2023 WL

8434452 (N.D. Tex. Dec. 4, 2023). The paradigm of *Davis* and *Wise Guys* should be used here.

When faced with a motion to transfer that invokes a forum-selection clause, the reviewing

court must "(1) determine whether the parties′ dispute is within the scope of the forum-selection

clause and whether that clause is mandatory and valid, (2) determine whether the forum-selection

clause is enforceable, and (3) determine whether 'extraordinary circumstances' weigh against

transfer despite a valid, enforceable forum-selection clause." *Wise Guys*, 2023 WL 8434452, at \*2;

*accord Davis,* 2023 WL 4670491, at \*9. This motion loses at both step (2) and step (3).

**A.     Defendants' forum-selection clauses are not enforceable.**

First, the motion fails because the public policy codified by Texas Civil Practice and

Remedies Code Chapter 143A renders the invoked forum-selection clauses unenforceable. The

enforceability test is a threshold requirement.  *See Wise Guys*, 2023 WL 8434452, at \*2; *Davis,*

2023 WL 4670491, at \*9. If the invoked clause is not "enforceable," the motion fails regardless of

whether or not a step (3) inquiry about extraordinary circumstances also defeats it. *See id.* Because

this motion's clauses are unenforceable as a matter of law, the motion fails without more.

<div align="center">

5

</div>

1.    **Federal law uses Texas law to determine enforceability.**

At bottom, Texas law determines the enforceability of this motion's forum-selection clauses because the dispositive question is one of forum state public policy. *See Wise Guys*, 2023 WL 8434452, at *2; *Davis,* 2023 WL 4670491, at *9. Though federal law governs the enforceability test overall, at issue here is a distinct and independently-operative facet of the test that federal law measures *by utilizing the law of the forum state. Id.* Specifically, federal law deems a forum-selection clause "unreasonable" and thus *not* enforceable if its enforcement would contravene a "strong public policy of the forum state." *Davis*, 2023 WL 4670491, at *11; *Weber v. PACT XPP Techs., AG*, 811 F.3d 758, 773 (5th Cir. 2016); *Haynsworth v. The Corp.*, 121 F.3d 956, 963 (5th Cir. 1997).

The motion only feigns disagreement. It insists that "courts must look to Section 1404(a) *rather than state law* in determining 'whether to give effect to the parties' forum-selection clause.'" Doc. 26 at 19 (emphasis added). But that just restates the point about federal law governing the *overall* enforceability test. The Defendants have no answer to *Wise Guys*, *Davis*, *Weber* (5th Cir. 2016) and *Haynsworth* (5th Cir. 1997), all of which know that federal law defines the particular "unreasonableness" trigger at issue in terms of a "strong public policy of the forum state."

Hence, it is Texas state law—not some freestanding federal gloss—that provides the rule of decision for the particular ground of unenforceability Defense Distributed invokes. That inquiry turns on whether enforcing this motion's clauses would contravene a strong public policy of Texas. Because Texas law shows that it clearly would do so, the motion fails without more.

2.    **Chapter 143A renders these clauses unenforceable.**

Texas Civil Practice and Remedies Code Chapter 143A supplies both the instant cause of action *and* a powerful set of ancillary rights, including both (1) a mandatory Texas-venue provision, and (2) a waiver shield deeming any contrary contracts unenforceable. These work hand in hand.

6

App.157

Section 143A.0035 provides that an action under Chapter 143A "shall be brought and maintained in a court in this state" "[n]otwithstanding any other law, any contract, or any venue, forum selection, or choice-of-law provision," § 143A.0035; and Section 143A.003 provides that a "waiver or purported waiver of the protections provided by this chapter is void as unlawful and against public policy, and a court or arbitrator may not enforce or give effect to the waiver, including in an action brought under Section 143A.007, notwithstanding any contract or choice-of-law provision in a contract." Together, these provisions codify the "strong public policy of the forum state" that enforcement of Defendants' clauses would contravene.

First, Chapter 143A supplies a core venue mandate in Section 143A.0035. It provides that any "action brought under this chapter against a social media platform shall be brought and maintained in a court in this state," and does so "[n]otwithstanding any other law, any contract, or any venue, forum selection, or choice-of-law provision in a contract":

### § 143A.0035. Venue and Choice of Law

Notwithstanding any other law, any contract, or any venue, forum selection, or choice-of-law provision in a contract, an action brought under this chapter against a social media platform shall be brought and maintained in a court in this state, and the law of this state applies to the action.

Tex. Civ. Prac. & Rem. Code § 143A.0035.

Second, Chapter 143A supplies a maximal waiver shield in Section 143A.003. It provides that any "waiver or purported waiver of the protections provided by this chapter is void as unlawful and against public policy, and a court or arbitrator may not enforce or give effect to the waiver, including in an action brought under Section 143A.007, notwithstanding any contract or choice-of-law provision in a contract," and does so "to the full extent permitted by the United States Constitution and Texas Constitution":

App.158

### § 143A.003. Waiver Prohibited

(a) A waiver or purported waiver of the protections provided by this chapter is void as unlawful and against public policy, and a court or arbitrator may not enforce or give effect to the waiver, including in an action brought under Section 143A.007, notwithstanding any contract or choice-of-law provision in a contract.

(b) The waiver prohibition described by Subsection (a) is a public-policy limitation on contractual and other waivers of the highest importance and interest to this state, and this state is exercising and enforcing this limitation to the full extent permitted by the United States Constitution and Texas Constitution.

Tex. Civ. Prac. & Rem. Code § 143A.003.

Both provisions apply here. Because Defense Distributed brought this action in Texas under Chapter 143A, *see* Doc. 1-2 at 35-39, ¶¶ 70-87, it shall be "maintained in a court in this state" "[n]otwithstanding any other law, any contract, or any venue, forum selection, or choice-of-law provision in a contract." *Id.* And because the motion's point about forum-selection clauses is one of "waiver," Doc. 26 at 21, the Texas statute deems it "void" and "unlawful" and "against public policy," such that the Court "may not enforce or give effect to the waiver." § 143A.003.

That straightforward reading is confirmed by context. Everyone knows that YouTube, Google, and the other "social media platforms" regulated by Chapter 143A operate only through mandatory clickwrap terms of service, each containing boilerplate forum-selection clauses. If Chapter 143A's venue mandate and waiver shield did not reach those very contracts, the statute would be a dead letter from day one—incapable of protecting any Texas user because every covered platform could immediately negate the statute by invoking its own pre-existing clause. By singling out "any contract" and "any forum selection ... provision" in its text, and by announcing a public policy "of the highest importance and interest to this state," the Legislature necessarily meant to cover exactly this situation. Otherwise, Chapter 143A would be pointless and ineffective.

App.159

###### 3.    Defendants' cases are inapposite.

The motion's best case is *Ameri-Fab, LLC v. Vanguard Energy Partners, LLC*, 646 F. Supp. 3d 795, 800 (W.D. Tex. 2022) (cited at 20-21). It is clearly inapposite for important reasons.

"Void" is not the same as "voidable." Not in general and especially not in Texas law. A void contract clause is treated as if it never existed; it is a legal nullity, unenforceable *ab initio* from the moment of its creation, no matter what the parties later say or do. *See, e.g.*, *ConocoPhillips Co. v. Hahn*, 704 S.W.3d 515, 526 n.15 (Tex. 2024); *Oncor Elec. Delivery Co. v. Wilbarger Cnty. Appraisal Dist.*, 691 S.W.3d 890, 907 (Tex. 2024).  By contrast, a voidable clause remains effective unless and until a party successfully invokes some defense to avoid it. *See, e.g., id.* This fundamental void/voidable distinction shows why the Defendants' best case is clearly off point.

"Void" is what Chapter 143A makes Defendants' forum selection clauses. It does not merely give users a defense they could elect to raise in certain circumstances. It categorically strips platforms of the ability to rely on such clauses at all, announcing in Section 143A.003 that any purported waiver of rights "is void as unlawful and against public policy, and a court or arbitrator may not enforce or give effect to the waiver." The Legislature thus removed judicial discretion, declaring these clauses nullities as a matter of law no matter what the parties may say or do.

"Voidable" is all that the *Ameri-Fab* statute did to its subject clauses: "Pursuant to the Texas law upon which this argument relies, such clauses are deemed 'voidable' under certain circumstances…." *Ameri-Fab*, 646 F. Supp. 3d at 801. That kind of "voidable" designation leaves the clause enforceable unless and until a party takes affirmative steps to set it aside, which is precisely the framework *Atlantic Marine* contemplates. Chapter 143A is different: it declares such waivers "void" *ab initio*.  By invoking *Ameri-Fab*, the Defendants want this Court to treat as voidable what Texas law has already made an absolute nullity.

*Matthews v. Tidewater, Inc.*, 108 F.4th 361, 370 (5th Cir. 2024) (cited by the Motion at 20), is obviously inapposite too. There is no federal statute that contradicts Section 143A.003 by expressly supporting the enforceability of forum-selection clauses in the HB20 context. But in *Matthews* there was such a direct and specific conflict. The state policy at issue did not stand alone like Chapter 143A does. The state policy that *Matthews* tested "conflict[ed] with and frustrate[d]" a competing federal law governing the particular kind of contracts at issue. *Id.* at 370. As Congress never enacted a statute reversing Section 143A.003, Defendants get nothing from *Matthews*.

The statute is not merely "unfavorable" to waiving contracts, as in *Stewart Organization Inc. v. Ricoh Corp.*, 487 U.S. 22 (1988) (cited by the motion at 19-20). Chapter 143A proudly voids them without qualification, touting that this scheme "is a public-policy limitation on contractual and other waivers of the highest importance and interest to this state, and this state is exercising and enforcing this limitation to the full extent permitted by the United States Constitution and Texas Constitution." § 143A.003. That kind of unabashed policy meets the test that others don't.

### 4.    The 2023 amendment filled the gap.

Why aren't Defendants touting *Wise Guys* and *Davis*? These two recent decisions are the only ones to have addressed the statute at issue (Chapter 143A) and both held that it does *not* evince the requisite "strong public policy of the forum state." *Wise Guys*, 2023 WL 8434452, at *2-3; *Davis,* 2023 WL 4670491, at *13-14. So why doesn't the motion say to follow *Wise Guys* and *Davis*?

The Defendants are hiding from *Wise Guys* and *Davis* because those holdings actually show why Defense Distributed should now prevail. *Wise Guys* and *Davis* allowed transfer away from Texas ***because Chapter 143A did not at that time have all of its current protective provisions***. When *Wise Guys* and *Davis* were decided, the statute lacked the core venue mandate that is now provided

App.161

by Section 143A.0035. Both decisions expressly turned on this missing link, which the Legislature remedied in late 2023 by adding the core venue provision of Section 143A.0035.

*Davis* makes this critical point clear. *Davis,* 2023 WL 4670491, at \*13-14. It begins by setting up the analysis just as Defense Distributed does, using Texas state law to define the particular "unreasonableness" trigger at issue. It then holds that the case can leave Texas only because the version of Chapter 143A in effect at that time *lacked an express provision setting venue in Texas and had a weaker waiver protection. Davis* sees the statute's current version on the horizon but is constrained to apply the lesser old version. Its careful analysis goes to show that, under the strengthened current version of the statute, the platforms must lose:

> According to Davis, the plain language of § 143A.003 prohibits the enforcement of the Meta Forum-Selection Clause (Dkt. #25 at p. 3). In its current form, § 143A.003 states that:
>
>> A waiver or purported waiver of the protections provided by this chapter is void as unlawful and against public policy, and a court or arbitrator may not enforce or give effect to the waiver, including in an action brought under Section 143A.007, notwithstanding any contract or choice-of-law provision in a contract.
>
> Tex. Civ. Prac. & Rem. Code Ann. § 143A.003(a). **As Meta points out, this language says nothing about forum-selection clauses.** To be sure, § 143A.003 expresses the Texas Legislature's desire to secure the substantive protections of Chapter 143A against choice-of-law agreements. But "even where Texas statutory provisions specify the application of Texas law, these provisions are irrelevant to the enforceability of a forum-selection clause where no statute 'requires suit to be brought or maintained in Texas.'" *In re AutoNation, Inc.*, 228 S.W.3d 663, 669 (Tex. 2007) (quoting *In re AIU Ins. Co.*, 148 S.W.3d 109, 114 (Tex. 2004)). Considering Texas's strong public policy in favor of the freedom of contract, the Supreme Court of Texas has set a high bar for rendering forum-selection clauses unenforceable: **"[A]bsent a statute requiring suit to be brought in Texas, the existence of statutory law in an area [does] not establish such Texas public policy as would negate a contractual forum-selection provision."** *In re Lyon Fin. Servs., Inc.*, 257 S.W.3d 228, 234 (Tex. 2008) (citing *In re AutoNation*, 228 S.W.3d at 669) (emphasis added). And, although there are no magic words that establish a state's strong public policy, "statutes found to evince a policy against forum-

selection clauses in certain contracts use the terms 'forum' and 'venue.' " *Al Copeland Inves., L.L.C. v. First Specialty Ins. Corp.*, 884 F.3d 540, 544 (5th Cir. 2018).

      **Neither term can be found in the current iteration of Chapter 143A, and nothing in the statute expressly requires suit to be brought in Texas courts.** Not only does Chapter 143A contain no language requiring suit to be brought in Texas courts, but it expressly contemplates at least one type of forum-selection clause— § 143A.003(a) indicates that parties can resolve disputes through arbitration, and an arbitration agreement is nothing more than "another type of forum-selection clause." *In re AIU Ins. Co.*, 148. The Court therefore finds that nothing in Chapter 143A establishes a public policy against the enforcement of forum-selection clauses.

      This finding is supported by the Texas Legislature's recent decision to add an entirely new section "relating to venue" to Chapter 143A. See Tex. S.B. 1602, 88th Leg., R.S. (2023). The Legislature specifically recognized that the current and effective version of Chapter 143A "[does] not specify a venue for these actions." Tex. S. Comm. on Jurisprudence, Bill Analysis, Tex. S.B. 1602, 88th Leg., R.S. (2023). And so, Senate Bill 1602, which will take effect as Texas Civil Practice and Remedies Code § 143A.0035 on September 1, 2023, requires any action under Chapter 143A to be "brought and maintained in a court in this state," notwithstanding any forum-selection clause. Act of May 29, 2023, 88th Leg., R.S., ch. 289, § 1, 2023 Tex. Sess. Law Serv. (to be codified at Tex. Civ. Prac. & Rem. Code Ann. § 143A.0035). Notably, however, this provision expressly applies "only to an action filed on or after" September 1, 2023, and is thus inapplicable here. *Id.* § 2.

      The Texas Legislature's addition to Chapter 143A—and the legislative history accompanying the bill—only highlights the fact that the version of the statute under which Davis brings this case is silent on the issue of venue. *Cf. Emergency Health Ctr. at Willowbrook, L.L.C. v. UnitedHealthcare of Tex., Inc.*, 892 F. Supp. 2d 847, 855 (S.D. Tex. 2012) (noting that, under Texas law, "when the legislature enacts an amendment, [a court] may presume that it thereby intended to change the original act"). **Of course, the addition of § 143A.0035 reflects the Texas Legislature's desire to keep future cases brought under Chapter 143A in Texas courts. But, rather than making the amendment retroactive, the Legislature expressly limited § 143A.0035 "only to [cases] filed on or after" September 1, 2023. Thus, the Court concludes that Senate Bill 1602 does not override Texas's strong public policy in favor of forum-selection clauses here.**

      In the end, the Court "look[s] to state statutes and judicial decisions to determine public policy." *Westchester Fire Ins. Co. v. Admiral Ins. Co.*, 152 S.W.3d 172, 182 (Tex. App.—Fort Worth 2004, pet. denied). As noted above, the relevant statute here is currently silent on the issue of venue. That is, there is no current

App.163

statute "requiring suit to be brought in Texas" under Chapter 143A. *In re Lyon Fin. Servs.*, 257 S.W.3d at 234. Accordingly, the Court concludes that Davis cannot point to any "Texas public policy as would negate a contractual forum-selection provision." *Id.*

*Davis v. Meta Platforms, Inc.*, No. 4:22-CV-01001, 2023 WL 4670491 (E.D. Tex. July 20, 2023).

The missing link is no longer missing. That is why the Defendants hide from *Davis* and *Wise Guys*.  Now that Section 143A.0035 supplies a venue mandate in the strongest possible terms, it operates in conjunction with the waiver shield of Section 143A.003 to conclusively establish that enforcing this motion's clauses would contravene a "strong public policy of the forum state." *Davis*, 2023 WL 4670491, at *11; *Weber v. PACT XPP Techs., AG*, 811 F.3d 758, 773 (5th Cir. 2016); *Haynsworth v. The Corp.*, 121 F.3d 956, 963 (5th Cir. 1997).

For these reasons, the motion fails at step (2) because the forum-selection clauses are not enforceable. This standalone failure warrants denying the motion without more. *See Wise Guys*, 2023 WL 8434452, at *2; *accord Davis,* 2023 WL 4670491, at *9.

### B.    Public-interest factors overwhelmingly favor Texas.

Second and alternatively, even if the forum-selection clauses at issue are valid and enforceable, the motion fails at step (3). *Atlantic Marine* reserves a lane of relief for "unusual" cases where the public-interest factors "overwhelmingly disfavor" enforcing a forum-selection clause. *Atl. Marine*, 571 U.S. at 67. This is that case.

"The public interest factors bearing on transfer are: '(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws [or in] the application of foreign law.'" *Def. Distributed*

*v. Bruck*, 30 F.4th 414, 435 (5th Cir. 2022). Taken together, all four of the public factors present the "rare" constellation that defeats transfer notwithstanding a contrary forum-selection clause.

> **1.    The administrative difficulties flowing from court congestion.**

The Western District of Texas is handling its cases substantially faster than the Northern District of California.[1] A civil action's median time "From Filing to Disposition" is ***7.6 months here versus 20.5 months there***; and a civil action's median time from "From Filing to Trial" is 33.4 months here versus 40.2 months there. *See* Ex. A (Administrative Office of the U.S. Courts, U.S. District Court — Judicial Caseload Profile (March 31, 2025)). These are not marginal differences; they represent years of potential delay.

This substantial disparity has special force where, as here, *both sides of the case* say that they are vindicating critical free speech rights. The Supreme Court has long held that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976), and the loss of freedoms that HB20 protects are likewise invaluable. If the Defendants really believe in their First Amendment defense, they should want to litigate it sooner here rather than much, much later there.

> **2.    The local interest in having localized interests decided at home.**

This factor strongly favors Texas because of *Defense Distributed v. Bruck*, 30 F.4th 414, 435 (5th Cir. 2022), where the Fifth Circuit analyzed strikingly parallel facts—Defense Distributed being illegally censored in Texas by out-of-state wrongdoers—and rightly held that "Texas's 'local interest in having [the] localized interests' this case implicates 'decided at home' cannot be overstated." *Id.* If anything, this factor now weighs even more strongly in favor of Texas than in

---

[1] The analysis is properly done at a district-wide level. *See In re Planned Parenthood Fed'n of Am., Inc.*, 52 F.4th 625, 631 (5th Cir. 2022)

*Defense Distributed* because the instant cause of action in question is a creature of Texas statute (as opposed to the Section 1983 and First Amendment rights at issue before).

This is a Texas plaintiff invoking a Texas speech-protection statute to remedy censorship of Texas speech shared and received in Texas. Chapter 143A applies only to users who reside, do business, or share/receive expression "in this state," and it directs that such actions "shall be brought and maintained in a court in this state." § 143A.0035. Texas therefore has the strongest possible stake in adjudicating such HB20 actions. *See Defense Distributed v. Bruck*, 30 F.4th 414.

### 3.    The familiarity of the forum with the law that will govern the case.

Texas courts are best positioned to apply and interpret Chapter 143A. *See, e.g.*, *Scivation, Inc. v. Xtend5, LLC*, No. 1:20-CV-00986-RP, 2021 WL 2177254, at \*2 (W.D. Tex. May 28, 2021) ("While both forums have familiarity with federal law, the Western District of Texas has more familiarity with Texas state law claims, and thus this factor weighs against transfer."), *report and recommendation adopted*, No. 1:20-CV-986-RP, 2021 WL 8083330 (W.D. Tex. June 29, 2021). Indeed, the Western District of Texas has already developed singular expertise with this statute because the first main constitutional challenge—*NetChoice, LLC v. Paxton*, No. 1:21-cv-00840-RP—has been and continues to be litigated in this very District. That case involves the same statutory regime, the same legislative findings, and the same speech/non-discrimination mandate at issue here. And the Fifth Circuit to receive this case has already spent considerable time analyzing the statute's text and structure and grappling with its constitutional footing.

The Western District of Texas' *NetChoice* experience is not just incidental—it makes this Court the national epicenter for HB20 litigation. So much so that, down the road, it may even become appropriate to consider whether this action should be coordinated with *NetChoice* for purposes of efficiency and consistency. Whether or not consolidation ever becomes necessary, the

App.166

mere viability of that option underscores an extraordinary reason to keep this case in Texas. Having already overseen the statute's seminal test case, the Western District of Texas is the natural and most efficient forum to resolve Chapter 143A's application to these facts.

### 4. The avoidance of unnecessary problems of conflict of laws.

Because this case arises under a Texas statute that explicitly mandates Texas law, sending it to California would invite unnecessary questions of what law governs—the law of the forum or the law specified by the Texas Legislature. A California court would be forced to parse whether to apply Texas's substantive law or default to its own forum rules, whereas a Texas forum avoids any such dissonance because both the statute and the forum align.

Conflict-of-laws problems would be heightened by transfer because this Court already has before it *NetChoice, LLC v. Paxton*, No. 1:21-cv-00840-RP—a separate constitutional challenge to Chapter 143A. That case involves the same statute, the same legislative findings, and the same speech-non-discrimination mandate at issue here. If this case were shipped to California, two federal courts in different circuits would be construing the very same Texas statute at the same time. And the risk here goes beyond duplication. Two courts might issue divergent rulings about the constitutionality or scope of Chapter 143A—one in Texas, one in California—leaving both litigants and the public uncertain about what the statute actually means. That is the very essence of an unnecessary "conflict of laws." The prudent course is to keep all Chapter 143A litigation consolidated in the courts that already have expertise and active cases on the subject.

Taken together, these factors leave no doubt that this is the "rare" case *Atlantic Marine* envisioned where the public-interest analysis defeats transfer. The Western District of Texas is not just *a* convenient federal forum—it is *the* federal forum best positioned to adjudicate Chapter 143A, the statute Texas has declared to be "of the highest importance and interest to this state."

App.167

§ 143A.003(b). (Of course, the best forum of all is the Texas state court where Plaintiff filed suit and where the Texas Legislature intended these claims to be heard—but which Defendants refuse to accept.). To uproot this case and send it to California would squander this venue's developed expertise, slow the resolution of urgent claims, and risk divergent interpretations of the same Texas law. The motion should therefore be denied on step (3) grounds alone.

## II.     Alternative request for relief.

If for whatever reason the Court decides that this case should be transferred out of Texas, the Court should *not* give any transfer order *immediate* effect.  Instead, the Court should in the same document that orders the transfer stay the transfer decision for no less than 30 days to afford the Plaintiff an adequate opportunity to pursue appellate review in the United States Court of Appeals for the Fifth Circuit. With the stay, an immediate transfer might deprive Defense Distributed of its right to appellate review in the appropriate circuit.

App.168

**Conclusion**

The motion should be denied.

Respectfully submitted,

Chad Flores
Texas Bar No. 24059759
cf@chadflores.law
Flores Law PLLC
917 Franklin Street, Suite 600
Houston, Texas 77002
(713) 364-6640

Colleen McKnight
Texas Bar No. 24078976
colleen.mcknight@mcknightlaw.us
McKnight Law PLLC
801 Travis Street Suite 2101
PMB 698
Houston, TX 77002
(713) 487-5645

Counsel for Plaintiff

**Certificate of Service**

A true and correct copy of this submission was served on the day of its filing via the Court's CM/ECF system on all counsel registered therewith and on those attorneys not registered for electronic filing (Elijah Barrish) via email.

Chad Flores
Texas Bar No. 24059759
cf@chadflores.law
Flores Law PLLC
917 Franklin Street, Suite 600
Houston, Texas 77002
(713) 364-6640

App.170

# EXHIBIT 10

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| |
|---|
| DEFENSE DISTRIBUTED, |
| Plaintiff, |
| v. |
| YOUTUBE LLC, GOOGLE LLC, and ALPHABET, INC., |
| Defendants. |

Case No. 1:25-cv-1095-ADA-ML

**DEFENDANTS' REPLY IN SUPPORT OF**
**MOTION TO TRANSFER TO**
**THE NORTHERN DISTRICT OF CALIFORNIA**

## I.    INTRODUCTION

Plaintiff does not dispute the existence of multiple valid forum-selection clauses requiring litigation of this case in the Northern District of California.  Instead, Plaintiff opposes transfer on the theory that Texas overrode federal law recognizing and enforcing forum-selection clauses by declaring that its anti-forum-selection-clause law embodies a strong public policy.  That cannot be.  If credited, Plaintiff's theory would allow states to "effectively override" the Supreme Court's forum selection decisions by "classifying" their anti-forum selection statutes as "manifesting a strong public policy." *Albemarle Corp. v. AstraZeneca UK Ltd.*, 628 F.3d 643, 652 (4th Cir. 2010) (rejecting a similar attempt).  Federal law—not Texas law—is supreme.  Federal law, not state law, governs the enforceability of forum-selection clauses. *Barnett v. DynCorp Int'l, L.L.C.*, 831 F.3d 296, 301 (5th Cir. 2016).  And critically, the U.S. Supreme Court has considered and rejected the same argument Plaintiff now advances, holding that federal law preempts states' efforts to invalidate such clauses in the context of 28 U.S.C. § 1404(a) transfers. *Stewart Org. v. Ricoh*

*Corp.*, 487 U.S. 22, 30 (1988).  Defendants respectfully request that the Court enforce the forum-selection clauses and transfer this case.

## II.    ARGUMENT

### A.  The Forum-Selection Clauses Should Be Enforced And This Case Should Be Transferred To The Northern District Of California.

#### 1.  Federal Law Governs The Enforceability Of Forum-Selection Clauses In Diversity Cases.

Plaintiff stumbles at the starting gate by claiming Texas state law determines the enforceability of forum-selection clauses.  *See* ECF No. 35 ("Opp.") at 6.  Plaintiff is wrong.  It is well-settled that in diversity cases, enforceability of forum-selection clauses is a matter of federal law, not Texas law.  *Barnett*, 831 F.3d at 301 ("[I]n diversity cases, federal law governs the 'enforceability' of forum selection clauses.").  Plaintiff's erroneous premise is no small matter.  Rather, it pervades—and undermines—Plaintiff's entire Opposition.

#### 2.  Transfer is Required Because Federal Law Preempts State Laws Purporting To Invalidate Forum-Selection Clauses In Diversity Cases.

Since federal law governs the transfer analysis under §1404(a) in diversity cases, state laws purporting to invalidate forum-selection clauses are irrelevant to the analysis this Court must conduct.  And to the extent state laws purport to direct federal courts not to consider such clauses, they are preempted under a line of Supreme Court cases and cases in this district faithfully following those precedents.  *See* ECF No. 26 ("Mot.") at 14–15 (collecting cases).  Plaintiff tries to get around these cases by claiming enforcement of the forum-selection clauses would contravene a strong public policy of the forum.  *See* Opp. at 6.  But Plaintiff fails to grasp that when the state's policy interest amounts to hostility to agreements selecting another forum, that interest is preempted by federal law.

The seminal Supreme Court case on this issue is *Stewart*, which Plaintiff largely ignores. There, the Supreme Court held that the § 1404(a) analysis in a diversity case must consider a forum-selection clause regardless of whether state law declares such clauses invalid. *Stewart*, 487 U.S. at 30. Importantly, it did not matter that Alabama's policy categorically invalidated[1] all such clauses—§ 1404(a) preempted that policy because "the instructions of Congress are supreme." *Id.* Twenty-five years later, the Supreme Court reaffirmed the logic of *Stewart* in *Atlantic Marine*, and clarified just how much weight such clauses are to be given: "controlling weight in all but the most exceptional cases." *Atl. Marine Const. Co., Inc. v. U.S. Dist. Court for W. Dist. of Tex.*, 571 U.S. 49, 60 (2013) (quoting *Stewart*, 487 U.S. at 33) (Kennedy, J., concurring)).

Thus, two relevant principles emerge from *Stewart* and *Atlantic Marine*. Where a party moves to transfer in a diversity case pursuant to § 1404(a) based on a forum-selection clause: (1) a district court **must** consider the clause in its analysis regardless of state law or policy purporting to dictate otherwise; and (2) once the clause is under consideration, the court **must** give it controlling weight in all but the most exceptional cases.

Here, the application of these principles requires transfer notwithstanding Plaintiff's arguments about Chapter 143A. Plaintiff does not dispute entering into several agreements preselecting the Northern District of California as the required venue. Plaintiff also does not dispute the validity of these agreements or that they cover its claims. Plaintiff instead disputes their **enforceability**, pointing to § 143A.0035, which requires an action brought under Chapter 143A to be brought in Texas "notwithstanding any other law . . . or any . . . forum selection . . .

---

[1] Plaintiff's claim that the Alabama policy at issue in *Stewart* was merely "unfavorable" to forum selection clauses is incorrect. *See* Opp. at 10. As the Fifth Circuit has explained, Alabama's policy categorically rendered all such clauses "invalid." *Barnett*, 831 F.3d at 302-03 (quoting *Redwing Carriers, Inc. v. Foster*, 382 So.2d 554, 556 (Ala. 1980)).

provision in a contract," and § 143A.003, which renders "waivers" of the "protections" of Chapter 143A "void as unlawful against public policy."

According to Plaintiff, when taken in combination, these two provisions establish a strong public policy against forum-selection clauses that prohibits enforcement of the clause. Opp. at 7-8. But this is exactly the same theory considered and rejected in *Stewart*, where the party opposing transfer based on a forum-selection clause relied on a state public policy purporting to invalidate forum-selection clauses. *Stewart*, 487 U.S. at 24; *Barnett*, 831 F.3d at 302-03 (quoting the Alabama policy preempted in *Stewart*). The Supreme Court rejected that argument, holding that because "the instructions of Congress are supreme" over state law, the forum selection clause must be considered. *Stewart*, 487 U.S. at 30.

The same is true here. This is a diversity case. The question before the Court is whether transfer is required under § 1404(a). And the Texas state law provisions Plaintiff relies on cannot be used to preclude this Court from considering and enforcing the forum-selection clause. *CyrusOne LLC v. Hsieh*, No. 4:21-cv-263, 2021 WL 2936379, at *6 n.1 (E.D. Tex. July 13, 2021) (California statute voiding forum-selection clauses not relevant because federal law governs enforceability); *Ameri-Fab, LLC v. Vanguard Energy Partners, LLC*, 646 F. Supp. 3d 795, 804 (W.D. Tex. 2022) (Texas statute making forum-selection clauses voidable entitled to no weight because federal law governs enforceability). To the extent the Texas statutes purport to require the Court to void the clause or refuse to enforce it notwithstanding *Stewart* and *Atlantic Marine*, they are preempted. *Stewart*, 487 U.S. at 30; *Albemarle Corp.*, 628 F.3d at 652 ("[I]nsofar as the South Carolina statute would purport to impose South Carolina procedural rules on a federal court, it would be preempted by federal law."); *Postnet Int'l Franchise Corp. v. Wu*, 521 F. Supp. 3d 1087, 1094 (D. Colo. 2021) ("The plaintiff in *Stewart* argued that a state law voiding forum-

App.175

selection clauses controlled in federal court . . . [b]ut federal law preempts California law here just as it preempted Alabama law in *Stewart*.").

Thus, while it is true that a party may avoid enforcement of a forum-selection law if it violates some **other** strong public policy of the forum state (*see* Opp. at 6), the party resisting enforcement may not do so if the cited public policy is one of hostility to forum-selection clauses. Were it otherwise, states could "effectively override" the Supreme Court's forum selection decisions by "classifying" their anti-forum selection statutes as "manifesting a strong public policy." *Albemarle Corp.*, 628 F.3d at 652.[2]  Federal law preempts that gambit.  At bottom, Plaintiff's argument is just another attempt to do what the Supreme Court prohibited in *Stewart*: use a state law to dictate to a federal court sitting in diversity that it may not consider a forum-selection clause when considering a motion to transfer venue under 28 U.S.C. § 1404(a).  The Court should reject this, follow *Stewart*, and transfer this case.

### 3.  Plaintiff's Other Arguments And Cited Cases Do Not Change The Outcome.

Plaintiff's other arguments against transfer fail for similar reasons.  To start, contrary to Plaintiff's argument, Opp. at 9, federal law reigns supreme regardless of whether the state public policy renders a forum-selection clause "void" rather than "voidable."  Courts regularly uphold the supremacy of federal law honoring forum-selection clauses in the face of state law that would render them void.  *See, e.g.*, *CyrusOne*, 2021 WL 2936379, at *6 n.1 (holding California statute purporting to "void" forum selection clauses was not relevant to § 1404(a) analysis because "the enforceability of a forum selection clause is governed by federal law.").  Indeed, the Alabama policy in *Stewart* invalidated such clauses outright, so there is no daylight between the state policy

---

[2] This is not a unique conclusion; the same approach applies to arbitration provisions.  *E.g.*, *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996).

in *Stewart* and the Texas laws here. *Supra* at § II.A.2.[3]

Next, Plaintiff cites two distinguishable district court cases to argue transfer is precluded by the Legislature's amendment of Chapter 143A in 2023 to add the anti-forum-selection provision. Opp. at 10–13 (citing *Davis v. Meta Platforms, Inc.*, No. 4:22-CV-01001, 2023 WL 4670491 (E.D. Tex. July 20, 2023) and *Wise Guys I v. Meta Platforms, Inc.*, No. 3:23-CV-0217-X, 2023 WL 8434452 (N.D. Tex. Dec. 4, 2023)). According to Plaintiff, since *Davis* and *Wise Guys* relied on the fact that this provision was not yet in effect to grant transfer, the fact that it is now in effect means transfer must be denied. Opp. at 13. But this is a logical fallacy. *Davis* and *Wise Guys* did not have to consider *Stewart* or the federal preemption issues discussed above because the relevant provisions had not been enacted. These cases simply are not relevant to the analysis, which is why Defendants did not discuss them in the opening brief.[4]

### 4. Section 143A.003 Does Not Apply At All Because The Forum-Selection Clauses In This Case Are Not "Waivers" of the Protections of Chapter 143A.

To the extent the Court is inclined to credit the argument that Section 143A.003 reflects a "strong public policy" that could justify refusal to enforce a forum-selection clause, that argument

---

[3] Numerous other federal courts have upheld forum selection clauses in the face of a state law purporting to render them "void." *Zeppelin Sys. USA, Inc. v. Pyrolyx USA Ind., LLC,* No. 19-cv-11222, 2020 WL 1082774, at *4 (S.D.N.Y. Mar. 5, 2020) (upholding forum-selection clause under federal law notwithstanding Indiana law that would void it); *Brand Energy Servs., LLC v. Enerfab Power & Indus., Inc.,* No. 3:15-01530, 2016 WL 1650607, at *3-4 (M.D. Tenn. Oct. 28, 2016) (upholding forum-selection clause under federal law despite Tennessee law purportedly voiding it).

[4] Plaintiff also claims Defendants "have no answer" to *Weber* and *Haynsworth*. But these cases actually support Defendants' arguments. Both found foreign forum-selection clauses mandatory and enforceable, and concluded that dismissal was appropriate. *Weber v. PACT XPP Techs., AG,* 811 F.3d 758, 776 (5th Cir. 2016) ("[T]he district court was well within the bounds of its considerable discretion in dismissing."); *Haynsworth v. The Corp.*, 121 F.3d 956, 958 (5th Cir. 1997) (concluding "that the parties are bound by the contracts they entered into"). Plaintiff relies on their generic language about strong public policy as a basis to avoid enforcement of a forum selection clause, but as discussed above, that policy cannot be mere hostility to forum selection clauses.

fails for an independent reason:  § 143A.003 does not apply at all given the unique facts of this

case.  That section only applies to "waivers" of "protections" provided elsewhere in Chapter 143A.

Tex. Civ. Prac. & Rem. Code Ann. § 143A.003(a).  Plaintiff argues the forum selection clauses to

which it agreed are "waivers" of § 143.0035, which requires civil actions to be "brought and

maintained" in a court in Texas.  Opp. at 8.  But there is a fundamental problem with this theory:

**the timeline doesn't work**.  The "protection" Plaintiff claims was "waived" by the forum selection

clauses—the state court venue provision at § 143A.0035—only became effective in September

2023, **after** Plaintiff agreed to the forum-selection clauses.  *Compare* Act of May 29, 2023, 88th

Leg., R.S., ch. 289, § 2, 2023 Tex. Sess. Law Serv. (providing that § 143A.0035 applies "only to

an action filed on or after" September 1, 2023) with ECF No. 26-2, Declaration of Victoria

McGinniss, ¶¶ 4-5 (establishing Plaintiff entered into Google's Advertising Program Terms

containing forum-selection clause in November 2022, before Section 143.0035 took effect); ECF

No. 26-1, Declaration of Nicole Korn, ¶¶ 3-6 (establishing that the YouTube Terms have had a

Santa Clara forum-selection clause at all relevant times, that use of YouTube's services subjects

users to the YouTube Terms, and that Plaintiff has continually used YouTube by uploading videos

to its channel since 2012).

Under basic principles of Texas law, a contract entered into **before** § 143A.0035 became

law cannot be a waiver of that not-yet-existing section's protections.  Waiver is the "intentional

relinquishment of a known right or intentional conduct inconsistent with claiming that right."

*Jernigan v. Langley*, 111 S.W.3d 153, 156 (Tex. 2003) (quotation omitted).  Here, the right in

question (§ 143A.0035) did not even exist at the time the forum-selection clauses were agreed to,

so the agreements by definition cannot be intentional *waivers* of that right.  *See Ulico Cas. Co. v.*

*Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008) (confirming that "an existing right" is an

element of a waiver). Put differently, at the time Plaintiff agreed to litigate in Santa Clara County, it had no existing "known right" to relinquish. *Mem'l Hermann Hosp. Sys. v. Hayden*, No. 01-13-00154-CV, 2014 WL 2767128, at *5 (Tex. App.—Houston [1st Dist.] June 17, 2014, pet. denied) ("[A] party cannot waive a right that does not exist at the time."). Thus, even if state law could apply here, Section 143A.003 does not because there was no "waiver."

Nor is there any basis for applying Chapter 143A retroactively to destroy pre-existing contracts. Under Texas law, courts "generally presume that statutes are prospective unless they are expressly made retroactive," *City of Austin v. Whittington*, 384 S.W.3d 766, 790 (Tex. 2012), and there is no such indicia here. Moreover, retroactive application of § 143A.003 (*i.e*, interpreting an already-existing contract as a waiver of a right that did not yet exist) would raise constitutional concerns, as that would invalidate agreements that predated § 143A.0035. Interpreting the statute to do that would implicate both the Contracts Clause of the U.S. Constitution and the Texas Constitution's prohibition on impairing contractual obligations. *Liberty Mut. Ins. Co. v. Tex. Dep't of Ins.*, 187 S.W.3d 808, 824 (Tex. App.—Austin 2006, pet. denied) ("Both the federal and Texas Constitutions provide protection from the impairment of contractual obligations.") (citing U.S. Const. Art. I, § 10, cl. 1; Tex. Const. Art. I, § 16).

The Court need not wade into these deep constitutional waters. Under basic principles of constitutional avoidance, it should simply avoid these issues by applying the normal presumption against retroactivity, in which case § 143A.003 does not apply to this case because the forum-selection clauses are not "waivers." *Quick v. City of Austin*, 7 S.W.3d 109, 115 (Tex. 1998) ("In analyzing the constitutionality of a statute, we should, if possible, interpret the statute in a manner that avoids constitutional infirmity.").

The end-result is the collapse of Plaintiff's "strong public policy" theory, which depends upon the applicability of § 143A.003. Since that section only applies in the event of a "waiver," and there was none here, that section does not apply even by its own terms. Without that hook, all that is left of Plaintiff's argument is a generic anti-forum selection clause provision (§ 143A.0035), which is plainly preempted by federal law.

### B. The Public Interest Factors Do Not Overwhelmingly Disfavor Transfer.

The Supreme Court has held that in cases like this one involving forum-selection clauses, a plaintiff may only avoid transfer by showing the "public-interest factors **overwhelmingly** disfavor a transfer." *Atl. Marine*, 571 U.S. at 67 (emphasis added). It is "rare" for a plaintiff to meet this burden because where a forum-selection agreement exists, all private interest factors "weigh entirely in favor of the preselected forum." *Id.* at 64. Plaintiff comes nowhere close to meeting this standard, instead pointing to a number of neutral public-interest factors.

**Local Interest.** Plaintiff insists there is a local interest in having its claims under Chapter 143A decided in Texas, but ignores three key facts that render this factor neutral. First, the relief Plaintiff seeks—an injunction restoring its content to a national platform—is not limited to Texas. It has national implications. Second, Plaintiff seeks injunctive relief against YouTube and Google, two companies headquartered in the Northern District of California. *See* ECF No. 1-2, Petition ¶¶ 30-31, 89. Because a "judicial district has a 'strong local interest' in cases involving a corporate party headquartered in that district," this factor is neutral when assessing identical claims against other social media platforms. *Davis*, 2023 WL 4670491, at *17. Third, as Plaintiff concedes, the core issue is whether this law violates the First Amendment of the U.S. Constitution. That is not a "localized interest." It is a national issue with national ramifications. *Id.* ("[I]n cases like this one, where a plaintiff accuses a defendant headquartered in another district of taking actions to

restrict the plaintiff's First Amendment rights, courts have found this factor to be neutral.").

**Familiarity Of Forum With The Law.** Plaintiff argues that this district is more familiar with the law given the ongoing trade association challenge to Chapter 143A. But "[t]his factor does not weigh in favor of transfer when both districts are 'equally capable of applying the relevant law.'" *In re TikTok, Inc.*, 85 F.4th 352, 365 (5th Cir. 2023). It is irrelevant that there is a similar case in this district or that Plaintiff has Texas law claims. *Id.* at 366 ("[E]ven if Texas law unequivocally governed petitioners' state-law claims, that alone is not enough to hold that a Texas federal judge is better equipped to handle these claims."). Courts assessing identical claims have concluded this factor is neutral. *Davis*, 2023 WL 4670491, at *17.

**Potential Conflict Of Laws.** Plaintiff also suggests transfer could result in a conflict of laws given the ongoing trade association challenge to Chapter 143A. But the mere existence of parallel proceedings does not constitute a public interest basis to deny transfer. The "conflict of laws" factor focuses on whether different laws might apply, not the potential for conflicting judicial outcomes arising from similar suits. *See In re Volkswagen of Am., Inc.*, 545 F.3d 304, 315 (5th Cir. 2008). Where the core issues are federal, *e.g.*, the First Amendment, courts find this factor neutral. *Valtrus Innovations Ltd. v. Google LLC*, No. 3:22-CV-066-L-BW, 2025 WL 2076627, at *9 (N.D. Tex. July 22, 2025) ("The Court finds this factor neutral as federal patent law governs the dispute, and therefore raises no conflict-of-law issues.").

**Court Congestion.** Plaintiff's statistics showing a difference in time-to-trial between the Western District of Texas and the Northern District of California "carry little weight" in the transfer analysis because docket speed comparisons are too speculative to overcome a valid forum-selection clause. *See In re Clarke*, 94 F.4th 502, 510 (5th Cir. 2024). Further, Plaintiff's "assertions that [its] case needs to be decided quickly should not affect the weight of this factor."

*In re Chamber of Com. of United States of Am.*, 105 F.4th 297, 310 (5th Cir. 2024). And while Plaintiff invokes the mantle of the First Amendment, Plaintiff does not have a First Amendment claim. Ultimately, Plaintiff's point comes down to an argument that it believes its case will be resolved faster if it stays in this district, but that is a **private** interest and not a public one. Finally, this case is likely to be resolved on the merits through summary judgment briefing on the constitutional issues, so the statistics Plaintiff cites are largely irrelevant.

Plaintiff fails to show the public-interest factors "overwhelmingly disfavor" transfer. *Atlantic Marine*, 571 U.S. at 67. At most, Plaintiff identifies neutral considerations. And even if the factors slightly disfavor transfer, that would not be enough to override the parties' agreement. *Weber*, 811 F.3d at 776 (public interest factors will "outweigh a valid forum selection clause only in truly extraordinary cases.").

Respectfully submitted,

Dated:  September 19, 2025

**SCOTT DOUGLASS & MCCONNICO LLP**

*/s/ Steven J. Wingard*
Steven J. Wingard
Texas Bar No. 00788694
Robyn Hargrove
Texas Bar No. 24031859
Eli Barrish
Texas Bar No. 24144433

303 Colorado Street, Suite 2400
Austin, TX 78701
Telephone: (512) 495-6300
Facsimile: (512) 474-0731
swingard@scottdoug.com
rhargrove@scottdoug.com
ebarrish@scottdoug.com

**COOLEY LLP**
Jonathan Patchen (admitted *pro hac vice*)
Michael A. Rome (admitted *pro hac vice*)
Anika Holland (admitted *pro hac vice*)
Madeleine R. Ahlers (admitted *pro hac vice*)

3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Telephone: (415) 693-2000
Facsimile: (415) 693-2222
jpatchen@cooley.com
mrome@cooley.com
anika.holland@cooley.com
mahlers@cooley.com

*Attorneys for Defendants YouTube LLC, Google
LLC, and Alphabet, Inc.*

App.183

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served electronically on all counsel of record on this the 19th day of September, 2025.


/s/ Steven J. Wingard
Steven J. Wingard

# EXHIBIT 11

—1—

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
 2                        AUSTIN DIVISION

 3    DEFENSE DISTRIBUTED      *
                              *      November 6, 2025
 4    VS.                      *
                              * CIVIL ACTION NO. 1:25-CV-1095
 5    YOUTUBE LLC, ET AL.      *

 6           BEFORE THE HONORABLE ALAN D ALBRIGHT
                 MOTIONS HEARING (via Zoom)
 7
      APPEARANCES:
 8
      For the Plaintiff:   Charles R. Flores, Esq.
 9                         Flores Law PLLC
                           917 Franklin Street, Suite 600
10                         Houston, TX 77002

11    For the Defendants:  Jonathan Alan Patchen, Esq.
                           Anika Holland, Esq.
12                         Cooley, LLP
                           3 Embarcadero Center, 20th Floor
13                         San Francisco, CA 94111

14                         Steven J. Wingard, Esq.
                           Scott, Douglass & McConnico, L.L.P.
15                         303 Colorado Street, Suite 2400
                           Austin, TX 78701
16
      Court Reporter:      Kristie M. Davis, CRR, RMR
17                         PO Box 20994
                           Waco, Texas 76702
18                         (254) 666-0904

19       Proceedings recorded by mechanical stenography,

20    transcript produced by computer-aided transcription.

21

22

23

24

25
```

—2—

```
10:16   1                    (Hearing begins.)
10:16   2                    DEPUTY CLERK:  A civil action in Case
10:16   3    AU:25-CV-1095, Defense Distributed versus YouTube LLC,
10:16   4    et al.  Case called for a motions hearing.
10:16   5                    THE COURT:  Announcements from counsel,
10:16   6    please.
10:16   7                    MR. FLORES:  For the plaintiff Defense
10:16   8    Distributed, I'm Chad Flores, Your Honor.
10:16   9                    MR. WINGARD:  For the defendants YouTube,
10:16  10    Google, and Alphabet, I'm Steve Wingard from Scott
10:16  11    Douglass & McConnico.  With me today are Jonathan
10:16  12    Patchen, Anika Holland, Michael Rome from Cooley.  And
10:17  13    Denisha Bacchus from Google as well.
10:17  14                    THE COURT:  Okey dokey.  Thank you all.
10:17  15                    I have a motion to transfer to the
10:17  16    Northern District of California.  I will hear first
10:17  17    from the defendant, please.
10:17  18                    MR. PATCHEN:  Thank you, Your Honor.
10:17  19    Jonathan Patchen on behalf of the defendants in this
10:17  20    case.
10:17  21                    Your Honor, this is a fairly
10:17  22    straightforward motion under 1404(a) with a forum
10:17  23    selection clause.  What is not in this issue is what is
10:17  24    typically at issue in forum selection clauses, whether
10:17  25    there's a formation, question, questions of fraud,
```

—3—

| | | |
|---|---|---|
| 10:17 | 1 | undue influence, over-weaning bargaining power, those |
| 10:17 | 2 | type of claims that go to standard garden variety |
| 10:17 | 3 | contract formation issues.  None of those are at issue |
| 10:17 | 4 | here.  The plaintiff does not contest any of those. |
| 10:17 | 5 | Nor is there any dispute that the forum |
| 10:17 | 6 | selection clauses -- and I say "clauses" because |
| 10:18 | 7 | obviously there are multiple ones, both with respect to |
| 10:18 | 8 | YouTube and Google Ads -- there's no dispute that the |
| 10:18 | 9 | forum selection clauses are mandatory and that the |
| 10:18 | 10 | dispute brought here is within the scope of the forum |
| 10:18 | 11 | selection clause. |
| 10:18 | 12 | The core issue, Your Honor, is whether |
| 10:18 | 13 | Texas law, specifically Sections 143A.003 and .0035 |
| 10:18 | 14 | somehow operate to invalidate or preclude a forum |
| 10:18 | 15 | selection clause transfer under 1404(a). |
| 10:18 | 16 | Now, the Supreme Court has been very |
| 10:18 | 17 | clear in Stewart and in Atlantic Marine that in a |
| 10:18 | 18 | 1404(a) context in which there is a forum selection |
| 10:18 | 19 | clause that is mandatory and covers the scope in |
| 10:18 | 20 | dispute, that the transfer should occur in all but the |
| 10:18 | 21 | most extraordinary circumstances. |
| 10:18 | 22 | The argument that the plaintiff makes |
| 10:18 | 23 | here is that that -- somehow that Texas statute |
| 10:18 | 24 | overrides Congress' command in 1404(a) and precludes |
| 10:19 | 25 | the transfer. |

—4—

| 10:19 | 1 | Now, obviously the plaintiff doesn't make |
| 10:19 | 2 | the strong form of the argument, the one that was |
| 10:19 | 3 | specifically rejected in Stewart that says that Texas |
| 10:19 | 4 | law controls and that Texas law precludes this Court |
| 10:19 | 5 | from transferring.  That can't be the case.  We know |
| 10:19 | 6 | from Stewart that 1404(a) is the framework, is the |
| 10:19 | 7 | controlling framework. |
| 10:19 | 8 | So what plaintiff argues is that the same |
| 10:19 | 9 | Texas law effectively undoes Stewart because it gets |
| 10:19 | 10 | smuggled in in the fourth factor under the Bremen |
| 10:19 | 11 | analysis as to the enforceability of the forum |
| 10:19 | 12 | selection clause, i.e., that there is a strong public |
| 10:19 | 13 | policy of the forum that precludes enforcement of the |
| 10:19 | 14 | forum selection clause. |
| 10:19 | 15 | I think Shakespeare probably said it |
| 10:19 | 16 | best, right, a rose by any other name still smells as |
| 10:19 | 17 | sweet.  If you can't do it directly under Stewart, then |
| 10:19 | 18 | it can't be the case that you can smuggle the exact |
| 10:20 | 19 | same statute, exact same argument and undo what the |
| 10:20 | 20 | Supreme Court said can't be done in Stewart and what |
| 10:20 | 21 | shouldn't be done under Atlantic Marine. |
| 10:20 | 22 | And that is precisely what the Fourth |
| 10:20 | 23 | Circuit said in the Albemarle case, that permitting |
| 10:20 | 24 | this argument would be, quote, an end run around the |
| 10:20 | 25 | rule of MS Bremen and Stewart and Atlantic Marine. |

| 10:20 | 1 | In other words, while it is true that MS |
| 10:20 | 2 | Bremen says that a strong public policy of the forum |
| 10:20 | 3 | state might be a ground by which you could avoid |
| 10:20 | 4 | enforcement of a forum selection clause, our |
| 10:20 | 5 | submission, Your Honor, is that strong public policy |
| 10:20 | 6 | cannot be an antiforum selection clause public policy. |
| 10:20 | 7 | Not only would that be an end run around |
| 10:20 | 8 | Bremen, not only would that be a end run around |
| 10:20 | 9 | Stewart, but in fact it completely undercuts the whole |
| 10:20 | 10 | point of Bremen.  Right? |
| 10:21 | 11 | If Bremen sets up the exception of strong |
| 10:21 | 12 | public policy as anti -- as an exception to an |
| 10:21 | 13 | enforcement of a forum selection clause, it makes no |
| 10:21 | 14 | sense that Bremen would say, well, in an entire opinion |
| 10:21 | 15 | that is devoted to rejecting antipathy to forum |
| 10:21 | 16 | selection clauses, calling them provincial and in fact |
| 10:21 | 17 | articulating a strong federal policy in favor of forum |
| 10:21 | 18 | selection clauses, that Bremen would have added an |
| 10:21 | 19 | exception that swallows the rule that any state at any |
| 10:21 | 20 | time could declare its antiforum selection clause a |
| 10:21 | 21 | strong public policy and completely undo what Bremen |
| 10:21 | 22 | said, that makes no sense, Your Honor.  And the Fourth |
| 10:21 | 23 | Circuit made that very clear in the Albemarle decision. |
| 10:21 | 24 | At best for the plaintiff, at best for |
| 10:21 | 25 | plaintiff, Texas' state law becomes a factor to |

—6—

| | | |
|---|---|---|
| 10:21 | 1 | consider in the 1404(a) transfer motion.  And that's |
| 10:22 | 2 | the Matthews decision. |
| 10:22 | 3 | The Matthews decision from the Fifth |
| 10:22 | 4 | Circuit in 2024 said we don't need to decide under the |
| 10:22 | 5 | Bremen analysis whether the forum public policy that is |
| 10:22 | 6 | referenced in Bremen is the federal forum or the state |
| 10:22 | 7 | forum, right?  Matthews was an antiforum selection |
| 10:22 | 8 | clause arising out of Louisiana as opposed to Texas. |
| 10:22 | 9 | And the Fifth Circuit said we don't need |
| 10:22 | 10 | to do that.  We'll look at both states' public |
| 10:22 | 11 | policies.  And in that case, which was an admiralty |
| 10:22 | 12 | case, not even a 1404 transfer case, but in an |
| 10:22 | 13 | admiralty case, Matthews said that the federal public |
| 10:22 | 14 | policy -- strong federal public policy in favor of |
| 10:22 | 15 | forum selection clauses did not allow Louisiana's |
| 10:22 | 16 | contrary public policy to preclude enforcement of the |
| 10:22 | 17 | forum selection clause in that case. |
| 10:22 | 18 | We submit, Your Honor, that if that's the |
| 10:22 | 19 | case in Matthews where the only public policy is the |
| 10:22 | 20 | articulated Bremen public policy, that this case is |
| 10:23 | 21 | stronger because not only do we have the Bremen strong |
| 10:23 | 22 | public policy just like in Matthews, but we also have |
| 10:23 | 23 | 1404(a), which is Congress' command to consider the |
| 10:23 | 24 | forum selection clauses precisely as Stewart and as |
| 10:23 | 25 | Atlantic Marine said. |

—7—

| | | |
|---|---|---|
| 10:23 | 1 | So in our position, Your Honor, is that |
| 10:23 | 2 | even if you were to consider the Texas law, which we |
| 10:23 | 3 | submit in the first place, our frontline argument, is |
| 10:23 | 4 | that it's an impermissible consideration under 1404(a) |
| 10:23 | 5 | and the Bremen fourth factor, even if you were to |
| 10:23 | 6 | consider it, federal law is the more important public |
| 10:23 | 7 | policy. |
| 10:23 | 8 | And because that compels enforcement of |
| 10:23 | 9 | the forum selection clause and because there is no |
| 10:23 | 10 | other reason to deny enforcement of the forum selection |
| 10:23 | 11 | clause, transfer should follow. |
| 10:23 | 12 | And I'm happy, if Your Honor has |
| 10:23 | 13 | questions, to talk about the public interest factor, |
| 10:23 | 14 | sort of the residual argument that's been made, or the |
| 10:23 | 15 | waiver argument that we have in our brief. But I think |
| 10:24 | 16 | our frontline position, subject to Your Honor's |
| 10:24 | 17 | questions, is that the enforceability question cannot |
| 10:24 | 18 | be answered by Texas' anti public -- antiforum |
| 10:24 | 19 | selection public policy. |
| 10:24 | 20 | THE COURT: Do you want to address |
| 10:24 | 21 | anything about the Fifth Circuit holding in Weber, |
| 10:24 | 22 | W-e-b-e-r, case? |
| 10:24 | 23 | MR. PATCHEN: I don't think that the |
| 10:24 | 24 | Weber decision, Your Honor, has particular bearing in |
| 10:24 | 25 | this matter. Apart from the fact that it's -- |

| | | |
|---|---|---|
| 10:24 | 1 | identifies that strong public policy is an exception to |
| 10:24 | 2 | the enforceability -- or one of the grounds for |
| 10:24 | 3 | nonenforceability in Bremen. |
| 10:24 | 4 | I don't think it (audio distortion) the |
| 10:24 | 5 | question in the way -- what forum gets to decide the |
| 10:24 | 6 | public policy and whether or not an antiforum selection |
| 10:24 | 7 | clause provision in a state law is a recognizable |
| 10:24 | 8 | public policy exception. |
| 10:25 | 9 | THE COURT: And also, what do we do if |
| 10:25 | 10 | the Court finds the forum selection clauses are |
| 10:25 | 11 | unenforceable? How do I move forward? |
| 10:25 | 12 | MR. PATCHEN: Well, I think that |
| 10:25 | 13 | obviously we would -- it's a question of law, we |
| 10:25 | 14 | would -- one that needs to be resolved for -- it's a |
| 10:25 | 15 | question of law, we'd have, you know, that that it |
| 10:25 | 16 | should come out differently. But at the very least, |
| | 17 | that's obviously repeatedly appealed to the Fifth |
| 10:25 | 18 | Circuit. We would probably deal with it in that way, |
| 10:25 | 19 | Your Honor. I have not -- |
| 10:25 | 20 | THE COURT: I'm sorry. What I meant was |
| 10:25 | 21 | what do I do -- how do I balance the private and public |
| 10:25 | 22 | interest factors if I determine that the -- it's |
| 10:25 | 23 | unenforceable? I'm sorry I wasn't clear. |
| 10:25 | 24 | MR. PATCHEN: Oh, I see what you're |
| | 25 | saying, Your Honor. I think if you just go to the |

| | | |
|---|---|---|
| 10:25 | 1 | 1404(a) and you see the forum selection clause, I think |
| 10:25 | 2 | all of the factors point in favor of transferring in |
| 10:25 | 3 | that context.  Obviously the parties haven't briefed to |
| 10:25 | 4 | a large extent the private interest factors. |
| 10:26 | 5 | But thinking about those, the convenience |
| 10:26 | 6 | of the witnesses, those are almost all exclusively in |
| 10:26 | 7 | California.  That's where policy is made at YouTube. |
| 10:26 | 8 | The -- it's where the Google Ads policy is made. |
| 10:26 | 9 | That's where YouTube and Google are headquartered.  So |
| 10:26 | 10 | the witnesses are going to be in California.  The vast |
| 10:26 | 11 | majority of the documents are going to be in |
| 10:26 | 12 | California.  This is an area of extensive experience. |
| 10:26 | 13 | That is where all the forum selection clauses point to. |
| 10:26 | 14 | So the convenience for Google is substantial. |
| 10:26 | 15 | It's not clear to me at all what the |
| 10:26 | 16 | documents or information that would be relevant on the |
| 10:26 | 17 | plaintiff's side of the private interest factors would |
| 10:26 | 18 | have anything to do with Texas.  The issue is they |
| 10:26 | 19 | wanted to post a video.  YouTube did not allow that |
| 10:26 | 20 | video, did not allow ads to generate revenue from that |
| 10:26 | 21 | video, and they want to sue under Texas law. |
| 10:26 | 22 | It's also untethered particularly to |
| 10:27 | 23 | Texas.  There's no particular Texas locale or -- at |
| 10:27 | 24 | issue here.  This is a First Amendment defense at the |
| 10:27 | 25 | end of the day, a question of national import.  And |

10:27  1    even if Defense Distributed is located in Texas, the

10:27  2    question is whether or not their video can be shown

10:27  3    worldwide.

10:27  4              There's no Texas-specific showing of the

10:27  5    video, if it's -- there's a holding or an injunction

10:27  6    that says it has to be posted.  It's a nationwide,

10:27  7    worldwide effect.  So both the public and the private

10:27  8    interest factors in our mind, Your Honor, even apart

10:27  9    from the forum selection clause, would certainly point

10:27  10   in favor of California.

10:27  11             And even if Your Honor found that the

10:27  12   forum selection clause was technically unenforceable,

10:27  13   we would argue that under Stewart and under Atlantic

10:27  14   Marine, that this Court should still weigh those

10:27  15   private interest factors in favor of a transfer.

10:27  16             Even if it's not dispositive in the way

10:28  17   that it would normally be in Atlantic Marine, the fact

10:28  18   that the parties agreed and agreed repeatedly that they

10:28  19   would be in California suggests that there is no real

10:28  20   credible private interest factors that cut the other

10:28  21   way in favor of staying in Texas.

10:28  22             THE COURT:  Anything else you wanted to

10:28  23   add before I bounce to the other side?

10:28  24             MR. PATCHEN:  No, Your Honor.

10:28  25             THE COURT:  Okay.  Thank you.

| | | |
|---|---|---|
| 10:28 | 1 | A response? |
| 10:28 | 2 | MR. FLORES:  Yes, Your Honor. |
| 10:28 | 3 | We have two independent reasons to deny |
| 10:28 | 4 | the motion to transfer.  One set of reasons has to do |
| 10:28 | 5 | with the enforceability argument you've heard.  There |
| 10:28 | 6 | is the second independent argument about the public |
| 10:28 | 7 | interest factors, and so those deserve independent |
| 10:28 | 8 | analysis. |
| 10:28 | 9 | Our view is that if the Court agrees with |
| 10:28 | 10 | us on Argument 1 and you deem this forum selection |
| 10:28 | 11 | clause unenforceable, it's game over.  You don't have |
| 10:28 | 12 | to reach Argument 2, but you could as an additional |
| 10:28 | 13 | reason.  So I'll take the points in that order. |
| 10:28 | 14 | First is the question of |
| 10:28 | 15 | unenforceability.  My friend on the other side says |
| 10:29 | 16 | that state public policy does not operate directly on |
| 10:29 | 17 | the analysis.  That's wrong, and more importantly the |
| 10:29 | 18 | bridge has been crossed. |
| 10:29 | 19 | The Court has already identified the |
| 10:29 | 20 | correct decision, that's Weber.  Weber is the Fifth |
| 10:29 | 21 | Circuit case that aligns exactly with what you see in |
| 10:29 | 22 | Davis and Wise Guys.  They all say that fourth piece, |
| 10:29 | 23 | the state public policy comes after an or.  There are |
| 10:29 | 24 | four ways that are independently sufficient to defeat |
| 10:29 | 25 | an invocation and the or means that state public policy |

10:29   1   alone can defeat this, and it does so here.

10:29   2              If ever there is a state law that can

        3   marshal enough power to defeat this kind of forum

10:29   4   selection clause, this is that statute.

10:29   5              My friend on the other side misframes it.

10:29   6   It is not a state public policy that is for or against

10:29   7   forum selection clauses.  The state public policy here

10:29   8   is the speech policy.  It is because if you look at the

10:29   9   exact statute we're talking about, this is 143A.003,

10:29  10   this is the protective provision that we invoke.  This

10:29  11   provision is not specific to forum selection clauses.

10:30  12   It does cover them, but the provision protects this

10:30  13   chapter.  It says the protection is provided by this

10:30  14   chapter.

10:30  15              So this is not an instance in which a

10:30  16   state is singling out forum selection clauses.  In

10:30  17   other context, for example, some states really don't

10:30  18   like arbitration.  They have arbitration-specific

10:30  19   statutes.  This is not that.  The protection here, the

10:30  20   public policy here is the speech policy codified by the

10:30  21   entire chapter.

10:30  22              Weber sets that as the rule and the Davis

10:30  23   and Wise Guys decisions are perfectly on point.  They

10:30  24   are this exact scenario, this exact analysis.  And they

10:30  25   go nine-tenths of the way and they don't get across the

—13—

| | | |
|---|---|---|
| 10:30 | 1 | threshold.  They say, no.  You don't remand in this |
| 10:30 | 2 | case because the statute lacks one little piece. |
| 10:30 | 3 | And the statute has since been fixed. |
| 10:30 | 4 | The Texas legislature read those decisions, knew |
| 10:30 | 5 | exactly what they meant, and changed the statute to |
| 10:30 | 6 | solve for this exact case. |
| 10:30 | 7 | So if ever there is a case where state |
| 10:30 | 8 | powers exercised enough and with enough specificity and |
| 10:30 | 9 | with enough power, this is that case. |
| 10:31 | 10 | If the Court agrees so far, you don't |
| 10:31 | 11 | have to do any more analysis.  My friend on the other |
| 10:31 | 12 | side made some arguments about the private factors. |
| 10:31 | 13 | Those are not properly in the case. |
| 10:31 | 14 | The motion to transfer made only the |
| 10:31 | 15 | invocation of their forum selection clause alone and |
| 10:31 | 16 | then we talked about public interest factors.  But |
| 10:31 | 17 | there's been no briefing about how the other private |
| 10:31 | 18 | interest factors might weigh in their favor and they |
| 10:31 | 19 | don't. |
| 10:31 | 20 | The real analysis here would be a public |
| 10:31 | 21 | interest mandate.  They're the four public interest |
| 10:31 | 22 | factors.  They all overwhelmingly favor keeping this |
| 10:31 | 23 | case in Texas.  It doesn't take long to go through them |
| 10:31 | 24 | because they're all dunks on our side. |
| 10:31 | 25 | One is the speed of disposition.  We've |

10:31  1   shown you and they have not controverted that if this

10:31  2   case stays in Texas, it's going to go three times as

10:31  3   fast as if it goes to California.

10:31  4            I'm going to go a little bit out of

10:31  5   order.

10:31  6            We have the local familiarity with the

10:31  7   local law here.  The law to be applied is Texas law.

10:31  8   This Court knows that the NetChoice litigation

10:31  9   exemplifies that much of this litigation is going to be

10:32  10  about what the statute means, how it operates, what its

10:32  11  exact scope is.  That is a core question of Texas state

10:32  12  law that the courts of Texas are obviously most

10:32  13  qualified to address, not just because they're in Texas

10:32  14  but because this circuit is already home to the

10:32  15  NetChoice litigation.

10:32  16            So we have speed overwhelmingly in our

10:32  17  favor.  We have the forum familiarity with the law.

10:32  18            There's a potential choice of law factor.

10:32  19  And so if you keep this case in Texas, choice of law is

10:32  20  easy because we apply Texas law by default.  If you go

10:32  21  to California, that's going to at least be a

       22  complicated question.

10:32  23            But, Your Honor, I want to call your

10:32  24  attention very specifically to the factor about the

10:32  25  local interest in deciding local interests at home.

—15—

| | | |
|---|---|---|
| 10:32 | 1 | Because this drives overwhelmingly in our favor for two |
| 10:32 | 2 | critical reasons. |
| 10:32 | 3 | One is first principles.  This is a case |
| 10:32 | 4 | about a speaker in Texas invoking a Texas state law |
| 10:32 | 5 | designed to protect speech in Texas.  These are all |
| 10:32 | 6 | inherently local interests.  Don't believe me, believe |
| 10:32 | 7 | the Fifth Circuit's decision in Bruck.  Which is styled |
| 10:32 | 8 | Defense Distributed versus Bruck.  It is the same |
| 10:32 | 9 | client, virtually the same case. |
| 10:33 | 10 | Our client sues to vindicate speech |
| 10:33 | 11 | rights that are being violated by an out-of-state |
| 10:33 | 12 | censoring regime.  And the Fifth Circuit holds that in |
| 10:33 | 13 | that scenario, when someone out of state is censoring |
| 10:33 | 14 | Texans, that kind of controversy is inherently local, |
| 10:33 | 15 | and under a transfer analysis, has to stay in Texas. |
| 10:33 | 16 | They have zero answer to Bruck. |
| 10:33 | 17 | So we have both the first principles of |
| 10:33 | 18 | all four factors and the most important Fifth Circuit |
| 10:33 | 19 | case is going right on point with this exact client in |
| 10:33 | 20 | a parallel scenario.  Those are the two independent |
| 10:33 | 21 | reasons to reject the motion to transfer.  Either is |
| 10:33 | 22 | sufficient, and I think we have the clear precedent on |
| 10:33 | 23 | both sides. |
| 10:33 | 24 | THE COURT:  Your brethren discussed |
| 10:33 | 25 | Weber -- I'm sorry, Stewart.  Did you want to say |

—16—

10:33    1    anything about Stewart?

10:33    2                    MR. FLORES:  Yes, Your Honor.

10:33    3                    We understand Stewart to acknowledge

10:33    4    that -- I think every case that we cite is after

10:34    5    Stewart.  And every case we cite says that the state

10:34    6    public policy is still a part of the analysis.

10:34    7                    I think their theory of Stewart might

10:34    8    apply if the argument were a state policy specific to

10:34    9    forum selection clauses and you had statute that

10:34   10    existed only to go after forum selection clauses, maybe

10:34   11    their argument would be better.  But it doesn't apply

10:34   12    here because the state public policy being invoked is

10:34   13    the speech policy, the chapter-wide policy there.

10:34   14                    So the precedent point I have is that

10:34   15    we've already crossed the bridge.  That's the Fifth

10:34   16    Circuit's decision in Weber and Wise Guys and Davis.

10:34   17    And then the practical argument I have is that this

10:34   18    statute is more -- is sort of distinguishable from the

10:34   19    ones they're trying to paint it as.

10:34   20                    THE COURT:  Anything else?

10:34   21                    MR. FLORES:  Your Honor, they have made

10:34   22    in their briefs some arguments about waiver and timing,

10:34   23    but if they're not going to argue them here, then we

10:34   24    don't need to respond to them.

10:34   25                    THE COURT:  Okay.  Rebuttal?

| | | |
|---|---|---|
| 10:34 | 1 | MR. PATCHEN:  Thank you, Your Honor. |
| 10:34 | 2 | With respect to the argument -- three |
| 10:35 | 3 | points.  One, Weber says nothing about whether or not |
| 10:35 | 4 | and in what circumstances a state law policy that says |
| 10:35 | 5 | forum selection clauses are unenforceable is or can |
| 10:35 | 6 | trump in the unenforceability analysis of Bremen. |
| 10:35 | 7 | If you look at what the arguments were, |
| 10:35 | 8 | those -- the arguments in Weber were -- deprive the |
| 10:35 | 9 | plaintiff of a remedy, that German law was unfavorable. |
| 10:35 | 10 | It's simply inapplicable except for the general |
| 10:35 | 11 | proposition that is discussed in Weber that in certain |
| 10:35 | 12 | circumstances, state public policy, if it's strong, may |
| 10:35 | 13 | preclude enforcement of a forum selection clause. |
| 10:35 | 14 | Now, my colleague on the other side says, |
| 10:35 | 15 | well, the public policy that's at issue here is a |
| 10:35 | 16 | speech protective public policy and not an antiforum |
| 10:35 | 17 | selection clause policy. |
| 10:35 | 18 | If that is their position, if their |
| 10:35 | 19 | position is that the state public policy is just we |
| 10:35 | 20 | want to protect speech of Texans, that has bearing. |
| 10:36 | 21 | There's no reason that that has any impact on a forum |
| 10:36 | 22 | selection clause. |
| 10:36 | 23 | Federal law is very clear that a |
| 10:36 | 24 | California court is to be trusted just as much as a |
| 10:36 | 25 | Texas court in terms of enforcing a Texas law that |

-18-

| | | |
|---|---|---|
| 10:36 | 1 | provides that.  There's no argument that suggests that |
| 10:36 | 2 | California's going to be unable to make that or be able |
| 10:36 | 3 | to rule in that way. |
| 10:36 | 4 | So the only argument, the only basis that |
| 10:36 | 5 | distinguishes -- that plaintiff says distinguishes the |
| 10:36 | 6 | case from Davis or Wise Guys is that in 2023, Texas |
| 10:36 | 7 | added in a provision that says the antiwaiver provision |
| 10:36 | 8 | in 143.003, which says that the protections of the |
| 10:36 | 9 | statute can be waived, they add in 0035, the Texas |
| 10:36 | 10 | legislature does in 2023, that says this -- there's no |
| 10:36 | 11 | forum selection clause, no choice of law, anything of |
| 10:36 | 12 | that sort with respect to the provisions of this |
| 10:36 | 13 | chapter. |
| 10:36 | 14 | It is that provision that is at issue |
| 10:37 | 15 | here.  That is the only possible provision that could |
| 10:37 | 16 | stand as a public policy that would preclude |
| 10:37 | 17 | enforcement of a freely entered into forum selection |
| 10:37 | 18 | clause. |
| 10:37 | 19 | And there's no argument that crediting |
| 10:37 | 20 | that public policy would be an end run around Bremen, |
| 10:37 | 21 | that the Fourth Circuit rejected that argument for four |
| 10:37 | 22 | independent reasons in Albemarle, and that the Court -- |
| 10:37 | 23 | the Fifth Circuit in Matthews, which -- if we want to |
| 10:37 | 24 | talk about what is the most applicable Fifth Circuit |
| 10:37 | 25 | decision, it would be the Matthews decision from last |

—19—

| 10:37 | 1 | year, 2024, which specifically asked this question: |
| 10:37 | 2 | When you say state public policy, do you look at state, |
| 10:37 | 3 | i.e., Louisiana, or do you look at federal?  And it |
| 10:37 | 4 | held that it didn't have to decide that question |
| 10:37 | 5 | because even if you did look at both, federal public |
| 10:37 | 6 | policy in favor of forum selection clauses trump. |
| 10:37 | 7 | If we're looking at -- and I disagree |
| 10:38 | 8 | with my colleague on the other side that the public |
| 10:38 | 9 | interest factors are a dunk in Defense Distributed's |
| 10:38 | 10 | favor.  I'm happy to talk about court congestion. |
| 10:38 | 11 | Frankly, Your Honor, court congestion is |
| 10:38 | 12 | a question of whether or not the Court is going to be |
| 10:38 | 13 | bothered.  Speed to disposition is in fact a private |
| 10:38 | 14 | factor and we cite the cases in our reply brief that |
| 10:38 | 15 | that's not even a consideration.  The speed of |
| 10:38 | 16 | disposition as a benefit to the parties is a private |
| 10:38 | 17 | interest, not a public interest factor. |
| 10:38 | 18 | But more importantly, the argument that |
| 10:38 | 19 | this is a speech protective and this is protecting a |
| 10:38 | 20 | Texan's speech is actually incorrect.  The speech that |
| 10:38 | 21 | is at issue is not Defense Distributed.  YouTube is not |
| 10:38 | 22 | the government.  Google is not the government.  Google |
| 10:38 | 23 | has the right to tell Defense Distributed we do not |
| 10:38 | 24 | want to put your video up.  It has the First Amendment |
| 10:38 | 25 | right to that. |

| 10:38 | 1 | The speech that is being protected is not |
|---|---|---|
| 10:38 | 2 | Defense Distributed's.  This is not a Texas speaker |
| 10:39 | 3 | whose speech is being protected.  The speech that is |
| 10:39 | 4 | being protected is a California company who has a forum |
| 10:39 | 5 | selection clause calling for litigation in California |
| 10:39 | 6 | and it is its speech that is being protected. |
| 10:39 | 7 | So to the extent that the argument is |
| 10:39 | 8 | there's censorship, that there's imposition of -- on a |
| 10:39 | 9 | party's speech, the Supreme Court's decision in Moody |
| 10:39 | 10 | makes very clear whose speech is being affected and |
| 10:39 | 11 | those public interest factors point to California, not |
| 10:39 | 12 | Texas. |
| 10:39 | 13 | THE COURT:  I'll be back in a second. |
| 10:42 | 14 | (Pause in proceedings.) |
| 10:42 | 15 | THE COURT:  Now -- thank you for the |
| 10:42 | 16 | break. |
| 10:42 | 17 | The Court is going to deny the motion to |
| 10:42 | 18 | transfer. |
| 10:42 | 19 | I'll hear the motion to remand. |
| 10:42 | 20 | MR. FLORES:  Thank you, Your Honor. |
| 10:42 | 21 | The motion to remand is a question of how |
| 10:42 | 22 | to perform the calculation of the amount in |
| 10:42 | 23 | controversy.  The rules that apply are necessarily |
| 10:42 | 24 | typical. |
| 10:42 | 25 | THE COURT:  So let me -- I'm sorry to |

| | | |
|---|---|---|
| 10:42 | 1 | interrupt. But here's the way I see it. If you want |
| 10:42 | 2 | to go on the record and say that there's no possibility |
| 10:42 | 3 | you are seeking more than $74,999 in this case, I'm |
| 10:42 | 4 | happy to hear that. |
| 10:43 | 5 | MR. FLORES: I mean, if that's |
| 10:43 | 6 | dispositive, then I think we would make that as an |
| 10:43 | 7 | alternative argument under the sort of indeterminant |
| 10:43 | 8 | amount. But our frontline argument is the amount in |
| 10:43 | 9 | controversy is indeterminant here. |
| 10:43 | 10 | THE COURT: I don't need to hear it. |
| 10:43 | 11 | MR. FLORES: Yes, Your Honor. We'll make |
| 10:43 | 12 | that representation. So we will not seek recovery of |
| 10:43 | 13 | damages more than $75,000. |
| 10:43 | 14 | THE COURT: Okay. |
| | 15 | MR. FLORES: The argument on the other |
| 10:43 | 16 | side is the value of their injunction, and so that's |
| 10:43 | 17 | why I'm happy to say that that's not part of what we |
| 10:43 | 18 | want. |
| 10:43 | 19 | THE COURT: Got it. |
| 10:43 | 20 | Let me hear a response from the other |
| 10:43 | 21 | side. |
| 10:43 | 22 | MS. HOLLAND: Thanks, Your Honor. Anika |
| 10:43 | 23 | Holland with Cooley for defendants. |
| 10:43 | 24 | I believe there's some case law in this |
| 10:43 | 25 | district that post removal representations, that the |

| | | |
|---|---|---|
| 10:43 | 1 | amount in controversy wouldn't exceed the $75,000 |
| 10:43 | 2 | threshold are not operative, that plaintiff -- |
| 10:43 | 3 | THE COURT: You just got him to cap his |
| 10:43 | 4 | damages. Why don't you call your client and have them |
| 10:43 | 5 | like, you know, praise, you know, take you out to a big |
| 10:44 | 6 | dinner? I've never had anyone accept that offer. I |
| 10:44 | 7 | mean, you know, he's put on the record the damages |
| 10:44 | 8 | they're seeking will not -- and that I'm assuming |
| 10:44 | 9 | includes attorneys' fees and everything -- it's not |
| 10:44 | 10 | going to exceed $75,000. Then why does it belong here? |
| 10:44 | 11 | MS. HOLLAND: Well, Your Honor, I think |
| 10:44 | 12 | there are two things. So first of all, we have the |
| 10:44 | 13 | allegation in the petition that the amount in |
| 10:44 | 14 | controversy exceeds $5 million, and that speaks to |
| 10:44 | 15 | equitable -- |
| 10:44 | 16 | THE COURT: Okay. He's -- I have him on |
| 10:44 | 17 | the record -- |
| 10:44 | 18 | MS. HOLLAND: And then we have the second |
| 10:44 | 19 | point about attorneys' fees here. So now -- |
| 10:44 | 20 | THE COURT: I'm including attorneys' |
| 10:44 | 21 | fees. He's making a representation that including |
| 10:44 | 22 | attorneys' fees, it's not going to go above $75,000. I |
| 10:44 | 23 | don't think that's included regardless, but I'm -- when |
| 10:44 | 24 | I asked him the question, I meant total recovery, |
| 10:45 | 25 | damages and attorneys' fees, won't go over $75,000, |

—23—

| | | |
|---|---|---|
| 10:45 | 1 | which is the jurisdictional minimum -- yeah, minimum |
| 10:45 | 2 | for me.  So what else do you need? |
| 10:45 | 3 | MS. HOLLAND:  Well, Your Honor, I did not |
| 10:45 | 4 | hear my friend on the other side say that that amount |
| 10:45 | 5 | included attorneys' fees -- |
| 10:45 | 6 | THE COURT:  I just -- he's not correcting |
| 10:45 | 7 | me.  I've said it now four times.  I mean, I would not |
| 10:45 | 8 | want to be him and come in and say, Judge, you said it |
| 10:45 | 9 | four times.  Now I want attorneys' fees to exceed -- he |
| 10:45 | 10 | is telling me that he is removing your jurisdictional |
| 10:45 | 11 | minimum to remain in my court.  And he's agreeing to |
| 10:45 | 12 | it. |
| 10:45 | 13 | So what do you want me to do?  I mean, |
| 10:45 | 14 | he's -- I don't have jurisdiction if he's not seeking |
| 10:45 | 15 | $75,000 or more. |
| 10:45 | 16 | MS. HOLLAND:  Your Honor, I think the |
| 10:45 | 17 | issue is that they've made a judicial admission that |
| 10:46 | 18 | the value of their injunction -- |
| 10:46 | 19 | THE COURT:  He -- no.  They put in the |
| 10:46 | 20 | complaint that it might be.  I have him on the record |
| 10:46 | 21 | saying that he's divested me of my jurisdiction. |
| 10:46 | 22 | MS. HOLLAND:  And this returns to the |
| 10:46 | 23 | first point, Your Honor, which I think the case law in |
| 10:46 | 24 | the Western District of Texas is that such stipulations |
| 10:46 | 25 | made post removal are not binding. |

—24—

| | | |
|---|---|---|
| 10:46 | 1 | THE COURT: Well, I don't think we'll |
| 10:46 | 2 | ever know because, as I remember, you don't get to |
| 10:46 | 3 | appeal a remand. So. |
| 10:46 | 4 | MR. PATCHEN: Your Honor, if I may assist |
| 10:46 | 5 | my colleague. |
| 10:46 | 6 | Is the plaintiff also walking away and |
| 10:46 | 7 | not going to be seeking injunctive or other equitable |
| 10:46 | 8 | relief? Because certainly even if they limit their |
| 10:46 | 9 | damage claim to less than $75,000, the question of |
| 10:46 | 10 | injunctive relief and the value of that injunctive |
| 10:46 | 11 | relief certainly is -- unless that's going away as well |
| 10:46 | 12 | and this is only a question of $75,000 -- |
| 10:46 | 13 | THE COURT: How would you value the value |
| 10:46 | 14 | of the injunction relief? |
| 10:46 | 15 | MR. PATCHEN: We know how much they did, |
| 10:47 | 16 | which they pled at 5,000 -- I'm sorry, 5 million. |
| 10:47 | 17 | THE COURT: No. How would you -- I asked |
| 10:47 | 18 | you, how would you put a value on the injunction? |
| 10:47 | 19 | MR. PATCHEN: The fact that Google has to |
| 10:47 | 20 | change its policy and essentially allow any video -- |
| 10:47 | 21 | THE COURT: What person would come in and |
| 10:47 | 22 | testify as to the value of that injunction? |
| 10:47 | 23 | MR. PATCHEN: I would have, Your Honor, |
| 10:47 | 24 | if you needed to have somebody, I would certainly be |
| 10:47 | 25 | able to put up a number of witnesses to talk about the |

—25—

| | | |
|---|---|---|
| 10:47 | 1 | value and importance of Google and YouTube's content |
| 10:47 | 2 | moderation policy, its importance of being able to |
| 10:47 | 3 | decide which videos. |
| 10:47 | 4 | Frankly, Your Honor, it's free speech |
| 10:47 | 5 | rights that are at issue. That's irreparable injury. |
| 10:47 | 6 | But that's -- |
| 10:47 | 7 | THE COURT: Do you have a counterclaim |
| 10:47 | 8 | under the First Amendment? |
| 10:47 | 9 | MR. PATCHEN: We've not moved to (audio |
| 10:47 | 10 | distortion) the time to respond to the pleadings by |
| 10:47 | 11 | stipulation was extended. We don't have a counterclaim |
| 10:47 | 12 | yet, but we -- |
| 10:47 | 13 | THE COURT: Do you intend to make a |
| 10:47 | 14 | counterclaim under the First Amendment? |
| 10:48 | 15 | MR. PATCHEN: I expect that we'll just |
| 10:48 | 16 | defend and argue that the -- |
| 10:48 | 17 | THE COURT: Well, if you had a |
| 10:48 | 18 | counterclaim under the First Amendment, I would |
| 10:48 | 19 | understand that. But if your defense is going to be -- |
| 10:48 | 20 | or might not be, I don't know what you're going to do |
| 10:48 | 21 | when you go to trial, you know, if you want to tell |
| 10:48 | 22 | me -- if you want -- if you want to tell me that you |
| 10:48 | 23 | are going to make a counterclaim that your client's |
| 10:48 | 24 | rights are protected under the First Amendment, well, |
| 10:48 | 25 | then there'll be federal jurisdiction and I wouldn't be |

| 10:48 | 1 | able to remand it. |
| 10:48 | 2 | MR. PATCHEN:  I will make that |
| 10:48 | 3 | representation, Your Honor.  When we plead, I will |
| 10:48 | 4 | represent that we will plead a First Amendment defense |
| 10:48 | 5 | that the Texas statute is precluded and preempted by |
| 10:48 | 6 | the First Amendment. |
| 10:48 | 7 | THE COURT:  And so here's what I'm going |
| 10:48 | 8 | to do because I've thrown all of this at you and you're |
| 10:48 | 9 | just having to kind of deal with me and you all have |
| 10:48 | 10 | done well. |
| 10:48 | 11 | I'm going to give -- before I rule, I'm |
| 10:48 | 12 | going to give the plaintiff an opportunity to research |
| 10:49 | 13 | and let me -- and obviously defendant can find stuff to |
| 10:49 | 14 | support it.  I'm not entirely certain a -- the fact |
| 10:49 | 15 | that they are asserting a defense in the First |
| 10:49 | 16 | Amendment is sufficient to have jurisdiction in this |
| 10:49 | 17 | case.  And it may not.  There may be cases that say |
| 10:49 | 18 | pleading a constitutional response doesn't get you |
| 10:49 | 19 | there. |
| 10:49 | 20 | But I'll give the plaintiff an |
| 10:49 | 21 | opportunity to research this and let me know one way or |
| 10:49 | 22 | the other. |
| 10:49 | 23 | And I'll also give the defendant, if |
| 10:49 | 24 | there's any other -- let me put it this way.  As of |
| 10:49 | 25 | right now, with the state of the pleadings, my |

| 10:49 | 1 | inclination would be to remand it.  Defendant has made |
| 10:49 | 2 | the representation without the opportunity to speak to |
| 10:49 | 3 | his client, and you ought to get to have that, that you |
| 10:49 | 4 | would make at least a First Amendment counterclaim or |
| 10:49 | 5 | make that part of it. |
| 10:49 | 6 | If you -- knowing what you know, if the |
| 10:50 | 7 | defendant wants to add any other arguments as to why |
| 10:50 | 8 | there might be federal jurisdiction that would prevent |
| 10:50 | 9 | me from removing it, in other words, other claims that |
| 10:50 | 10 | might be made by the defendant, you can do that and get |
| 10:50 | 11 | that to the plaintiff. |
| 10:50 | 12 | And then I'll hear -- the plaintiff can |
| 10:50 | 13 | file whatever it wants to -- I'm sorry, he wants to as |
| 10:50 | 14 | to why a defendant can't create jurisdiction by having |
| 10:50 | 15 | an affirmative defense, and then we all get back |
| 10:50 | 16 | together.  So I'm going to postpone ruling on the |
| 10:50 | 17 | motion to remand at this point. |
| 10:50 | 18 | I think that was the last motion we had, |
| 10:50 | 19 | though.  So is there anything else we needed to take |
| 10:50 | 20 | up? |
| 10:50 | 21 | MR. PATCHEN:  Your Honor, if -- I heard |
| 10:50 | 22 | the Court deny the motion to transfer.  Will there be a |
| 10:50 | 23 | written order as to the reasons? |
| 10:50 | 24 | THE COURT:  Yes.  Yes. |
| 10:50 | 25 | MR. PATCHEN:  Okay.  I just wanted to |

| | | |
|---|---|---|
| 10:50 | 1 | make sure. |
| 10:50 | 2 | THE COURT:  You may not have heard, but |
| 10:50 | 3 | we get a lot of motions to transfer.  We have a |
| 10:51 | 4 | template. |
| 10:51 | 5 | MR. PATCHEN:  Yep. |
| 10:51 | 6 | THE COURT:  And counsel for plaintiff? |
| 10:51 | 7 | MR. FLORES:  Judge, could you confirm the |
| 10:51 | 8 | order of those supplemental submissions that you |
| 10:51 | 9 | wanted?  You wanted the defendants to go first and then |
| 10:51 | 10 | the plaintiff to respond; is that right? |
| 10:51 | 11 | THE COURT:  I'd like for the defendant -- |
| 10:51 | 12 | knowing that my -- as it stands now with your |
| 10:51 | 13 | representation about taking away my jurisdictional |
| 10:51 | 14 | power under -- because of the amount, any other reason |
| 10:51 | 15 | that they might -- and I will tell -- I'll tell defense |
| 10:51 | 16 | in advance, I'm not going to buy the there's some value |
| 10:51 | 17 | to an injunction because I don't believe that that |
| 10:51 | 18 | could ever be proven. |
| 10:51 | 19 | Even if Yahoo comes in or the defendant |
| 10:51 | 20 | comes in and says, oh, you know, having the ability to |
| 10:51 | 21 | do this is important to us, I get that.  But that -- I |
| 10:51 | 22 | would never -- I can't imagine a Daubert where I'd let |
| 10:51 | 23 | someone quantify that.  So. |
| 10:51 | 24 | But if the defendant wants to articulate |
| 10:51 | 25 | a First Amendment counterclaim defense, affirmative |

—29—

| 10:52 | 1 | defense, whichever it is, and anything else, everything |
| 10:52 | 2 | they want to do, they need to get to you within the |
| 10:52 | 3 | next two weeks.  Once you have that, once you see what |
| 10:52 | 4 | they are saying they would like to -- and I would allow |
| 10:52 | 5 | them to amend to do that.  Once you have -- you see |
| 10:52 | 6 | that -- there's got to be case law one way or the other |
| 10:52 | 7 | about whether or not that's sufficient in this |
| 10:52 | 8 | situation.  And then once you respond, we'll get back |
| 10:52 | 9 | together and I'll let you guys argue it to me. |
| 10:52 | 10 | Is there anything else we need to take up |
| 10:52 | 11 | this morning? |
| 10:52 | 12 | MR. PATCHEN:  Not that I'm aware of, Your |
| 10:52 | 13 | Honor. |
| 10:52 | 14 | THE COURT:  Well, I'll tell you, I |
| 10:52 | 15 | routinely, at the end of hearings involving patent |
| 10:52 | 16 | cases, compliment the lawyers and say that's why I |
| 10:52 | 17 | enjoy patent cases so much is the quality of the |
| 10:52 | 18 | lawyers.  But I will tell you you've given me hope in |
| 10:52 | 19 | that I thought the arguments from counsel on both sides |
| 10:52 | 20 | were really excellent this morning and I enjoyed the |
| 10:53 | 21 | hearing very much.  So I look forward to getting |
| 10:53 | 22 | together again in the future.  And have a good day. |
| 10:53 | 23 | Take care. |
| 10:53 | 24 | (Hearing adjourned.) |
| | 25 | |

```
1    UNITED STATES DISTRICT COURT )

2    WESTERN DISTRICT OF TEXAS     )

3

4

5              I, Kristie M. Davis, Official Court

6    Reporter for the United States District Court, Western

7    District of Texas, do certify that the foregoing is a

8    correct transcript from the record of proceedings in

9    the above-entitled matter.

10             I certify that the transcript fees and

11   format comply with those prescribed by the Court and

12   Judicial Conference of the United States.

13             Certified to by me this 6th day of

14   November 2025.

15
                         /s/ Kristie M. Davis
16                       KRISTIE M. DAVIS
                         Official Court Reporter
17                       PO Box 20994
                         Waco, Texas 76702
18                       (254) 666-0904
                         kmdaviscsr@yahoo.com
19

20

21

22

23

24

25
```

10:53

# EXHIBIT 12

No. 25-51004

---

In the United States Court of Appeals for the Fifth Circuit

---

Defense Distributed,

Plaintiff—Appellee.

v.

YouTube LLC, Google LLC, and Alphabet, Inc.,

Defendants-Appellants,

---

Appeal from the United States District Court for the
Western District of Texas; No. 1:25-cv-01095-ADA-ML

---

**Defense Distributed's
Motion to Dismiss the Appeal for Lack of Jurisdiction**

---

Chad Flores
Flores Law PLLC
917 Franklin Street, Suite 600
Houston, Texas 77002
(713) 893-9440

Counsel for Defense Distributed

**Table of Contents**

**Page**

Table of Contents ...................................................................................... ii

Certificate of Interested Persons.............................................................iii

Argument ................................................................................................. 1

I.    The Court lacks appellate jurisdiction. ......................................... 1

II.   Dismissal should occur *immediately* to stop lower court interference. ............4

Conclusion ............................................................................................... 7

Certificate of Conference ........................................................................ 8

Certificate of Compliance........................................................................ 8

## Certificate of Interested Persons

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| | |
|---|---|
| Appellants | Youtube LLC<br>Google LLC<br>Alphabet Inc. |
| Appellants' Counsel | Scott Douglass & McConnico LLP |
| Appellee | Defense Distributed |
| Appellee's Counsel | Flores Law PLLC<br>Chad Flores |

/s/ Chad Flores
Chad Flores
cf@chadflores.law
Texas Bar No. 24059759
Flores Law PLLC
917 Franklin Street, Suite 600
Houston, Texas 77002
(713) 893-9440

Counsel for Defense Distributed

**Argument**

Appellee Defense Distributed moves to dismiss this appeal for lack of appellate jurisdiction. Plain Section 1404 transfer orders are not appealable. Dismissal is required. Appellants nevertheless invoke this invalid appeal to claim a *Griggs* stay below, hoping to block a fully briefed remand ruling the district court is inclined to grant. But *Griggs* warrants no stay when the attempted appeal will not lie. So it is not just critical that the Court dismiss this appeal for the usual reasons (enforcement of Congress's immutable jurisdictional limits). It is critical that the Court dismiss this appeal *immediately* so that proceedings below are wrongly detained no longer.

## I.     The Court lacks appellate jurisdiction.

This Court has only the jurisdiction that Congress gives and a party invokes. Appellants seek an exercise of appellate jurisdiction over a plain interlocutory order denying a motion to transfer under 28 U.S.C. § 1404(a). *See* Ex. A (Doc. 50 notice of appeal); Ex. B (Doc. 48 decision). But this Court has no such appellate jurisdiction.

The accepted national rule is that an interlocutory order denying a motion to transfer under 28 U.S.C. § 1404(a) is not appealable as a "final" decision: "An order granting or denying a motion to transfer venue under 28 U.S.C.A. § 1404(a) is interlocutory and thus is not immediately appealable as a 'final decision' under 28 U.S.C.A. § 1291." 15 Charles A. Wright & Arthur R. Miller, Federal Practice &

Procedure § 3855 & n.1 (3d ed. West 2025) (hereinafter "Wright & Miller"). And though "the party contesting the order may attempt to invoke the 'collateral order' doctrine, which allows immediate review of orders that are effectively unreviewable from final judgment," the accepted national rule "rejects it on the ground that other avenues—such as a motion to retransfer, certification under Section 1292(b), and extraordinary writ—remain available to review the issue." *Id.* § 3855 & n.22.

The Fifth Circuit follows these accepted rules about the appealability of plain Section 1404 transfer orders. *See generally In re Volkswagen of Am., Inc.*, 545 F.3d 304 (5th Cir. 2008) (en banc); *Defense Distributed v. Bruck*, 30 F.4th 414, 421 (5th Cir. 2022). Here and everywhere else, an order denying a motion to transfer under 28 U.S.C. § 1404(a) is certainly not appealable as a "final" decision. *See* Wright & Miller § 3914.12 ("Grant or denial of transfer is not final."). And neither does this Court's collateral order doctrine cover a standard Section 1404(a) transfer order. *Id.*

*In re Rolls Royce Corp.*, 775 F.3d 671 (5th Cir. 2014), correctly announces the Fifth Circuit position: "While the Supreme Court has crafted a narrow exception to the final order doctrine, termed the 'collateral order doctrine' or '*Cohen* exception,' we have previously held that transfer orders do not fall within the scope of this doctrine." *In re Rolls Royce Corp.*, 775 F.3d 671, 676 (5th Cir. 2014) (applying *Brinar v. Williamson*, 245 F.3d 515, 517 (5th Cir. 2001)). Indeed, the Supreme Court itself

held in the key case about forum selection clauses, *Lauro Lines s.r.l. v. Chasser*, 490 U.S. 495 (1989), that a transfer order does not qualify for a collateral order appeal. *Id.* at 501 ("Petitioner's claim that it may be sued only in Naples, while not perfectly secured by appeal after final judgment, is adequately vindicable at that stage—surely as effectively vindicable as a claim that the trial court lacked personal jurisdiction over the defendant—and hence does not fall within the third prong of the collateral order doctrine."). Since this appeal challenges nothing but a plain Section 1404 transfer order, the Court has no appellate jurisdiction.

It is true that original mandamus proceedings can review certain extraordinary transfer rulings—the key case being one of a combined transfer-*and-sever* order with extraordinary circumstances, *Defense Distributed v. Bruck*, 30 F.4th at 421. But no such extraordinary transfer+ order is at issue here. And more importantly, mandamus jurisdiction is not at issue here. A party seeking mandamus "must file a petition," Fed. R. App. P. 21, and then meet the doctrine's unique demands. No filing here has mentioned mandamus, let alone made a colorable showing of its high requirements.

This is an attempted appeal from a Section 1404(a) transfer decision and nothing more. Appellate jurisdiction is plainly absent. Enforcement of Congress's jurisdictional boundaries via dismissal is mandatory. And for the key reasons shown below, this dismissal for lack of appellate jurisdiction should occur i*mmediately.*

**II.    Dismissal should occur *immediately* to stop lower court interference.**

The process of carrying a motion to dismiss with the appeal is not appropriate here. Instead, *immediate* adjudication of this motion to dismiss is warranted because Appellants are using this baseless appeal as a procedural weapon to interfere with ongoing district court proceedings. Below, Appellants are invoking this appeal's existence to claim a *Griggs* stay and freeze the district court just as an adverse remand ruling became imminent. But *Griggs* stays nothing if the appeal lacks jurisdiction. This Court should therefore dismiss the appeal for lack of jurisdiction *immediately* to remove any *Griggs*-based pretext for halting the district court's work.

This litigation's trajectory is clear. The case is going back to Texas state court where it belongs. Appellants rightly lost their motion to transfer to this case from a Texas federal court to a California federal court. Remand is next. A motion to remand the action back to its original state court is almost fully briefed, Exs. C-H, and the district court has said that it is inclined to grant remand soon, Ex. F at 26-27 ("As of right now, with the state of the pleadings, my inclination would be to remand it."). Knowing that a remand decision is not appealable, *see, e.g.*, *Harrow v. Dep't of Def.*, 601 U.S. 480, 487 (2024), Appellants engineered this detour in hopes of further delaying the inevitable.

4

Below, Appellants say that the mere existence of this appeal from the transfer decision divests the district court of its power to decide the pending motion to remand. Right after filing their notice of appeal, Appellants filed in the district court a "Notice of Notice of Appeal." Ex. H (Doc. 51 below). The "Notice" invokes *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56 (1982), to say that this appeal's pendency automatically halts the district court's resolution of the motion to remand. Not so. Because this Court lacks appellate jurisdiction, the court below must proceed.

In truth, *Griggs* does not apply and the district court retains full authority to decide the motion to remand and every other part of this case. The *Griggs* divestiture principle does *not* apply when the appellate court lacks jurisdiction—i.e., when the appeal is from an unappealable order. Trying to appeal an unappealable order yields no stay. *Griggs* says so. *Griggs*, 459 U.S. at 58 ("notice of appeal from unappealable order does not divest district court of jurisdiction" (explaining *Ruby v. Secretary of United States Navy*, 365 F.2d 385, 389 (9th Cir. 1966) (en banc)). This Court agrees. *See Doucet v. Gulf Oil Corp.*, 783 F.2d 518, 526 (5th Cir. 1986). Nationwide, "an appeal from a clearly non-appealable order fails to oust district court authority." Wright & Miller § 3949.1 & nn.72-73. Because this transfer decision's appeal is jurisdictionally dead on arrival, the *Griggs* divestiture principle does not apply and the district court remains free and indeed obligated to proceed forthwith.

App.224

The district court may very well realize all of this and proceed as it should. Yet prompt action from this Court remains essential to prevent abuse. A key case *Griggs* approved supports the approach of having the court of appeals promptly confirm to the district court that proceeding is proper. *See Ruby*, 365 F.2d at 389 ("Where the deficiency in a notice of appeal, by reason of untimeliness, lack of essential recitals, or reference to a non-appealable order, is clear to the district court, it may disregard the purported notice of appeal and proceed with the case, knowing that it has not been deprived of jurisdiction. If the district court is in doubt as to whether the notice of appeal is inoperative by reason of some such defect, it may decline to act further until the purported appellee obtains dismissal of the appeal in the court of appeals."). A faithful application of *Griggs* makes it this Court's prerogative to extinguish defective appeals swiftly, ensuring they cannot be weaponized for delay.

Letting this appeal remain on the docket—even briefly—gives Appellants exactly what they seek: leverage to obstruct an imminent remand ruling. That delay burdens the trial court and undermines its need to police original jurisdiction at the earliest possible moment. But the district court here cannot do so cleanly while Appellants wave notions of a doomed appeal's mandatory stay. Allowing this appeal to remain open therefore frustrates the statutory duty to remand with expediency and undermines efficient docket management in both courts.

To get the stay they want, Appellants would have to do things the right way: file a mandamus petition, file a stay motion in that proceeding, and make a serious showing that they are likely to obtain that extraordinary relief. They have done none of that. They instead try to hijack *Griggs* by appealing a nonappealable order and claiming an automatic stay they have not earned. As inequitable as that jurisdictional end run may be, the equities don't matter. A lack of appellate jurisdiction must always be fully enforced no matter what. The Court should end the confusion and prevent further gamesmanship by enforcing its jurisdictional boundaries not just eventually (as by carrying the motion with the case), but immediately.

## Conclusion

The Court should resolve the motion as soon as is practicable, either without waiting for a response or by setting an expedited schedule. The Court should grant the motion and issue an order dismissing the appeal for lack of appellate jurisdiction.

Respectfully submitted,

/s/ Chad Flores
Chad Flores
cf@chadflores.law
Texas Bar No. 24059759
Flores Law PLLC
917 Franklin Street, Suite 600
Houston, Texas 77002
(713) 893-9440

Counsel for Defense Distributed

7

## Certificate of Conference

The Appellants oppose this motion. Movant's counsel determined that by

conferring with counsel for the Appellants and obtaining their position via e-mail

/s/ Chad Flores
Chad Flores

## Certificate of Compliance

This filing complies with the type-volume limitations of the Federal Rules of

Appellate Procedure because it contains 1,640 not-exempted words.

This filing complies with the typeface and typestyle requirements of Federal

Rule of Appellate Procedure 32 and Fifth Circuit Rule 32 because it has been

prepared in a proportionally spaced typeface in 14-point font using Microsoft Word

for Mac Version 16.103.3

/s/ Chad Flores
Chad Flores

# EXHIBIT 13

No. 25-51004

# United States Court of Appeals for the Fifth Circuit

DEFENSE DISTRIBUTED,

*Plaintiff-Appellee*

*v.*

YOUTUBE LLC, GOOGLE LLC, AND ALPHABET, INC.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Western District of Texas (No. 1:25-cv-01095-ADA)

## OPPOSITION OF DEFENDANTS-APPELLANTS TO MOTION TO DISMISS FOR LACK OF JURISDICTION

Steven J. Wingard
Robyn Hargrove
Eli Barrish
SCOTT DOUGLASS & MCCONNICO LLP
303 Colorado Street, Suite 2400
Austin, TX 78701
(512) 495-6300

Jonathan Patchen
Michael A. Rome
Anika Holland
Madeleine R. Ahlers
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
(415) 693-2000
jpatchen@cooley.com

Connie L. Wang
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
(650) 843-5000

*Counsel for Defendants-Appellants*
*YouTube LLC, Google LLC, and Alphabet, Inc.*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case.  These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1.     Plaintiff-Appellee is Defense Distributed.  To Defendants-Appellants' knowledge, Defense Distributed has no parent company and is not a publicly traded company.

2.     Plaintiff-Appellee is represented in the Fifth Circuit by Chad Flores of Flores Law PLLC.

3.     Defendants-Appellants are YouTube LLC, Google LLC, and Alphabet, Inc.  YouTube LLC is a subsidiary of Google LLC.  Google LLC is a subsidiary of XXVI Holdings, Inc., which is a subsidiary of Alphabet, Inc.  Alphabet, Inc. is a publicly traded company, but no publicly traded company owns 10% or more of its stock.

4.     Defendants-Appellants are represented in the Fifth Circuit by Jonathan Patchen, Michael A. Rome, Anika Holland, Madeleine R. Ahlers, and Connie L. Wang of Cooley LLP and Steven J. Wingard, Robyn Hargrove, and Eli Barrish of Scott Douglass & McConnico LLP.

/s/ Jonathan Patchen

Jonathan Patchen
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
(415) 693-2000
jpatchen@cooley.com

*Counsel for Defendants-Appellants
YouTube LLC, Google LLC, and
Alphabet, Inc.*

INTRODUCTION ....................................................................................1

BACKGROUND ......................................................................................4

    A.    Plaintiff Appeals an Adverse Transfer Order......................................4

    B.    Plaintiff Agrees to YouTube's and Google Ads's Terms of
        Service, Including Their Forum-Selection Clauses ............................5

    C.    Plaintiff Sues Defendants in Texas in Contravention of the
        Forum-Selection Clauses....................................................................6

    D.    The District Court Denies Defendants' Motion to Transfer ...............6

ARGUMENT ...........................................................................................7

    I.    This Court Has Appellate Jurisdiction to Review the District
       Court's Transfer Order Under the Collateral-Order Doctrine .............8

    II.    Alternatively, This Court May Review the District Court's
       Transfer Order As an Exercise of Its Mandamus Jurisdiction...........14

    III.    If the Motions Panel Does Not Deny Plaintiff's Motion, It
       Should Be Carried With the Case .....................................................16

CONCLUSION .....................................................................................21

**Cases**

*In re Bradford*,
    660 F.3d 226 (5th Cir. 2011) .......................................................*passim*

*Brinar v. Williamson*,
    245 F.3d 515 (5th Cir. 2001) ....................................................... 11-12

*Cheney v. U.S. Dist. Ct. for D.C.*,
    542 U.S. 367 (2004) .........................................................................19

*Cohen v. Beneficial Indus. Loan Corp.*,
    337 U.S. 541 (1949) ...........................................................................8

*Davis v. Meta Platforms, Inc.*,
    2023 WL 4670491 (N.D. Cal. July 20, 2023) ...............................3, 13

*Defense Distributed v. Bruck*,
    30 F.4th 414 (5th Cir. 2022) .......................................................*passim*

*In re Delta Servs. Indus., Etc.*,
    782 F.2d 1267 (5th Cir. 1986) ...........................................................15

*In re Foster*,
    644 F. App'x 328 (5th Cir. 2016) (per curiam) .................................15

*Gebbia v. Wal-Mart Stores, Inc.*,
    233 F.3d 880 (5th Cir. 2000) .............................................................18

*Griggs v. Provident Consumer Disc. Co.*,
    459 U.S. 56 (1982) ...........................................................................18

*Lauro Lines s.r.l. v. Chasser*,
    490 U.S. 495 (1989) ...................................................................... 13-14

*In re Media Matters for Am.*,
    143 F.4th 631 (5th Cir. 2025) ...........................................................16

*Nat'l Oilwell Varco, L.P. v. Auto-Dril, Inc.*,
    68 F.4th 206 (5th Cir. 2023) .............................................................17

*Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*,
   506 U.S. 139 (1993)....................................................................8

*Quackenbush v. Allstate Ins. Co.*,
   517 U.S. 706 (1996)............................................................... 13-14

*In re Rolls Royce Corp.*,
   775 F.3d 671 (5th Cir. 2014) ............................................... 9-11

*In re Sepulvado*,
   707 F.3d 550 (5th Cir. 2013) ......................................... 4, 9-11

*St. Paul Mercury Indem. Co. v. Red Cab Co.*,
   303 U.S. 283 (1938).................................................................18

*In re TikTok, Inc.*,
   85 F.4th 352 (5th Cir. 2023) ............................................. 15-16

*United Nat. Foods, Inc. v. NLRB*,
   66 F.4th 536 (5th Cir. 2023) ..................................................17

*United States v. Williams*,
   400 F.3d 277 (5th Cir. 2005) ..................................................15

*In re Volkswagen of Am., Inc.*,
   545 F.3d 304 (5th Cir. 2008) (en banc) ........................*passim*

**Statutes**

28 U.S.C.
   § 1292(b)...............................................................................10
   § 1404(a) ..................................................................... 6, 14-16
   § 1631....................................................................................11

Tex. Civ. Prac. & Rem. Code
   §143A..................................................................................6, 7
   §143A.003................................................................................7
   §143A.0035..............................................................................7

**Other Authorities**

Fed. R. App. P. 21 ......................................................................................15

## **INTRODUCTION**

Plaintiff Defense Distributed unambiguously agreed to forum-selection clauses requiring disputes just like this one to be litigated exclusively in California. Plaintiff did not contest that those clauses are mandatory and presumptively enforceable, or that its lawsuit falls squarely within their scope. Nonetheless, the district court denied Defendants' motion to transfer, holding that the forum-selection clauses are unenforceable on the basis of Texas's "strong public policy." The district court's decision was legally erroneous. As explained in Defendants' forthcoming opening brief, under Supreme Court and Fifth Circuit precedent, the district court was not permitted to consider Texas's public policy of hostility toward forum-selection clauses in the enforceability analysis, and even if it could, the district court failed to give proper weight to the strong federal public policy in favor of enforcing such clauses.[1]

Plaintiff now seeks to insulate the district court's unsound decision from this Court's review by moving this Court to dismiss Defendants' appeal for lack of jurisdiction. This Court should deny Plaintiff's motion because, whether through appeal or mandamus—which Defendants seek in the alternative—this Court has

---

[1] Defendants are prepared to file their opening brief—which requests mandamus relief in the alternative—within two business days of the Record on Appeal becoming available. The brief is complete save for Record on Appeal cites. The record was requested from the district court on December 18, 2025, so should be filed in this Court shortly. Dkt. No. 32.

jurisdiction to review the district court's transfer order. Plaintiff claims (at 4) that the "accepted national rule" is that a transfer order cannot be appealed. But just a handful of years ago, Plaintiff *itself* appealed an adverse transfer order and argued that such orders are appealable under the collateral-order doctrine. And far from rejecting Plaintiff's argument, this Court noted that some panels had "appl[ied] the [collateral-order] doctrine to transfer orders," although the Court ultimately had no occasion to decide whether appeal was available because it granted mandamus instead. *Defense Distributed v. Bruck*, 30 F.4th 414, 423 & n.8 (5th Cir. 2022). Plaintiff's about-face from its own position is remarkable.

In any event, this Court unquestionably has mandamus jurisdiction. *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 309 (5th Cir. 2008) (en banc). Plaintiff protests that Defendants have not filed a mandamus petition. But Defendants stand ready to file, as soon as the Record on Appeal becomes available, an opening brief that requests mandamus relief in the alternative. That is precisely what Plaintiff did—and what this Court permitted—in *Bruck*.

Therefore, this Court should deny Plaintiff's motion to dismiss Defendants' appeal. At the very least, the motions panel should defer judgment to the merits panel. Plaintiff insists (at 7) that the Court must instead grant its motion to dismiss "*immediately*" based on unfounded accusations of gamesmanship. Plaintiff would have this Court believe that remand to state court is preordained, and that Defendants

are appealing solely to forestall that inevitable result.  To the contrary, the district court remains undecided as to whether remand is warranted, which is why it requested supplemental briefing.[2]  As shown in Defendants' supplemental brief, remand would be inappropriate because the district court plainly has diversity jurisdiction.  Ex. I.

More to the point, the district court itself determined that resolution of the transfer dispute should precede any decision on remand.  Mot. Ex. B at n.2. Defendants seek appellate review to ensure that "the court who would ultimately try the case" had the forum-selection clauses been properly enforced is the one "to rule on the remand motion."  *Davis v. Meta Platforms, Inc.*, 2023 WL 4670491, at *5 (N.D. Cal. July 20, 2023).  In addition, Defendants had no choice but to appeal in order to protect their right to this Court's review of the transfer order.  In previous litigation and earlier *in this very case*, Plaintiff took the position that transfer orders are appealable.  Because mandamus is only available if there is no other adequate means of obtaining relief, if Defendants had not appealed and this Court then denied mandamus on the basis that transfer orders are appealable (as Plaintiff previously argued), then Defendants would likely have lost any opportunity for this Court's review.

---

[2] Mot. Ex. F at 26 (district court stating that it is not "entirely certain" about the remand arguments); *id.* at 26-29 (stating that after supplemental briefs are filed, "we'll get back together and I'll let you guys argue it to me").

The real reason why Plaintiff urges this Court to hastily dismiss the appeal—without even affording Defendants a chance to respond—is not difficult to deduce. An order granting remand to state court is generally unappealable even if such remand is contrary to binding Circuit and Supreme Court authority. So if the district court were to grant remand—accepting Plaintiff's argument that diversity jurisdiction is lacking even though it *expressly pleaded* that the amount in controversy exceeds $5 million—then Defendants would likely be forced to litigate in Texas state court despite Plaintiff having agreed to a California forum. And this Court would be deprived of any opportunity to review the district court's erroneous transfer order. This Court should not entertain Plaintiff's gambit.

## **BACKGROUND**

### A.    **Plaintiff Appeals an Adverse Transfer Order**

In 2021, Plaintiff sued the New Jersey Attorney General in Texas federal district court. *Bruck*, 30 F.4th at 422. Over Plaintiff's objection, the district court transferred the case to New Jersey. *Id.* at 423. Plaintiff immediately appealed. *Id.* New Jersey urged this Court to dismiss for lack of appellate jurisdiction. Ex. B at 20-22. In response, Plaintiff argued that, under Fifth Circuit precedent, transfer orders are appealable under the collateral-order doctrine. Ex. C at 9-10 (citing *In re Bradford*, 660 F.3d 226 (5th Cir. 2011), and *In re Sepulvado*, 707 F.3d 550, 552 (5th Cir. 2013)). In the alternative, it asked this Court to construe its appeal as a

mandamus petition.  Ex. A at 18.  After receiving full briefing and holding oral

argument, the Fifth Circuit concluded that it had jurisdiction and ordered the district

court to request re-transfer.  *Bruck*, 30 F.4th at 421.  The Court flagged a "potential

intra-circuit split" on whether transfer orders "fall within the scope of the collateral

order doctrine" but declined to reach that issue, instead accepting Plaintiff's

alternative request for mandamus treatment.  *Id.* at 423 & n.8.

**B.    Plaintiff Agrees to YouTube's and Google Ads's Terms of Service, Including Their Forum-Selection Clauses**

Defendant YouTube LLC makes YouTube—an online service for sharing and

viewing videos—available to the public.  Ex. D at 20.  Defendant Google LLC

provides the YouTube service as well as Google Ads, a digital service that allows

businesses and individuals to display ads on YouTube and other Google websites.

*Id.*; Ex. F at 10.  Defendant Alphabet, Inc. is the parent company of both YouTube

LLC and Google LLC.  Ex. D at 20-21.

YouTube and Google Ads users must agree to the platforms' Terms of

Service, each of which contains a mandatory, exclusive forum-selection clause

requiring litigation in Santa Clara County, California.  Ex. F ¶ 5; Ex. G ¶ 5.  There

was no dispute below that Plaintiff agreed to those Terms, including the forum-

selection clauses.  Mot. Ex. B at 3-4.

of Chapter 143A that declare any forum-selection clause in a Chapter 143A case to be void and announce that non-enforcement of such clauses reflects a "public-policy limitation . . . of the highest importance and interest" to Texas. Tex. Civ. Prac. & Rem. Code §§143A.003, 143A.0035.

Defendants timely appealed the district court's order denying their motion to transfer. Defendants' opening brief, which will be filed as soon as the Record on Appeal becomes available, explains that the district court's order was legally erroneous under Supreme Court and Fifth Circuit precedent. Plaintiff now moves to dismiss Defendants' appeal for lack of jurisdiction.

## **ARGUMENT**

As Plaintiff argued to this Court just a few years ago, while represented by the same counsel, "[t]he question is not whether jurisdiction exists, but which— appellate jurisdiction via the collateral order doctrine or original mandamus jurisdiction. Either way, the Court has all the power it needs." Ex. C at 9. That is just as true now as it was when Plaintiff appealed an adverse transfer order in *Bruck*. Plaintiff's about-face now that it is on the other end of a transfer order is striking. It goes so far as to urge (at 7) that this Court grant its motion "*immediately*," without even affording Defendants an opportunity to respond, supposedly to put a stop to gamesmanship—but the only gamesmanship is Plaintiff's own. Plaintiff seeks to thwart this Court's ability to review the district court's transfer decision by ushering

the case into the confines of Texas state court. Rather than facilitate such circumvention, this Court should deny Plaintiff's motion. And if the motions panel does not deny the motion outright, it should at least defer judgment to the merits panel. That would allow the Court to make a considered, rather than rushed, decision about the proper jurisdictional basis for reviewing the district court's transfer order and whether that order was correct—just as it did in *Bruck*.

## I.    This Court Has Appellate Jurisdiction to Review the District Court's Transfer Order Under the Collateral-Order Doctrine

This Court has appellate jurisdiction to review the district court's order erroneously denying Defendants' motion to transfer under the collateral-order doctrine, as Plaintiff correctly observed when it appealed an adverse transfer order a handful of years ago. *See Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949); Ex. A at 17; Ex. C at 9.

A district court's order is reviewable under the collateral-order doctrine if it "(1) conclusively determine[s] the disputed question, (2) resolve[s] an important issue completely separate from the merits of the action, and (3) [is] effectively unreviewable on appeal from a final judgment." *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993). This Court has already established that those three requirements are satisfied with respect to transfer orders. In *Bradford*, this Court held that it had jurisdiction to consider an appeal from a district court's transfer order under the collateral-order doctrine. 660 F.3d at 229.

This Court reaffirmed that holding in *Sepulvado*. 707 F.3d at 552.

Plaintiff repeatedly invokes (at 4, 5) the purported "accepted national rule" to claim that a transfer order "is not appealable as a 'final' decision." But it makes no difference whether a transfer order is "final" as traditionally understood because such orders fall within the collateral-order doctrine, an *exception* to the final-judgment rule. Mot. 5 (quoting *In re Rolls Royce Corp.*, 775 F.3d 671, 676 (5th Cir. 2014) (describing the collateral-order doctrine as an "exception to the final order doctrine")). And as Plaintiff itself previously explained, this Court's rule as established in *Bradford* and *Sepulvado* is that transfer orders are immediately appealable under the collateral-order doctrine. Ex. C at 9-11. This Court's on-point, precedential decisions carry more weight than the treatise Plaintiff invokes.

Plaintiff relies (at 5) on *Volkswagen* and *Bruck* to argue that this Court follows the supposed "national rule" against collateral-order review of transfer orders. Neither case supports Plaintiff's contention, and indeed, *Bruck* affirmatively contradicts it.

*First*, in *Volkswagen*, the Court did not even address the collateral-order doctrine. It merely stated that "mandamus is *an* appropriate means"—not the exclusive means—of seeking review of a district court's transfer order. 545 F.3d at 308 (emphasis added). Therefore, the Court did not rule out *other* appropriate means of seeking review, such as an appeal under the collateral-order doctrine. Moreover,

*Volkswagen* explicitly states that (1) appeal from a final judgment is not an "adequate remedy" for obtaining relief from an "improper failure to transfer" (one of the requirements for collateral-order review), and (2) that "interlocutory review of transfer orders under 28 U.S.C. § 1292(b) is unavailable." *Id.* at 318-19. But tellingly, the Court made no mention of collateral-order review being off limits.

*Second*, in *Bruck*, far from rejecting the applicability of the collateral-order doctrine to transfer orders, the Court explicitly acknowledged that prior Fifth Circuit decisions have held that the doctrine does apply to transfer orders. As explained above, in that case, Plaintiff itself appealed from an adverse transfer order and, in the alternative, asked this Court to construe its opening brief as a mandamus petition. In resolving Plaintiff's appeal, the Court noted that while some of its previous decisions had suggested that transfer orders do not fall within the scope of the collateral-order doctrine, others had applied the doctrine to transfer orders. *Bruck*, 30 F.4th at 423 n.8 (citing *Rolls Royce*, 776 F.3d at 676, for the former, and *Bradford*, 660 F.3d at 229, and *Sepulvado*, 707 F.3d at 552, for the latter). Rather than wade into that "potential intra-circuit split," this Court "pretermit[ted] [Plaintiff's] resort to the collateral order doctrine" and treated its appeal as a mandamus petition, which the Court granted. 30 F.4th at 423 & n.8. By definition, if *Bruck* "pretermit[ted]" the "intra-circuit split" on whether transfer orders can be appealed as collateral orders, then *Bruck* did not settle that issue. In any event, the three-judge panel in

*Bruck* could not have conclusively resolved the issue even had it wanted to because one panel of this Court has no power to nullify the earlier decisions of other panels like *Bradford* and *Sepulvado*.

Plaintiff then invokes *Rolls Royce* (at 5) to argue that "the Fifth Circuit's position" is that the collateral-order doctrine does not cover transfer orders. But as Plaintiff itself previously observed, "*Rolls Royce* is not controlling because the rule of orderliness gives precedence to other decisions," like the Court's earlier decisions in *Bradford* and *Sepulvado*, "that uphold the collateral order doctrine's application here." Ex. C at 9. Moreover, as Plaintiff noted in *Bruck*, *Rolls Royce*'s conclusion that "the unavailability of meaningful review from final judgment gives rise to mandamus jurisdiction *but not a collateral order appeal* . . . is likely errant and would warrant reconsideration if it were controlling." *Id.* (emphasis in original).

*Brinar v. Williamson*, 245 F.3d 515 (5th Cir. 2001), upon which *Rolls Royce* relied, "is inapposite." *Bradford*, 660 F.3d at 229. In *Brinar*, the district court transferred a successive petition for post-conviction relief to the Ninth Circuit under 28 U.S.C. § 1631. 245 F.3d at 516. The *Brinar* Court held that the transfer order was not appealable under the collateral-order doctrine, reasoning that the order was *not* "effectively unreviewable" because it could be reviewed by the Ninth Circuit as the transferee court. *Id.* at 517-18. By contrast, the transfer order at issue here *is* effectively unreviewable on appeal from final judgment. *Volkswagen*, 545 F.3d at

318-19.  It was precisely on that basis that this Court in *Bradford*, in holding that the district court's transfer order fell within the collateral-order doctrine, distinguished *Brinar*.  Unlike in *Brinar*, where the case had been transferred to and was subject to review in the Ninth Circuit, in *Bradford*, the case remained in the Fifth Circuit.  660 F.3d at 229.  So if the Fifth Circuit dismissed the appeal, the transfer order *would* be "effectively unreviewable."  *Id.*  The same is true here.  The district court denied Defendants' motion to transfer, so just as in *Bradford*, there is no transferee court from which Defendants can seek review.

Even if this Court had not already held that the collateral-order doctrine applies to transfer orders generally, that doctrine would at least apply to transfer orders in circumstances like these, where a pending remand motion threatens to eviscerate any possibility of further review.  The real reason why Plaintiff wants this Court to grant its motion "*immediately*," without even affording Defendants time to respond, is because Plaintiff hopes to quickly usher this case into Texas state court— even though such a remand would plainly be inappropriate, *see infra* Part III—and eliminate this Court's ability to review the district court's flawed transfer order.  Plaintiff shows its cards when it asserts (at 7) that "a remand decision is not appealable."  Its plan of action is clear:  Convince the district court to incorrectly remand, argue that the remand decision cannot be appealed, and thereby lock Defendants into Texas state court without recourse—all before this Court has an

opportunity to scrutinize the district court's transfer decision and send the case to California where it belongs.

It is for that reason that Plaintiff's reliance (at 5-6) on *Lauro Lines s.r.l. v. Chasser*, 490 U.S. 495 (1989), is misguided. In *Lauro Lines*, the Court reasoned that an order denying a motion to dismiss on forum non conveniens grounds did not fall within the collateral-order exception because the petitioner could seek review of the order after final judgment—consequently, the "legal and practical value" of the "asserted right" would not "be destroyed if it were not vindicated before trial." 490 U.S. at 499, 501. Here, by contrast, if the district court grants Plaintiff's remand motion, then the case will likely be stuck in Texas state court, and Defendants will have no opportunity to appeal the district court's transfer order to this Court even after final judgment. Therefore, unlike in *Lauro Lines*, the "legal and practical value" of Defendants' right to proper application of the federal presumption in favor of enforcing forum-selection clauses *would* likely "be destroyed" if "not vindicated" at this juncture. *Id.* at 501; *cf. Davis*, 2023 WL 4670491, at *5. And as Plaintiff makes clear, it is not seeking to "ensure[] that litigation will continue in the District Court." *Lauro Lines*, 490 U.S. at 498. It seeks an (erroneous) remand to state court and to prevent both the remand order and transfer order from ever being reviewed in federal court. *Cf. Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 714 (1996) (holding that collateral-order doctrine applied to abstention-based remand order

because it "surrender[ed] jurisdiction of a federal suit to a state court").[3]

Finally, Plaintiff's insistence that this court lacks appellate jurisdiction is particularly hollow given that Plaintiff acknowledged earlier *in this very case* that appeal remains an open avenue for seeking review of a transfer order.  Below, Plaintiff asked the district court to issue a 30-day stay in the event that it granted the motion to transfer, explaining that if the court did so, it would "pursue appellate review."  Ex. H at 18.  But now that the district court has denied the motion to transfer and Defendants, rather than Plaintiff, are the ones seeking review, Plaintiff insists that, actually, appellate review is not available.  This Court should not reward Plaintiff's blatant about-face.

## II.    Alternatively, This Court May Review the District Court's Transfer Order As an Exercise of Its Mandamus Jurisdiction

Even if this Court concludes that it lacks appellate jurisdiction, there is no good reason to dismiss this appeal because the Court unquestionably has jurisdiction to treat the appeal as a request for mandamus relief and to grant such relief.  Plaintiff asserts (at 6) that "mandamus jurisdiction is not at issue here" because Defendants have not filed a mandamus petition.  Defendants, however, will within two business

---

[3] The fact that *Lauro Lines* involved a motion to dismiss for forum non conveniens rather than a transfer order under section 1404(a) also renders it inapposite.  While the Court in *Lauro Lines* stated that a motion to dismiss for forum non conveniens would not be effectively unreviewable on appeal from final judgment, this Court sitting en banc in *Volkswagen*—which was decided well after *Lauro Lines*—expressly held that "appeal from an adverse final judgment" would "*not* [be] an adequate remedy for an improper failure to transfer the case" under section 1404(a).  545 F.3d at 318-19 (emphasis added).

days of the Record on Appeal becoming available file their opening brief, which properly requests mandamus relief in the alternative. This Court has explained that appellants seeking mandamus relief in the alternative can either "appl[y] for a writ of mandamus under Fed. R. App. P. 21" *or* "request[] that [the Court] treat their appeal as a petition for a writ." *In re Delta Servs. Indus., Etc.*, 782 F.2d 1267, 1272 (5th Cir. 1986). And this Court regularly entertains such alternative requests for mandamus treatment, as it did in *Bruck*. *See, e.g.*, 30 F.4th at 423 & n.8; *United States v. Williams*, 400 F.3d 277, 280 (5th Cir. 2005); *In re Foster*, 644 F. App'x 328, 330 n.1 (5th Cir. 2016) (per curiam).[4]

It is well-established that this Court has mandamus jurisdiction to review transfer orders, and specifically orders on motions to transfer under section 1404(a). In *Volkswagen*, this Court made clear that "mandamus is an appropriate means of testing a district court's section 1404(a) ruling." 545 F.3d at 309. And this Court has repeatedly granted requests seeking mandamus relief from erroneous section 1404(a) decisions. *See, e.g.*, *In re TikTok, Inc.*, 85 F.4th 352, 356 (5th Cir.

---

[4] Any suggestion that Defendants' alternative request for mandamus relief is improper because Defendants' opening brief does not comply with the technical requirements of Federal Rule of Appellate Procedure 21 would be baseless. In *Bruck*, New Jersey argued that Plaintiff was not entitled to mandamus relief because Plaintiff failed to file a separate mandamus petition that met the requirements of Rule 21. Ex. B at 34-35 & n.5. In granting Plaintiff's request for mandamus relief, this Court stated that New Jersey's "contention that [Plaintiff] [could] not seek mandamus due to technical noncompliance with FRAP Rule 21 [was] *frivolous*." 30 F.4th at 425 n.10 (emphasis added). Just as in *Bruck*, Defendants' forthcoming opening brief is a proper request for mandamus relief, both "procedurally and substantively," because it "state[s] clearly the relief requested and grounds for seeking mandamus relief." *Id.*

2023); *In re Media Matters for Am.*, 143 F.4th 631, 640 (5th Cir. 2025).

Most notably, in *Bruck*, this Court granted Plaintiff's request to have its opening brief on appeal of the district court's section 1404(a) transfer order construed as a mandamus petition and granted mandamus relief. 30 F.4th at 423 & n.8, 436. Plaintiff halfheartedly suggests (at 6) that mandamus treatment was warranted in *Bruck* only because that case involved a combined transfer-and-sever order. But this Court in *Bruck* plainly stated that "mandamus is the prescribed vehicle for reviewing rulings on *transfers* of cases," citing this Court's en banc decision in *Volkswagen*, which concerned only transfer and not severance. 30 F.4th at 423 (emphasis added). And the other cases cited above in which this Court granted mandamus relief likewise involved transfer-only orders. *TikTok*, 85 F.4th at 356; *Media Matters*, 143 F.4th at 634-35.

In the end, by asking this Court to dismiss Defendants' appeal (with forthcoming alternative request for mandamus relief) even though it is on all fours with Plaintiff's own earlier appeal of an adverse transfer order, Plaintiff seeks to deny other litigants the benefit of a previous ruling in its favor. This Court should not countenance such a transparent request for preferential treatment.

## III.    If the Motions Panel Does Not Deny Plaintiff's Motion, It Should Be Carried With the Case

For the reasons explained above, the motions panel should deny Plaintiff's motion to dismiss for lack of jurisdiction outright. But at the very least, the panel

should defer judgment to the merits panel, as it does regularly. *See, e.g.*, *United Nat. Foods, Inc. v. NLRB*, 66 F.4th 536, 540 (5th Cir. 2023); *Nat'l Oilwell Varco, L.P. v. Auto-Dril, Inc.*, 68 F.4th 206, 212 (5th Cir. 2023). Plaintiff's insistence that this Court grant its motion "*immediately*"—without even affording Defendants an opportunity to respond—rests on its baseless accusation that Defendants are using appeal as "a procedural weapon" to delay an "imminent" remand to state court. Mot. 6-7. To the contrary, a state-court remand is in no way "imminent," and Defendants *had to* appeal to fully protect their right to this Court's review of the district court's transfer order. As explained above, Plaintiff's plea for a rushed dismissal is instead a poorly disguised attempt to obtain an inappropriate state-court remand that would thwart this Court's ability to review the district court's erroneous transfer order (confirming why collateral-order jurisdiction is appropriate). This Court should not permit such an end-run around its own jurisdiction, especially when the district court itself determined that transfer should be resolved before remand.

Plaintiff's assertion that this Court must dismiss Defendants' appeal immediately is premised on its claim that remand to state court is inevitable. That badly mischaracterizes the state of play in the district court. It is undisputed that the citizenship of the parties is diverse, and Plaintiff expressly and unambiguously admitted in its Petition that the amount in controversy exceeds $5 million. Ex. D at 17 ¶ 14. The only reason there is even a live question over remand is that Plaintiff

attempted to stipulate at a motions hearing that it would limit its monetary recovery to $74,999, after which the district court sought supplemental briefing on the impact of that stipulation and other bases for jurisdiction.  *See* Mot. Ex. F at 20-29.

Since then, Defendants have submitted a supplemental brief establishing that the district court must disregard Plaintiff's post-removal stipulation because where, as here, "it is facially apparent from the petition that the amount in controversy exceeds $75,000 at the time of removal, post-removal affidavits, stipulations, and amendments reducing the amount do not deprive the district court of jurisdiction." *Gebbia v. Wal-Mart Stores, Inc.*, 233 F.3d 880, 883 (5th Cir. 2000) (citing *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 292 (1938)).  Binding law thus forecloses Plaintiff's eleventh-hour ploy to defeat diversity jurisdiction.

For that reason, Plaintiff's motion to remand should be denied.  But under *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56 (1982), the district court lacks jurisdiction to rule on the remand motion while this appeal is pending.  Mot. Ex. H.  Plaintiff asserts (at 7-8) that *Griggs* does not apply because this Court lacks appellate jurisdiction.  That is wrong for the reasons set out above.  *See supra* Part I.

Plaintiff then (at 7-9) incorrectly suggests that the only reason Defendants filed an appeal was to divest the district court of jurisdiction to rule on the remand motion.  Not so.  It is true that the unique circumstances of a pending remand motion strengthen the case for collateral-order jurisdiction.  As explained above, Defendants

were *compelled* to appeal or else potentially lose any opportunity to obtain this Court's review of the transfer order if the district court were to wrongly remand. But it is the district court, not Defendants, who made the judgment that transfer should be settled *before* remand. In its transfer order, the district court explicitly stated that it was "exercis[ing] its discretion to resolve the motion to transfer before the motion to remand." Mot. Ex. B at n.2. Therefore, there is every reason to fully resolve the transfer dispute first, including this Court's review of the district court's transfer order, rather than skip ahead to the motion to remand and potentially eliminate any avenue for higher-court review of the transfer order. After all, regardless of how this Court rules on transfer, Plaintiff will remain free afterward to argue for remand to state court. And if Plaintiff is correct that remand is "inevitable," then the Northern District of California can remand just as well as the Western District of Texas.

Defendants also had no choice but to appeal due to the interaction between the unsettled state of the law in this Circuit and the requirements for mandamus relief. As Plaintiff well knows, this Court in *Bruck* left open the possibility that transfer orders may be appealed under the collateral-order doctrine. 30 F.4th at 423 & n.8. And one of the fundamental prerequisites to mandamus relief is that "the party seeking issuance of the writ [must] have no other adequate means to attain the relief he desires." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380-81 (2004).

If this Court were to hold that its prior decisions applying the collateral-order doctrine to transfer orders are binding, or that the doctrine applies in a case like this one where there is also a pending remand motion, then Defendants would have "other adequate means" to obtain relief—namely, an appeal—and mandamus relief may very well be foreclosed.

Therefore, unless and until this Court conclusively resolves the acknowledged intra-circuit split on the proper vehicle(s) for seeking review of a transfer order generally and in circumstances like these, litigants seeking to fully protect their rights will have no choice but to do precisely what Defendants have done here: file an appeal while seeking mandamus relief in the alternative—which Plaintiff previously described as "a perfectly orthodox way of advancing the Court's interest in judicial efficiency and simplified submissions." Ex. C at 17.

Plaintiff concludes its motion (at 10) by asserting that in order for Defendants to secure this Court's review, they must "do things the right way" by "fil[ing] a mandamus petition" and "mak[ing] a serious showing that they are likely to obtain that extraordinary relief," and claiming that Defendants "have done none of that." Quite the opposite. Defendants have prepared—and stand ready to file as soon as the Record on Appeal is available—a brief that functions as either an opening brief on appeal or a mandamus petition and that demonstrates that Defendants are entitled to relief whether under ordinary appellate or mandamus standards.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should deny Plaintiff's motion to dismiss for lack of jurisdiction.  Alternatively, the motions panel should defer judgment on Plaintiff's motion to the merits panel.[5]

---

[5] If the Court grants Plaintiff's motion, Defendants respectfully request a brief administrative stay from this Court pending the filing and disposition of a motion to stay in the district court. Defendants would also promptly file a mandamus petition in this Court.

Dated:   December 22, 2025          Respectfully submitted,

*/s/ Jonathan Patchen*
Jonathan Patchen
Michael A. Rome
Anika Holland
Madeleine R. Ahlers
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
(415) 693-2000
jpatchen@cooley.com

Connie L. Wang
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
(650) 843-5000

Steven J. Wingard
Robyn Hargrove
Eli Barrish
SCOTT DOUGLASS & MCCONNICO LLP
303 Colorado Street, Suite 2400
Austin, TX 78701
(512) 495-6300

*Counsel for Defendants-Appellants*
*YouTube LLC, Google LLC, and*
*Alphabet, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 22, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.  Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Jonathan Patchen*
Jonathan Patchen

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that:

1.      This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 27(d)(2)(A) because it consists of 5,184 words, excluding parts exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32.2.

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced, serif typeface using Microsoft Word in 14-point Times New Roman font.

<div align="right">

*/s/ Jonathan Patchen*
Jonathan Patchen

</div>

# EXHIBIT 14

No. 25-51004

_____

In the United States Court of Appeals for the Fifth Circuit

_____

Defense Distributed,

Plaintiff—Appellee.

v.

YouTube LLC, Google LLC, and Alphabet, Inc.,

Defendants-Appellants,

_____

Appeal from the United States District Court for the
Western District of Texas; No. 1:25-cv-01095-ADA-ML

_____

**Defense Distributed's Reply in Support of
Defense Distributed's Motion to Dismiss the Appeal for Lack of Jurisdiction**

_____

Chad Flores
Flores Law PLLC
917 Franklin Street, Suite 600
Houston, Texas 77002
(713) 893-9440

Counsel for Defense Distributed

## Table of Contents

Table of Contents ........................................................................... ii

Argument ...................................................................................... 1

I.    The Court lacks appellate jurisdiction. ....................................... 2

    A.    *Bruck* (5th Cir. 2022) dispels appellate jurisdiction here. ..................... 3

    B.    Prior Fifth Circuit decisions dispel appellate jurisdiction here. ........... 4

    C.    Later Fifth Circuit precedent dispels jurisdiction here. ...................... 5

II.   The Court lacks mandamus jurisdiction. ..................................... 6

III.  Jurisdiction by estoppel isn't a thing, especially here. .................... 7

    A.    Jurisdiction never arises by estoppel. .................................. 8

    B.    The *Bruck* argument is consistent with dismissing this appeal. ............ 8

    C.    The *Bruck* result is consistent with dismissing this appeal. ................. 8

IV.   Dismissal should occur *immediately* to stop lower court interference. ............ 9

Conclusion .................................................................................... 10

Certificate of Compliance ................................................................. 11

## Argument

The only kind of jurisdiction that has been actually invoked is appellate jurisdiction under the collateral-order doctrine. But the Fifth Circuit's governing rule holds that plain Section 1404(a) transfer orders are not appealable. That rule was synthesized in *In re Rolls-Royce Corp.*, 775 F.3d 671 (5th Cir. 2014), enforced in *Defense Distributed v. Bruck*, 30 F.4th 414 (5th Cir. 2022), and reaffirmed in *Hinkle v. Phillips 66 Co.*, 35 F.4th 417 (5th Cir. 2022). Mandamus—not appeal—is the only path.

Yet Appellants have not actually invoked the Court's mandamus jurisdiction. They filed no petition for a writ of mandamus, no mandamus appendix, and no brief satisfying Rule 21. The point isn't that they *can't do so*. It's that they *haven't done so*. Saying that they "stand ready" to seek mandamus relief later does not presently invoke this Court's original jurisdiction. This Court's authority extends only to properly invoked appeals and original proceedings, not to hypothetical alternatives.

Hence the last-ditch effort at jurisdiction by estoppel. But this Court's jurisdiction can never be created by estoppel, waiver, or any other party conduct. *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006). And in any event, there can be no estoppel here because (1) the prior and current positions were not inconsistent, and more importantly (2) Defense Distributed's prior position *did not work*, as *Bruck* exercised only mandamus jurisdiction and not the appellate power now claimed.

1

App.263

For these reasons, the Court should grant the motion to dismiss this appeal for lack of appellate jurisdiction. Doing so is quite fair to the Appellants, who remain perfectly free to pursue the mandamus they say they're imminently prepared to pursue. Critically, though, *immediately* dismissing this appeal has this additional necessary impact: Whereas carrying this motion would risk perpetuating the cloud of an erroneous *Griggs* stay that has no jurisdictional basis, immediately granting this motion to dismiss removes the cloud of an erroneously-claimed *Griggs* stay that hangs over the district court below. Immediately dismissal corrects that error while preserving Appellants' ability to seek mandamus if they choose.

## I.      The Court lacks appellate jurisdiction.

Appellants invoke only this Court's appellate jurisdiction under the collateral-order doctrine. But that path—though arguably open in some recent years—is now decisively closed and no longer open to debate. In this Circuit, plain Section 1404(a) transfer orders are *not* appealable under the collateral-order doctrine. Any uncertainty that once existed about that issue was resolved by this Court in *Defense Distributed v. Bruck*, 30 F.4th 414 (5th Cir. 2022), which necessarily refused appellate jurisdiction because it utilized mandamus—even after Defense Distributed had indeed expressly urged the other view. With the bridge having been crossed, everyone is now bound to acknowledge that such orders are not appealable.

2

### A.   *Bruck* (5th Cir. 2022) dispels appellate jurisdiction here.

*Defense Distributed v. Bruck*, 30 F.4th 414 (5th Cir. 2022), did not evade the question of appellate jurisdiction. It answered it. By proceeding solely through mandamus, the Court necessarily rejected collateral-order jurisdiction. The panel expressly "pretermit[ted]" reliance on the collateral-order doctrine because, in this Circuit, "mandamus is the prescribed vehicle for reviewing rulings on transfers of cases pursuant to 28 U.S.C. § 1404(a)." *Id.* at 423. That statement was not dicta. It was the jurisdictional foundation for the Court's authority to act. *Id.* at 423–25.

Appellants' response does not meaningfully dispute this sequence or explain how mandamus could have issued if appellate jurisdiction were available. Instead, it characterizes *Bruck* as having "sidestepped" appellate jurisdiction. But *Bruck* did the opposite: it rejected appellate jurisdiction as unavailable and proceeded only through mandamus.

*Bruck's* stay decision confirms this point. If Appellants' version of appellate jurisdiction existed in *Bruck*, a *Griggs* stay would have attached automatically and stopped the district court there from sending the case away. But because the *Bruck* panel decided that no proper appeal existed there, no automatic *Griggs* stay existed. So when the *Bruck* panel wanted further district court proceedings stayed, the *Bruck*

App.265

panel could only do so by issuing a freestanding stay—the kind that accompanies only mandamus and not any case in which appellate jurisdiction truly lies.

### B.     Prior Fifth Circuit decisions dispel appellate jurisdiction here.

The key Fifth Circuit decision preceding *Bruck* is *In re Rolls-Royce Corp.*, 775 F.3d 671 (5th Cir. 2014), which addressed and resolved the appellate-jurisdiction question after surveying the earlier cases. Yet Appellants still suggest that earlier decisions somehow control. *See* Doc. 42-1 at 20. That framing fails for two reasons.

First, Defense Distributed's reading of the pre- *Rolls-Royce* cases is correct. From *Brinar v. Williamson*, 245 F.3d 515, 517–18 (5th Cir. 2001), forward, this Court has treated plain Section 1404(a) transfer orders as paradigmatic non-final decisions because they remain reviewable after final judgment. *In re Bradford*, 660 F.3d 226 (5th Cir. 2011), did not retreat from that rule; it expressly confined its jurisdictional holding to an anomalous habeas-transfer posture in which dismissal would have rendered the transfer order effectively unreviewable. *Id.* at 228–29. And nothing in those cases suggested that a routine, whole-case transfer between district courts triggers collateral-order jurisdiction (as opposed to *sui generis* orders that materially restructure the litigation, such as the sever-and-transfer order addressed via mandamus in *Bruck*).

4

Second—and more importantly—any arguable ambiguity in the earlier cases has been resolved. *Rolls-Royce* synthesized the prior precedent and announced the controlling rule: "While the Supreme Court has crafted a narrow exception to the final order doctrine, termed the 'collateral order doctrine' or '*Cohen* exception,' we have previously held that transfer orders do not fall within the scope of this doctrine." 775 F.3d at 676 (citing *Brinar*, 245 F.3d at 517). *Bruck* then applied that rule, refusing appellate jurisdiction and proceeding only by mandamus because "mandamus is the prescribed vehicle for reviewing rulings on transfers of cases pursuant to 28 U.S.C. § 1404(a)." *Bruck*, 30 F.4th at 423. Together, *Rolls-Royce* and *Bruck* foreclose appellate jurisdiction here, regardless of how one parses the earlier cases.

### C.     Later Fifth Circuit precedent dispels jurisdiction here.

Later Fifth Circuit decisions confirm—rather than disturb—the rule articulated in *Rolls-Royce* and applied in *Bruck*. Most directly, *Hinkle v. Phillips 66 Co.*, 35 F.4th 417 (5th Cir. 2022), squarely dismissed an interlocutory appeal from the denial of a motion to transfer venue for lack of appellate jurisdiction. *Id.* at 420–21. *Hinkle* did not treat the transfer order as even arguably appealable under the collateral-order doctrine. Instead, it cited *Rolls-Royce* and *Volkswagen* for the settled proposition that venue-transfer orders are unappealable and reviewable, if at all, only by mandamus. *Id.* at 421.

5

## II.    The Court lacks mandamus jurisdiction.

Appellants have not invoked this Court's mandamus jurisdiction. They filed no petition for a writ of mandamus. They submitted no mandamus appendix. They did not comply with Rule 21. Instead, they say only that they "stand ready" to seek mandamus relief later. Doc. 42-1 at 9. That is not an invocation of jurisdiction.

The distinction is dispositive. Congress vested this Court with jurisdiction over actual appeals and properly commenced original proceedings—not over hypothetical alternatives that a party may pursue in the future. A statement of readiness does not create jurisdiction.

Waiting for an appellate record provides no excuse. Mandamus review proceeds on a mandamus record, not an appellate one. *See* Fed. R. App. P. 21. Appellants chose not to assemble such a record here. They cannot obtain mandamus relief without shouldering mandamus obligations.

*Bruck* illustrates the point. There, Defense Distributed affirmatively invoked mandamus jurisdiction on a complete record and fully briefed the demanding mandamus standard. That filing satisfied Rule 21 and properly triggered this Court's original jurisdiction. This case is the opposite. Appellants seek the benefits of mandamus while avoiding its procedural and substantive burdens. The Court lacks mandamus jurisdiction because Appellants never actually invoked it.

To be clear, the point is not that Appellants are barred from seeking mandamus relief. They remain free to do so at any time, subject to the rules that govern such petitions. The point is that they have not done so here. Having declined to invoke mandamus jurisdiction in fact, Appellants cannot claim the procedural or jurisdictional advantages that would follow from a properly filed mandamus petition. Jurisdiction turns on what parties do, not on what they say they might do later.

The demanding nature of mandamus review is not a technicality; it is the safeguard that prevents routine transfer disputes from overwhelming appellate dockets. *See In re Volkswagen of Am., Inc.*, 545 F.3d 304, 310 (5th Cir. 2008) (en banc). Mandamus also carries none of appeal's automatic incidents: a party seeking mandamus does not obtain an automatic *Griggs* stay merely by filing papers, but must affirmatively request—and justify—any stay as discretionary relief. Appellants' effort to recharacterize a transfer order as appealable seeks to evade those safeguards and lower the threshold that Congress and this Court have deliberately imposed.

## III.    Jurisdiction by estoppel isn't a thing, especially here.

Google's fallback theory is jurisdiction by estoppel. They argue that Defense Distributed previously took a different position on appellate jurisdiction and should now be bound by it. Doc. 42-1 at 9. That argument fails at every level.

**A.    Jurisdiction never arises by estoppel.**

Subject-matter jurisdiction is structural. It cannot be created by consent, waiver, forfeiture, or estoppel. Even perfect estoppel would not supply jurisdiction Congress has withheld. This Court has an independent duty to police its jurisdiction, regardless of party conduct. That principle alone ends the argument.

**B.    The *Bruck* argument is consistent with dismissing this appeal.**

Even setting doctrine aside, estoppel still fails. Defense Distributed has never claimed appellate jurisdiction over a *plain* § 1404(a) transfer order like the one here. The order in *Bruck* was materially different. It severed claims and transferred only part of the case, reshaping the litigation itself. *See Defense Distributed v. Bruck*, 30 F.4th 414, 419–20 (5th Cir. 2022). That *sui generis* posture drove the mandamus analysis and the finding of irreparable harm. *Id.* at 424–25.

This case bears no resemblance. The district court ordered a routine, whole-case transfer between federal courts. Such orders are paradigmatic non-final decisions—reviewable, if at all, only by mandamus. Whatever complexity existed in *Bruck* only reinforces why a simple transfer like this one is not appealable.

**C.    The *Bruck* result is consistent with dismissing this appeal.**

Most importantly, Defense Distributed did not prevail on appellate jurisdiction in *Bruck*. It lost that argument. The Court rejected collateral-order

review and proceeded solely by mandamus. Estoppel requires a successful prior position. Appellants identify none.

Defense Distributed's current position tracks *Bruck*'s holding exactly: Section 1404(a) transfer orders are not appealable. Prior references to "appellate" review used the term in its ordinary, non-technical sense to include mandamus—just as courts routinely do. Nothing in those filings asserted appealability under § 1291.

Most importantly, *Bruck*'s result forecloses Appellants' argument. Defense Distributed did not obtain appellate review in that case. It obtained mandamus relief. That outcome confirms the rule Appellants now resist.

## IV.    Dismissal should occur *immediately* to stop lower court interference.

Ordinarily, the distinction between appeal and mandamus has little practical consequence while jurisdictional issues are pending. This case is different. Appellants assert a *Griggs* stay—a stay that exists only if a valid appeal is pending— to freeze proceedings in the district court below.

That assertion is legally wrong. No appellate jurisdiction exists. And yet the claimed stay has real, immediate effects. It halts proceedings, distorts the district court's authority, and interferes with orderly case management—all without jurisdictional footing.

App.271

Carrying this motion with the merits would prolong that interference. It would allow an improperly claimed Griggs stay to persist even though this Court lacks appellate jurisdiction to support it. That result serves no party and no court.

Dismissal fixes the problem cleanly and immediately. It removes the jurisdictional cloud, restores the district court's authority, and preserves the proper procedural order. Appellants lose nothing by dismissal. They remain free to seek mandamus in the ordinary course, exactly as Fifth Circuit precedent contemplates.

This is the rare case where prompt jurisdictional resolution matters. The Court should dismiss the appeal now and end the improper assertion of appellate control.

## Conclusion

As soon as is practicable, the Court should grant the motion and issue an order dismissing the appeal for lack of appellate jurisdiction.

Respectfully submitted,

/s/ Chad Flores
Chad Flores
cf@chadflores.law
Texas Bar No. 24059759
Flores Law PLLC
917 Franklin Street, Suite 600
Houston, Texas 77002
(713) 893-9440

Counsel for Defense Distributed

10

App.272

## Certificate of Compliance

This filing complies with the type-volume limitations of the Federal Rules of Appellate Procedure because it contains 2,051 not-exempted words.

This filing complies with the typeface and typestyle requirements of Federal Rule of Appellate Procedure 32 and Fifth Circuit Rule 32 because it has been prepared in a proportionally spaced typeface in 14-point font using Microsoft Word for Mac Version 16.104.

/s/ Chad Flores
Chad Flores

# EXHIBIT 15

No. 25-51004

# United States Court of Appeals for the Fifth Circuit

DEFENSE DISTRIBUTED,

*Plaintiff-Appellee*

*v.*

YOUTUBE, L.L.C.; GOOGLE, L.L.C.; ALPHABET, INCORPORATED,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Western District of Texas (No. 1:25-cv-01095-ADA)

## DEFENDANTS-APPELLANTS' OPENING BRIEF

Steven J. Wingard
Robyn Hargrove
Eli Barrish
SCOTT DOUGLASS & MCCONNICO LLP
303 Colorado Street, Suite 2400
Austin, TX 78701
(512) 495-6300

Jonathan Patchen
Michael A. Rome
Anika Holland
Madeleine R. Ahlers
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
(415) 693-2000
jpatchen@cooley.com

Connie L. Wang
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
(650) 843-5000

*Counsel for Defendants-Appellants*
*YouTube LLC, Google LLC, and Alphabet, Inc.*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

The undersigned counsel of record in *Defense Distributed v. YouTube, L.L.C.; Google, L.L.C.; Alphabet, Incorporated* (No. 25-51004), on appeal from the United States District Court for the Western District of Texas (No. 1:25-cv-01095-ADA), certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1.     Plaintiff-Appellee is Defense Distributed. To Defendants-Appellants' knowledge, Defense Distributed has no parent company and is not a publicly traded company.

2.     Plaintiff-Appellee is represented in the Fifth Circuit by Chad Flores of Flores Law PLLC.

3.     Defendants-Appellants are YouTube LLC, Google LLC, and Alphabet, Inc. YouTube LLC is a subsidiary of Google LLC. Google LLC is a subsidiary of XXVI Holdings, Inc., which is a subsidiary of Alphabet, Inc. Alphabet, Inc. is a publicly traded company, but no publicly traded company owns 10% or more of its stock.

4.     Defendants-Appellants are represented in the Fifth Circuit by Jonathan Patchen, Michael A. Rome, Anika Holland, Madeleine R. Ahlers, and Connie L.

Wang of Cooley LLP and Steven J. Wingard, Robyn Hargrove, and Eli Barrish of

Scott Douglass & McConnico LLP.

/s/ Jonathan Patchen

Jonathan Patchen
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
(415) 693-2000
jpatchen@cooley.com

*Counsel for Defendants-Appellants*
*YouTube LLC, Google LLC, and*
*Alphabet, Inc.*

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Pursuant to Federal Rule of Appellate Procedure 34 and Fifth Circuit Rule 28.2.3, Defendants-Appellants respectfully request oral argument. This case presents an important question regarding the proper analysis of a motion to transfer under 28 U.S.C. § 1404(a) when the parties have agreed to a forum-selection clause. Forum-selection clauses are ubiquitous in contractual agreements across a wide range of contexts, and certainty with respect to their enforceability is critical to the stability and predictability that businesses depend on to operate effectively in the modern economy. Defendants-Appellants submit that oral argument will assist this Court in deciding the legally and practically significant question presented.

INTRODUCTION ........................................................................................1

JURISDICTIONAL STATEMENT .............................................................5

    I.    District Court Jurisdiction .................................................5

    II.    Appellate Jurisdiction..........................................................5

    III.    Alternative Petition for Writ of Mandamus .......................6

STATEMENT OF THE ISSUE .....................................................................9

STATEMENT OF THE CASE .......................................................................9

    I.    Factual Background...............................................................9

        A.    YouTube, Google Ads, and the Relevant Terms of
            Service....................................................................9

        B.    Defense Distributed Agrees to YouTube's and Google
            Ads's Terms of Service, Including Their Forum-
            Selection Clauses ...................................................12

    II.    Procedural Background......................................................15

SUMMARY OF THE ARGUMENT ...........................................................20

STANDARD OF REVIEW ..........................................................................24

ARGUMENT ...............................................................................................25

    I.    Forum-Selection Clauses Enjoy a Strong Presumption of
        Enforceability. ....................................................................25

    II.    The District Court Committed Clear Legal Error by Holding
        That the Forum-Selection Clauses Are Unenforceable....................28

        A.    State public policy may not be considered in the
            enforceability analysis. ...........................................31

        B.    Even if consideration of state public policy were
            permissible, that policy cannot be one of hostility to
            forum-selection clauses...........................................34

        C.    At the very least, the district court was required to weigh
            federal and state public policy, and federal public policy
            prevails here. ..........................................................38

III.    This is Not the Exceptional Case In Which the Public-Interest
        Factors Can Overcome an Otherwise Enforceable Forum-
        Selection Clause. .................................................................................44

CONCLUSION .......................................................................................................51

**Cases**

*Alaniz v. Liberty Life Assurance Co. of Boston*,
　　No. 1:18-cv-297, 2018 WL 11428242 (E.D. Tex. Oct. 4, 2018) ...................... 48

*Albemarle Corp. v. AstraZeneca UK Ltd.*,
　　628 F.3d 643 (4th Cir. 2010) ................................................................ 22, 37-38

*Ameri-Fab, LLC v. Vanguard Energy Partners, LLC*,
　　646 F. Supp. 3d 795 (W.D. Tex. 2022) .............................................................. 36

*Atl. Marine Constr. Co., Inc. v. U.S. Dist. Ct.*,
　　571 U.S. 49 (2013) ....................................................................................*passim*

*Barnett v. DynCorp Int'l, LLC*,
　　831 F.3d 296 (5th Cir. 2016) .................................................................... 44-45

*Barton v. Young*,
　　144 F. Supp. 2d 685 (E.D. Tex. 2001)............................................................... 48

*In re Bradford*,
　　660 F.3d 226 (5th Cir. 2011) ............................................................................... 6

*In re Chamber of Com. of U.S.*,
　　105 F.4th 297 (5th Cir. 2024) ............................................................................ 50

*Cheney v. U.S. Dist. Ct.*,
　　542 U.S. 367 (2004)................................................................................... 8, 24

*Cohen v. Beneficial Indus. Loan Corp.*,
　　337 U.S. 541 (1949)........................................................................................... 5

*Davis v. Meta Platforms, Inc.*,
　　No. 4:22-cv-01001, 2023 WL 4670491 (E.D. Tex. July 20, 2023) ............. 47-49

*Defense Distributed v. Bruck*,
　　30 F.4th 414 (5th Cir. 2022) ........................................................7-8, 24, 47-48

*In re Fort Worth Chamber of Com.*,
　　100 F.4th 528 (5th Cir. 2024) ............................................................................ 20

*Great Lakes Ins. SE v. Raiders Retreat Realty Co.*,
601 U.S. 65 (2024) .........................................................................*passim*

*Griggs v. Provident Consumer Disc. Co.*,
459 U.S. 56 (1982) ..................................................................................20

*Haynsworth v. The Corporation*,
121 F.3d 956 (5th Cir. 1997) ......................................................*passim*

*Hoffman v. Blaski*,
363 U.S. 335 (1960) .................................................................................27

*Huffman v. Activision Publ'g, Inc.*,
No. 2:19-cv-00050, 2019 WL 12498087 (E.D. Tex. Nov. 27, 2019) ...............48

*Lim v. Offshore Specialty Fabricators, Inc.*,
404 F.3d 898 (5th Cir. 2005) .......................................4, 22-23, 41-43

*M/S Bremen v. Zapata Off-Shore Co.*,
407 U.S. 1 (1972) ............................................................................*passim*

*Matthews v. Tidewater, Inc.*,
108 F.4th 361 (5th Cir. 2024) ....................................................*passim*

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) .................................................................................49

*Noble House, LLC v. Certain Underwriters at Lloyd's, London*,
67 F.4th 243 (5th Cir. 2023) .......................................................23, 43

*PCL Civ. Constructors, Inc. v. Arch Ins. Co.*,
979 F.3d 1070 (5th Cir. 2020) ...................................................17, 25

*In re Sepulvado*,
707 F.3d 550 (5th Cir. 2013) ................................................................6

*Stewart Org., Inc. v. Ricoh Corp.*,
487 U.S. 22 (1988) ..........................................................................*passim*

*In re TikTok, Inc.*,
85 F.4th 352 (5th Cir. 2023) .............................................6-7, 46-47

*In re Volkswagen of Am., Inc.*,
  545 F.3d 304 (5th Cir. 2008) (en banc) ..................................................6, 24, 46

*Weber v. PACT XPP Techs., AG*,
  811 F.3d 758 (5th Cir. 2016) .......................................................................*passim*

**Statutes**

28 U.S.C.
  § 1292(b) ........................................................................................................6
  § 1332 ........................................................................................................5, 16
  § 1404(a) .................................................................................................*passim*
  § 1441 ........................................................................................................16

Act of June 25, 1948, ch. 646, 62 Stat. 937 .........................................................27

Federal Courts Jurisdiction and Venue Clarification Act of 2011,
  Pub. L. No. 112-63, § 202, 125 Stat. 764 .........................................................27

Texas Civil Practice and Remedies Code
  Chapter 143A .........................................................................................*passim*
  § 143A.002 ........................................................................................................15
  § 143A.003 ................................................................................................. 18-19
  § 143A.0035 ............................................................................................... 18-19

**Other Authorities**

U.S. Const. amend. I .........................................................................................*passim*

15 Wright & Miller's Federal Practice and Procedure §§ 3841, 3845
  (4th ed. Sept. 2025 update) ......................................................................... 27-28

Defense Distributed, https://perma.cc/NG5S-QV9A ............................................13

Judges, United States District Court Northern District of California,
  https://perma.cc/2AME-8XEX .........................................................................50

# INTRODUCTION

Plaintiff Defense Distributed uses YouTube and Google Ads to post videos and ads about its products.  In doing so, Defense Distributed has repeatedly agreed to abide by YouTube's and Google Ads's Terms of Service, which contain forum-selection clauses requiring that any disputes arising from use of those platforms be litigated exclusively in the courts of Santa Clara County, California.  Nonetheless, Defense Distributed sued YouTube, Google, and their parent company, Alphabet (collectively, "Defendants") in Texas state court.  Defense Distributed alleged that Defendants "censored" its content by removing videos and ads that violate YouTube's and Google Ads's content policies.  After removing the case to federal court, Defendants moved to transfer the case to the Northern District of California, which is located within Santa Clara County, under 28 U.S.C. § 1404(a).  Section 1404(a) states that "a district court may transfer any civil action to any other district or division . . . *to which all parties have consented*." *Id.* (emphasis added).  The rationale for the motion was straightforward:  By agreeing to be bound by the forum-selection clauses in YouTube's and Google Ads's Terms of Service, Defense Distributed consented to litigate exclusively in California—therefore, the case should be transferred to California.

Defense Distributed did not contest that the forum-selection clauses at issue are mandatory or that its lawsuit falls squarely within their scope.  Nor could it

credibly contest that federal law governs the analysis of whether a forum-selection clause is enforceable, and that the Supreme Court has long held that, pursuant to a federal presumption of enforceability, such clauses should be given effect in all but the most exceptional circumstances.  *See M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 915 (1972) ("*The Bremen*"); *Atl. Marine Constr. Co., Inc. v. U.S. Dist. Ct.*, 571 U.S. 49, 59-60 (2013); *see also Haynsworth v. The Corporation*, 121 F.3d 956, 963 (5th Cir. 1997); *Weber v. PACT XPP Techs., AG*, 811 F.3d 758, 773 (5th Cir. 2016).  That presumption is well-justified:  Enforcing freely-agreed-to forum-selection clauses, even in the face of state laws that purport to void them, promotes predictability as to where litigation will occur and vindicates the contracting parties' expectations.  As the Supreme Court explained in *The Bremen*, giving effect to forum-selection clauses "accords with ancient concepts of freedom of contract" and is critical to the "expansion of American business and industry."  407 U.S. at 9, 11; *see also Atl. Marine*, 571 U.S. at 66 ("When parties have contracted in advance to litigate disputes in a particular forum, courts should not unnecessarily disrupt the parties' settled expectations.").

Despite finding that the YouTube and Google Ads forum-selection clauses are mandatory and govern the dispute at issue, and despite the substantial body of Supreme Court and Fifth Circuit precedent making clear that forum-selection clauses are to be enforced in nearly every case, the district court denied Defendants' motion

to transfer. The court held that the YouTube and Google Ads forum-selection clauses are unenforceable because Texas has announced that it has a strong public policy against enforcement of such clauses. The district court's decision was wrong for three reasons, each of which independently warrants reversal.

*First*, in determining under federal law whether a forum-selection clause is unenforceable on grounds of public policy, the district court was not permitted to consider *state* public policy to begin with. *See Great Lakes Ins. SE v. Raiders Retreat Realty Co.*, 601 U.S. 65, 78 (2024). Only federal public policy or that of a foreign nation, if relevant, may be considered. *See id.* The Supreme Court has explained that "[a] federal presumption of enforceability would not be much of a presumption if it could be routinely swept aside based on 50 States' public policy determinations." *Id.* at 77. The district court's ruling produces exactly such an outcome: It improperly sweeps away the long-settled federal public policy in favor of forum-selection clauses based on Texas's state-specific public policy.

*Second*, even if the district court could consider state public policy in the enforceability analysis, it contravened Supreme Court precedent by allowing a state public policy *against forum-selection clauses* to override the federal presumption in favor of such clauses. *See The Bremen*, 407 U.S. at 9-15; *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 30, 31 n.10 (1988) (holding that a district court erred by brushing aside a forum-selection clause based on a state law declaring such clauses to be

void).  After all, the federal presumption of enforceability would be even less of a presumption if a State could effectively nullify it simply by declaring that it has a strong public policy against forum-selection clauses.

*Third*, even assuming that the district court was permitted to consider Texas's public policy of hostility toward forum-selection clauses, it was required to weigh that public policy against the strong *federal* public policy in favor of forum-selection clauses.  Under the proper analysis, federal public policy would have easily prevailed, as demonstrated by Fifth Circuit precedent.  *See Matthews v. Tidewater, Inc.*, 108 F.4th 361, 369-70 (5th Cir. 2024); *Lim v. Offshore Specialty Fabricators, Inc.*, 404 F.3d 898, 905-06 (5th Cir. 2005).

Absent these legal errors, the forum-selection clauses at issue are plainly enforceable.  And because the case implicates speech on national platforms and First Amendment issues of national importance that the Northern District of California is just as well-equipped to adjudicate as the Western District of Texas, there is no overwhelming public interest against transfer that could overcome the otherwise enforceable forum-selection clauses.

In short, the district court committed clear legal error thrice over.  Accordingly, this Court should reverse the district court's order denying Defendants' motion to transfer under section 1404(a).  In the alternative, this Court should treat

this filing as a petition for mandamus and order the district court to transfer the case to the Northern District of California.

## JURISDICTIONAL STATEMENT

### I.    District Court Jurisdiction

The district court has diversity jurisdiction under 28 U.S.C. § 1332 because diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000. *See* ROA.27 ¶ 14 (alleging that the "amount in controversy exceeds $5 million, excluding interest, statutory damages, exemplary damages, penalties, attorney's fees, and court costs"); ROA.28 ¶ 21, ROA.30 ¶¶ 30-32 (alleging that Defense Distributed is a citizen of Texas and all three Defendants are citizens of Delaware and California for diversity purposes).

### II.    Appellate Jurisdiction

Defendants filed a timely notice of appeal on December 1, 2025. ROA.654. Defendants seek review of the district court's order denying Defendants' motion to transfer, dated November 13, 2025. *See* ROA.546-553. That order is appealable by virtue of the collateral-order doctrine because (1) this appeal will conclusively determine the correctness of the district court's transfer decision, (2) the transfer decision is separate from the action's merits, and (3) the transfer decision is otherwise effectively unreviewable. *See Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949). There can be no real dispute that the first two requirements

of the collateral-order doctrine are satisfied.  And as to the third, in *In re Volkswagen of America, Inc.*, 545 F.3d 304 (5th Cir. 2008) (en banc), this Court concluded that "an appeal from an adverse final judgment" would not provide "an adequate remedy for an improper failure to transfer [a] case," and that "interlocutory review of transfer orders under 28 U.S.C. § 1292(b) is unavailable."  545 F.3d at 318-19 (citation omitted).

Accordingly, in *In re Bradford*, 660 F.3d 226 (5th Cir. 2011), this Court held that it had jurisdiction to consider an appeal from a district court's transfer order under the collateral-order doctrine.  *Id.* at 229.  The Court reaffirmed that holding in *In re Sepulvado*, 707 F.3d 550, 552 (5th Cir. 2013).  Under those precedents, this Court has appellate jurisdiction over the district court's order denying Defendants' motion to transfer.  Indeed, Defense Distributed itself indicated to the district court that had the court granted the motion to transfer, it would have "pursue[d] appellate review" in this Court.  ROA.412.

## III.    Alternative Petition for Writ of Mandamus

If this Court determines that it lacks appellate jurisdiction, Defendants request that the Court treat this filing as a petition for a writ of mandamus.  In *Volkswagen*, this Court stated that "[t]here can be no doubt . . . that mandamus is an appropriate means of testing a district court's § 1404(a) ruling."  545 F.3d at 309; *see also In re TikTok, Inc.*, 85 F.4th 352, 356 (5th Cir. 2023) (granting petition for writ of

mandamus seeking transfer from Western District of Texas to Northern District of California).

In *Defense Distributed v. Bruck*, 30 F.4th 414 (5th Cir. 2022), Defense Distributed itself both appealed from an adverse decision on its transfer motion and, in the alternative, asked this Court to construe its filing as a petition for a writ of mandamus. *See* Brief of Appellants at 16-17, *Defense Distributed v. Bruck*, No. 21-50327 (5th Cir. June 17, 2021), Dkt. No. 37; *see also* Reply Brief of Appellants at 8-16, *Bruck* (5th Cir. July 28, 2021), Dkt. No. 55. In resolving Defense Distributed's appeal, this Court flagged a potential intra-circuit split on whether the collateral-order doctrine applies to transfer orders. *Bruck*, 30 F.4th at 423 n.8. Rather than weigh in on that potential split, this Court "pretermit[ted] Defense Distributed's resort to the collateral order doctrine" and treated its appeal as a petition for a writ of mandamus. *Id.* at 423. The Court explained that it had no need to resolve whether the collateral-order doctrine applies to transfer orders because, "in this circuit, mandamus is the prescribed vehicle for reviewing rulings on transfers of cases pursuant to 28 U.S.C. § 1404(a)." *Id.*

In recognition of the lingering uncertainty as to the proper mechanism for seeking review of an adverse transfer decision in this Circuit, Defendants have followed the same course as Defense Distributed in its earlier litigation by both appealing and alternatively petitioning for a writ of mandamus. While this Court in

*Bruck* ultimately selected the mandamus route, Defendants would risk losing the opportunity to obtain this Court's review of the district court's transfer decision by filing only a mandamus petition. That is because one of the fundamental prerequisites to mandamus relief is that "the party seeking issuance of the writ [must] have no other adequate means to attain the relief he desires—a condition designed to ensure that the writ will not be used as a substitute for the regular appeals process." *Cheney v. U.S. Dist. Ct.*, 542 U.S. 367, 380-81 (2004) (internal quotation marks and citation omitted). If this Court were to conclude that its precedents holding that transfer orders fall within the scope of the collateral-order doctrine are correct, then Defendants would have "other adequate means" to obtain relief—namely, an appeal—and mandamus relief would likely be foreclosed. *Id.*

\* \* \*

In short, this Court has jurisdictional authority to correct the district court's erroneous decision by either (a) reversing the district court's order denying Defendants' transfer motion as an exercise of the Court's appellate jurisdiction or (b) issuing a writ of mandamus directing the district court to transfer the case as an exercise of the Court's original jurisdiction.

## STATEMENT OF THE ISSUE

Whether the district court committed legal error by denying Defendants' motion to transfer despite Defense Distributed's agreement to mandatory, applicable, and enforceable forum-selection clauses.

## STATEMENT OF THE CASE

### I.    Factual Background

### A.    YouTube, Google Ads, and the Relevant Terms of Service

Defendant YouTube LLC makes YouTube—an online video service that allows users to create channels and upload videos—available to the public.  ROA.30 ¶¶ 27, 29; ROA.272 ¶ 2.  Defendant Google LLC provides the YouTube service.  ROA.280.  Google LLC also provides Google Ads, which is a digital advertising service that allows businesses, organizations, and individuals to display ads on YouTube and other Google websites or apps.  ROA.30 ¶¶ 28-29.  Defendant Alphabet, Inc. is the parent company of both YouTube LLC and Google LLC.  ROA.30-31 ¶ 33.  All three Defendants are incorporated in Delaware and headquartered in California.  ROA.30 ¶¶ 30-32.

In order to view and upload videos on YouTube, users must agree to abide by the YouTube Terms of Service, which govern the relationship between YouTube and its users and also expressly incorporate YouTube's Community Guidelines.  ROA.272-73 ¶ 3; ROA.275 ¶ 9. The Guidelines prohibit content that may be

harmful, offensive, or unlawful in order to promote a safe and thriving platform. ROA.272 ¶ 2. YouTube's Terms specify that users "must not submit to the Service," *i.e.*, upload to YouTube, "any Content that does not comply with this Agreement (including the YouTube Community Guidelines)." ROA.275 ¶ 9. And the Terms state that YouTube reserves the "right to remove or take down some or all of such Content in [its] discretion." *Id.*

YouTube's Community Guidelines incorporate its firearms policy, which states that "[c]ontent intended to sell firearms, instruct viewers on how to make firearms, ammunition, and certain accessories, or instruct viewers on how to install those accessories is not allowed on YouTube." ROA.33-34 ¶¶ 39, 40. It further states that "YouTube shouldn't be used as a platform to sell firearms or [firearm] accessories." ROA.34 ¶ 40. The policy provides specific, non-exhaustive examples of content that would violate the policy, such as "[l]inks in the title or description of your video to sites where firearms or [firearm] accessories . . . are sold" and "[d]isplaying a firearm with the intention to sell that firearm via public sale." ROA.36 ¶ 40. YouTube explicitly informs users that if their content violates the firearms policy, it will "remove the content and send you an email to let you know." *Id.*

YouTube's Terms of Service also contain a forum-selection clause, which requires that disputes between YouTube and its users arising out of or relating to the

Terms or use of the YouTube service be litigated exclusively before a court in Santa Clara County, California.  ROA.273-74 ¶ 5.  Specifically, the current version of the "Governing Law" provision, which has been in effect since December 2019, states:

> All claims arising out of or relating to these terms or the Service will be governed by California law, except California's conflict of laws rules, and *will be litigated exclusively in the federal or state courts of Santa Clara County, California, USA.*  You and YouTube consent to personal jurisdiction in those courts.

ROA.273-74 ¶¶ 5, 6 (emphasis added).  The "Service" is defined as "the YouTube platform and the products, services, and features we make available to [the users] as part of the platform."  ROA.274 ¶ 5.  And previous versions of the Terms in effect since Defense Distributed created its YouTube channel in January 2012 included similar language requiring disputes to be litigated exclusively in Santa Clara County. ROA.274 ¶ 6.

YouTube makes clear to its users that they agree to the Terms of Service by using the YouTube platform.  ROA.272-73 ¶ 3; *see* ROA.280 ("Please read this Agreement carefully and make sure you understand it.  If you do not understand the Agreement, or do not accept any part of it, then you may not use the Service.").  In addition, a user necessarily accepts and agrees to YouTube's Terms of Service every time he or she uploads a video to the platform.  ROA.274 ¶ 7.  In order to upload videos to YouTube, a user must first create a "channel" on YouTube.  ROA.273 ¶ 4. Then, when a user attempts to upload a video to his or her channel, YouTube presents

the user with a notice that states: "By submitting your videos to YouTube, you acknowledge that you agree to YouTube's Terms of Service and Community Guidelines," with hyperlinks to the Terms and Guidelines. ROA.274 ¶ 7. A user cannot upload a video without viewing this screen and affirmatively choosing to proceed after viewing it. *Id.*

Google Ads also has Terms of Service governing the relationship between the platform and its users. *See* ROA.300-06. Users must click a button indicating that they agree to be bound by the Google Ads Terms before they can begin posting ads using the service. ROA.296 ¶ 2. The Google Ads Terms incorporate a policy, akin to YouTube's firearms policy, that prohibits ads for firearms. ROA.50 ¶ 59. And like the YouTube Terms, the Google Ads Terms contain a forum-selection clause stating: "ALL CLAIMS ARISING OUT OF OR RELATING TO THESE TERMS OR THE PROGRAMS WILL BE LITIGATED EXCLUSIVELY IN THE FEDERAL OR STATE COURTS OF SANTA CLARA COUNTY, CALIFORNIA," with "PROGRAMS" defined to encompass all of Google's advertising programs and services. ROA.297 ¶ 5.

**B.    Defense Distributed Agrees to YouTube's and Google Ads's Terms of Service, Including Their Forum-Selection Clauses**

Defense Distributed markets itself as a "private defense contractor" based in Texas that purportedly "define[s] the state of the art in small scale, digital, personal gunsmithing technology." ROA.28 ¶¶ 21-22. In plain terms, Defense Distributed is

a manufacturer and advocate of "ghost guns," which are untraceable firearms that individuals can create at home using 3-D printers. *See* Defense Distributed, https://perma.cc/NG5S-QV9A (Defense Distributed's homepage, which contains prominent links for "GHOST GUNNER" and "GHOST GUNS").

Defense Distributed alleges that it "regularly publishes videos th[r]ough YouTube and utilizes the Google Ads platform" and "has posted, uploaded, transmitted, shared, and otherwise published expression . . . through YouTube and the Google Ads platform from at least 2013 to present." ROA.28 ¶ 22; ROA.29 ¶ 25.

Defense Distributed created a YouTube channel entitled "DXLiberty" in January 2012, and it has "continually uploaded videos to its DXLiberty YouTube channel between February 13, 2012 and June 9, 2025." ROA.273 ¶¶ 4-5. Every time Defense Distributed uploaded a video to DXLiberty, it necessarily was informed of and agreed to be bound by YouTube's Terms of Service, including the forum-selection clause and incorporated Community Guidelines. ROA.274-75 ¶ 8. Since YouTube last updated its Terms of Service on December 15, 2023, Defense Distributed has uploaded four videos, including one entitled "G80 | Next-Gen Fixtures," which was uploaded on April 30, 2024. *Id.*[1]   According to Defense

---

[1] The updated version of the Terms of Service contains the same forum-selection clause language quoted above, which has been in effect since December 2019. *See* ROA.273-74 ¶ 5.

Distributed, the "G80 | Next-Gen Fixtures" video displayed various components of an unfinished firearm and the tools required to finish the firearm, including the "G80 Jig Set," "G80 Unfinished Receiver," and "G80 Grip Module."  ROA.39-45 ¶ 47. Defense Distributed alleges that YouTube took down the "G80 | Next-Gen Fixtures" video on May 2, 2025, and notified Defense Distributed that the video was "removed for violating YouTube's Community Guidelines."  ROA.46 ¶¶ 48-49.  Defense Distributed also alleges that YouTube stopped hosting its video entitled "Inside The Battle To Arm America," which it claims to have uploaded in 2013.  ROA.46 ¶ 51; ROA.49 ¶ 56.  Defense Distributed does not dispute, nor could it, that at the time it uploaded each of these videos, it received the disclosures referenced above that it was agreeing to the then-current YouTube Terms of Service, including the forum-selection clause.  ROA.548-49; ROA.274-75 ¶ 8.

Defense Distributed created a Google Ads account on October 25, 2022, and accepted the Google Ads Terms of Service, including the firearms policy and forum-selection clause contained in the Terms, on November 14, 2022.  ROA.297 ¶ 4. Defense Distributed alleges that it has repeatedly sought to publish ads for firearms through the Google Ads platform but has been prevented from doing so.  ROA.50 ¶ 59.  For example, Defense Distributed cites an ad it tried to post through Google Ads for "80% AR-15[s]" and "80% AR-15 Receivers" through

"www.ghostguns.com," which was disapproved of under Google Ads's firearms policy. *Id.*

## II.    Procedural Background

In June 2025, Defense Distributed "flout[ed] its contractual obligation" to resolve all disputes concerning its use of YouTube and Google Ads in the courts of Santa Clara County, California by suing Defendants in Texas state court. *Atl. Marine*, 571 U.S. at 64; ROA.21.  Defense Distributed alleged that Defendants had "censored" its "pro-gun" videos and ads in violation of Texas House Bill 20, codified as Texas Civil Practice and Remedies Code Chapter 143A.  ROA.25 ¶ 8; ROA.26 ¶¶ 10, 12.  Chapter 143A prohibits "social media platform[s]" from "censor[ing] a user [or] a user's expression" based on the "viewpoint of the user" or "the viewpoint represented in the user's expression."  Tex. Civ. Prac. & Rem. Code § 143A.002.

Defense Distributed alleged three causes of action, asserting that Defendants violated Chapter 143A by "censoring" Defense Distributed's publications on the YouTube and Google Ads platforms because of (1) "the viewpoints expressed in" the publications, (2) "the viewpoints expressed by Defense Distributed at large," and (3) "the viewpoints expressed by Defense Distributed's audience."  ROA.54 ¶ 70; ROA.55 ¶ 76; ROA.57 ¶ 82.  Defense Distributed sought an injunction requiring Defendants to stop removing its videos and ads, a declaration that Defendants had violated Chapter 143A, and costs and attorney's fees.  ROA.58-60 ¶¶ 89-91.

Defense Distributed claimed that its videos and ads are "protected by the First Amendment" of the United States Constitution, and that Defendants' actions have caused "irreparable harm to [its] First Amendment" liberties.  ROA.38 ¶ 44; ROA.51 ¶¶ 60-61.  And it alleged that the "amount in controversy exceeds $5 million, excluding interest, statutory damages, exemplary damages, penalties, attorney's fees, and court costs."  ROA.27 ¶ 14.

As a matter between completely diverse parties with an amount in controversy in excess of $75,000, Defense Distributed's case is subject to federal jurisdiction. *See* 28 U.S.C. § 1332.  Therefore, upon being served with Defense Distributed's petition, Defendants timely removed the case to federal court under 28 U.S.C. § 1441.  *See* ROA.12-17.  Shortly thereafter, Defendants filed a motion to transfer the case from the Western District of Texas to the Northern District of California under 28 U.S.C. § 1404(a).  *See* ROA.247-71; *see also Atl. Marine*, 571 U.S. at 52 ("[A] forum-selection clause may be enforced by a motion to transfer under § 1404(a).").  Section 1404(a) states that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."  28 U.S.C. § 1404(a).  Defendants' motion was premised on the forum-selection clauses in YouTube's and Google Ads's Terms of Service, through which Defense Distributed consented to litigating

any claims "arising out of or relating to" the YouTube or Google Ads platforms "exclusively in the federal or state courts of Santa Clara County, California." ROA.292; ROA.305.

The district court denied Defendants' motion to transfer. The district court acknowledged that "forum-selection clauses should be given 'controlling weight in all but the most exceptional cases.'" ROA.548 (quoting *Atl. Marine*, 571 U.S. at 63). The court also noted that Defense Distributed "does not dispute that its claims fall within the scope of the forum-selection clauses or that the clauses are mandatory." ROA.548-49 (citing ROA.400). The court further recognized that "[f]ederal law applies to determine the enforceability of forum selection clauses in diversity cases," ROA.549 (quoting *PCL Civ. Constructors, Inc. v. Arch Ins. Co.*, 979 F.3d 1070, 1074 (5th Cir. 2020)), and that "[u]nder federal law, there is a 'strong presumption' in favor of enforcing mandatory forum-selection clauses," ROA.549 (quoting *Weber*, 811 F.3d at 773).

Nevertheless, the district court declined to enforce the concededly mandatory, applicable, and presumptively enforceable forum-selection clauses. The court concluded that Defense Distributed had overcome the strong presumption in favor of enforceability by showing that the clauses are "unreasonable" because "enforcing them would contravene the strong public policy of Texas." ROA.553. The Court

relied on two provisions of Chapter 143A to support its conclusion. The first, an anti-forum-selection clause provision entitled "Venue and Choice of Law," states:

> Notwithstanding any other law, any contract, or any venue, forum selection, or choice-of-law provision in a contract, an action brought under this chapter against a social media platform shall be brought and maintained in a court in this state, and the law of this state applies to the action.

Tex. Civ. Prac. & Rem. Code § 143A.0035. The second, a provision entitled "Waiver Prohibited" that purports to void forum-selection clauses, states:

> (a) A waiver or purported waiver of the protections provided by this chapter is void as unlawful and against public policy, and a court or arbitrator may not enforce or give effect to the waiver, including in an action brought under Section 143A.007, notwithstanding any contract or choice-of-law provision in a contract.
>
> (b) The waiver prohibition described by Subsection (a) is a public-policy limitation on contractual and other waivers of the highest importance and interest to this state, and this state is exercising and enforcing this limitation to the full extent permitted by the United States Constitution and Texas Constitution.

*Id.* § 143A.003.

Based on those two provisions, the district court determined that if it "transferred this case to California pursuant to the forum-selection clauses, it would contravene Texas's policy that actions under Chapter 143A are to be 'maintained' in this state notwithstanding any 'forum selection' provision in a contract," as well as "Texas's policy that waivers of Chapter 143A's protections—including the protection provided by the venue provision—are void and unenforceable."

ROA.550-51 (quoting Tex. Civ. Prac. & Rem. Code § 143A.0035) (citing Tex. Civ. Prac. & Rem. Code § 143A.003).  The court characterized Texas's public policy as reflected in the anti-forum-selection clause and anti-waiver provisions as "undoubtedly strong," stating that "Texas made clear that it wants Chapter 143A actions litigated within its borders and that it does not tolerate contracts that waive the chapter's protections."  ROA.551.

The district court rejected Defendants' argument that "state laws purporting to invalidate forum-selection clauses are irrelevant" to the section 1404(a) transfer analysis in diversity cases.  ROA.551 (citing ROA.517).  The court reasoned that Texas's anti-forum-selection clause law is "relevant to the threshold enforceability determination," because forum-selection clauses that "would contravene a strong public policy of the forum state" are unenforceable, interpreting "the forum state" to refer to Texas.  ROA.551-52 (quoting *Weber*, 811 F.3d at 773).  The court likewise dismissed Defendants' reliance on a series of Supreme Court cases directing courts to apply the federal presumption in favor of enforcing forum-selection clauses when analyzing a transfer motion, even in the face of state laws declaring such clauses void or otherwise disfavoring them.  ROA.552.  The district court claimed that it was following those Supreme Court cases and applying federal law, but that federal law permits it to consider state anti-forum-selection clause policies and laws in the enforceability analysis.  ROA.552-53.

Having concluded


Having concluded that the forum-selection clauses at issue are unenforceable, the district court did not reach the question of whether the traditional public-interest factors relevant to transfer motions could overcome otherwise enforceable forum-selection clauses. *See* ROA.553 n.5.[2]

## SUMMARY OF THE ARGUMENT

It is beyond dispute in this Circuit that federal law governs whether a forum-selection clause is enforceable. *Haynsworth*, 121 F.3d at 962. And the Supreme Court has confirmed time and time again that, under federal law, forum-selection clauses enjoy a strong, nearly insurmountable presumption of enforceability. *The Bremen*, 407 U.S. at 9-15; *Atl. Marine*, 571 U.S. at 59-60; *Great Lakes*, 601 U.S. at 71.

Here, Defense Distributed repeatedly agreed to abide by forum-selection clauses in YouTube's and Google Ads's Terms of Service that the district court correctly concluded are mandatory and encompass Defense Distributed's lawsuit. Nonetheless, the district court denied Defendants' motion to transfer based on the faulty conclusion that federal law's presumption of enforceability is overcome by

---

[2] Defense Distributed filed a motion to remand the case to state court. *See* ROA.232-46. The district court "exercise[d] its discretion to resolve the motion to transfer before the motion to remand." ROA.547 n.2 (citing *KeyCity Cap., LLC v. Davenport Invs., LLC*, No. 3:21-cv-2046-D, 2022 WL 581146, at *2 (N.D. Tex. Feb. 25, 2022)). Defense Distributed's motion to remand therefore remains pending before the district court, but the district court is precluded from acting on that motion until this appeal is resolved. *See Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 68 (1982); *In re Fort Worth Chamber of Com.*, 100 F.4th 528, 536-37 (5th Cir. 2024).

App.303

Texas's strong public policy as reflected in Chapter 143A's anti-forum-selection clause and anti-waiver provisions. The district court's decision was infected by clear legal error in three ways.

*First*, the district court erred by considering Texas public policy at all in determining whether the forum-selection clauses are enforceable. It relied on an exception originating in the Supreme Court's decision in *The Bremen* for when enforcement of a forum-selection clause "would contravene a strong public policy of the forum state." *Haynsworth*, 121 F.3d at 963. But the Supreme Court has made clear that the "public policy of the forum state" referenced in that exception means only federal public policy or that of a foreign country, *not* that of an individual State. *Great Lakes*, 601 U.S. at 78. The Court explained that permitting state public policy to override the federal presumption of enforceability would undercut the presumption and would be a backdoor way of using state law, rather than federal law, to determine enforceability. *Id.* at 77-78.

*Second*, even if the district court could consider Texas public policy in the enforceability analysis, it erred by relying on Texas's public policy *against forum-selection clauses* in particular. In *The Bremen*, the Supreme Court forcefully rejected the "parochial" tendency for state courts to decline to enforce forum-selection clauses as contrary to public policy and established the strong presumption in favor of enforcing such clauses under federal law. 407 U.S. at 9-10. And in

*Stewart*, the Court held that because federal law is supreme, a district court may not refuse to enforce a forum-selection clause on the basis that state law disfavors such clauses and deems them to be invalid. *See* 487 U.S. at 29-32 & n.10. If a district court could claim to be applying federal law but nonetheless hold a forum-selection clause to be unenforceable based on state public policy manifesting hostility toward such clauses, that would create an obvious end-run around the Supreme Court's decisions in *The Bremen* and *Stewart*. This Court should reject that perverse result, as the Fourth Circuit did under similar circumstances. *See Albemarle Corp. v. AstraZeneca UK Ltd.*, 628 F.3d 643, 652 (4th Cir. 2010).

*Third*, even assuming the district court was permitted to consider Texas's public policy against forum-selection clauses, it was at the very least required to weigh that state public policy against federal public policy on forum-selection clauses. It failed to do so. Had the district court conducted such a weighing, the federal public policy strongly favoring enforcement of forum-selection clauses would have easily prevailed, as it did in several of this Court's previous decisions. *See Matthews*, 108 F.4th at 370 (holding that "[e]ven if Louisiana's public policy is relevant under a *Bremen* analysis," it could "not overcome" the federal presumption of enforceability); *Lim*, 404 F.3d at 901, 905-06 (holding that "the strong federal policy in favor of . . . arbitration agreements," a type of forum-selection clause,

outweighed Louisiana's "strong public policy against a forum selection clause in an employment contract").

Under the proper enforceability analysis, there can be only one conclusion: The YouTube and Google Ads forum-selection clauses are enforceable. And when a district court is confronted with a motion to transfer under section 1404(a) premised on an enforceable forum-selection clause, the court "should transfer the case" in all but the most "extraordinary circumstances." *Atl. Marine*, 571 U.S. at 52. Unlike in a normal transfer analysis, the plaintiff's choice of forum warrants no deference, and the private-interest factors concerning the convenience of the parties necessarily support litigation in the forum selected in advance by the parties. *See id.* at 63-64. The plaintiff therefore bears a heavy "burden of showing that public-interest factors *overwhelmingly* disfavor a transfer." *Id.* at 67 (emphasis added). Defense Distributed cannot shoulder that burden here. The Northern District of California is just as well-equipped as the Western District of Texas to handle this case, which turns on fundamental First Amendment issues of national importance. Therefore, none of the public-interest factors weigh against transfer to the parties' preselected forum, let alone weigh so heavily against transfer to render this one of the "rare cases" in which an enforceable forum-selection clause may be disregarded. *Noble House, LLC v. Certain Underwriters at Lloyd's, London*, 67 F.4th 243, 249 (5th Cir. 2023) (quoting *Weber*, 811 F.3d at 776).

For those reasons, this Court should reverse the district court's order denying Defendants' motion to transfer. Alternatively, this Court should grant mandamus relief and order the district court to transfer the case to the Northern District of California.

## STANDARD OF REVIEW

The enforceability of a forum-selection clause is a question of law. *See Haynsworth*, 121 F.3d at 961. Therefore, this Court reviews a district court's interpretation of a forum-selection clause and its assessment of that clause's enforceability *de novo*. *See Matthews*, 108 F.4th at 366.

If this Court construes this filing as a petition for mandamus, then mandamus relief is warranted if there has been a "clear abuse of discretion." *Cheney*, 542 U.S. at 380 (citation omitted). "A district court by definition abuses its discretion when it makes an error of law." *Bruck*, 30 F.4th at 427 (quoting *Koon v. United States*, 518 U.S. 81, 100 (1996)); *see also Volkswagen*, 545 F.3d at 310-11 (a district court commits a "clear abuse of discretion" when it "relies on erroneous conclusions of law"). Therefore, if the district court committed legal error in its analysis of the forum-selection clauses' enforceability, then it necessarily abused its discretion.

# **ARGUMENT**

## I.   **Forum-Selection Clauses Enjoy a Strong Presumption of Enforceability.**

It is well-established in this Circuit that, in cases like this one premised on diversity jurisdiction, federal law governs the enforceability of a forum-selection clause. *See Haynsworth*, 121 F.3d at 962; *PCL Civ. Constructors*, 979 F.3d at 1074. And under federal law, forum-selection clauses enjoy a strong presumption of enforceability. *See The Bremen*, 407 U.S. at 9-15; *see also Weber*, 811 F.3d at 773 (affirming that "[t]his [C]ourt, in keeping with Supreme Court precedents, applies a strong presumption in favor of the enforcement of mandatory [forum-selection clauses]").

In *The Bremen*, one of the Supreme Court's seminal cases on the enforceability of forum-selection clauses, the Court observed that such clauses "have historically not been favored by American courts" and that "[m]any courts" had "declined to enforce such clauses on the ground that they were 'contrary to public policy,' or that their effect was to 'oust the jurisdiction' of the court." 407 U.S. at 9. The Court repudiated that "parochial" view, holding that forum-selection clauses are "prima facie valid and should be enforced" so as to "give effect to the legitimate expectations of the parties, manifested in their freely negotiated agreement." *Id.* at 9-10, 12.

The Court explained that permitting contracting parties to reduce uncertainty by agreeing on a dispute-resolution forum in advance is critical to "[t]he expansion of American business and industry." 407 U.S. at 9; *see id.* 13-14. "[F]orum-selection clauses respect 'ancient concepts of freedom of contract.'" *Great Lakes*, 601 U.S. at 71-72 (quoting *The Bremen*, 407 U.S. at 11). And they "have 'the salutary effect of dispelling any confusion' on the manner for resolving future disputes, thereby slashing the 'time and expense of pretrial motions.'" *Great Lakes*, 601 U.S. at 72 (quoting *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 593-94 (1991)); *see Atl. Marine*, 571 U.S. at 66 ("When parties have contracted in advance to litigate disputes in a particular forum, courts should not unnecessarily disrupt the parties' settled expectations."). Given all the benefits of forum-selection clauses, and "in the light of present-day commercial realities," *The Bremen* Court concluded that a forum-selection clause "should control absent a strong showing that it should be set aside." 407 U.S. at 15. The Supreme Court's view on the importance of forum-selection clauses has not wavered since *The Bremen*—if anything, it has grown even stronger. *See Atl. Marine*, 571 U.S. at 59-60 (Section "1404(a) requires that a forum-selection clause be 'given controlling weight in all but the most exceptional circumstances.'" (quoting *Stewart*, 487 U.S. at 33 (Kennedy, J., concurring))).

Indeed, the presumption in favor of enforcing forum-selection clauses is particularly strong in cases involving section 1404(a), because the statute itself reflects a favorable policy toward forum-selection clauses. As originally enacted in 1948, section 1404(a) read: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." Act of June 25, 1948, ch. 646, 62 Stat. 937. In *Hoffman v. Blaski*, 363 U.S. 335 (1960), the Supreme Court interpreted the phrase "where [the action] might have been brought" quite restrictively. 15 Wright & Miller's Federal Practice and Procedure § 3841 (4th ed. Sept. 2025 update). It held that section 1404(a) only permitted transfer to a court that "(1) would have been a proper venue and (2) would have had personal jurisdiction over the defendant had the case been filed there initially," regardless of whether the parties consented to a forum not satisfying those requirements. *Id.*; *Hoffman*, 363 U.S. at 343-44. But in 2011, Congress amended the statute to add that a district court may transfer to any district or division where the action might have been brought "*or to any district or division to which all parties have consented*." Federal Courts Jurisdiction and Venue Clarification Act of 2011, Pub. L. No. 112-63, § 202, 125 Stat. 764 (emphasis added). That new language reflects Congress's special solicitude for venues that the parties have agreed to in advance, as in a forum-selection clause. And the statute as amended is a particularly powerful indication of

Congress's favorable attitude toward forum-selection clauses, given that it permits transfer to a district selected by the parties, *even if* it is not a district where the action might otherwise "have been brought." 28 U.S.C. § 1404(a). In other words, the statute now "permits transfer even to a district that is not a proper venue and that does not have personal jurisdiction over the defendant," so long as the parties consented to litigate in that district. Wright & Miller, *supra*, § 3845.

Therefore, under governing federal law, the forum-selection clauses at issue here are presumptively enforceable. That should have been the start and end of the district court's analysis of whether to grant Defendants' motion to transfer.

## II.    The District Court Committed Clear Legal Error by Holding That the Forum-Selection Clauses Are Unenforceable.

The district court acknowledged that "[u]nder federal law, there is a 'strong presumption' in favor of enforcing mandatory forum-selection clauses." ROA.549 (quoting *Weber*, 811 F.3d at 773). But it agreed with Defense Distributed that the presumption had been overcome, on the theory that the clauses at issue contravene Texas's strong public policy as manifested in the anti-forum-selection clause and anti-waiver provisions of Chapter 143A. That was clear legal error, and therefore a clear abuse of discretion, because Texas's public policy of antipathy toward forum-selection clauses may not be considered in the enforceability analysis—and even if it could be, it cannot outweigh the powerful federal presumption in favor of enforceability.

In *The Bremen* and subsequent cases, the Supreme Court identified a narrow set of circumstances under which a forum-selection clause may be deemed "unreasonable," and therefore unenforceable, despite the strong presumption of enforceability. In particular, enforcement of a forum-selection clause may be unreasonable under the circumstances if:

> (1) the incorporation of the forum selection clause into the agreement was the product of fraud or overreaching; (2) the party seeking to escape enforcement "will for all practical purposes be deprived of his day in court" because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law will deprive the plaintiff of a remedy; or (4) enforcement of the forum selection clause would contravene a strong public policy of the forum state.

*Haynsworth*, 121 F.3d at 963 (quoting *The Bremen*, 407 U.S. at 18) (citing *The Bremen*, 407 U.S. at 12-13, 15; *Carnival Cruise Lines*, 499 U.S. at 595). The party resisting enforcement on any of these grounds "bears a 'heavy burden of proof.'" *Haynsworth*, 121 F.3d at 963 (quoting *The Bremen*, 407 U.S. at 17).

Defense Distributed effectively conceded that the first three potential sources of unreasonableness are inapplicable here: Defense Distributed has never argued that its agreement to the YouTube and Google Ads forum-selection clauses was the product of fraud or overreaching, that it would be deprived of its day in court in the Northern District of California, or that the law that would be applied in California court is fundamentally unfair and would deprive it of a remedy. The only point of contention is whether enforcement of the YouTube and Google Ads forum-selection

clauses would be unreasonable because it would "contravene a strong public policy of the forum state." *Haynsworth*, 121 F.3d at 963; *see The Bremen*, 407 U.S. at 15 ("A contractual choice-of-forum clause should be held unenforceable if enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision.").

Relying on the public-policy exception as articulated in *Weber* and *Haynsworth*, which in turn relied on *The Bremen*, the district court concluded that enforcement of the forum-selection clauses would be unreasonable because it would contravene Texas's public policy against such clauses, as declared in Chapter 143A. *See* ROA.549 (quoting *Haynsworth*, 121 F.3d at 963, which quotes and cites *The Bremen*, 407 U.S. at 12-13, 15, 18); ROA.551-52 (quoting *Weber*, 811 F.3d 773, which quotes *Haynsworth*, 121 F.3d at 963). That conclusion was erroneous for three reasons: (1) Supreme Court precedent establishes that a court may not consider state public policy in determining whether a forum-selection clause is unenforceable; (2) even assuming that state public policy may factor into the enforceability analysis, that policy cannot be one of hostility toward forum-selection clauses; and (3) even if the court could consider Texas's public policy against forum-selection clauses, it failed to give proper consideration to the countervailing federal policy strongly favoring enforcement.

**A.     State public policy may not be considered in the enforceability analysis.**

Federal law governs the enforceability analysis.  And relying on state public policy is merely an indirect way of allowing state law, rather than federal law, to govern the enforceability analysis.  *See* ROA.517 (explaining that Defense Distributed's erroneous claim that "Texas state law determines the enforceability of forum-selection clauses" "pervades" all of its arguments premised on Texas public policy); *see also* ROA.265-66.  In recognition of that basic proposition, the Supreme Court has made clear that *The Bremen*'s reference to unreasonableness based on "a strong public policy of the forum state" refers only to federal public policy or that of a foreign state and *not* the public policy of a State like Texas.  *See Great Lakes*, 601 U.S. at 78.  The district court, however, interpreted *Haynsworth*'s and *Weber*'s references to the "strong public policy of the forum state," which derive from *The Bremen*, as authorization for it to consider Texas public policy (even though *Weber* itself did not interpret that language to encompass state public policy).  In doing so, the district court contravened Supreme Court precedent.

This Court has previously stated that an "underlying . . . question" in the enforceability analysis "is whether the Supreme Court in *Bremen* was referring to the state forum, federal forum, or both, when it stated a forum-selection 'clause should be held unenforceable if enforcement would contravene a strong *public policy of the forum in which suit is brought*.'"  *Matthews*, 108 F.4th at 369 (quoting

*The Bremen*, 407 U.S. at 15) (emphasis in original).  In *Matthews*, this Court declined to decide which forum's policy is relevant and instead "examine[d] both Louisiana and federal public policy."  *Id.*; *see infra* Part I.C.  But the Supreme Court recently and conclusively resolved the question of which forum *The Bremen* was referring to—and made clear that only federal public policy is relevant.  *See Great Lakes*, 601 U.S. at 77-78.

In *Great Lakes*, the Supreme Court held that the enforceability of choice-of-law provisions in maritime contracts should be determined by federal law, not state law, and that, like forum-selection clauses, choice-of-law clauses enjoy a federal presumption of enforceability.  *See* 601 U.S. at 71.  The respondent argued that the presumption should be overcome when enforcing a choice-of-law provision "would contravene the fundamental public policy" of a State.  *Id.* at 77.  The Court squarely rejected that argument, explaining that state public policy is irrelevant to whether a choice-of-law provision is enforceable.  *Id.* at 77-78.  Part of the Court's rationale was that it has not "looked to state law in the analogous forum-selection context." *Id.* at 78.  In support of looking to state public policy, the respondent had "point[ed] to [the] sentence in *The Bremen* stating that a 'contractual choice-of-forum clause should be held unenforceable if enforcement would contravene a strong public policy of the forum in which suit is brought.'"  *Id.* (quoting *The Bremen*, 407 U.S.

at 15).  The Court repudiated that reading of *The Bremen*'s exception for the "strong public policy of the forum in which suit is brought" in no uncertain terms:

> [T]hat sentence, read in context, was referring to the possibility of a conflict between federal maritime law and a foreign country's law— there, England's.  State law was not relevant to the case.  *The Bremen* said nothing about the law or public policy of Florida.  *Carnival Cruise* likewise said nothing about the law or public policy of Washington.

*Great Lakes*, 601 U.S. at 78 (citations omitted).

The Supreme Court's conclusion that the presumptive enforceability of forum-selection and choice-of-law clauses cannot be overcome on the basis of state public policy makes good sense.  After all, as the Court put it, "[a] federal presumption of enforceability would not be much of a presumption if it could be routinely swept aside based on 50 States' public policy determinations."  *Great Lakes*, 601 U.S. at 77.

The Court also explained that the respondent's argument for an exception to the presumption of enforceability based on state public policy was "essentially a repackaged version of its initial argument that the enforceability of choice-of-law provisions in maritime contracts should be determined by state law."  *Great Lakes*, 601 U.S. at 77.  In the same way, the district court's use of Texas public policy to hold unenforceable the YouTube and Google Ads forum-selection clauses was a backdoor way of using state law to determine the enforceability of those clauses. The district court insisted that it was applying federal law, rather than state law, to

decide the enforceability of the forum-selection clauses, and that federal law merely incorporates state public policy. *See* ROA.552-53. But according to the Supreme Court's logic in *Great Lakes*, relying on state public policy in the enforceability analysis is just a "repackaged" way of improperly using state, rather than federal law, to determine enforceability. 601 U.S. at 77.

**B.      Even if consideration of state public policy were permissible, that policy cannot be one of hostility to forum-selection clauses.**

Even assuming it were permissible for the district court to consider state public policy of some kind in the enforceability analysis, it would still be impermissible for the court to rely on state law manifesting hostility to forum-selection clauses to defeat the federal presumption in favor of enforcing such clauses. Under the Supreme Court's decisions in *Stewart* and *The Bremen*, such a law would necessarily be preempted by federal law establishing that forum-selection clauses must be considered in the analysis and enforced in all but the most exceptional cases.

In *Stewart*, an Alabama marketing company and New Jersey-based manufacturer entered into an agreement that contained a forum-selection clause requiring any disputes be resolved in a New York court. *See* 487 U.S. at 24. When the marketing company sued in the Northern District of Alabama, the manufacturer moved to transfer the case to the Southern District of New York under section 1404(a). *Id.* The district court denied the motion, reasoning that the "transfer

motion was controlled by Alabama law and that Alabama looks unfavorably upon contractual forum-selection clauses." *Id.* The Eleventh Circuit reversed, and the Supreme Court affirmed. *Id.* at 25.

The Supreme Court explained that the district court faced a choice between either (1) applying federal law, specifically section 1404(a), and giving weight to the forum-selection clause, or (2) applying state law, specifically Alabama's categorical policy disfavoring forum-selection clauses, and therefore disregarding the forum-selection clause. *Id.* at 30. The Court held that, because federal law is supreme and preempts contrary state law, the district court should have chosen the former option and therefore should not have denied the motion on the basis of Alabama's anti-forum-selection clause law. *Id.* The dissent in *Stewart* took the contrary position that the enforceability of a forum-selection clause should be determined by state law. *See id.* at 31 n.10; *id.* at 35, 39 (Scalia, J., dissenting). The majority disagreed, explaining that the dissent's position would impermissibly "make[] the applicability of a federal statute depend on the content of state law." *Id.* at 31 n.10.

In short, *Stewart* holds that a court cannot deny a motion to transfer pursuant to a forum-selection clause simply because state law declares such clauses invalid. If a court considering a transfer motion under section 1404(a) could consider state public policy hostile to forum-selection clauses as part of the enforceability analysis, that would open up a gaping loophole to the rule the Court announced in *Stewart*.

The district court in *Stewart* could have achieved the same result by simply claiming that it was not applying Alabama law to determine the enforceability of the forum-selection clause but was merely incorporating Alabama's strong public policy against forum-selection clauses into the federal enforceability analysis. And any State could render meaningless the federal presumption of enforceability by simply passing a law that voids forum-selection clauses and declaring that such law reflects that State's strong public policy. Permitting such an end-run would effectively nullify the Court's holding in *Stewart*. And it would make the federal enforceability analysis "depend on the content of state law," in contravention of explicit language in the majority opinion. *Stewart*, 487 U.S. at 31 n.10.

Therefore, if *Stewart* is to retain any force, it necessarily must be impermissible for a district court to hold a forum-selection clause unenforceable on the basis of a state law disfavoring forum-selection clauses. It makes no difference whether the court does so by explicitly applying state law to determine the enforceability of such a clause or by sneaking that state law in through the federal enforceability analysis. *See Ameri-Fab, LLC v. Vanguard Energy Partners, LLC*, 646 F. Supp. 3d 795, 804 (W.D. Tex. 2022) (explaining that a Texas law disfavoring forum-selection clauses was no "different from the Alabama law given no weight in *Stewart*," and that denying enforcement of the forum-selection clause on the basis

of that Texas law would "require the [c]ourt to disregard the central holdings in *Stewart* and *Atlantic Marine*").

The Fourth Circuit reached the same conclusion based on the Supreme Court's decision in *The Bremen*. *See Albemarle*, 628 F.3d at 652. In *Albemarle*, the plaintiff brought suit in South Carolina even though it had entered into a contract containing a forum-selection clause requiring that disputes be litigated in the United Kingdom. *Id.* at 645-46. The plaintiff argued that the forum-selection clause was unreasonable and therefore unenforceable because it "would violate a strong public policy of South Carolina," as manifested in a South Carolina law disfavoring forum-selection clauses. *Id.* at 651.

The Fourth Circuit rejected that argument, explaining that it was contrary to the Supreme Court's decision in *The Bremen* in two ways. *First*, the Fourth Circuit explained that the Supreme Court had "specifically addressed and countered" "state reluctance to recognize and enforce forum selection clauses" in *The Bremen*. *Albemarle*, 628 F.3d at 652. As explained earlier, *The Bremen* Court disavowed the "provincial attitude" that had motivated many state courts to decline to enforce forum-selection clauses "on the ground that they were 'contrary to public policy.'" 407 U.S. at 9, 12. And the Supreme Court "held that, contrary to judicial disfavor of forum selection clauses such as that manifested in the South Carolina statute [at issue in *Albemarle*], in federal court, forum selection clauses enjoy a presumption of

enforceability." *Albemarle*, 628 F.3d at 652. *Second*, the Fourth Circuit observed that "it can hardly be a strong public policy to countermand the very policy that the Supreme Court adopted in *The Bremen*." *Id.* The court reasoned that "*The Bremen* would have little effect if [S]tates could effectively override the decision by expressing disagreement with the decision's rationale." *Id.* Accordingly, the Fourth Circuit concluded that "[c]lassifying South Carolina's statute as manifesting a strong public policy within *The Bremen*'s reasoning would allow the very 'provincial attitude' rejected by *The Bremen* to override the federal policy of favoring a contractual choice of forum." *Id.*

This Court should align itself with the Fourth Circuit's well-reasoned opinion in *Albemarle* and hold that, under *Stewart* and *The Bremen*, it was impermissible for the district court "to override the federal policy" in favor of enforcing forum-selection clauses based on Texas public policy manifesting hostility to forum-selection clauses. *Albemarle*, 628 F.3d at 652.

### C. At the very least, the district court was required to weigh federal and state public policy, and federal public policy prevails here.

Even if state public policy could be considered in the enforceability analysis, and even if that state public policy could be one embodying hostility to forum-selection clauses, the district court still legally erred by denying Defendants' motion to transfer. The district court was at the very least required to consider both state *and* federal public policy, and it failed to give proper weight to the latter. Federal

policy strongly favors the enforcement of forum-selection clauses and outweighs Texas's anti-forum-selection clause policy under this Court's precedents.

This Court's decision in *Matthews* demonstrates that even if consideration of Texas's anti-forum-selection clause policy were permissible, the federal policy requiring enforcement of forum-selection clauses in all but the most unusual cases would prevail. In *Matthews*, the plaintiff argued that a forum-selection clause in his employment contract requiring litigation in England was unenforceable because it ran "afoul of Louisiana public policy." 108 F.4th at 368. Specifically, he pointed to a Louisiana statute that declared forum-selection clauses like the one at issue in his case to be "null and void." *Id.* (quoting La. R.S. § 23:921A(2)). The Louisiana Supreme Court had declared that the statute was "an expression of strong Louisiana public policy concerning forum selection clauses." *Id.* at 369 (quoting *Sawicki v. K/S Stavanger Prince*, 802 So. 2d 598, 603 (La. 2001)).

Rather than decide whether *The Bremen*'s invocation of the "public policy of the forum state" referred to state or federal public policy, this Court examined both. *Matthews*, 108 F.4th at 369 (quoting *The Bremen*, 407 U.S. at 15). This Court recognized that the forum-selection clause in the plaintiff's employment contract "contravene[d] the strong public policy of Louisiana." *Id.* at 370. But the Court determined that the strong *federal* public policy in favor of enforcing forum-selection clauses outweighed Louisiana's admittedly strong interest against

enforcing such clauses. *See id.* The Court explained that "Louisiana public policy conflicts with and frustrates the federal public policy's presumption of validity and arguably perpetuates the uncertainties *Bremen* warns against." *Id.* And this Court was "wary of creating any inconsistency or unpredictability that federal public policy so adamantly strains to prevent." *Id.* It therefore concluded that "[e]ven if Louisiana's public policy is relevant under a *Bremen* analysis," it could "not overcome" the federal presumption of enforceability and that the plaintiff had failed to make the necessary "'strong showing' that the clause [was] unreasonable under the circumstances." *Id.* (quoting *The Bremen*, 407 U.S. at 15).

Here, despite Defendants prominently raising *Matthews* in their briefing, the district court barely considered the case, dismissing it in a footnote on the ground that "its holding was limited to the facts presented and based on federal public policy considerations in the maritime context." ROA.552 n.3. But the critical facts in *Matthews*—a mandatory and applicable forum-selection clause and a state law reflecting that State's strong public policy against forum-selection clauses—are also present here. And while *Matthews* noted that forum-selection clauses are presumptively enforceable in the maritime context, it is well-established that the presumption of enforceability extends beyond that context. *The Bremen* arose in the admiralty context, and yet, "this court and others have not hesitated to apply the[] federal enforceability standards" articulated in *The Bremen* "in non-admiralty

cases." *Haynsworth*, 121 F.3d at 962; *Stewart*, 487 U.S. at 33 (Kennedy, J., concurring) ("Although our opinion in [*The Bremen*] involved a Federal District Court sitting in admiralty, its reasoning applies with much force to federal courts sitting in diversity."); *see, e.g.*, *Stewart*, 487 U.S. at 24 (non-maritime case involving dispute between marketer and manufacturer of copier products); *Haynsworth*, 121 F.3d at 958-61 (non-maritime case concerning an insurance-underwriting exchange); *Weber*, 811 F.3d at 863 (non-maritime case involving compensation dispute between technology start-up and its former CEO). If anything, the presumptive enforceability of forum-selection clauses is *even stronger* in cases governed by section 1404(a) than maritime cases, because section 1404(a) reflects Congress's favorable view of transfer to a district "to which all parties have consented" in advance, even if the suit could not have otherwise been brought in that district.

In any event, this Court in *Matthews* in no way cabined its holding to maritime cases. Indeed, in relying on its prior decision in *Lim v. Offshore Specialty Fabricators, Inc.*, 404 F.3d 898 (5th Cir. 2005), the Court dismissed the plaintiff's objection that *Lim* was inapposite because the plaintiffs in *Lim* were not Jones Act seamen. *See Matthews*, 108 F.4th at 370. The Court explained that those distinctions were "inapposite to [its] analysis" and "[t]he similarities are more important." *Id.*

*Lim*, like *Matthews*, shows that between federal public policy in favor of forum-selection clauses and state public policy against forum-selection clauses, federal policy comes out ahead. In *Lim*, this Court considered both Louisiana and federal public policy in considering the enforceability of an arbitration agreement and concluded that the plaintiffs failed to "meet the 'high burden of proof' necessary to show public policy renders the arbitration clause unreasonable." 404 F.3d at 906.[3] The plaintiffs had entered into employment contracts containing clauses requiring them to submit claims and disputes arising from their employment to arbitration. *Id.* at 900. The district court denied the Defendant's motion to dismiss on the basis of the arbitration clauses, concluding that the clauses were "unenforceable" because of Louisiana's "strong public policy against a forum selection clause in an employment contract." *Id.* at 901. Specifically, a provision of the Louisiana Labor and Worker's Compensation Code prohibited forum-selection clauses "in *all* employment contracts." *Id.* at 906 (emphasis in original). Rather than decide whether the relevant forum for purposes of *The Bremen*'s strong-public-policy exception to the presumption of enforceability was the United States or Louisiana, this Court "consider[ed] both United States and Louisiana public policy in [its] *M/S Bremen* reasonableness analysis." *Id.* at 905. After "weighing the[] competing policy

---

[3] The Court noted that an "arbitration clause is a subset of a forum selection clause," so the same analysis applies to both. *Lim*, 404 F.3d at 901.

concerns," the Court concluded that "the strong federal policy in favor of . . . arbitration agreements" outweighed Louisiana's strong public policy against forum-selection clauses, including arbitration agreements. *Id.* at 906.

Under *Matthews* and *Lim*, the district court should have at the very least weighed Texas's public policy of hostility toward forum-selection clauses against the strong federal policy in favor of enforcing such clauses. And just as in *Matthews* and *Lim*, federal policy would have prevailed, given that there are no unusual circumstances here that would render the federal presumption of enforceability particularly weak or the state interest against forum-selection clauses particularly strong.

Notably, the district court did not cite a single case in which this Court actually held that enforcement of a forum-selection clause would be unreasonable on grounds of state public policy. *Cf. Noble House*, 67 F.4th at 252 (noting that the plaintiff "fail[ed] to cite a case where enforcement of a forum-selection clause contravened state public policy" and conceded at oral argument "that it was not aware of such a case"). The district court relied primarily on this Court's decisions in *Weber* and *Haynsworth*. But in *Weber*, this Court held that the plaintiff's arguments were "insufficient to overcome our strong presumption in favor of enforcement of" forum-selection clauses and that "the district court was well within the bounds of its considerable discretion in dismissing" the action based on such a clause. 811 F.3d

at 775-76. And in *Haynsworth*, this Court held that Texas public policy as manifested in anti-waiver provisions of the Texas Securities Act and Texas Deceptive Trade Practice-Consumer Protection Act could not overcome the "presumption that the [forum-selection] clause is binding." 121 F.3d at 967; *see id.* at 969. That the district court's decision was an outlier as measured against this Court's precedents should have been a clear indication to the court that it had gone off track.

### III. This is Not the Exceptional Case In Which the Public-Interest Factors Can Overcome an Otherwise Enforceable Forum-Selection Clause.

Under a normal section 1404(a) analysis, the party moving for transfer must demonstrate that transfer would serve "the convenience of the parties and witnesses" and otherwise promote "the interest of justice." 28 U.S.C. § 1404(a). To assess whether the moving party has done so, the court considers a variety of private- and public-interest factors, including deference to the plaintiff's choice of forum. But the presence of a mandatory, applicable, and enforceable forum-selection clause "dramatically alters this analysis" in at least two ways. *Weber*, 811 F.3d at 767; *see also Barnett v. DynCorp Int'l, LLC*, 831 F.3d 296, 300 (5th Cir. 2016). *First*, "the plaintiff's choice of forum merits no weight." *Atl. Marine*, 571 U.S. at 63. That is because "when a plaintiff agrees by contract to bring suit only in a specified forum, . . . the plaintiff has effectively exercised its 'venue privilege' before a dispute arises." *Id.* The plaintiff therefore "bear[s] the burden of showing why the court

should not transfer the case to the forum to which the parties agreed." *Id.* at 64. *Second*, the private-interest factors—which generally focus on the convenience of the forum for the parties and witnesses—"'weigh entirely in favor of the preselected forum,' so that the 'district court may consider arguments about public-interest factors only.'" *Barnett*, 831 F.3d at 300 (quoting *Atl. Marine*, 571 U.S. at 64). The private-interest factors necessarily favor the contracted-for forum because, "[w]hen parties agree to a forum-selection clause, they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation." *Atl. Marine*, 571 U.S. at 64.

As a result, "[w]hen a defendant files . . . a motion" to transfer based on an enforceable forum-selection clause, "a district court should transfer the case unless extraordinary circumstances unrelated to the convenience of the parties clearly disfavor a transfer." *Atl. Marine*, 571 U.S. at 52. The public-interest factors "will rarely defeat a transfer motion," so "the practical result is that forum-selection clauses should control . . . [i]n all but the most unusual cases." *Id.* at 64, 66. That result accords with the Supreme Court's "guidance that contractually selected forums often . . . become part of th[e] parties' 'settled expectations'—so if a plaintiff disregards such a contractual commitment, 'dismissal [or transfer to that forum] . . . work[s] no injustice.'" *Barnett*, 831 F.3d at 300 (quoting *Atl. Marine*, 571 U.S. at 66 & n.8).

To prevent transfer in a case like this one involving an enforceable forum-selection clause, Defense Distributed bears a heavy "burden of showing that public-interest factors *overwhelmingly* disfavor a transfer." *Atl. Marine*, 571 U.S. at 67 (emphasis added). Defense Distributed cannot satisfy that burden. This is not "one of the rare cases in which the public-interest . . . factors favor keeping a case despite the existence of . . . valid and enforceable" forum-selection clauses. *Weber*, 811 F.3d at 776.

Courts have identified four public-interest factors that, in exceptional circumstances, may justify disregarding a forum-selection clause: (1) "the familiarity of the forum with the law that will govern the case," (2) "the avoidance of unnecessary problems of conflict of laws [or in] the application of foreign law," (3) "the local interest in having localized interests decided at home," and (4) "the administrative difficulties flowing from court congestion." *Volkswagen*, 545 F.3d at 315 (citation omitted).

None of those four public-interest factors weigh in Defense Distributed's favor, let alone amount to the exceptional justification necessary to override the mandatory, applicable, and enforceable forum-selection clauses that Defense Distributed agreed to.

*First*, familiarity with the relevant law "does not weigh in favor of transfer when both districts are 'equally capable of applying [that] law.'" *TikTok*, 85 F.4th

at 365 (citation omitted).  There is no reason to think "that the judges of the Northern District of California would be less equipped to handle these claims" than judges in the Western District of Texas.  *Id.* at 366.  Chapter 143A may be a Texas law, but Defense Distributed has identified no difficult statutory-interpretation questions about Chapter 143A.  Rather, the contested question will be whether enforcing Chapter 143A against these Defendants under these circumstances violates the First Amendment, and Texas judges have no special expertise in First Amendment law.  In any event, "[f]ederal judges routinely apply the law of a State other than the State in which they sit."  *Bruck*, 30 F.4th at 436 (quoting *Atl. Marine*, 571 U.S. at 67).  And there are no "exceptionally arcane features of" Chapter 143A that "are likely to defy comprehension by a federal judge sitting in" California.  *Atl. Marine*, 571 U.S. at 68; *Bruck*, 30 F.4th at 436 (concluding that there were no "exceptionally arcane features" of Texas, New Jersey, or constitutional law applicable to Defense Distributed's claims); *TikTok*, 85 F.4th at 366 (concluding that Texas law pertaining to unfair-competition and unjust-enrichment claims was not "exceptionally arcane").  Thus, there is no reason to think that federal judges in Texas would have a unique institutional advantage over federal judges in California when it comes to interpreting Chapter 143A.  *See Davis v. Meta Platforms, Inc.*, No. 4:22-cv-01001, 2023 WL 4670491, at *11 (E.D. Tex. July 20, 2023) ("[A] judge sitting in the

Northern District of California is capable of applying Texas law," specifically Chapter 143A.).

*Second*, because this case turns on federal First Amendment law and a body of Supreme Court precedent that governs all jurisdictions in the United States, there is no risk of conflict-of-law issues or need for application of foreign law. *See Bruck*, 30 F.4th at 436 (finding that there was "no risk[]" of conflict of laws because the case primarily implicated federal law). Courts in this Circuit have repeatedly held that the conflict-of-laws factor does not move the needle where the legal issues in dispute are predominantly federal. *See Barton v. Young*, 144 F. Supp. 2d 685, 689 (E.D. Tex. 2001) ("[N]o conflict of laws problems will result by such a transfer because federal constitutional law will govern the dispute without regard to forum."); *Alaniz v. Liberty Life Assurance Co. of Boston*, No. 1:18-cv-297, 2018 WL 11428242, at *8 (E.D. Tex. Oct. 4, 2018) ("No conflict of laws problems will result from the proposed transfer because federal law governs the dispute."); *Huffman v. Activision Publ'g, Inc.*, No. 2:19-cv-00050, 2019 WL 12498087, at *7 (E.D. Tex. Nov. 27, 2019), *report and recommendation adopted*, 2020 WL 8269309 (E.D. Tex. Feb. 25, 2020) ("[T]he avoidance of unnecessary problems of conflict of laws" is "neutral since both districts would apply federal law.").

*Third*, this is not a quintessentially local matter focused on local interests. The case involves videos and ads that Defense Distributed would like to publish to a

national audience.  The relief Defense Distributed seeks—an injunction restoring its content to YouTube and Google Ads, both national platforms—is not limited to Texas.  And the core legal dispute will be over whether enforcement of Chapter 143A here would violate YouTube's and Google Ads's First Amendment right to make editorial choices about the content that they will or will not display on their platforms.  *See Moody v. NetChoice, LLC*, 603 U.S. 707, 731, 734-35 (2024) (in facial challenge to the same Texas law, explaining that decisions that YouTube and similar platforms make about "the third-party speech that will be included in or excluded from" their platforms constitute "expressive activity").  Those core First Amendment issues are of national interest and have national implications.  *See Davis*, 2023 WL 4670491, at \*17 (concluding that local-interest factor did not weigh against transfer to California from Texas given that the plaintiff had accused the defendant of taking actions to restrict the plaintiff's "First Amendment rights").  Moreover, Defendants are all headquartered in the Northern District of California, and a "judicial district has a 'strong local interest' in cases involving a corporate party headquartered in that district."  *Id.* (citation omitted).

Defense Distributed has previously asserted that its lawsuit is quintessentially local because Texas has a particular interest in protecting a Texas plaintiff from "censorship."  ROA.410.  But "[t]he interests of . . . the [S]tates individually in protecting their own citizens are implicated in *every* case in which a U.S. citizen

attempts to resist enforcement of a[] [forum-selection clause]." *Weber*, 811 F.3d at 776 (emphasis in original). If that interest were sufficient to overcome a forum-selection clause, it "would nullify the Supreme Court's clear directive to reserve, for truly exceptional cases, the step of disregarding the parties' agreement that a case should be litigated elsewhere." *Id.*

*Fourth*, the Northern District of California is perfectly capable of adjudicating cases promptly, especially those like this one that largely turn on pure issues of law, require little fact development, and are likely to be resolved on the basis of dispositive motions. Given that the Northern District of California is equipped with 25 district-court judges and 13 magistrate judges, it is implausible that the addition of this case to the District's docket would generate administrative difficulties or court congestion. *See* Judges, United States District Court Northern District of California, https://perma.cc/2AME-8XEX. Moreover, Defense Distributed's "assertions that [its] case needs to be decided quickly should not affect the weight of this factor." *In re Chamber of Com. of U.S.*, 105 F.4th 297, 310 (5th Cir. 2024). Defense Distributed's individual interest in the fastest possible resolution of the case is a *private* interest, not a public one.

In sum, this case does not present the rare constellation of circumstances that might warrant disregarding a mandatory, applicable, and enforceable forum-selection clause on the basis of the public interest. Rather, the "interest of justice"

warrants transferring this case to California, the place that the parties agreed in advance would be the exclusive forum for precisely this kind of dispute.  28 U.S.C. § 1404(a); *Atl. Marine*, 571 U.S. at 66 ("'[T]he interest of justice' is served by holding parties to their bargain.").

## **CONCLUSION**

For the foregoing reasons, this Court should reverse the district court's order denying Defendants' motion to transfer.  Alternatively, this Court should treat this filing as a petition for mandamus and order the district court to transfer the case to the Northern District of California.

Dated:   January 16, 2026

Respectfully submitted,

*/s/ Jonathan Patchen*
Jonathan Patchen
Michael A. Rome
Anika Holland
Madeleine R. Ahlers
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
(415) 693-2000
jpatchen@cooley.com

Connie L. Wang
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
(650) 843-5000

Steven J. Wingard
Robyn Hargrove

Eli Barrish
Scott Douglass & McConnico LLP
303 Colorado Street, Suite 2400
Austin, TX 78701
(512) 495-6300

*Counsel for Defendants-Appellants*
*YouTube LLC, Google LLC, and*
*Alphabet, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 16, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Jonathan Patchen*
Jonathan Patchen

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that:

1.     This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it consists of 11,875 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.2.

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced, serif typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Jonathan Patchen*
Jonathan Patchen

# EXHIBIT 16

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 20, 2026

Lyle W. Cayce
Clerk

---

No. 25-51004

---

Defense Distributed,

*Plaintiff—Appellee,*

*versus*

Youtube, L.L.C.; Google, L.L.C.; Alphabet, Incorporated,

*Defendants—Appellants.*

---

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:25-CV-1095

---

## UNPUBLISHED ORDER

Before Smith, Haynes, and Oldham, *Circuit Judges*.

Per Curiam:

IT IS ORDERED that Appellee's opposed motion to dismiss the appeal for lack of jurisdiction is GRANTED.[1]

---

[1] Appellant claims that a motion for mandamus would be proper but the document before this court states only "Notice of Appeal," so we need not address the mandamus issue.

## CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Jonathan Patchen*
Jonathan Patchen